IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| LOL FINANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | 4:09CV3224 |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT P. JOHNSON, individually | ) | MEMORANDUM AND ORDER |
| and, KERI J. MALOLEY, individually | ) | |
| and, JOHN DOE, ABC COMPANY, | ) | |
| FIRST NATIONAL BANK OF | ) | |
| OMAHA, and PAUL JOHNSON & | ) | |
| SONS CATTLE CO., Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| PAUL JOHNSON & SONS CATTLE | ) | |
| CO., INC. | ) | |
| | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MAVERICK FEEDER, INC., | ) | |
| SHON SAWYER and JULIE | ) | |
| SAWYER, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |
| | ) | |

This matter is before the court on Third Party Defendant/Cross Claimant Maverick Feeders, Inc.'s ("Maverick Feeders") motion to amend its cross claim and counterclaim (filing no. 60). Maverick Feeders seeks leave to amend its claims in order to revive its previously dismissed claim of fraud against Third Party Plaintiffs Paul Johnson & Sons Cattle Co., Inc. (the "Feed Yard"), Robert P. Johnson ("Johnson"), Keri J. Maloley

("Maloley"), and First National Bank of Omaha ("FNBO")[1]. For the reasons set forth below, Maverick Feeders' motion is denied without prejudice.

## BACKGROUND

The plaintiff in this action, LOL Finance Company ("LOL") provided financing to Maverick Feeders for the purchase of cattle from Tri-County Livestock Exchange, Inc. (the "Tri-County Cattle"). LOL alleges it possesses a security interest in the Tri-County Cattle. LOL further alleges Maverick Feeders placed the Tri-County Cattle at the Feed Yard and that the Feed Yard later sold the Cattle and wrongfully retained the entire sale proceeds.

The Feed Yard filed a third-party complaint against Maverick Feeders to recover amounts it alleges are owed for feed and services in the event LOL is found to be entitled to the sale proceeds. Maverick Feeders counterclaimed against the Feed Yard and cross claimed against Johnson, Maloley, and FNBO, alleging (1) breach of contract by the Feed Yard, (2) conversion by the Feed Yard and FNBO, (3) fraud and deceit by the Feed Yard, Johnson, and Maloley, and (4) civil conspiracy by all Defendants. Maverick Feeders alleges the Feed Yard sold the Tri-County Cattle and wrongfully retained the entire proceeds in an effort to offset an outstanding debt owed by Maverick Feeders to the Feed Yard for services the Feed Yard rendered Maverick Feeders in 2008 for cattle unrelated to the Tri-County Cattle.

Upon Defendants' motion, Maverick Feeders' claims for fraud and deceit and civil conspiracy to commit fraud and deceit were dismissed under Federal Rule of Civil Procedure

---

[1] Johnson and Maloley are officers and agents of the Feed Yard. FNBO is the Feed Yard's banker and lender.

12(b)(6), (filing no. 54). Maverick Feeders now seeks leave to amend its counterclaim and cross claim in an attempt to cure the defects in its claim for fraud.

    **A.    Judge Kopf's Opinion**

Judge Kopf identified several fatal flaws in Maverick Feeders' claims for fraud:

- "The only representations allegedly made prior to Maverick Feeders agreeing to contract with the Feed Yard for custom feeding of the 'Tri-County cattle' were 'representations made by Johnson and Maloley . . .[that] led [Maverick Feeders] to believe the Feed Yard could successfully feed its cattle and secure profitable price from nearby packers.' . . . Maverick Feeders fails to allege when or where these representations were made, or even what was said by Johnson and Maloley that caused it to believe the cattle could be fed successfully and sold for a profitable price." (Filing no. 54, p. 9).

- Maverick Feeders' fraud claim was based on " 'predictions or expressions of mere possibilities in reference to future events.' " Id. (citations omitted). Maverick did not provide any factual allegations that the Feed Yard knew its representations as to future events were false when made. Id.

- The other alleged false or misleading statements, that the parties would "settle up at the end," were not made until after all the Cattle were placed with the Feed Yard and there was no allegation that the Feed Yard did not "intend to perform these contractual obligations at the time it entered the contract." (Filing no. 54, p. 10-11).

