UNITED STATES DISTRICT COURT

DISTRICT OF NEBRASKA

---

| | |
|---|---|
| LOL Finance Company, | Case No. 09-CV-3224-RGK |
| Plaintiff, | |
| v. | **PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| Paul Johnson & Sons Cattle Co., Inc., First National Bank of Omaha, Robert P. Johnson Keri J. Maloley, John Doe and ABC Company, | |
| Defendants. | |

---

Paul Johnson & Sons Cattle Co., Inc.,

Third-Party Plaintiff,

v.

Maverick Feeders, Inc., Shon Sawyer and Julie Sawyer,

Third-Party Defendants.

---

## INTRODUCTION

This case involves a priority dispute between three creditors over proceeds from the sale of 3,397 head of cattle formerly owned by Third-Party Defendants. Pursuant to a Temporary Restraining Order entered by the Court on November 4, 2009, proceeds in the principal amount of $630,290.28 were deposited into an Approved Escrow Account during late 2009. Defendants retained and spent the remaining net proceeds in the amount of $1,496,152.49.

Plaintiff LOL Finance Company ("LOLFC") financed the purchase of the cattle and obtained a security interest in the cattle and proceeds, which was perfected by a financing statement filed with the South Dakota Secretary of State on February 28, 2003. Defendant Paul Johnson & Sons Cattle Co., Inc. ("PJSCC") claims a security interest in the cattle and proceeds based upon a financing statement filed with the Nebraska Secretary of State on February 22, 2006, and a second financing statement filed with the South Dakota Secretary of State on June 30, 2006.  PJSCC's lender, Defendant First National Bank of Omaha ("FNBO"), claims a security interest in the cattle and proceeds based upon a financing statement filed with the South Dakota Secretary of State on January 26, 2007.  The financing statements filed by PJSCC and FNBO do not properly perfect any security interests.  Moreover, LOLFC perfected its security interest almost three years before the financing statements relied upon by PJSCC were filed and almost four years before FNBO filed its financing statement.  Accordingly, even if PJSCC and FNBO held proper security interests, LOLFC's security interest would still be prior and superior as a matter of law.

Because the security interests claimed by PJSCC and FNBO are inferior to LOLFC's security interest as a matter of law, LOLFC respectfully requests the Court to enter summary judgment as follows:

1.      Awarding LOLFC funds deposited into the Approved Escrow Account in the principal amount of $630,290.28;

2.      Awarding LOLFC a money judgment against Defendants, jointly and severally, for the remaining net proceeds in the amount of $1,496,152.49; and

2

3.     Awarding LOLFC interest under Neb. Rev. Stat. § 45-104 in the amount of $191,553.40 from December 1, 2009, through September 1, 2010, plus additional interest at the rate of $699.10 per day from September 1, 2010, through the date of entry of judgment.

### STATEMENT OF UNDISPUTED MATERIAL FACTS

**A.     Parties, Jurisdiction and Venue.**

1.     LOLFC is a Minnesota corporation with its principal place of business located in Arden Hills, Minnesota.  (McKay SJ Aff. ¶ 2; First Amended Complaint ¶ 1; PJSCC Answer ¶ 1; FNBO Answer ¶ 1).

2.     PJSCC is a Nebraska corporation with its principal place of business located in Bertrand, Nebraska.  (First Amended Complaint ¶ 2; PJSCC Answer ¶ 2; FNBO Answer ¶ 2).

3.     FNBO is a national banking association with its principal place of business located in Omaha, Nebraska.  (First Amended Complaint ¶ 3; FNBO Answer ¶ 3; PJSCC Answer ¶ 3).

4.     Defendant Robert P. Johnson is a citizen of the State of Nebraska.  (First Amended Complaint ¶ 4; PJSCC Answer ¶ 4; FNBO Answer ¶ 4).

5.     Defendant Keri J. Maloley is a citizen of the State of Nebraska.  (First Amended Complaint ¶ 5; PJSCC Answer ¶ 5; FNBO Answer ¶ 5).

6.     The amount in controversy in this case exceeds the sum of $75,000.00. (Miesen SJ Aff. ¶¶ 4 and 8 and Exs. A and F).

7.     The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(a) based upon the complete diversity of citizenship between LOLFC and all of the Defendants and the fact that the amount in controversy, exclusive of costs and interest, exceeds the sum of $75,000.00.  (First Amended Complaint ¶ 7; PJSCC Answer ¶ 7; FNBO Answer ¶ 7).

8.     Venue is proper in this judicial district under 28 U.S.C. § 1391(a) because all of the Defendants reside in Nebraska, a substantial part of the events giving rise to the claims asserted in this case occurred in Nebraska and all of the Defendants are subject to personal jurisdiction in Nebraska.  (First Amended Complaint ¶ 8; PJSCC Answer ¶ 8; FNBO Answer ¶ 8).

**B.     Revolving Line of Credit.**

9.     LOLFC is engaged in the business of providing financing to agricultural businesses and producers, including cattle producers.  (McKay SJ Aff. ¶ 3; First Amended Complaint ¶ 9; PJSCC Answer ¶ 9; FNBO Answer ¶ 9).).

10.     LOLFC provides financing for cattle producers in cooperation with its sister company, Land O'Lakes Purina Feed LLC ("LOLPF"), doing business as 4-Square Cattle Services ("4-Square").   Both LOLFC and LOLPF are subsidiaries of Land O'Lakes, Inc.  (McKay SJ Aff. ¶ 4; Sauder Aff. ¶ 2).

11.     4-Square provides cattle-consulting services to cattle producers.   The services provided by 4-Square include cattle sourcing, profitability analysis, cattle accounting and cattle monitoring and inspections.  4-Square also assists cattle producers in obtaining financing through LOLFC.  (Sauder Aff. ¶ 2; McKay SJ Aff. ¶ 5).

12.     Third-Party Defendants Maverick Feeders, Inc. ("Maverick"), Shon D. Sawyer and Julie K. Sawyer are engaged in the business of raising and marketing cattle. (Sawyer Aff. ¶ 4; McKay SJ Aff. ¶ 6; Sauder Aff. ¶ 3).

13.     Maverick is a South Dakota corporation with its principal place of business located in Hurley, South Dakota.  (First Amended Complaint ¶ 11; PJSCC Answer ¶ 11; FNBO Answer ¶ 11).

14.     The Sawyers are citizens of the State of South Dakota, who reside in Hurley, South Dakota.  The Sawyers have been residing in Hurley, South Dakota, continuously since approximately 1995.  (Sawyer Aff. ¶ 3; Johnson Depo. p. 25, lines 16-24; Maloley Depo. p. 31, lines 4-21).

15.     In November 2002, Maverick, Shon D. Sawyer and Julie K. Sawyer (hereinafter collectively referred to as "Debtors") retained 4-Square to provide them with cattle-consulting services.  Debtors also retained 4-Square to assist them in obtaining financing from LOLFC to purchase and raise cattle.  To implement their business relationship, Debtors entered into a Cattle Consulting Agreement with 4-Square on November 20, 2002.  (Sawyer Aff. ¶ 5; Sauder Aff. ¶ 4 and Ex. A).

16.     Pursuant to the terms of the Cattle Consulting Agreement, 4-Square assisted Debtors in obtaining financing from LOLFC.  (Sawyer Aff. ¶ 6; Sauder Aff. ¶ 5; McKay SJ Aff. ¶ 7).

17.     On November 22, 2002, LOLFC provided Debtors with a revolving line of credit in the principal amount of $2 million ("Revolving Line of Credit") to purchase and raise cattle.  (Sawyer Aff. ¶ 7; McKay SJ Aff. ¶ 8 and Ex. A).

18.     To secure the Revolving Line of Credit, Debtors entered into a Commercial Security Agreement with LOLFC on November 22, 2002, under which they granted LOLFC a security interest in all of the cattle they placed with 4-Square for cattle-consulting services.  (Sawyer Aff. ¶ 8; McKay SJ Aff. ¶ 9 and Ex. B).

19.     The Commercial Security Agreement describes the collateral as follows:

All of the cattle whether now owned or hereafter acquired by Grantor and placed by Grantor with 4-Square Cattle Management Services under a Cattle Consulting Agreement executed between Grantor and 4-Square Cattle Management Services, all additions thereto, whether such additions are by reproduction, purchase, acquisition, inheritance, gift or otherwise; all feed and grain inventories now owned or hereafter acquired used for feeding such cattle; all commodity futures contracts, hedging accounts, other documents of title, accounts, contract rights, now owned or hereafter acquired by Grantor pertaining to such cattle; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and other accounts proceeds), and any & all equities or patronage credit.

(Commercial Security Agreement p. 1 (McKay SJ Aff. Ex. B)).

20.     LOLFC perfected its security interest by filing the following financing statements:

| State | Date | Reference No. |
|---|---|---|
| South Dakota | February 28, 2003 | 030591101840 |
| Minnesota | February 27, 2003 | 20036656390 |

(McKay SJ Aff. ¶ 10 and Ex. C)

21.     The financing statements describe the collateral as follows:

All of the cattle whether now owned or hereafter acquired by Debtorr[sic] and placed by Debtor with 4-Square Cattle Management Services under a Cattle Consulting Agreement executed between Debtor and 4-Square Cattle Management Services, all additions thereto, whether such additions are by

reproduction, purchase, acquisition, gift, inheritance or otherwise; all feed and grain inventories now owned or hereafter acquired used for feeding such cattle; all commodity futures contracts, hedging accounts, other documents of title, accounts contract rights, now owned or hereafter acquired by Grantor pertaining to such cattle; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and other accounts proceeds), and & all equities or patronage credit; whether any of the foregoing is now owned or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing.

(McKay SJ Aff. Ex. C).

22.   LOLFC maintained its security interest by timely filing the following continuation statements:

| State | Date | Reference No. |
|---|---|---|
| South Dakota | January 24, 2008 | 20080240810009 |
| Minnesota | January 17, 2008 | 20081023516 |

(McKay SJ Aff. ¶ 11 and Ex. D).

23.   The collateral description in the Commercial Security Agreement and financing statements refers to cattle placed with 4-Square under a Cattle Consulting Agreement because cattle placed by producers in the 4-Square consulting program are generally ear tagged and/or branded with the 4-Square logo for identification.  (McKay SJ Aff. ¶ 12).

24.   The Revolving Line of Credit was renewed and extended on multiple occasions from 2002 through 2009.  The renewals and extensions allowed Debtors to purchase and raise new groups of cattle.  (Sawyer Aff. ¶ 9; McKay SJ Aff. ¶ 15; Sauder Aff. ¶ 6).

25.     All cattle financed by LOLFC were placed by Debtors with 4-Square under Cattle Consulting Agreements.  (Sawyer Aff. ¶ 10; Sauder Aff. ¶ 7; McKay SJ Aff. ¶ 16).

**C.     Purchase of Cattle.**

26.     From November 7, 2008, through January 19, 2009, Debtors purchased 3,504 head of cattle from Tri-County Livestock Exchange, Inc. ("Tri-County") in Motley, Minnesota.  (Sawyer Aff. ¶ 11; Sauder Aff. ¶ 8; McKay SJ Aff. ¶ 18).

27.     Debtors informed Tri-County that the cattle purchases were going to be financed by LOLFC through 4-Square.  (Sawyer Aff. ¶ 12; Sauder Aff. ¶ 9; McKay SJ Aff. ¶ 19).

28.     To facilitate the purchases, Tri-County sent copies of the invoices (referred to as "Buyer Recaps") to 4-Square.  (Sawyer Aff. ¶ 12; Sauder Aff. ¶ 9 and Ex. B; McKay SJ Aff. ¶ 19).

29.     Upon receipt of the Buyer Recaps, 4-Square prepared Cattle Receipt and Evaluation Agreements for each Buyer Recap.  The Cattle Receipt and Evaluation Agreements confirmed the placement of the cattle into the 4-Square consulting program.  (Sauder Aff. ¶ 10 and Ex. C).

30.     4-Square forwarded the Buyer Recaps to LOLFC with written requests to fund the purchases under the Revolving Line of Credit.  (Sauder Aff. ¶ 11 and Ex. D; McKay SJ Aff. ¶ 19).