**B.  The Proposed Amended Pleading**

In an attempt to cure the defects, Maverick Feeders has overhauled its complaint and added numerous amended, or entirely new allegations:

9. Beginning in March of 2009 and continuing for several weeks Maverick Feeders began sending large groups of cattle to the Feed Yard to be custom feed (the "Tri-County cattle"). The shipments of Tri-County cattle totaled 3,446 head.

12. As with the 2008 cattle, Maverick initially received timely feed bills for the Tri-County cattle. Through Bob Johnson, the Feed Yard discussed the possibility of financing the cattle and the initial relationship in regard to the Tri-County cattle appeared to be a legitimate deal. By May 2009, the Tri-County cattle had all been placed with the Feed Yard, and the legitimacy of the business relationship became increasingly suspicious.

13. After arrival of the last of the Tri-County cattle, the Feed Yard was in position to execute its plan to extract inflated pay-back. For example, Maverick's feed bills began reflecting a "feed adjustment" premium which increased the bills substantially. When questioned about the feed adjustment, Bob Johnson told Shon Sawyer this was a cost passed on from corn contracts with Jeff Biegert (which discovery suggests did not exist).

14. Subsequent feed bills from June-September also continued to reflect high "feed adjustment" charges. The bills also conflicted as certain lots of cattle were charged comparatively more while consuming less feed over an identical

4

period, adding to the suspicious nature of the bills and the Feed Yard's true intentions.

15. By July, Johnson had still not submitted a final invoice from the 2008 cattle or otherwise demanded payment on that un-quantified debt.

16. By July, Maverick (through Sawyer) began pressing Johnson for some indication as to how much debt was owed from the 2008 cattle. Sawyer also asked for an explanation regarding the suspicious Tri-County feed bills that began arriving in May after the cattle were placed. Johnson assured Maverick Feeders that they would work it all out once the Tri-County cattle were sent to the meat packers. In reality, Johnson was putting Sawyer off until the cattle could be sold at the meatpackers, and the proceeds collected by the Feed Yard.

17. By late August, Sawyer became sufficiently concerned about the lack of information and the growing size of the feed bills that he confronted Johnson, and told him that his feed bills stunk so bad that he could smell them in South Dakota, or something to that effect. Contrary to earlier assurances and knowing that Maverick was in a vulnerable position without possession of the cattle, Johnson told Sawyer that feed yards were a license to steal.

18. By September, the Feed Yard quit sending bills altogether. Despite Johnson's assurance that everything would be worked out at the end, the Feed Yard kept all the proceeds from the sale of the Tri-County cattle and failed to report to Maverick regarding the results of the sale.

19. Throughout the spring and into the summer of 2009, the Feed Yard, through Johnson, indicated to Sawyer that the Feed Yard was interested in financing the Tri-County cattle. By this process, the Feed Yard would pay off Maverick's third party debt on the cattle. The Feed Yard would then recover its loan, feed costs, and interest from Maverick once the cattle were taken to the meat packers. Maverick had previously participated in such an arrangement with the Feed Yard.

20. Acting on the Feed Yard's overtures. Shon Sawyer provided a personal balance sheet to the Feed Yard on April 15, 2009. The Feed Yard also obtained a subordination agreement from Campbell County Bank, Maverick's primary lender at the time. The agreement gave the Feed Yard priority in the proceeds from Maverick's cattle. This exercise was another part of the Feed yard's plan to gain possession of all the Tri-County cattle and then pacify Sawyer's concerns about the growing feed bills.

21. Between April and July of 2009, Maverick and the Feed Yard continued to discuss a financing arrangement. As part of the financing discussions, Johnson repeatedly asked Sawyer for a letter indicating that Campbell County Bank did not have any interest in the Tri-County cattle. Sawyer told Johnson on several occasions that Campbell County did not have an interest in these cattle.

22. Despite Sawyer's representations the Feed Yard contacted Campbell County Bank directly and requested a letter disclaiming any security interest. At the Feed Yard's request, Campbell County sent the requested letter on July 10.

23. Once the Feed Yard received the Campbell County letter, it no longer expressed any willingness to finance the cattle. On information and belief, the Feed Yard requested a letter from Campbell County Bank, solely to obtain a green light to take all the proceeds from the Tri-County cattle, not just limit itself to its imaginative feed bills or inflating debt from the 2008 cattle.