31.     Upon receipt of the funding requests, LOLFC wired funds advanced under the Revolving Line of Credit to purchase the cattle to Tri-County's bank, First Integrity Bank in Staples, Minnesota.  (Sawyer Aff. ¶ 12; McKay SJ Aff. ¶ 19; Sauder Aff. ¶ 11).

32.     On January 8, 2009, Debtors and LOLFC entered into a supplemental Commercial Security Agreement.  The January 8, 2009, Commercial Security Agreement contains the same collateral description as prior Commercial Security Agreements. (McKay SJ Aff. ¶ 20 and Ex. F).

33.     On the same day, Debtors and 4-Square entered into a supplemental Cattle Consulting Agreement to specifically cover the Tri-County cattle.  (Sawyer Aff. ¶ 11; Sauder Aff. ¶ 12 and Ex. E).

**D.     Security Interests Claimed by PJSCC and FNBO.**

34.     PJSCC operates a cattle feedlot near Bertrand, Nebraska.  (Johnson Depo. p. 7, line 24, through p. 8, line 8).

35.     In the past, Maverick delivered cattle to PJSCC's feedlot to be fed and raised to market weight.  (Johnson Depo. p. 18, lines 14-17, and p. 22, line 24, through p. 23, line 10).

36.     On February 22, 2006, PJSCC filed a financing statement with the Nebraska Secretary of State identifying itself as the "creditor" and Maverick as the "debtor."  The collateral is described as "all livestock."  (Depo. Ex. 1 (Miesen SJ Aff. Ex. N)).

37.     On June 30, 2006, PJSCC or FNBO filed a financing statement with the South Dakota Secretary of State identifying FNBO as the "creditor" and Maverick as the "debtor."  The collateral is described as all of Maverick's "assets now or hereafter in the care of [PJSCC]."  (Depo. Ex. 2 (Miesen SJ Aff. Ex. O)).

38.     FNBO terminated the June 30, 2006, financing statement on January  29, 2007.  (Miesen SJ Aff. Exs. O-P; Kalkowski Depo. p. 41, lines 14-19).

39.     Defendants have been unable to identify any security agreement supporting the February 22, 2006, financing statement.  (Johnson Depo. p. 23, line 11, through  p. 24, line 12; Maloley Depo. p. 28, line 17, through p. 29, line 13; Kalkowski Depo. p. 35, line 5, through p. 36, line 7).

40.     On January 26, 2007, FNBO filed a financing statement with the South Dakota Secretary of State identifying itself as the "creditor" and Maverick as the "debtor."  The collateral is described as "[a]ll of [Maverick's] assets now or hereafter in the care or possession of [PJSCC] . . . ."  (Depo. Ex. 4 (Miesen SJ Aff. Ex. R)).

41.     During 2007, PJSCC agreed to provide financing to Maverick to purchase and raise certain cattle.  PJSCC obtained the funds to finance the cattle under its "customer finance" credit line with FNBO.  (Kalkowski Depo. p. 54, line 17, through p. p. 56, line 3).

42.     On November 12, 2007, PJSCC and Maverick entered into a contract identified as a "LOC Master Promissory Note and Security Agreement/Margin" ("Security Agreement").  (Depo. Ex. 3 (Miesen SJ Aff. Ex. Q)).  Under the terms of the Security Agreement, Maverick granted PJSCC a security interest in "[a]ll of [Maverick's] livestock, including cattle, on [PJSCC's] feedlot . . . ."  (Id.).

43.     On the same day it was signed, PJSCC assigned all of its rights under the Security Agreement to FNBO.  (Security Agreement p. 4 (Miesen SJ Aff. Ex. Q);

Johnson Depo. p. 31, line 18,  through p. 32, line 15; Kalkowski Depo. p. 43, lines 12-18).

44.     The cattle financed by PJSCC/FNBO did not perform well.  PJSCC claims that Maverick incurred losses on the cattle ranging from approximately $600,000.00 to $960,000.00 (hereinafter "the Prior Debt").   (Johnson Depo. p. 266, lines 3-10; Kalkowski Depo. p. 54, line 17,  through p. 56, line 16).

45.     Debtors allege that they never received any notice from PJSCC regarding the Prior Debt.  (Sawyer Aff. ¶ 17).

**E.     Plan to Convert Cattle and Proceeds.**

46.     During early 2009, Debtors agreed to deliver some of the cattle they purchased from Tri-County to PJSCC's feedlot to be raised to market weight.  (Sawyer Aff. ¶ 14).

47.     Unbeknownst to Debtors, PJSCC planned sell the Tri-County cattle and keep the proceeds to pay off the Prior Debt (hereinafter "the Plan"). (Johnson Depo. p. 68, line 18, through, p. 69, line 10, p. 76, line 18, through p. 77, line 5, and p. 78, lines 13-16; Kalkowski Depo. p. 61, lines 5-24, and p. 62, lines 1-16).

48.     In or around March 2009, PJSCC disclosed the Plan to FNBO.  (See Depo. Ex. 53, p. 3 (Miesen Aff. Ex. W)).  Because PJSCC agreed to use the proceeds from the sale of the cattle to pay down the debt under its customer finance credit line, FNBO supported the Plan.  As FNBO's Vice President, Christopher Kalkowski, testified:

> Q:     Did Mr. Johnson tell you that he was planning on retaining all of the proceeds from the sale of the cattle and using them to pay off the prior debt?

A:     At some point he did, yes.

Q:     And FNBO supported that plan, didn't it?

A:     Yeah, I think so.

Q:     FNBO supported Mr. Johnson's plan because it wanted Johnson feedlot to use the money that it would obtain from the sale of Maverick's cattle to pay down the customer credit line, right?

A:     Yes.

(Kalkowski Depo. p. 62, lines 6-16).

49.     Mr. Kalkowski and FNBO's attorney, Richard ("Rick") Myers, participated in a conference call with PJSCC's owner and President, Robert P. Johnson, on March 31, 2009.  (See Depo. Ex. 53, p. 3 (Miesen SJ Aff. Ex. W)).  During the conference call, Messrs. Johnson, Kalkowski and Myers agreed to implement the Plan using the "[d]octrine of set off."  (Id.; Kalkowski Depo. p. 67, line 9, through p. 69, line 9; Supp. Johnson Depo. p. 7, lines 19-22, and p. 9, lines 12-25).

50.     Messrs. Kalkowski, Myers and Johnson determined that they needed to do four things before PJSCC could claim a right of set off: (a) confirm that Maverick owned the cattle; (b) conduct a lien search to confirm no other creditors had a lien against the cattle; (c) check Maverick's corporate status; and (d) check with Maverick's South Dakota bank, Campbell County Bank, to confirm it was not claiming a lien against the cattle.  (Depo. Ex. 53, p. 3 (Miesen SJ Aff. Ex. W); Kalkowski Depo. p. 68, line 25, through p. 69, line 16, p. 70, lines 14-22,  and p. 72, line 10, through p. 74, line 19).

51.     FNBO actively assisted PJSCC in completing the four tasks.  (Kalkowski Depo. p. 88, line 6, through p. 91, line 5).

52.     To implement the Plan, FNBO had a lien search conducted in South Dakota.  (Kalkowski Depo. p. 69, lines 13-20, and p. 112, lines 2-14).  The lien search revealed LOLFC's February 28, 2003, financing statement.  (Id. p. 112, lines 15-18).

53.     FNBO did not conduct a thorough review LOLFC's February 28, 2003, financing statement.  It mistakenly believed the reference to cattle consulting services was a reference to cattle feedlot services.  (Kalkowski Depo. p. 116, lines 12-14).  As Mr. Kalkowski testified:

> Q:     Did FNBO believe that LOL Finance Company's security interest only applied to cattle located at a feedlot operated by 4-Square Cattle Services?
>
> A:     Initially, at this time, yes.
>
> * * *
>
> Q:     Did FNBO assume that cattle consulting services referred to cattle feedlot services?
>
> A:     Yes.

(Id. p. 116, lines 1-4 and 12-14).

54.     Neither FNBO nor PJSCC ever asked LOLFC or 4-Square for a copy of the Commercial Security Agreement or a copy of the Cattle Consulting Agreement or took any other measures to try to determine whether Debtors' cattle and proceeds were subject to LOLFC's security interest.  (Johnson Depo. p. 74, line 9, through p. 75, line 10;

Maloley Depo. p. 79, lines 1-25; Kalkowski Depo. p. 118, line 20, through p. 120, line 11, p. 156, lines 5-19, and p. 161, lines 8-11).

    **F.    Transfer of Cattle to PJSCC.**

    55.    During March and April 2009, Debtors transferred 3,431 head of the cattle they purchased from Tri-County (hereinafter "the Maverick Cattle") PJSCC's feedlot. (See Depo. Exs. 6-11 (Miesen SJ Aff. Ex. B); Sawyer Aff. ¶ 14; Johnson Depo. p. 40, lines 4-17,  and p. 46, line 17, through p. 47, line 21; Maloley Depo. p. 41, lines 2-21, and p. 43, line 2, through p. 44, line 8).

    56.    The Maverick Cattle were segregated by PJSCC into six lots, which were identified as Lots 1996, 1997, 1999, 2000, 2005 and 2006.  (Depo. Exs. 6-11 (Miesen SJ Aff. Ex. B); Maloley Depo. p. 41, lines 2-21).

    57.    In late May or early June 2009, LOLFC learned that the Maverick Cattle had been moved to PJSCC's feedlot.  (McKay SJ Aff. ¶ 23).

    58.    On June 3, 2009, LOLFC filed a financing statement with the Nebraska Secretary of State.  (McKay SJ Aff. ¶ 23 and Ex. G).  The collateral description contained in the Nebraska financing statement is virtually identical to the collateral description contained in LOLFC's South Dakota and Minnesota financing statements.  (Id. Ex. G).

    59.    On June 4, 2009, LOLFC's Senior Loan Officer, Ronald C. McKay, called PJSCC's owner and President, Mr. Johnson, and informed him that LOLFC had a security interest in the Maverick Cattle and that 4-Square was helping Debtors and LOLFC monitor and manage the Maverick Cattle.  (McKay SJ Aff. ¶ 24; Johnson Depo. p. 54, line 4, through p. 56, line 3).

60.    LOLFC learned that FNBO was PJSCC's lender and had filed a financing statement with the South Dakota Secretary of State identifying Maverick as a debtor and cattle as collateral.  To avoid any misunderstanding, LOLFC sent FNBO a proposed Subordination Agreement on June 5, 2009.  As Mr. Kalkowski admitted, both the cover letter and the Subordination Agreement made it perfectly clear that the Maverick Cattle had been placed by Debtors with 4-Square under a Cattle Consulting Agreement. (McKay SJ Aff. ¶ 25 and Ex. H; Kalkowski Depo. p. 141, line 8, through p. 143, line 10).

61.    On June 5, 2009, the same day that LOLFC sent the proposed Subordination Agreement to FNBO, 4-Square's Financial Analyst, Michelle H. Sauder, contacted PJSCC's bookkeeper, Keri J. Maloley, and informed her that the Maverick Cattle were owned by Debtors and financed by LOLFC.  Ms. Sauder further informed Ms. Maloley that 4-Square would be monitoring and inspecting the Maverick Cattle for Debtors and LOLFC.  (Sauder Aff. ¶ 15 and Ex. H; Maloley Depo. p. 55, line 7, through p. 56, line 21).

62.    Ms. Sauder also informed Ms. Maloley that 4-Square would be sending PJSCC ear tags bearing the 4-Square logo to be placed on the Maverick Cattle to identify them as 4-Square cattle.  (Sauder Aff. ¶ 15; Maloley Depo. p. 56, lines 22-25).

63.    On the same day, Ms. Sauder ordered 4,000, 4-Square ear tags from 4-Square's ear-tag supplier, Lextron Southeast.  Lextron Southeast shipped the ear tags directly to PJSCC's feedlot.  The ear tags arrived at PJSCC's feedlot on June 9, 2009. Ms. Maloley signed the receipt for the ear tags.  (Sauder Aff. ¶ 16 and Exs. I-J; Maloley Depo. p. 57, line 1, through p. 58, line 5).