24. In September of 2009 the Feed Yard began selling Tri-County cattle. Unlike prior business dealings with Maverick, the Feed Yard, through Defendants Johnson and Maloley, did not supply Maverick with finishing statements, final feed bills or other supporting documents evidencing the sale and resulting proceeds.

25. Between September 14 and November 15, the Feed Yard's records indicate that approximately $3.8 million in proceeds were collected from meat packers in regard to the Tri-County cattle. During that time, Maverick was not in any way informed of the results of the sale or the final feed bills claimed against the proceeds.

26. As more cattle were being sold, Maverick learned from LOL that the Feed Yard was similarly not remitting any proceeds to satisfy LOL's security interest even though the Feed Yard was, by now, well aware of LOL's interest in the cattle.

27. Both LOL and Sawyer inquired as to the status of the proceeds throughout late September and October. The Feed Yard, through Bob Johnson, gave its assurances that proceeds would soon be paid out. When those verbal promises went unfulfilled, the Feed Yard began fielding inquiries by

promising that the proceeds were being deposited in a separate account and that payment would be reconciled when all the cattle were sold.

28. By mid-October, based on the lack of information and cooperation from the Feed Yard, LOL began contacting First National Bank in regard to the status of the proceeds. As with the Feed Yard, the Bank assured LOL that the money was segregated and safe. Despite notice of LOL's security interest, the Bank allowed the Feed Yard to keep all the proceeds from the Tri-County cattle, and to pay down over $1 million of debt on its line of credit with the Bank.

29. Based on the lack of response from the Defendants, LOL sued and received an injunction as to the small amount of proceeds from the Tri-County cattle that have not disappeared.

30. Maverick was only able to obtain finishing statements and documents that purport to be final feed bills, through discovery in this action, long after the Tri-County cattle were sold. The feed bills obtained indicate that Maverick owed approximately $1.8 million in feed costs on the Tri-County cattle. On information and belief, these feed costs include fictitious feed adjustment charges and other suspicious charges that grossly exceed typical industry feed charges, and the Feed Yard's prior bills.

31. Based on Maverick's feed bills from the Feed Yard over the last several years, the cost of feeding the Tri-County cattle was significantly higher than any prior business relationship.

32. The proceeds obtained from the sale of the Tri-County cattle exceed the Feed Yard's inflated bills by as much as $2 million, yet none of this money has ever been paid to either LOL or Maverick.

46. In a two-part scheme, the Feed Yard through Johnson and Maloley induced Maverick to place all of the Tri-County cattle at the Feed Yard through initial submission of inauspicious feed bills, and a claimed interest in financing the Tri-County cattle. Both the initial feed bills and the interest in financing the cattle were nothing more than a ruse to obtain possession of the Tri-County cattle. Once they were placed with the Feed Yard it began increasing the feed bills by adding false feed adjustment charges and falsely inflating the amounts of feed consumed, and/or the cost for that feed. As a result, the feed bills for the Tri-County cattle averaged $2.50-$2.90 a head, per day. In past feeding relationships with Maverick, the Feed Yard never charged anything close to this amount.

47. Maverick was additionally induced into continuing its relationship with the Feed Yard, under the false promise and belief that the validity of the feed bills would be sorted once the cattle began to be sold. In reality, the Feed Yard was simply putting Maverick off, as it planned all along to secure inflated pay back for the unrelated debt on the 2008 cattle, and secure windfall on the fake feed charges on the Tri-County Cattle. On or about June 10, 2009, the Feed Yard formulated the (erroneous) belief that there was no security interest in the Tri-County cattle. Once it drew this conclusion, the Feed Yard decided to wrongfully take all the proceeds from the cattle, and not just limit itself to its phony feed bills and exaggerated debt from the 2008 cattle.

48. The Feed Yard's wrongful intent is evidenced by the fact that it pocketed over $2 million in proceeds from the Tri-County cattle beyond even its own inflated feed bills.