15

64.     FNBO was aware that 4-Square sent the ear tags to PJSCC.  (Kalkowski Depo. p. 162, lines 1-11, and p. 305, lines 5-11).

65.     Mr. Johnson, Ms. Maloley and Mr. Kalkowski all understood that 4-Square sent the ear tags to PJSCC to identify the Maverick Cattle <u>as 4-Square cattle</u>.  (Maloley Depo. p. 59, lines 22-25; Kalkowski Depo. p. 163, line 6, through p. 164, line 3; Johnson Depo. p. 59, line 18, through p. 60, line 12).

66.     On June 16, 2009, Mr. McKay sent a letter to both PJSCC and FNBO notifying them that LOLFC had a "first lien" on the Maverick Cattle and that the Maverick Cattle were being "monitored for LOL Finance Co. by 4-Square Cattle Services."  (McKay SJ Aff. ¶ 26 and Exs. I-J; Johnson Depo. p. 56, line 6, through p. 57, line 20; Kalkowski Depo. p. 153, line 3, through p. 155, line 22).

67.     Mr. McKay also personally contacted Mr. Kalkowski and notified him of LOLFC's security interest in the Maverick Cattle.  (McKay SJ Aff. ¶ 27; Kalkowski Depo. p. 149, line 4, through p. 151, line 10).

68.     Mr. McKay asked Mr. Kalkowski about the proposed Subordination Agreement that LOLFC had sent to FNBO on June 5, 2009.  Mr. Kalkowski responded that a subordination agreement was not necessary because FNBO was not claiming any interest in the Maverick Cattle.  He agreed, however, to send Mr. McKay a proposed subordination agreement that FNBO had used for PJSCC in the past.  (McKay SJ Aff. ¶ 27).

69.     The proposed subordination agreement that Mr. Kalkowski sent to Mr. McKay erroneously stated that <u>PJSCC</u> had financed the purchase of the Maverick

16

Cattle.  (McKay SJ Aff. ¶ 28 and Ex. K; Kalkowski Depo. p. 174, line 5, through p. 175, line 3).  Based upon Mr. Kalkowski's assurances that FNBO was not claiming any interest in the Maverick Cattle, Mr. McKay did not further pursue obtaining a formal subordination agreement.  (McKay SJ Aff. ¶ 28).

70.     4-Square inspected the Maverick Cattle on a monthly basis while they were at PJSCC's feedlot.  4-Square also continued to prepare monthly status reports relating to the Maverick Cattle, which were distributed to Debtors and LOLFC.  (Sauder Aff. ¶¶ 17-17 and Exs. K-Q; Sawyer Aff. ¶ 15; Johnson Depo. p. 61, line 14, through p. 65, line 6; Maloley Depo. p. 67, line 5, through p. 68, line 17; Kalkowski Depo. p. 164, lines 4-21).

71.     While the Maverick Cattle were at its feedlot, PJSCC provided 4-Square with monthly reports so that 4-Square could monitor the performance of the Maverick Cattle.  (Sauder Aff. ¶ 19 and Exs. R-T; Maloley Depo. p. 60, line 1, through p. 67, line 1; Johnson Depo. p. 65, line 13, through p. 66, line 5; Kalkowski Depo. p. 164, line 22, through p. 165, line 1, and p. 305, lines 16-19).

### G.     Continued Implementation of the Plan.

72.     To bolster the Plan, Mr. Johnson decided to artificially inflate Debtors' feed bills with fictitious "feed adjustments."  (See Depo. Exs. 6-11 (Miesen SJ Aff. Ex. B)).  PJSCC added total "feed adjustments" to Debtors' bills for the Maverick Cattle in the amount of $307,167.66.  (Id.; Johnson Depo. p. 222, lines 2-13).

73.     Mr. Johnson admitted during his deposition that the purported "feed adjustments" were simply "arbitrary numbers" that he made up to extract extra amounts from Debtors to pay the Prior Debt.  (Johnson Depo. p. 222, line 9, through p. 224, line 5,

p. 195, lines 10-25 p. 204, line 7, through p. 205, line 10, and p. 206, line 20, through p. 207, line 1).

74.     Ms. Maloley, who prepared the feed bills, confirmed Mr. Johnson's testimony.  (Maloley Depo. p. 100, lines 18-22, p. 101, lines 5-9, and p. 201, line 23, through p. 202, line 17).   Ms. Maloley also testified that PJSCC had never charged Debtors or another other customer any purported "feed adjustments" in the past.  (Id. p. 102, line 1, through p. 103, line 15, and p. 146, lines 6-13).

75.     To further bolster the Plan, PJSCC acquired a purported assignment of an alleged debt owed by Maverick to a company called Biegert, LLC.  (See Depo. Ex. 21 (Miesen SJ Aff. Ex. T)).

76.     The owner of Biegert, LLC, Jeff Biegert, is a close friend of Mr. Johnson. (Johnson Depo. p. 170, lines 7-12; Maloley Depo. p. 206, line 9, through p. 207, line 21; Kalkowski Depo. p. 208, lines 21-23).   Mr. Biegert is also another client of PJSCC's attorneys, Domina Law Group.  (Kalkowski Depo. p. 208, line 24, through p. 209, line 4).

77.     Mr. Biegert claimed that Maverick owed his company approximately $430,000.00 relating to alleged losses from a prior cattle partnership ("Biegert Debt"). (Johnson Depo. p. 93, line 11, through p. 94, line 4).

78.     Mr. Johnson, Domina Law Group and Mr. Biegert decided that Biegert LLC would assign the Biegert Debt to PJSCC "for collection purposes."  (Depo. Ex. 21 (Miesen SJ Aff. Ex. T); Johnson Depo. p. 97, line 6, through p. 98, line 22, and p. 267, line 12, through p. 268, line 3).

79.     During their depositions, Mr. Johnson and Ms. Maloley admitted that the purported assignment of the Biegert Debt was simply a ruse concocted by the Domina Law Group to retain all of the proceeds from the sale of the Maverick Cattle.  (Johnson Depo. p. 69, lines 2-17, and p. 97, lines 6-10).  In particular, they conceded that the assignment was created because they anticipated obtaining a lot of money from the sale of the Maverick Cattle and wanted to be able to justify keeping <u>all</u> of the proceeds (<u>Id</u>. p. 98, lines 14-22); that PJSCC did not provide any consideration to Biegert LLC for the purported assignment (<u>Id</u>. p. 98, line 1-3, and p. 186, lines 16-20); that any amounts collected by PJSCC to pay the Biegert Debt would simply be turned over to Biegert LLC (<u>Id</u>. p. 186, lines 1-20, and p. 267, lines 12-25; Maloley Depo. p. 97, line 15, through p. 98, line 11); and that Mr. Johnson agreed to go along with the scheme because he and Mr. Biegert are close friends.  (Johnson Depo. p. 267, line 12, through p. 268, line 3).

80.     FNBO continued to assist PJSCC in implementing the Plan during the summer of 2009.  Messrs. Kalkowski and Myers participated in multiple conference calls with Mr. Johnson "to troubleshoot as to how to recover the [Prior Debt]."  (Kalkowski Depo. p. 241, line 23, through p. 243, line 9; Supp. Johnson Depo. p. 30, lines 1-10).

81.     FNBO was also aware that Mr. Johnson was using the fictitious "feed adjustments" to try to collect the Prior Debt.  (Kalkowski Depo. p. 205, lines 3-18, and p. 207, lines 2-13).

82.     Mr. Kalkowski worked with Mr. Myers to find ways to "take other $'s owed [i.e., Prior Debt] out of the check when [Debtors'] cattle are sold."  (Depo. Ex. 50 (Miesen SJ Aff. Ex. U); Kalkowski Depo. p. 268, line 6, through p. 269, line 25, and p.

19

270, lines 1-21; Supp. Kalkowski Depo. p. 241, line 23, through p. 242, line 20).   Among

other things, Mr. Kalkowski suggested that PJSCC sell the cattle in its own name, rather

than Debtors' names.  (Depo. Ex. 65 (Miesen SJ Aff. Ex. Y)).

83.     FNBO and/or Mr. Myers also "shared theories and ideas" with PJSCC's

initial attorney regarding ways to retain the proceeds from the sale of Debtors' cattle.

(Depo. Ex. 64 (Miesen SJ Aff. Ex. X); Supp. Johnson Depo. p. 34, line 11, through p. 35,

line 5).

**H.     Sale of Maverick Cattle.**

84.     In September 2009, PJSCC began selling the Maverick Cattle to meat-

packing companies.  (Sawyer Aff. ¶ 16; Depo. Exs. 6-11 (Miesen SJ Aff. Ex. B)).

85.     PJSCC did not turn any of the proceeds from the sale of the Maverick

Cattle over to Debtors or LOLFC.  (Johnson Depo. p. 268, lines 4-10; Sawyer Aff. ¶ 16;

McKay SJ Aff. ¶ 30).

86.     The proceeds from the sale of the Maverick Cattle were deposited into

PJSCC's Business Checking Account with FNBO.  (Maloley Depo. p. 108, line 19,

through p. 109, line 25, and p. 110, lines 1-2; Kalkowski Depo. p. 196, lines 15-18).

87.     All proceeds deposited into PJSCC's Business Checking Account were

automatically transferred (swept) into a special clearing account identified as the "Central

Account" on a daily basis.  (Kalkowski Depo. p. 214, line 1, through p. 215, line 9; Supp.

Kalkowski Depo. p. 43, line 13, through p. 44, line 7).

88.     PJSCC cannot deposit money into or withdraw money from the Central Account.   (Maloley Depo. p. 22, lines 8-16; Supp. Kalkowski Depo. p. 46, line 14, through p. 47, line 17).

89.     Funds transferred into the Central Account were automatically withdrawn by FNBO to pay down PJSCC's operating credit line.   (Kalkowski Depo. p. 196, lines 15-21, and p. 217, lines 1-18; Miesen SJ Aff. ¶ 7-8 and Exs. C-F).

90.     Pursuant to specific instructions from Ms. Maloley, FNBO reversed payments made to reduce the operating credit line and applied those payments to reduce the Prior Debt under PJSCC's customer finance credit line.   (Kalkowski Depo. p. 226, line 1, through p. 231, line 14; Depo. Ex. 52, p. 2 (Miesen SJ Aff. Ex. V)).

91.     In early October 2009, Mr. McKay spoke with Mr. Johnson on the telephone.   During this conversation, Mr. Johnson stated, for the first time, that he was planning to use the proceeds from the sale of the Maverick Cattle to pay the Prior Debt. Mr. Johnson further claimed that PJSCC's banker, Mr. Kalkowski, was making him use the proceeds to pay the Prior Debt.   (McKay SJ Aff. ¶ 30).

92.     Mr. McKay objected to Mr. Johnson using any of the proceeds to pay the Prior Debt and reminded Mr. Johnson that LOLFC held a perfected security interest in the Maverick Cattle and proceeds.   (McKay SJ Aff. ¶ 30).

93.     After speaking with Mr. Johnson, Mr. McKay contacted Mr. Kalkowski. Mr. McKay relayed to Mr. Kalkowski the substance of his telephone conversation with Mr. Johnson.   Mr. Kalkowski claimed that FNBO was not forcing Mr. Johnson to use the

proceeds to pay the Prior Debt and that Mr. Johnson was trying to use Mr. Kalkowski as "the fall guy" for his actions.  (McKay SJ Aff. ¶¶ 31 and 34 and Ex. L).

94.     Mr. Kalkowski also assured Mr. McKay that the proceeds from the sale of the Maverick Cattle were being kept separate from PJSCC's other funds and were not being used to pay PJSCC's credit lines with FNBO.  (McKay SJ Aff. ¶¶ 31 and 34 and Ex. L).

95.     Mr. Kalkowski admits that he told Mr. McKay that PJSCC was not going to distribute the proceeds anywhere until all of the Maverick Cattle had been sold. (Kalkowski Depo. p. 220, line 24, through p. 221, line 6; Depo. Ex. 52, p. 1 (Miesen SJ Aff. Ex. V)).  Mr. Kalkowski further admits that he told Mr. McKay that he and Mr. Johnson had agreed that <u>all</u> of the proceeds, less the fees for feeding and caring for the Maverick Cattle, would be paid to LOLFC.  (Kalkowski Depo. p. 186, line 25, through p. 188, line 9).