49. The Feed Yard's initial feed bills and offers to finance the Tri-County cattle were false statements intended to deceive Maverick Feeders to its injury by setting Maverick up in order to obtain possession of over 3,400 head of cattle and to gain the inside track on keeping all proceeds from their eventual sale.

50. Maverick Feeders has sustained damage and detriment as a result of the Feed Yard's fraudulent conduct, including lost equity in the cattle, lost opportunity, trucking and other shipping charges, interest to its lender, damage to credit and other financial damage and detriment, all of which is expected to exceed $2 million by the time of trial.

51. The Feed Yard's fraudulent conduct in inducing Maverick to contract, manipulating feed bills, suggesting it would finance the Tri-County cattle and eventually pocketing all the money from the sale of the cattle arose from the wrongful actions of Johnson and Maloley.

**ANALYSIS**

After the time for amending a pleading as a matter of course has expired, Federal Rule of Civil Procedure 15(a)(2) provides that a pleading may only be amended if the opposing party provides written consent or with leave of the court. In general, courts are encouraged to allow amendments liberally. See Shen v. Leo A. Daly Co., 222 F.3d 472, 478 (8th Cir. 2000). However, the right to amend a complaint is not without limits. The Eighth

Circuit Court of Appeals has discussed the circumstances under which an amendment should be denied:

> [A] district court can refuse to grant leave to amend a pleading only where it will result in undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment.

Dennis v. Dillard Dept. Stores, Inc., 207 F.3d 523, 525 (8th Cir. 2000)(internal citations omitted); see also K-tel Int'l, Inc. Sec. Litig., 300 F.3d 881, 899 (8th Cir. 2002)(noting futility constitutes a valid reason for denial of leave to amend).

Leave to amend should be denied as futile "where the proposed amendment would not cure the defect the party sought to correct." Asbury Square, L.L.C. v. Amoco Oil Co., 218 F.R.D. 183, 195 (S.D. Iowa 2003); see also Mississippi River Revival, Inc. v. City of Minneapolis, 319 F.3d 1013, 1018 (8th Cir. 2003); K-tel, Int'l, Inc., 300 F.3d at 899; Wiles v. Capitol Indemnity Corp., 280 F.3d 868, 871 (8th Cir. 2002); Ingrim v. State Farm Fire & Cas. Co., 249 F.3d 743, 745-46 (8th Cir. 2001). For instance, in cases where a party attempts to cure a deficient fraud pleading, a court should deny additional attempts to cure the defect "if it is readily apparent any future amendment would be futile." Asbury Square, L.L.C., 218 F.R.D. at 196.

Thus, when trying to correct deficiencies in a pleading alleging fraud, any amendment must meet the pleading requirements under Federal Rule of Civil Procedure Rule 9(b). "[T]he complaint must allege 'such matters as the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby.' " Drobnak v. Andersen Corp., 561 F.3d 778. 783 (8th

Cir. 2009) (quoting Schaller Tel. Co. v. Golden Sky Sys., Inc., 298 F.3d 736, 746 (8th Cir. 2002)). "In other words, the party must typically identify the 'who, what, where, when, and how' of the alleged fraud." BJC Health Sys. v. Columbia Cas. Co., 478 F.3d 908, 917 (8th Cir.2007) (quoting United States ex rel. Costner v. URS Consultants, Inc., 317 F.3d 883, 888 (8th Cir. 2003)). "[C]onclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." Commercial Prop. Inv. Inc. v. Quality Inns Int'l Inc., 61 F.3d 639, 644 (8th Cir.1995) (citation omitted). When the pleading requirements are not met and the proposed pleading is legally insufficient on its face, the request to amend should be denied as futile. See United States ex rel. Joshi v. St. Luke's Hospital, Inc., 441 F.3d 552, 558 (8th Cir. 2006); Wiles v. Capital Indemnity Corp, 280 F.3d 868, 871 (8th Cir. 2002) (finding an amendment that will fail as a matter of law should be denied).