96.     Mr. Johnson denies that he ever told Mr. Kalkowski that PJSCC was going to hold the proceeds until all of the Maverick Cattle had been sold.  (Supp. Johnson Depo. p. 59, lines 1-18).

97.     As Mr. Kalkowski admitted, the proceeds could not be held for any length of time because they were being automatically swept out of PJSCC's Business Checking Account and used by FNBO to pay down PJSCC's operating line of credit <u>on a daily basis</u>.  (Kalkowski Depo. p. 214, line 1, through p. 215, line 9, p. 196, lines 15-21, and p. 217, lines 1-10; Supp. Maloley Depo. p. 43, line 17, through p. 45, line 9; Supp. Johnson Depo. p. 59, line 2, through p. 60, line 8)

98.     Mr. Johnson also denies that he ever reached any agreement with Mr. Kalkowski to pay any of the proceeds to LOLFC.  (Supp. Johnson Depo. p. 55, line 25, through p. 56, line 24).

99.     Several weeks passed and neither Maverick nor LOLFC received any proceeds from the sale of the Maverick Cattle.  Mr. McKay called Mr. Johnson on the telephone on Friday, October 16, 2009, to inquire about the proceeds.   During this conversation, Mr. Johnson acknowledged that he could not use the proceeds from the sale of the Maverick Cattle to pay the Prior Debt and promised to forward the proceeds, after deducting PJSCC's fees for feeding and caring for the Maverick Cattle, to LOLFC the following week.  (McKay SJ Aff. ¶¶ 32 and 34 and Ex. L).

100.    On the following Monday, October 19, 2009, Ms. Maloley called Mr. McKay on the telephone and informed him that he would have to communicate with PJSCC's attorney, David A. Domina, regarding the Maverick Cattle and proceeds. (McKay SJ Aff. ¶ 33).

101.    On November 3, 2009, LOLFC commenced this action and brought a Motion for Temporary Restraining Order to freeze the proceeds from the sale of the Maverick Cattle.  (See Docket Nos. 1 and 8-11).

102.    On November 4, 2009, with the consent of all of the parties, the Court issued a Temporary Restraining Order requiring, among other things, that proceeds from the sale of the remaining Maverick Cattle be deposited into an Approved Escrow Account at FNBO's sister bank, First National Bank of Columbus, pending the disposition of this case on the merits.  (See Docket No. 18).

I.     **Conversion of $491,534.72 Check After Temporary Restraining Order.**

103.    On September 27, 2009, PJSCC delivered 420 head of the Maverick Cattle to Tyson Fresh Meats, Inc. ("Tyson") in Lexington, Nebraska.  (Miesen SJ Aff. Ex. Z).

104.    On September 29, 2009, Tyson issued a check for the 420 head of cattle delivered by PJSCC in the amount of $491,534.72.  (Miesen SJ Aff. Z).

105.    During discovery in this case, PJSCC produced a copy of the check stub, but not the actual check issued by Tyson on September 29, 2009.  (See Miesen SJ Aff. Z).

106.    On April 6, 2010, five months after the issuance of the Temporary Restraining Order, Tyson issued a Outstanding Check Status Report to PJSCC indicating that the September 29, 2009, check had not be cashed.  (Depo. Ex. 89 (Miesen SJ Aff. AA)).

107.    Ms. Maloley filled out the Outstanding Check Status Report and requested a replacement check from Tyson.  (Depo. Ex. 89 (Miesen SJ Aff. AA); Supp. Maloley Depo. at  p. 48, line 17, through p. 49, line 23).

108.    Sometime after April 6, 2010, Tyson issued a replacement check in the amount of $491,534.72 to PJSCC.  (Supp. Maloley Depo. p. 49, line 24, through p. 50, line 1).

109.    PJSCC did not deposit the replacement check into the Approved Escrow Account.  Ms. Maloley testified that because the original check was sent prior to the issuance of the Temporary Restraining Order, she believed PJSCC had the right to retain

the proceeds from the replacement check. (Supp. Maloley Depo. p. 50, lines 2-21).   She claimed that she did not know who made the actual decision to retain the proceeds.  (Id., lines 22-24).

110.   Ms. Maloley claimed that the replacement check was deposited into PJSCC's Business Checking Account with FNBO.  (Supp. Maloley Depo. p. 50, lines 2-11).

111.   FNBO has been unable to locate any records confirming the deposit of the replacement check.   (Supp. Kalkowski Depo. p. 70, lines 1-17).

**J.    Proceeds from Sale of Maverick Cattle.**

112.   Mr. Johnson testified that the proceeds from the sale of the Maverick Cattle that would be due to Debtors, in the absence of any other claim, would be calculated as the total sales proceeds less PJSCC's fees, plus interest charged on those fees (Sales Proceeds – (Fees + Interest).  (Johnson Depo. p. 118, lines 5-12).

113.   The sales proceeds, PJSCC's fees and the interest charged on those fees are all reflected on the face of closeout statements for the Maverick Cattle.  (See Depo. Exs. 6-11 (Miesen SJ Aff. Ex. B)).[1]

114.   The total amount of sales proceeds reflected on the closeout statements is as

---

[1]      The interest charges were handwritten on the closeout statements by Mr. Johnson. (Johnson Depo. p. 118, lines 13-16).  The closeout statements also reference figures for "Cattle Purchases," but these numbers do not reflect any amounts due to PJSCC.  (Id. p. 41, line 19, through p. 42, line 5; Maloley Depo. p. 42, lines 5-14).

follows:

| Lot | Sales Proceeds |
|-----|----------------|
| 1996 | $  779,405.30 |
| 1997 | $  428,890.51 |
| 1999 | $  706,010.86 |
| 2000 | $  504,289.85 |
| 2005 | $  521,445.63 |
| 2006 | $   788,716.80 |
| Total | $3,728,758.95 |

(Depo. Exs. 6-11 (Miesen SJ Aff. Ex. B)).

115.    The total amount of PJSCC's fees reflected on the closeout statements is as follows:

| Lot | Fees |
|-----|------|
| 1996 | $  372,740.19 |
| 1997 | $  224,566.92 |
| 1999 | $  342,646.21 |
| 2000 | $  247,795.18 |
| 2005 | $  283,175.91 |
| 2006 | $   410,930.96 |
| Total | $1,881,855.37 |

(Depo. Exs. 6-11 (Miesen SJ Aff. Ex. B)).

116.   The total amount of interest reflected on the closeout statements is as follows:

| Lot | Interest |
|---|---|
| 1996 | $   6,893.14 |
| 1997 | $   4,706.67 |
| 1999 | $   6,407.00 |
| 2000 | $   6,294.58 |
| 2005 | $   6,109.61 |
| 2006 | $   9,240.34 |
| Total | $  39,651.34 |

(Depo. Exs. 6-11 (Miesen SJ Aff. Ex. B)).

117.   Based upon the foregoing amounts, the proceeds due to Debtors can be calculated as follows:

| Total Sales Proceeds | $3,728,758.95 |
|---|---|
| Total Fees | ($1,881,855.37) |
| Total Interest | ($     39,651.34) |
| Amount Due to Debtors | $1,807,252.24 |

118.   The "Total Fees" referenced above include the fictitious "feed adjustments" PJSCC added to Debtors' closeout statements.   The total amount of fictitious "feed adjustments" reflected on the closeout statements is as follows:

| Lot | "Feed Adjustment" |
|---|---|
| 1996 | $  56,746.64 |

| | |
|---|---|
| 1997 | $  37,473.32 |
| 1999 | $  58,535.72 |
| 2000 | $  38,384.52 |
| 2005 | $  47,099.52 |
| 2006 | $  68,927.94 |
| Total | $ 307,167.66 |

(Depo. Exs. 6-11 (Miesen SJ Aff. Ex. B)).

119.   During her deposition, PJSCC's bookkeeper, Ms. Maloley, admitted that the proceeds reflected on two of the closeout statements were understated and that Debtors were entitled to the following credits:

| Lot | Mistake | Actual | Difference |
|---|---|---|---|
| 1999 | $1,197.31 | $12,479.55 | $ 11,282.24 |
| 2006 | $  299.33 | $ 1,039.96 | $     740.63 |
| | | Total | $ 12,022.87 |

(Maloley Depo. p. 183, line 21, through p. 184, line 13, and p. 188, line 1, through p. 189, line 25; Depo. Exs. 6-11 (Miesen SJ Aff. Ex. B)).

120.   Adding back the fictitious "feed adjustments" and the credits conceded by Ms. Maloley, results in total proceeds due to Debtors as follows:

| Item | Amount |
|---|---|
| Net Proceeds | $1,807,252.24 |
| "Feed Adjustments" | $   307,167.66 |

| Credits for Mistakes | | $   12,022.87 |
|---|---|---|
| | Total | $2,126,442.77 |

121.   Proceeds in the principal amount of $630,290.28 have been deposited into the Approved Escrow Account.  (Miesen SJ Aff. ¶ 4 and Ex. A).

122.   PJSCC concedes that at least $426,494.00 of the proceeds deposited into the Approved Escrow Account belongs to Debtors.   (Johnson Depo. p. 269, line 13, through p. 271, line 3).

123.   Defendants retained the remaining net proceeds in the amount of $1,496,152.49  ($2,126,442.77 - $630,290.28).  (Johnson Depo. p. 268, lines 4-10).

124.   As of September 1, 2010, the following amounts were due to LOLFC under the Revolving Line of Credit:

| Principal | | $2,075,772.83 |
|---|---|---|
| Interest | | $  156,805.03 |
| | Total | $2,232,577.86 |

(McKay SJ Aff. ¶ 36 and Ex. M).

## STANDARD FOR SUMMARY JUDGMENT

Under Rule 56 of the Federal Rules of Civil Procedure, a party is entitled to summary judgment where the record shows "that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Under this standard, evidence of some alleged factual dispute will not defeat a well-grounded motion for summary judgment.  Instead, only a genuine issue of material

fact precludes summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

A factual dispute is material if its resolution will affect the outcome of the litigation.  Rakes v. Life Investors Ins. Co. of America, 582 F.3d 886, 893 (8th Cir. 2009).  A factual dispute is genuine, on the other hand, only if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248; Baucom v. Holiday Cos., 428 F.3d 764, 766 (8th Cir. 2005).  The basic issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251-52.

A party opposing a motion for summary judgment has an obligation to come forward with sufficient evidence to sustain a verdict in his or her favor.  The adverse party may not simply rest on his or her pleadings.  Similarly, the adverse party cannot create a genuine issue of material fact by making unsupported or conclusory allegations or by speculating about evidence that might be presented at trial.  Helfter v. United Parcel Service, Inc., 115 F.3d 613, 616 (8th Cir. 1997); Wilson v. International Business Machines Corp., 62 F.3d 237, 241 (8th Cir. 1995).  Rather, the adverse party has a duty to come forward with "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  If this burden is not met, Rule 56 provides that summary judgment "shall be entered against the adverse party."  Id.

## ARGUMENT

**LOLFC IS ENTITLED TO JUDGMENT AS A MATTER OF LAW FOR THE NET PROCEEDS FROM THE SALE OF THE MAVERICK CATTLE.**

LOLFC has alleged claims against Defendants for conversion of its collateral. (See First Amended Complaint Counts I-IV). Under Nebraska law, "[w]hen property is subject to a security interest, an exercise of dominion or control over the property that is inconsistent with the rights of the secured party constitutes, as to that secured party, conversion of the property." Ag Services of America, Inc. v. Empfield, 255 Neb. 957, 959, 587 N.W.2d 871, 873 (1999); Battle Creek State Bank v. Preusker, 253 Neb. 502, 511, 571 N.W.2d 294, 300-01 (Neb. 1997); Chadron Energy Corp. v. First Nat. Bank, 221 Neb. 590, 603, 379 N.W.2d 742, 750 (Neb. 1986). All persons who knowingly participated in converting the collateral are liable to the secured party. In re Turner, 13 B.R. 15, 20-22 (Bankr. D. Neb. 1981); Sprague v. Allied Mills, Inc., 129 Neb. 394, 397, 261 N.W. 892, 893 (1935); Talich v. Marvel, 115 Neb. 255, 259, 212 N.W. 540, 542 (1927). The secured party is entitled to recover damages against the wrongdoers equal to the value of the collateral at the time of conversion, plus interest. Turner, 13 B.R. at 21; Mapledge Corp. v. Coker, 167 Neb. 420, 428, 93 N.W.2d 369, 374 (Neb. 1958).