**Fraud and Deceit (Count III)**

Maverick Feeders' proposed amended counterclaim and cross claim essentially asserts three instances of fraud: (1) it was induced to place the Tri-County Cattle with the Feed Yard "through initial submission of inauspicious feed bills;" (2) it was induced to place the Tri-County Cattle with the Feed Yard through the Feed Yard's "claimed interest in financing the Tri-County cattle;"and (3) was induced to continue its relationship with the Feed Yard under the allegedly false promise that the financial matters regarding the 2008 cattle and the feed bills for the Tri-County Cattle would be settled up once all the Tri-County Cattle were sold. Despite the fact it has attempted to supplement its original pleading with numerous additional allegations, Maverick Feeders' claim for fraud simply cannot be saved.

To prove a claim for fraud under Nebraska law a plaintiff must establish "(1) that a representation was made; (2) that the representation was false; (3) that when made, the

representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion; (4) that it was made with the intention that it should be relied upon; (5) that the party did so reply; and (6) that he or she suffered damage as a result." Eichner v. Mid America Financial Inv. Corp., 748 N.W.2d 1, 12-13 (Neb. 2008).

Maverick Feeders does not need to prove its allegations to justify a motion to amend pleadings, but it must establish the amendment would not be futile. In other words, Maverick Feeders must be able to make a showing that its amended claims will not fail as a matter of law. See United States ex rel. Joshi, 441 F.3d at 558 (8th Cir. 2006); Wiles, 280 F.3d at 871. The proposed amended pleading does not cure the defects identified in Judge Kopf's order dismissing the fraud and deceit claim. Nor do the new instances of alleged fraud meet the pleading requirements.

### A. Submission of feed bills.

Maverick Feeders alleges it was induced to place the Tri-County Cattle with the Feed Yard because once the first group of Tri-County Cattle were placed, the Feed Yard submitted "timely feed bills." However, once all of the Tri-County Cattle were placed, Maverick Feeders asserts that the bills "began reflecting a 'feed adjustment' premium which increased the bills substantially" (filing no. 60-1, ¶ 46). Maverick Feeders alleges the initial feed bills served as an inducement for it to place all of the Tri-County Cattle with the Feed Yard.

Even if the allegations are taken as true, Maverick Feeders has not met the pleading requirements for a cause of action based on fraud. Maverick Feeders provides no particulars of the contractual arrangements regarding the feed bills, it does not state what was promised by the Feed Yard, how the initial feed bills were false, when the initial and subsequent feed

bills were received by Maverick Feeders, or any other facts to support the assertion that Maverick Feeders submitted the "timely feed bills" to induce Maverick Feeders to place all of the Tri-County Cattle with the Feed Yard. Without such particulars, the claim for fraud will fail as a matter of law. See U.S. ex rel. Joshi v. St. Luke's Hosp., Inc., 441 F.3d 552, 558 (8th Cir. 2006)(denying leave to amend on the basis of futility when the proposed amendment lacked specificity); United States ex rel. Costner, 317 F.3d at 888 (noting that a party must identify "who, what, where, when and how" of the fraudulent activity). Mere conclusory allegations, such as the ones presented by Maverick Feeders regarding the feed bills, do not satisfy the rule that fraud must be pled with particularity. Commercial Prop. Inv. Inc. v. Quality Inns Int'l Inc., 61 F.3d 639, 644 (8th Cir. 1995).

## B. Unfulfilled Promises of Financing and "Settling Up."

The other two claims of fraud are based on the Feed Yard's alleged misrepresentations regarding its interest in financing the Tri-County Cattle and its declarations that it would "settle up" previous debts with Maverick Feeders once the Tri-County Cattle were sold.

In his ruling on the motion to dismiss, Judge Kopf held Maverick Feeders had done no more than assert the Feed Yard had made predictions about future events or simply failed to fulfill its contractual obligations. (Filing no. 54). Because fraud generally "cannot be based on predictions or expressions of mere possibilities in reference to future events" and cannot be not proved by the mere failure to keep a promise or to pay a debt," the fraud claim was fatally flawed. Alliance Nat. Bank & Trust Co. v. State Sur. Co., 390 N.W.2d 487, 493 (Neb. 1986)(quoting Sterner v. Lehmanowsky, 113 N.W.2d 588, 595 (Neb. 1962)); see also Brown, 987 F.Supp. at 1156-57 (N.D. Iowa 1997)(noting breach of contract claims, even if bad faith is involved, cannot be converted to a claim of fraud).