In this case, there is no question that Defendants exercised control and dominion over the Maverick Cattle and proceeds. Indeed, Defendants sold the Maverick Cattle and kept all of the proceeds. Therefore, the only issues that need to be resolved are: (a) whether LOLFC obtained a properly perfected security interest in the Maverick Cattle and proceeds; (b) whether LOLFC's security interest is prior and superior to any interest

31

claimed by Defendants; and (c) the damages recoverable by LOLFC based upon Defendants' conversion. All of these issues can be resolved the by Court as a matter of law.

> **A.    LOLFC Obtained a Properly Perfected Security Interest in the Maverick Cattle and Proceeds.**

A security interest attaches and becomes enforceable against the debtor when three conditions have been satisfied: (1) the debtor signs a security agreement granting the creditor a security interest in the collateral; (2) value is given to the debtor; and (3) the debtor has acquired rights in the collateral or the power to transfer rights in the collateral. Neb. Rev. Stat. (UCC) § 9-203(a) and (b). A security interest is generally perfected, and becomes enforceable against third parties, through the filing of an appropriate financing statement. See Neb. Rev. Stat. (UCC) § 9 -310(a) ("a financing statement must be filed to perfect all security interests and agricultural liens").

In this case, there is no dispute:

1.    That LOLFC and Debtors entered into Commercial Security Agreements under which Debtors granted LOLFC a security interest in cattle placed with 4-Square under Cattle Consulting Agreements and related proceeds (McKay SJ Aff. ¶¶ 9 and 20 and Exs. B and F);

2.    That Debtors acquired rights in the Maverick Cattle when they purchased the Maverick Cattle from Tri-County in late 2008 and early 2009 (McKay SJ Aff. ¶¶ 18-20; Sauder Aff. ¶¶ 8-11 and Exs. B-D); and

3.     That LOLFC provided Debtors with value in the form of multi-million dollar Revolving Line of Credit, a significant portion of which was used to finance the purchase of the Maverick Cattle.  (McKay SJ Aff. ¶¶ 8, 18-20 and Exs. A, B and F; Sauder Aff. ¶¶ 8-11 and Exs. B and D).

There is also no dispute that LOLFC filed financing statements in every jurisdiction that had any conceivable connection to the Maverick Cattle or Debtors: Minnesota (where the Maverick Cattle were purchased); South Dakota (where Debtors reside and where the Maverick Cattle were raised); and Nebraska (where the Maverick Cattle were finished and sold).  (McKay SJ Aff. ¶¶ 10-11 and 23 and Exs. C-D and G).

The only issue that Defendants have raised regarding the validity of LOLFC's security interest relates to the collateral descriptions in LOLFC's Commercial Security Agreements and financing statements.  More specifically, Defendants argue that the collateral descriptions are legally insufficient.  (PJSCC Answer ¶ 59; FNBO Answer ¶ 59).

### 1.     The Collateral Description in LOLFC's Financing Statements is Sufficient as a Matter of Law.

Under Revised Article 9 of the Uniform Commercial Code, a financing statement is legally sufficient, among other things, if it "indicates the collateral covered by the financing statement."   Neb. Rev. Stat. (UCC) § 9-502(a)(3).   A financing statement "sufficiently indicates the collateral" if it provides a description of the collateral pursuant to Neb. Rev. Stat. (UCC) § 9-108 or an indication that it covers all assets or all personal property.   Id. § 9-504.  A collateral description is sufficient under Section 9-108 if it

"reasonably identifies" the collateral.  Id. § 9-108(a).  A financing statement may contain "minor errors or omissions" as long as they do not make the financial statement "seriously misleading."  Id. § 9-506(a).

The provisions of revised Article 9 relating to financing statements establish a system of "notice filing."  Id. § 9-502 Official Comment No. 1.  A financing statement is not required to actually describe the collateral.  Thorp Commercial Corp. v. Northgate Indus., Inc., 654 F.2d 1245, 1248 (8th Cir. 1981) ("The description of collateral in the financing statement does not function to identify the collateral and define the property which the creditor may claim . . . ."); In re Cushman Bakery, 526 F.2d 23, 28 (5th Cir. 1975) ("a financing statement is not intended to enable other creditors to learn the 'true nature' of the secured transaction"), cert. denied, 425 U.S. 937 (1976); First Bank v. Eastern Livestock Co., 837 F. Supp. 792, 799 (S.D. Miss. 1993) ("in order to perfect a security interest, [a financing statement] need not specifically identify the property which is the subject of a security interest"); In re Bob Schwermer & Assocs., Inc., 27 B.R. 304, 309 (Bankr. N.D. Ill. 1983) ("the financing statement is not intended to enable other creditors to learn the 'true nature' of the secured transaction").  Instead, the purpose of a financing statement is simply to provide notice to interested third parties that the debtor's assets might be subject to a preexisting security interest.  Thorp, 654 F.2d at 1248-49; Cushman, 526 F.2d at 28; Ag Venture Financial Services, Inc. v. Montagne, 409 B.R. 685, 698 (Bankr. D. Vt. 2009) ("A financing statement is intended merely to put creditors on notice that further inquiry is prudent"); First Bank, 837 F. Supp. at 799 ("the sole function of financing statements . . . is to put third parties – usually prospective buyers or

34

lenders – on notice that there may be an enforceable security interest in the property of the debtor"); Bob Schwermer, 27 B.R. at 309; Border State Bank v. Bagley Livestock Exchange, Inc., 690 N.W.2d 326, 331 (Minn. Ct. App. 2003), pet. for rev. denied (Minn. Feb. 23, 2005).  As stated by the drafters of Revised Article 9:

> This section adopts a system of "notice filing."  What is required to be filed is . . . only a simple record providing a limited amount of information (financing statement). * * * The notice itself indicates merely that a person may have a security interest in the collateral indicated.  Further inquiry from the parties concerned will be necessary to disclose the complete state of affairs.  Section 9-210 provides a statutory procedure under which the secured party, at the debtor's request, may be required to make disclosure. However, in many cases, information may be forthcoming without the need to resort to the formalities of that section.

Neb. Rev. Stat. (UCC) § 9-502 Official Comment 1 (emphasis added).

A financing statement is simply intended to be a "starting point" for investigation by interested third parties.  In re Outboard Marine Corp., 300 B.R. 308, 320 (Bankr. N.D. Ill. 2003) (quoting In re Environmental Aspecs, Inc., 235 B.R. 378, 385 (E.D.N.C. 1999)).  "Further inquiry, beyond the financing statement, is thus required, with the burden of that inquiry placed on anyone in search of additional information." Outboard Marine, 300 B.R. at 320.  Because the purpose of a financing statement is simply to provide notice, courts liberally and leniently construe collateral descriptions.  CLC Equipment Co. v. Brewer, 139 F.3d 543, 545 (5th Cir. 1998) ("Collateral descriptions are liberally construed"); U.S. v. Collingwood Grain, Inc., 792 F.2d 972, 974 (10th Cir. 1986) ("The consistent trend of courts construing the Uniform Commercial Code is to be lenient in judging the sufficiency of descriptions in financing statements"); In re Tri-State Equipment, Inc., 792 F.2d 967, 971 (10th Cir. 1986); Bob Schwermer, 27 B.R. at 309;

35

Border State, 690 N.W.2d at 331 ("We liberally construe descriptions in the security agreement and financing statement because their essential purpose is to provide notice, not to definitively describe each item of collateral"); Polk County Bank v. Graven, 745 S.W.2d 793, 795 (Mo. Ct. App. 1988).

Based upon the foregoing principles, the true test for the sufficiency of a collateral description in a financing statement is whether the description contains just enough information "to induce a subsequent creditor to make further inquiries." Thorp, 654 F.2d at 1249; U.S. v. Southeast Mississippi Livestock Farmers Assoc., 619 F.2d 435, 439 (5th Cir. 1980) (upholding financing statements because "any reasonable party examining the financing statements . . . would have been sufficiently alerted to direct an inquiry to [the secured creditor]"); Bryan Brothers Cattle Co. v. Glenbrook Cattle Co., LLC, 2006 U.S. Dist. LEXIS 29926 **24-25 (N.D. Miss. 2006) (financing statement upheld because it was "sufficient to put a reasonable purchaser on notice that it should at least inquire into the status of the cattle in question"); In re Pickle Logging, Inc., 286 B.R. 181, 184 (Bankr. M.D. Ga. 2002) ("The description merely needs to raise a red flag to a third party indicating that more investigation may be necessary to determine whether or not an item is subject to a security agreement"); In re Van Rhee, 80 B.R. 844, 846 (W.D. Mich. 1987) (affirming bankruptcy court's ruling upholding collateral description in financing statement because it was "sufficient to notify third parties that additional inquiry may have been warranted"); Flores de N.M., Inc. v. Bandra Negra Intern., Inc. 151 B.R. 571, 583 (Bankr. D. N.M. 1993) ("A description contained within a financing statement is thus sufficient if it puts a potential lender on notice to inquire whether a security interest

exists"); Moffat County State Bank, v. Producers Livestock Marketing Assoc., 598 F. Supp. 1562, 1567 (D. Colo. 1984), aff'd, 833 F.2d 1562 (10th Cir. 1987).  Even a collateral description that is vague or ambiguous can pass this test.  Indeed, vague or ambiguous descriptions, by their very nature, prompt further inquiry.  Tri-State, 792 F.2d at 971-72; Thorp, 654 F.2d at 1249-53; Bryan Brothers, 2006 U.S. Dist. LEXIS at **24-25; First Bank, 837 F.Supp. at 800.  "Only where the financing statement does not perform its notice function by reason of an inadequate, ambiguous or misleading description of the encumbered property will it be deemed insufficient to constitute perfection of the secured party's interest in the collateral."  First Bank, 837 F. Supp. at 800 (cases cited therein); In re Katz, 563 F.2d 766, 768-69 (5th Cir. 1977).

The question of whether a collateral description contained in a financing statement is legally sufficient is a question of law.  Tri-State, 792 F.2d at 970; Pickle Logging, 286 B.R. at 184 ("'The question of sufficiency of [a] description of [collateral] in a [recorded document] is one of law'"); In re John Oliver Co., Inc., 91 B.R. 643, 645 (Bankr. N.H. 1988) (sufficiency of collateral description is "a question of law"); Driggers v. Continental Grain Co., 435 S.E.2d 722, 722 (Ga. Ct. App. 1993), rev. denied (Ga. Jan. 7, 1994); Citizens Nat. Bank of Evansville v. Wedel, 489 N.E.2d 1203, 1208 (Ind. Ct. App. 1986) ("In light of the purpose of the collateral description in a financing statement – to provide enough notice for further inquiry – we note the adequacy of the description in the financing statement is a question of law"); Valley Federal Savings Bank v. Stahl, 793 P.2d 851, 854 (N.M. 1990) ("Whether the description of the collateral is adequate is a question of law, not of fact").

In this case, the descriptions contained in LOLFC's financing statements clearly and unambiguously describe the collateral as "[a]ll cattle whether now owned or hereafter acquired by [Debtors] and placed by [Debtors] under a Cattle Consulting Agreement executed between [Debtors] and [4-Square]." (McKay SJ Aff. Exs. C and G). There is only one minor mistake in LOLFC's February 28, 2003, financing statement. In one place, the word "Debtor" is incorrectly spelled "Debtorr." (Id. Ex. C). This minor and obvious mistake clearly does not make the financing statement "seriously misleading." Neb. Rev. Stat. (UCC) § 9-506(a).