14

Maverick Feeders attempts to correct this deficiency by alleging the Feed Yard made the representations, albeit different representations than those appearing in the original pleading, with the intention of keeping the proceeds from the sale of the Tri-County Cattle. That is, Maverick Feeders alleges the Feed Yard had no intention of following through with its promises and contractual commitments from the beginning, and certainly not by the time Maverick Feeders was assured by Johnson that a feed bill would be "settled up" at the end. It is true, "fraud may be predicated on the representation that an event, which is in the control of the maker, will or will not take place in the future, if the representation as to the future event is known to be false when made or is in reckless disregard as to its truthfulness or falsity and the other elements of fraud are present." NECO, Inc., 597 N.W.2d at 606. However, "conclusory allegations, even of knowledge of falsity, are insufficient." Brown, 987 F.Supp. at 1158 (citations omitted). Thus, Maverick Feeders must present facts from which it is reasonable to believe the Feed Yard knew its representations and promises were false, when made. Id.; see also International Travel Arrangers v. NWA, Inc., 991 F.2d 1389, 1403 (8th Cir.)

> Such facts would include facts in the form of affirmative evidence from which it can reasonably be inferred that, at the time the promises were made, the defendant would have been unable to perform its promises or had already undertaken action that was inconsistent with its commitments . . . or that the defendant was insolvent, knew it could not perform the promises, repudiated the promises soon after they were made, with no intervening change in the situation, failed even to attempt performance, or continued to offer assurances after it was clear that it would not perform as promised.

Brown, 987 F.Supp. at 1159 (citations omitted).

Maverick Feeders has presented no such facts with regard to its claims for fraud based on the Feed Yard's expressed interest in financing the Tri-County Cattle or its expressed intention to "settle up" after the sale of the Tri-County Cattle.

**1.   Financing**.

Maverick Feeders alleges it was induced to place the Tri-County Cattle with the Feed Yard through the Feed Yard's claimed interest in assisting with the financing of the Tri-County Cattle. This claim is facially deficient. As an initial matter, although Maverick asserts the Feed Yard, through Johnson, expressed interest in financing the Tri-County Cattle, Maverick Feeders' assertions are short on particulars. Maverick Feeders does not offer the specifics of the content of any representations regarding financing upon which Maverick Feeders allegedly relied. Nor does Maverick Feeders allege that without the possibility of financing from the Feed Yard, it would not have placed the Tri-County Cattle with the Feed Yard. Thus, at least one of the essential elements of a claim for fraud – reliance– has not been met as to the allegations of fraud based on financing. See, e.g., Cao v. Nguyen, 607 N.W.2d 528, 532-33 (Neb. 2000)(noting a cause of action based on fraud requires reasonable reliance by the plaintiff).

Maverick Feeders' amended pleading regarding the Feed Yard's interest in financing is also insufficient because the allegations are mere predictions of a future event, similar to the same type of "promises" that doomed its initial cause of action for fraud. Maverick Feeders asserts that Johnson had continuing communications with Maverick Feeders regarding the potential financing terms and that upon "information and belief," the Feed Yard requested a letter from Maverick Feeders' primary lender solely to "obtain a green light to take all the proceeds" from the sale of the Tri-County Cattle (filing no. 60-1, ¶ 23).

Maverick Feeders does not offer any factual basis of fraud. The best Maverick Feeders can allege is that the Feed Yard indicated an <u>interest</u> in financing the Tri-County Cattle. It does not allege the Feed Yard promised or guaranteed it would finance the Tri-County Cattle. The mere possibility that Maverick Feeders might have been interested in financing the Tri-County Cattle and then elected against financing, is not a factual representation upon which a claim of fraud can be made, nor does it provide the necessary inference that the Feed Yard never intended to assist with the financing of the Tri-County Cattle. See Parnes v. Gateway 2000, Inc., 122 F.3d 539, 550 (8th Cir. 1997) (noting that a pleading based on information and belief must "set forth the source of information and reasons for the belief")(quoting Romani v. Shearson Lehman Hutton, 929 F.2d 875, 878 (1st Cir. 1991)); <u>see</u> also Brown v. North Central F.S., Inc., 987 F.Supp. 1150, 1156-58 (N.D. Iowa 1997)(requiring affirmative evidence that the promisor had no intention of performing on a promise or guarantee). Indeed, Maverick Feeders offers little more than conclusory allegations that the Feed Yard never had any interest in financing the Tri-County Cattle, despite the Feed Yard's assertions to the contrary.