PJSCC and FNBO argue that the reference to cattle "placed" with 4-Square under a Cattle Consulting Agreement makes the collateral description legally insufficient. They claim that the term "placed" is a special term of art in the cattle industry that exclusively refers to placement of cattle at cattle feedlots. They rely upon monthly "Cattle on Feed" reports issued by the United States Department of Agriculture, which collectively refer to cattle placed on feed at feedlots located throughout the country as "placements." (See Miesen SJ Aff. Ex. BB). Because the Cattle on Feed reports define the term "placements" as "cattle put into a feedlot," Defendants claim that the word "placed" can only have one meaning in the cattle industry, namely placement of cattle on feed at feedlots.

At the outset, it should be noted that the argument made by PJSCC and FNBO is belied by their own Security Agreement and financing statements. The Security Agreement and financing statements relied upon by PJSCC and FNBO do not refer to cattle "placed" at PJSCC's feedlot. To the contrary, they refer to cattle "located" at

38

PJSCC's feedlot and cattle "in the care and possession" of PJSCC.  (Depo. Exs. 2, 3 and 4 (Miesen SJ Aff. Exs. O, Q and R)).[2]  If the term "placed" were some special term of art in the cattle industry that solely and exclusively referred to physical delivery of cattle to feedlots, then clearly PJSCC and FNBO would have used that special term in their own Security Agreement and financing statements.

Defendants' argument also ignores the plain language of LOLFC's financing statements.  LOLFC readily concedes that cattle can be "placed" at a feedlot.  The term "placed," however, is not limited to <u>physical</u> placement at a particular geographic location.  Instead, the term includes putting or setting "in a particular place, condition, relation, category, etc."  Webster's New World Dictionary p. 365 (1979).  Consequently, the meaning of the term "placed," like most terms, depends upon the context in which it is used.  In the cattle industry, the term "placed" can mean a number of different things.  For example, cattle can be "placed on" pasture.  Cattle can be "placed under" a delivery contract with a meat-packing company or "placed in" a meat-packing plant.  Cattle can be "placed on" the Chicago Board of Trade under a futures contract.  (McKay SJ Aff. ¶ 13; McKay Depo. p. 180, lines 1-25, and p. 183, line 21,  through p. 185, line 19).  In the context of LOLFC's financing statements, the term "placed" clearly and unambiguously means cattle "placed with" 4-Square for cattle-consulting services under a Cattle Consulting Contract.   Any reasonable person reviewing the collateral description contained in LOLFC's financing statements would understand that the term "placed"

---

[2]    Financing statements filed by Debtors' other creditors similarly describe cattle collateral as assets or livestock "in the care or possession" or "in the possession" of cattle feedlots.  (<u>See</u> Miesen SJ Aff. Ex. S).

does not refer to <u>physical</u> placement of cattle "at" any particular location, but instead refers to <u>legal</u> placement of cattle "with" 4-Square "<u>under a Cattle Consulting Agreement</u>."

If the collateral description contained in LOLFC's financing statements referred to cattle "placed at 4-Square feedlot" or even cattle placed "at" some geographic location, Defendants might have an argument.   The description, however, contains no such references.  It does not refer to <u>any</u> geographic location.  It does not even refer to cattle placed "at" 4-Square.  Instead, it plainly refers to cattle placed "with" 4-Square <u>under a contract</u>.  (McKay Aff. Ex. C and G).  Moreover, the referenced contract is not a "feeding agreement" or a "feedlot agreement."   Instead, the referenced contract is a "Cattle Consulting Agreement."   (<u>Id</u>.) (emphasis added).   Defendants readily admit that a company can provide cattle-consulting services without owning or operating a feedlot.  As Mr. Kalkowski testified:

> Q:     Does the collateral description refer to any feedlot operated by 4-Square?
>
> A:     Not that I see.
>
> Q:     Does the collateral description refer to cattle placed under a cattle feeding or cattle feedlot agreement.
>
> A:     It referenced a cattle consulting agreement.
>
> Q:     Which doesn't mean – which isn't feeding or feedlot, is it?
>
> A:     No, it does not say feeding or feedlot.
>
> Q:     And instead, what it refers to is cattle placed with 4-Square under a cattle consulting agreement, doesn't it?

A:     It does say that.

Q:     What does consulting mean to you?

* * *

A:     A whole range of things.  In cattle consulting, it could be purchase, feeding, care, marketing, arrangement of financing.

Q:     Would you agree that a company can provide cattle consulting services without operating a feedlot?

A:     Yes.

(Kalkowski Depo. p. 117, line 17, through p. 118, line 6, and p. 118, lines 9-14).

In sum, the description contained in LOLFC's financing statements reasonably describes the collateral.  At a bare minimum, applying the lenient and liberal standard for construing financing statements, the collateral description was clearly sufficient to prompt a reasonable person to at least conduct a further inquiry.  Even if the term "placed," as it is used in LOLFC's financing statements, could be twisted out of context to have more than one meaning, any ambiguity regarding that term would, in and of itself, prompt additional inquiry by interested parties.  Tri-State, 792 F.2d at 971-72; Thorp, 654 F.2d at 1249-53; Bryan Brothers, 2006 U.S. Dist. LEXIS at **24-25; First Bank, 837 F.Supp. at 800.  Accordingly, the collateral description is sufficient as a matter of law.

Finally, it should be emphasized that any feigned confusion by Defendants regarding the collateral description contained in LOLFC's financing statements was resolved long before the sale of the Maverick Cattle.  LOLFC notified PJSCC and FNBO both orally and in writing of its security interest in and 4-Square's involvement with the

41

Maverick Cattle in June 2009.  (McKay SJ Aff. ¶¶ 24-27, 30 and 32 and Exs. H-J and L; Johnson Depo. p. 54, line 4, through p. 57, line 20; Maloley Depo. p. 55, lines 7-25; Kalkowski Depo. p. 141, line 8, through p. 143, line 10, p. 149, line 4, through p. 151, lines 1-10, and p. 153, line 3, through p. 155, line 22).   In June 2009, 4-Square sent PJSCC ear tags bearing the 4-Square logo to be placed on the Maverick Cattle.  (Sauder Aff. ¶¶ 15-16 and Exs. I-J; Maloley Depo. p. 57, line 1, through p. 58, line 5; Johnson Depo. p. 59, lines 12-17; Kalkowski Depo. p. 162, lines 1-11, and p. 305, lines 5-11).   Defendants admit that they knew the sole purpose of the ear tags was to identify the Maverick Cattle as 4-Square cattle.  (Maloley Depo. p. 59, lines 22-25; Kalkowski Depo. p. 163, line 6, through p. 164, line 3; Johnson Depo. p. 59, line 18, through p. 60, line 12).   4-Square also inspected the Maverick Cattle on a monthly basis while they were located at PJSCC's feedlot.  (Sauder Aff. ¶¶ 17-18 and Exs. K-Q; Johnson Depo. p. 61, line 14, through p. 65, line 6; Maloley Depo. p. 67, line 5, through p. 68, line 17; Kalkowski Depo. p. 164, lines 4-21)   PJSCC itself furnished 4-Square with monthly feed invoices and reports so that 4-Square could monitor the performance of the Maverick Cattle.  (Sauder Aff. ¶ 19 and Exs. R-T; Maloley Depo. p. 60, line 1, through p. 67, line 1; Johnson Depo. p. 65, line 1, through p. 66, line 5; Kalkowski Depo. p. 164, line 22, through p. 165, line 1, and p. 305, lines 16-19).   By the end of the summer of 2009, PJSCC and FNBO were so thoroughly convinced of the priority of LOLFC's security interest that they agreed, according to Mr. Kalkowski, to turn all of the proceeds from the sale of the Maverick Cattle, less PJSCC's fees for feeding and caring for the Maverick Cattle, over to LOLFC.  (Kalkowski Depo. p. 186, line 25, through p. 188, line 9).  When

the proceeds started rolling in from the meat-packing companies, however, PJSCC and

FNBO apparently had a change of heart.

> **2.     The Collateral Description Contained in LOLFC's**
> **Commercial Security Agreements is Also Sufficient as a**
> **Matter of Law.**

Unlike a financing statement, the purpose of a collateral description in a security

agreement is <u>not</u> to provide notice to third parties.  Instead, the purpose of a collateral

description in a security agreement is "evidentiary."  Neb. Rev. Stat. (UCC) § 9-108

Official Comment 2.  In other words, a security agreement serves to define and identify

the collateral actually subject to the security interest.  <u>GP Credit Co., LLC v. Orlando</u>

<u>Residence, Ltd.</u>, 349 F.3d 976, 982 (7th Cir. 2003); <u>Outboard Marine</u>, 300 B.R. at 320.

As explained by the drafters of Revised Article 9:

> The purpose of requiring a description of collateral in a security agreement
> . . . is evidentiary.  The test of sufficiency of a description under this section
> . . . is that the description do the job assigned to it: make possible the
> identification of the collateral described.

Neb. Rev. Stat. (UCC) § 9-108, Official Comment 2.  As with financing statements,

Revised Article 9 does not require an "exact and detailed" description.  <u>Id</u>.  Instead, a

collateral description is sufficient if it "reasonably describes" the collateral.  <u>Id</u>. § 9-

108(a).  A description "reasonably describes" the collateral if, among other things, it uses

an "allocational formula or procedure" or a method that allows the collateral to be

"objectively determinable." <u>Id</u>. § 9-108(b)(5) and (6).

In this case, the collateral description in the Commercial Security Agreements

between LOLFC and Debtors is identical to the collateral description contained in

LOLFC's financing statements.  (<u>Compare</u> McKay Aff. Exs. B and F <u>with</u> McKay Aff. Exs. C and G).  The descriptions clearly "make possible the identification of the collateral described."  Indeed, by specifying the collateral as cattle placed with 4-Square under a Cattle Consulting Agreement, the descriptions use an "<u>allocational</u> formula or <u>procedure</u>" and make identification of the collateral "objectively determinable."  The detailed records used by 4-Square to formally introduce the Maverick Cattle into the 4-Square consulting program alone makes identification of the collateral described in the Commercial Security Agreements "objectively determinable."  (<u>See</u> Sauder Aff. ¶¶ 8-12 and Exs. B-E).  Therefore, under the plain language of Section 9-108, the description reasonably describes the collateral.

There is also no legitimate dispute that the Maverick Cattle were, in fact, placed with 4-Square for consulting under a Cattle Consulting Agreement.  4-Square was involved with the Maverick Cattle from the beginning.  Debtors arranged for the Buyer Recaps for the Maverick Cattle to be sent to 4-Square.  (Sawyer Aff. ¶ 12; Sauder Aff. ¶¶ 8-9 and Ex. B).  Upon receipt of the Buyer Recaps, 4-Square prepared Cattle Receipt and Evaluation Agreements to confirm placement of the Maverick Cattle into the 4-Square consulting program.  (Sauder Aff. ¶ 10 and Ex. C).  Debtors and 4-Square entered into a supplemental Cattle Consulting Agreement on January 8, 2009, to specifically cover the Maverick Cattle.  (Sawyer Aff. ¶ 11; Sauder Aff. ¶ 12 and Ex. E).  4-Square monitored and inspected the Maverick Cattle while they were located on Debtors' ranch in South Dakota.  (Sauder Aff. ¶ 13 and Exs. F-G).  4-Square also regularly monitored and inspected the Maverick Cattle after they were moved to PJSCC's feedlot in Nebraska.

(Id. ¶¶ 17-18 and Exs. K-Q; Sawyer Aff. ¶ 15; Johnson Depo. p. 61, line 14, through p. 65, line 6; Maloley Depo. p. 67, line 5, through p. 68, line 17; Kalkowski Depo. p. 164, lines 4-21). 4-Square provided Debtors and LOLFC with regular reports relating to the Maverick Cattle. (Sawyer Aff. ¶ 15; Sauder Aff. ¶¶ 13 and 17-18 and Exs. F-G and K-Q). Finally, 4-Square was paid all of its fees for the services it performed relating to the Maverick Cattle. (Sauder Aff. ¶ 20). Defendants have not disputed any of these facts.