### 2. **Promises to "settle up."**

Maverick Feeders asserts it was induced to continue its relationship with the Feed Yard due to the ongoing statements that once the Cattle were sold the feed bills would be "sorted." Maverick Feeders alleges that the Feed Yard "was simply putting Maverick off, as it planned all along to secure inflated pay back for the unrelated debt on the 2008 cattle, and secure a fake windfall on the fake feed charges on the Tri-County Cattle ," (filing no. 60-1, ¶ 47). The proposed amended complaint states that the Feed Yard, through Johnson, "gave its assurances that proceeds [of the sale of the Tri-County Cattle] would soon be paid out" throughout late September and October (filing no. 60-1, ¶ 27).

Like its other claims, Maverick Feeders' claim it was induced to "continue its relationship with the Feed Yard" will also fail as a matter of law. Maverick Feeders does not offer any facts indicating the Feed Yard never intended to fulfill its contractual obligations. Maverick Feeders makes no allegations that the Feed Yard was unable to perform at the time the promises were made, that the Feed Yard was insolvent, or that the Feed Yard repudiated the promises. See Brown, 987 F.Supp. at 1158 (citations omitted)(listing the types of facts necessary to create an inference the party never intended to fulfill its promises). Maverick Feeders does appear to allege that the Feed Yard either acted inconsistently with the promise to "settle up" or failed to attempt to perform its promise. Id. However, Maverick Feeders alleges it was told that payment would be reconciled when all of the Tri-County Cattle were sold. (Filing no. 60-1, ¶ 27). This law suit was filed prior to all of the Tri-County Cattle being sold, thus any assertion that the Feed Yard failed to attempt to "settle up" is tempered by the fact some of the Tri-County Cattle still remained at the Feed Yard. Based on the facts as pled by Maverick Feeders, it cannot allege the Feed Yard never attempted to fulfill its promise to "settle up" after all of the Tri-County Cattle were sold. Id. The remaining assertions regarding the Feed Yard's promise to "settle up" amount to conclusory allegations that do not support an inference that the Feed Yard, or its representatives, had no intention of performing the promises when made.

## CONCLUSION

Although more specific than its previous claims, Maverick Feeders still fails to include vital factual allegations, such as how it relied upon the Feed Yard's assertions it would "settle up" at the end. Maverick Feeders does not state it would, or even could, have removed the remaining Cattle from the Feed Yard. Indeed, Maverick Feeders alleges that it confronted the Feed Yard about suspicious feed bills in July and August of 2009 and Johnson told him that "feed yards were a license to steal." (Filing no. 60-1, ¶ 17) in August

of 2009. Maverick Feeders asserts the Feed Yard was able to make this assertion because Maverick Feeders was in a "vulnerable position without possession of the cattle," but Maverick Feeders did not act on this information prior to the sale of the Tri-County Cattle in September of 2009. (Filing no. 60-1, ¶ 24).

Maverick Feeders' offers little but conclusory allegations in an attempt to distinguish its case from an ordinary breach of contract case. The additional allegations contained in the proposed amended counterclaim and cross claim add virtually no substance to Maverick Feeders' allegations of fraud. It is simply not sufficient to state that the Feed Yard had no intention of carrying out the provisions of the contract at the time the contract was made. The allegations must be supported by facts. In short, Maverick Feeders has not, and cannot, provide the necessary factual allegations, to convert this breach of contract claim into an action for fraud.

IT IS ORDERED, Third Party Defendant/Cross Claimant Maverick Feeders motion for leave to amend, (filing no. 60), is denied without prejudice.[2]

August 26, 2010.  BY THE COURT:
s/ Cheryl R. Zwart
United States Magistrate Judge

---

[2] The Court understands that a significant amount of discovery has been completed since the filing of Maverick Feeders' motion to amend, thus the motion is denied without prejudice in the event discovery has uncovered facts that will cure the defective pleading.

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.