### B.    LOLFC's Security Interest Is Prior and Superior to Any Interest Claimed by PJSCC.

PJSCC has claimed two interests in the Maverick Cattle and proceeds. First, PJSCC claims an agister's lien against the Maverick Cattle to secure payment of its fees under Neb. Rev. Stat. § 54-201. (PJSCC Answer ¶ 34). Second, PJSCC claims a security interest in the Maverick Cattle and proceeds pursuant to the financing statement that it filed with the Nebraska Secretary of State on February 22, 2006, and the financing statement filed by FNBO with the South Dakota Secretary of State on June 30, 2006. (PJSCC Answer ¶ 60). LOLFC's security interest is prior and superior to both of these alleged interests as a matter of law.

There is no dispute that PJSCC received full payment of its fees for feeding and caring for the Maverick Cattle. (Johnson Depo. p. 86, line 7, through p. 87, line 4; Maloley Depo. p. 87, lines 13-18; Kalkowski Depo. p. 219, line 18, through p. 220, line 7). Consequently, any agister's lien that PJSCC may have held against the Maverick Cattle was extinguished through payment. See Graff v. Burnett, 226 Neb. 710, 715, 414 N.W.2d 271, 275-76 (Neb. 1987); Sticknell v. Haggerty, 158 Neb. 34, 38-39, 62 N.W.2d

107, 109 (Neb. 1954).  Moreover, PJSCC's agister's lien only applied to the Maverick Cattle.  It could not be extended to the Prior Debt.  See Neb. Rev. Stat. § 54-201(2) (agister's lien only applies to "such livestock" that were actually fed and cared for by the agister).

LOLFC's security interest prevails over PJSCC's alleged security interest for two reasons.  First, PJSCC does not have a valid security interest.  As previously stated, a written security agreement is required to create an enforceable security interest.  See Neb. Rev. Stat. (UCC) § 9-203(b)(3).  Defendants have been unable to identify any security agreement relating to the February 22 or June 30, 2006, financing statements.  (Johnson Depo. p. 23, line 11, through p. 24, line 2; Maloley Depo. p. 28, line 17, through p. 29, line 13; Kalkowski Depo. p. 35, line 5, through p. 36, line 7).  PJSCC has suggested that the November 12, 2007, Security Agreement supports the financing statements (PJSCC Answer ¶ 60), but that Security Agreement was given to secure financing through FNBO under PJSCC's "customer finance" credit line.  (Maloley Depo. p. 34, line 9, through p. 35, line 8).  PJSCC assigned all of its rights under the November 12, 2007, Security Agreement to FNBO.  (Security Agreement p. 4 (Miesen SJ Aff. Ex. Q); Johnson Depo. p. 31, line 18, through p. 32, line 15; Kalkowski Depo. p. 43, lines 12-18).

Second, even if PJSCC had a valid security agreement with Maverick, the financing statements it relies upon are ineffective as a matter of law.  FNBO, not PJSCC, is identified as the "creditor" in the June 30, 2006, financing statement.  (See Depo. Ex. 2 (Miesen SJ Aff. Ex. O)).  Moreover, the June 30, 2006, financing statement was terminated by FNBO on January 29, 2007.  (Miesen SJ Aff. Exs. O-P; Kalkowski Depo.

p. 41, lines 14-19).  The February 22, 2006, financing statement is ineffective because it was filed with the <u>Nebraska</u> Secretary of State.  (Depo. Ex. 1 (Miesen SJ Aff. Ex. N)).  Maverick is a South Dakota corporation with its principal place of business located in Hurley, South Dakota.  (First Amended Complaint ¶ 11; PJSCC Answer ¶ 11; FNBO Answer ¶ 11).  Consequently, to be effective, any financing statement identifying Maverick as a debtor would have to be filed with the <u>South Dakota</u> Secretary of State.  <u>See</u> Neb. Rev. Stat. (UCC) § 9-301(1).

Second, even if there were a valid security agreement between PJSCC and Maverick, and even if the financing statements relied upon by PJSCC were effective, LOLFC's security interest would still have priority.  With respect to competing secured creditors, the first creditor to perfect its security interest has priority.  <u>Id</u>. § 9-322(a)(1).  LOLFC perfected its security interest by filing its financing statement with the South Dakota Secretary of State on February 28, 2003.  (McKay SJ Aff. ¶ 10 and Ex. C).  The financing statements relied upon by PJSCC were filed almost three years later, on February 22, 2006, and June 30, 2006.  (Depo. Exs. 1-2 (Miesen SJ Aff. Exs. N-O)).  Because LOLFC perfected its security interest three years before any purported security interest in favor of PJSCC was perfected, LOLFC's security interest is prior and superior as a matter of law.

PJSCC attempts to avoid LOLFC's three-year priority by arguing that Nebraska law governs the perfection of any security interest in the Maverick Cattle under the choice-of-law rules set forth in Neb. Rev. Stat. (UCC) §§ 9-301 and 9-302.  Relying on

those rules, PJSCC argues that its security interest prevails over LOLFC's security interest because it filed first <u>in Nebraska</u>.

PJSCC misconstrues the choice-of-law rules. The general rule is that "while a <u>debtor is located in a jurisdiction</u>, the local law of <u>that jurisdiction</u> governs <u>perfection</u> . . . of a security interest in collateral." Neb. Rev. Stat. (UCC) § 9-301(1)(emphasis added). Maverick is a South Dakota corporation. Its principal place of business is located in Hurley, South Dakota. (First Amended Complaint ¶ 11; PJSCC Answer ¶ 11; FNBO Answer ¶ 11). The Sawyers have lived on their ranch in Hurley, South Dakota, continuously since approximately 1995. (Sawyer Aff. ¶ 3; Johnson Depo. p. 25, lines 16-24; Maloley Depo. p. 31, lines 4-21). Consequently, at all pertinent times, Debtors were "located" in South Dakota. <u>Id</u>. § 9-307(b)(1) and (2). Because Debtors were and are located in South Dakota, the law of South Dakota governs "perfection" of security interests in the Maverick Cattle. There is no dispute that LOLFC was the first to file in South Dakota. (McKay Aff. ¶ 10 and Ex. C).

PJSCC argues that Nebraska law applies under Neb. Rev. Stat. (UCC) § 9-301(2), which provides that while collateral is located in a jurisdiction, "the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a <u>possessory security interest</u> in that collateral." (Emphasis added). As indicated by its plain language, Section 9-301(2) only applies to "possessory" security interests. PJSCC did not attempt to perfect its security interest in the Maverick Cattle by taking possession of the Maverick Cattle. Instead, it attempted to perfect its security interest by filing a financing statement. (PJSCC Answer ¶ 60; Depo. Ex. 1 (Miesen SJ Aff. Ex. N)).

Accordingly, Section 9-301(2) is inapplicable.  Capital Solutions, LLC v. Konica Minolta Business Solutions U.S.A., Inc., 2010 U.S. Dist. LEXIS 10387 **8-10 (D. Kan. 2010). Moreover, any alleged possessory security interest would have been lost when PJSCC voluntarily relinquished possession of the Maverick Cattle to the meat-packing companies.  See Neb. Rev. Stat. (UCC) § 9-313(d); In re Rogers, 39 B.R. 295, 299 (Bankr. W.D. Ken. 1984)(any possessory security interest claimed by creditor was relinquished upon sale of the collateral).

PJSCC also claims that Nebraska law governs the parties' security interests under Neb. Rev. Stat. (UCC) § 9-302, which provides:  "While farm products are located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of an agricultural lien on the farm products." (Emphasis added).  As indicated by its plain language, Section 9-302 only applies to "agricultural liens."  PJSCC is not seeking to enforce an agricultural lien.  It is seeking to enforce an alleged security interest.  (PJSCC Answer ¶ 60).

PJSCC also ignores the law.  Even if the governing law had changed from South Dakota to Nebraska, LOLFC's security interest would still have priority.  Neb. Rev. Stat. (UCC) § 9-316 governs perfection when there is a change in the applicable law.  Under Section 9-316, a security interest perfected in one jurisdiction remains perfected until the earliest of the following:

> 1.      the time perfection would have ceased under the law of that jurisdiction;
>
> 2.      the expiration of four months after a change of the debtor's location to another jurisdiction; or

3.      the expiration of one year after a transfer of collateral to a person that thereby becomes a debtor and is located in another jurisdiction.

Neb. Rev. Stat. (UCC) § 9-316(a).  Because Debtors did not change their location or transfer the Maverick Cattle to another person who became LOLFC's debtor, LOLFC's security interest would remain perfected <u>despite any change of applicable law</u> until perfection would have ceased under South Dakota law.  Because LOLFC timely filed a Continuation Statement, its security interest will not expire under South Dakota law until January 23, 2013.  (McKay SJ Aff. ¶¶ 10-11 and Exs. C-D).  S.D.C.L. § 57A-9-515(e).  Moreover, even if Debtors had moved to Nebraska or PJSCC became LOLFC's debtor, the perfected status of LOLFC's security interest would continue after the four-month or one-year periods under Section 9-316(a)(2) and (3) because LOLFC filed a financing statement in Nebraska before the expiration of those periods.  (McKay SJ Aff. ¶ 23 and Ex. G).  <u>See</u> Neb. Rev. Stat. (UCC) § 9-316(b).

**C.      LOLFC's Security Interest is Also Prior and Superior to Any Interest Claimed By FNBO.**

FNBO has asserted two grounds to support its claim to the proceeds from the sale of the Maverick Cattle.  First, FNBO claims that it has a security interest in PJSCC's accounts receivable and that the proceeds constitute a receivable belonging to PJSCC.  (FNBO Answer ¶ 33).  Second, FNBO claims that it has a security interest granted by Maverick that covers the Maverick Cattle and proceeds.  (FNBO Answer ¶¶ 34 and 60).  FNBO is not asserting any other basis for its claim to the proceeds.  (Kalkowski Depo. p. 26, line 19, through p. 30, line 9).  Both of FNBO's arguments fail as a matter of law.

A secured party's rights with respect to enforcement of a security interest in accounts receivable are governed by Neb. Rev. Stat. (UCC) § 9-607. Under Section 9-607(a)(1)(C), a secured party "may enforce the obligation of an account debtor or other person obligated on collateral and exercise the rights of the debtor with respect to the obligation of the account debtor or other person obligated on collateral to make payment or otherwise render performance to the debtor. . . ." (Emphasis added). In other words, the secured party steps into the shoes of the debtor. A secured party acquires no more rights against the account debtor than those formerly held by the debtor. See id. Official Comment 3. FNBO readily concedes this point. (Kalkowski Depo. p. 31, line 7, through p. 32, line 20). As previously stated, any rights of PJSCC to the Maverick Cattle and proceeds are inferior to LOLFC's security interest as a matter of law. Consequently, any rights that FNBO may have acquired by virtue of its security interest in PJSCC's accounts receivable are similarly inferior to LOLFC's security interest as a matter of law.

FNBO's claim that it holds a security interest granted by Maverick in the Maverick Cattle and proceeds also fails as a matter of law. Assuming that the November 12, 2007, Security Agreement created the security interest relied upon by FNBO (which would simply confirm that there is no security agreement to support PJSCC's alleged security interest), the only valid financing statement filed by FNBO is the financing statement filed with the South Dakota Secretary of State on January 26, 2007. (Depo. Ex. 4 (Miesen SJ Aff. Ex. R)). Because FNBO's January 26, 2007, financing statement was filed almost four years after LOLFC's February 28, 2003, financing statement, LOLFC's

51

security interest is prior and superior to FNBO's security interest as a matter of law.  See Neb Rev. Stat. (UCC) § 9-322(a)(1)

### D. LOLFC Is Entitled to Recover the Net Proceeds From the Sale of the Maverick Cattle.

As previously stated, the total proceeds due to Debtors from the sale of the Maverick Cattle are $2,126,442.77.  As of September 1, 2010, the amount of principal and interest due to LOLFC under the Revolving Line of Credit was $2,232,577.86. (McKay SJ Aff. ¶ 36 and Ex. M).  Because the balance due under the Revolving Line of Credit exceeds the amount of proceeds due to Debtors, LOLFC is entitled to recover all of those proceeds.

Of the total proceeds, the principal sum of $630,290.28 was deposited into the Approved Escrow Account.  (Miesen SJ Aff. ¶ 4 and Ex. A).  The Court's November 4, 2009, Temporary Restraining Order provides that the funds deposited into the Approved Escrow Account may only to be released pursuant to an Order of the Court upon a determination of this case on the merits.  (Temporary Restraining Order p. 3 (Docket No. 18)).  Accordingly, LOLFC respectfully requests the Court to issue an Order directing FNBO to release all funds deposited into the Approved Escrow Account to LOLFC.

The remaining proceeds, after subtracting the amounts deposited into the Approved Escrow Account, amount to $1,496,152.49 ($2,126,442.77 - $630,290.28). There is no question that PJSCC knowingly participated in the conversion of those proceeds.  Turner, 13 B.R. at 20-22; Sprague, 261 N.W. at 893; Talich, 212 N.W. at 542. The record before the Court clearly demonstrates that FNBO, Mr. Johnson and Ms.

Maloley also knowingly participated in the conversion.  In addition, the record firmly establishes those parties conspired and colluded together to convert LOLFC's collateral, which also results joint and several liability.  See, e.g., Eicher v. Mid-American Financial Investment Corp., 270 Neb. 370, 380-81, 702 N.W.2d 792, 805 (2005); Koster v. P & P Enterprises, Inc., 248 Neb. 759, 765, 539 N.W.2d 274, 279 (1995).  In particular:

1.     Mr. Johnson participated in hatching the Plan.  (Depo. Ex. 53 (Miesen SJ Aff. Ex. W); Johnson Depo. p. 68, line 18, through p. 69, line 10, p. 76, line 18, through p. 77, line 5, and p. 78, lines 13-16; Kalkowski Depo. p. 61, lines 5-24, and p. 62, lines 1-16).  He made the decision not to turn any proceeds over to Debtors or LOLFC and to use the proceeds to pay the Prior Debt.  (Johnson Depo. p. 139, lines 18-21, and p. 142, line 20, through p. 143, line 2).  Mr. Johnson was primarily responsible for concocting the fictitious "feed adjustments."  (Id. p. 222, line 9, through p. 224, line 5, p. 195, lines 1-25, p. 204, line 7, through p. 205, line 10, and p. 206, line 20, through p. 207, line 1; Maloley Depo. p. 201, line 23, through p. 202, line 17).  Mr. Johnson also participated in the bogus assignment of the Biegert Debt to PJSCC.  (Depo. Ex. 21 (Miesen SJ Aff. Ex. T); Johnson Depo. p. 267, line 12, through p. 268, line 3).

2.     FNBO and its counsel participated in hatching the Plan.  (Depo. Ex. 53 (Miesen SJ Aff. Ex. W); Kalkowski Depo. p. 67, line 9, through p. 69, line 16, p. 70, lines 14-22, and p. 72, line 10, through p. 74, line 19; Johnson Depo. p. 76, line 18, through p. 77, line 16, p. 78, line 13, through p. 79, line 22, and p. 68, line 18, through p. 70, line 4; Supp. Johnson Depo. p. 7, lines 19-22, and p. 9, lines 12-25).  FNBO supported the Plan because it provided PJSCC with funds to pay down its credit lines

with FNBO.  (Kalkowski Depo. p. 62, lines 6-16).  FNBO actively assisted PJSCC in completing the tasks necessary for PJSCC to implement the Plan.  (Depo. Ex. 53, p. 3 (Miesen SJ Aff. Ex. W); Kalkowski Depo. p. 70, lines 14-22, p. 72, line 10, through p. 74, line 19, and p. 88, line 6, through p. 91, line 5).  FNBO also participated in multiple conference calls with it attorney and Mr. Johnson and to help PJSCC "troubleshoot as to how to recover the [Prior Debt.]"  (Kalkowski Depo. p. 241, line 23, through p. 243, line 9; Supp. Johnson Depo. p. 30, lines 1-10).  FNBO worked with its counsel during the summer of 2009 to find ways to "take other $'s owed [i.e., Prior Debt] out of the check when [the Maverick Cattle] are sold."  (Depo. Ex. 50 (Miesen SJ Aff. Ex. U); Kalkowski Depo. p. 268, line 6, through p. 270, line 21; Supp. Kalkowski Depo. p. 241, line 23, through p. 242, line 20).  Among other things, Mr. Kalkowski proposed that the Maverick Cattle be sold in PJSCC's name, rather than under Debtors' names.  (Depo. Ex. 65 (Miesen SJ Aff. Ex. Y)).  FNBO also lined up an attorney for PJSCC and "shared theories and ideas" with that attorney regarding ways to retain the proceeds from the sale of the Maverick Cattle.  (Depo. Ex. 64 (Miesen SJ Aff. Ex. X; Supp. Johnson Depo. p. 34, line 11, through p. 35, line 4).  FNBO was aware that Mr. Johnson was using the fictitious "feed adjustments" to collect the Prior Debt.  (Kalkowski Depo. p. 205, lines 3-18, and p. 207, lines 2-13).  FNBO knew that PJSCC was not going to turn any proceeds from the sale of the Maverick Cattle over to Debtors or LOLFC.  (Johnson Depo. p. 139, line 22, through p. 140, line 25, p. 141, lines 1-6, and p. 153, lines 9-20).  FNBO also knew that the proceeds were being deposited into PJSCC's Business Checking Account, automatically swept into PJSCC's Central Account and then used to pay down PJSCC's

operating credit line on a daily basis. (Kalkowski Depo. p. 196, lines 15-18, p. 214, line 1, through p. 215, line 9, and p. 217, lines 1-18; Supp. Kalkowski Depo. p. 43, line 13, through p. 44, line 7). Yet, when Mr. McKay inquired about the status of the proceeds, Mr. Kalkowski lied and told him that PJSCC was not distributing the proceeds anywhere and that FNBO and PJSCC had agreed that all of the proceeds, less the fees for feeding and caring for the Maverick Cattle, would be paid to LOLFC. (McKay SJ Aff. ¶¶ 31 and 34 and Ex. L; Kalkowski Depo. p. 186, line 25, through, p. 188, line 9, p. 220, line 24, through p. 221, line 6; Depo. Ex. 52, p. 1 (Miesen SJ Aff. Ex. V); Supp. Johnson Depo. p. 55, line 25, through p. 56, line 24, and p. 59, line 2, through p. 60, line 8; Supp. Maloley Depo. p. 43, line 17, through p. 45, line 9).

        3.    Ms. Maloley prepared the closeout statements containing the fictitious "feed adjustments." (Maloley Depo. p. 201, line 23, through p. 202, line 9). She knew that the "feed adjustments" were arbitrary and fictitious numbers that were being inserted into the closeout statements to collect the Prior Debt. (Id. p. 202, lines 7-9, p. 100, lines 18-22, and p. 101, lines 5-9). Ms. Maloley also worked with FNBO to ensure that the proceeds from the sale of the Maverick Cattle were applied to pay the Prior Debt. (Kalkowski Depo. p. 226, line 7, through p. 231, lines 1-14; (Depo. Ex. 52, p. 2 (Miesen SJ Aff. Ex. V)). Finally, Ms. Maloley was directly involved in converting the "lost" Tyson check in the amount of $491,534.72 in April 2010, five months after the entry of the Temporary Restraining Order. (Miesen SJ Aff. Exs. Z-AA; Supp. Maloley Depo. p. 48, line 17, through p. 50, line 21; Supp. Johnson Depo. p. 62, line 8, through p. 64, line 5; Supp. Kalkowski Depo. p. 68, lines 4-14, and p. 70, lines 1-17).

Finally, even if FNBO did not knowingly participate in the conversion or conspire with the other Defendants to commit the conversion, it would still liable to LOLFC for the proceeds that it used to pay down PJSCC's credit lines. Under Neb. Rev. Stat (UCC) § 9-315, "a security interest attaches to any identifiable proceeds of collateral." Neb. Rev. Stat. (UCC) § 9-315(a)(2). Proceeds that are commingled with other funds are "identifiable" "to the extent that the secured party identifies the proceeds by a method of tracing, including application of equitable principles, that is permitted under the law other than this article with respect to commingled property of the type involved." Id. § 9-315(b)(2). Nebraska courts follow the "first in, last out" rule. See, e.g., Turner, 13 B.R. at 22. Under this rule, "a presumption arises that general payments are first made from general funds and that the security interest is only eroded as the balance in the account drops below the amount of the proceeds deposited." Id. Applying this simple rule, LOLFC has effectively traced proceeds from the sale of the Maverick Cattle from the time they were deposited into PJSCC's Business Checking Account to the time they were removed from PJSCC's Central Account by FNBO to pay down PJSCC's operating line of credit in the total amount of $1,596,227.45, far in excess of the remaining net proceeds due to Debtors. (Miesen SJ Aff. ¶ 7-8 and Exs. C-F). Consequently, even in the absence of any knowing participation or conspiracy, FNBO would still liable as a matter of law for the remaining net proceeds.

### E.    LOLFC is Also Entitled to Recover Interest.

As part of its compensatory damages, LOLFC is entitled to recover interest on the funds converted by Defendants.  <u>Turner</u>, 13 B.R. at 21; <u>Mapledge</u>, 93 N.W.2d at 374. Under Neb. Rev. Stat. § 45-104, a claimant is allowed to recover interest at the rate of 12% per year "on money received to the use of another and retained without the owner's consent, express or implied, from the receipt thereof. . . ."  Defendants received and wrongfully withheld the proceeds from the sale of the Maverick Cattle, which are due and owing to LOLFC.  The amounts converted by Defendants are liquidated and certain. Defendants have also failed to raise any legitimate defense to  LOLFC's claim to the proceeds.   Accordingly, LOLFC is entitled to recover interest under Section 45-104. <u>Chelona v. Chelona</u>, 255 Neb. 32, 41-44, 582 N.W.2d 291, 299-301 (1998)(awarding interest under Section 45-104 in conversion action).

The cattle closeout statements indicate that all of the Maverick Cattle were sold by November 27, 2009.  (Depo. Exs. 6-11 (Miesen SJ Aff. Ex. B)).  By the end of November 2009, the proceeds had either been deposited into the Approved Escrow Account or withdrawn from PJSCC's Central Account and used to pay down PJSCC's operating line of credit with FNBO.  (<u>See</u> Miesen SJ Aff. Exs. C-F).  Accordingly, to simplify the calculations, LOLFC is willing to use December 1, 2009, as the starting date for the calculation of interest.  Using December 1, 2009, as the starting date, LOLFC is entitled to interest through September 1, 2010, as follows:

| | |
|---|---|
| Total Proceeds | $2,126,442.77 |
| Rate | x           .12 |
| Yearly Interest | $  255,173.13 |

|  |  | ÷ | 365.00 |
|---|---|---|---|
| Daily Interest |  | $ | 699.10 |
| Days From 12/01/09 to 09/01/10 |  | x | 274.00 |
|  |  | $ | 191,553.40 |

Since September 1, 2010, interest has accrued and will continue to accrue at the rate of $699.10 per day.

## CONCLUSION

There is no genuine issue of material fact relating to either liability or damages. Defendants sold LOLFC's collateral and converted the proceeds.  As a matter of law, LOLFC is entitled to summary judgment against Defendants as follows:

1.    Ordering FNBO to transfer to LOLFC proceeds deposited into the Approved Escrow Account in the principal amount of $630,290.28;

2.    Awarding LOLFC a money judgment against Defendants, jointly and severally, for the remaining net proceeds in the amount of $1,496,152.49; and

3.    Awarding LOLFC interest against Defendants, jointly and severally, in the amount of $191,553.40, plus additional interest at the rate of $699.10 per day from

September 1, 2010, through the date of entry of judgment.

                                            Respectfully submitted,

                                            STOEL RIVES LLP

                                            By: s/Jonathan C. Miesen

Dated:  September 16, 2010                    Jonathan C. Miesen
                                              Minn. Atty. Reg. No. 19752X

                                            Suite 4200
                                            33 South Sixth Street
                                            Minneapolis, MN 55402
                                            Telephone:   (612) 373-8810
                                            Facsimile:    (612) 373-8881
                                            E-mail:        JCMiesen@stoel.com

                                            Attorneys for Plaintiff

70278068.1 0099999-00001