United States District Court
District of Nebraska

| | |
|---|---|
| **LOL Finance Company,**<br>         Plaintiff, | No  09-cv-3224<br>Judge Kopf |
| v. | |
| **Paul Johnson & Sons Cattle Co., Inc.,<br>First National Bank of Omaha, Robert<br>P. Johnson and Keri J. Maloley, John<br>Doe and ABC Company,** | Defendant Paul Johnson & Sons, et al.,<br>Brief Opposing Plaintiff's Motion in<br>Limine to Exclude Expert Testimony<br>(Filing #147) |
|          **Defendants.** | |
| **Paul Johnson & Sons Cattle Co., Inc.,**<br>         Third Party Plaintiff, | |
| v. | |
| **Maverick Feeders, Inc.,<br>A South Dakota Corporation,<br>Shon Sawyer and Julie Sawyer,<br>Husband and wife,**<br>         Third Party Defendants | |

## Case Overview

1.   LOL Finance asserts it is a creditor with a highest priority security interest in 3,397 head of cattle.  Its position depends on the adequacy of LOL's security agreement's description of collateral pledged to it.

2.   Commercial feedlot Paul Johnson & Sons Cattle Co., Inc. and commercial cattle lender First National Bank of Omaha claim the LOL financing documents do not enjoy priority status because, as a matter of fact, they contain insufficient descriptions of cattle purportedly pledged by LOL's borrowers and Johnson & Sons' customers.  The customers are Maverick Feeders, Inc. and its owners, Shon and Julie Sawyer.

3. Johnson & Sons offer five expert witnesses, all with extensive experience in the cattle industry, and with different perspectives on the industry. Viewed from all sides, these industry experts are able to inform the trier of fact that the phrase that the critical language in LOL's security agreement does not impart notice that sufficiently identifies the cattle LOL claims as collateral.

4. A term of art used in the agreement, "placed", refers to cattle physically relocated to a feed yard where they are to be fed a ration designed to cause weight gain and prepare them for slaughter and human consumption. "Placements" are tracked by the United States Department of Agriculture, described in cattle population census information, counted to understand the adequacy of the beef supply for the American population, and are used for other purposes. Security interests often attached to cattle when they are "placed" in feed yards. "Placements" are events that demark a maturation point, and change in description and type, among cattle. Industry experts know this. Average jurors outside of the cattle business do not. The scope, and breadth, of expert testimony on this issue is central to this case.

5. The experts proffered by Johnson & Sons are:

    5.1. A large animal veterinarian who focuses on feed yards.

    5.2. An animal nutritionist who works with cattle in feed yards.

    5.3. A custom cattle feeder in Nebraska whose operations include customer financing.

    5.4. A northern Kansas custom cattle feeder who is familiar with the Johnson yard.

    5.5. A business executive and accountant with many years of experience as a chief financial officer in a company with large cattle ownership interests, placements, and also large feedlot ownership interests, and custom feeding operations. This witness also offers the lender's perspective as her company engaged in financing.

6.  Each of these distinct perspectives is necessary to inform the jury fully about the perception, and significance, to Johnson & Sons as well as its lender FNBO, concerning the limitations on LOL's security interests. Principal witnesses for LOL conceded as much in their depositions given

7.  The experts tendered are qualified. Their testimony will be helpful. They rely on publications including those of the United States Department of Agriculture's National Agricultural Statistics Service in most instances, they have years of experience in the business, and they come from different perspectives. The witnesses do not practice junk science, do not offer opinions about matters within the experience of average jurors, or matters of law, and they meet all tests of FRE 702 and judicial decisions concerning experts.

8.  Johnson & Sons' experts should be permitted to testify at trial.

### The Issues Presented

9.  LOL's motion, and its supported brief, frame these issues concerning Johnson & Sons' five experts.

   9.1.  Is their proposed testimony "more than a legal opinion"?

   9.2.  Are the testimonial perspectives of the witnesses sufficiently different to avoid indictment as "cumulative, prejudicial and a waste of time and judicial resources"?

   9.3.  Do the experts' reports satisfy requirements of FRCP26(a)(2)(B)?

### How the Issues Should Be Decided

10.  First, the witnesses do not offer legal opinions. They are confined to the facts. Facts they address concern the nature of the services rendered by Johnson & Sons, the nature and substance of the act of "placing" cattle, i.e., what does it mean to place cattle in the industry from the perspective of different persons in the industry, and are they sufficiently focused, succinct and effective so as not to be cumulative?

11.  Their reports satisfy essential requirements of Rule 26?

**Argument**

### I. The Johnson & Sons' Experts Will Testify About Facts, Not the Law.

12. LOL asserts that "whether a collateral description is legally sufficient is a question of law", citing *United States vs. First National Bank*, 470 F2d 944, 947 (8th Cir 1973). It is true that there are cases concerning the judiciary's role in deciding when a collateral description is legally sufficient. But, the case before the court involves a specialized term "placed". The court has no context within which to discuss or understand the term unless it, and jurors, are informed by experts.

13. Here, the court might decide that a description of "livestock" or "cattle" is, or is not, legally sufficient. But the use of a specialized industry term to describe which cattle, by invoking a specialized livestock census term, makes expert testimony necessary, and removes this case from the ambit of those described in each instance in LOL's brief on its third page. This is not a case involving simply "cattle" or "corn" or even "machinery and equipment".

14. Here, the issue is whether the cattle were "placed". The sufficiency of the description is not the issue. The scope or extent of the description is. In other words, LOL may have had a perfected security interest in Maverick Feeders and Sawyer Cattle "placed with Four-Square".

15. The issue here, however, is whether the cattle in question were ever "placed" with anyone other than Johnson & Sons. The experts offer valuable, industry-specific testimony concerning a seductively ordinary term "placed" which holds a highly specialized, livestock census and livestock-specific meaning among cattle producers, cattle feeders, cattle investors, and cattle financiers, as well as the state and federal agencies who track the livestock industry in order to understand and appreciate it.

16. It is true that the jury's role is to settle factual disputes. Here, the dispute is simple: Did Maverick Feeders place cattle with Four-Square? Or, were the cattle placed with Johnson & Sons?

17. LOL contends that the execution of the document which resides in its file constitutes a "placement" with Four-Square. It claims the placement, which amounts to nothing more than an extra level of invoicing for an extra layer of credit charges to be paid by the investor to the financier, constitutes a "placement".

18. But the industry experts, from their different and important perspectives, informed the trier of fact that cattle are "placed" only when they physically move from one location at a relatively early stage in their lives to another location, i.e., a feed yard, where the cattle are placed on a feeding ration designed to produce, as rapidly as possible, a market ready slaughter animal.

19. The term "placement" is so technical in the cattle industry that the USDA defines it for use in monthly Cattle on Feed reports. These reports are pivotal to the industry's tracking of the national cattle herd, the age of the herd, and the flow of cattle from mother cows to growing locations, to feed yards, and finally to slaughter plants. The USDA's definition is as follows:

> **Placements** are cattle put into a feedlot, fed a ration which will produce a carcass that will grade select or better, and are intended for the slaughter market.

http://usda.mannlib.cornell.edu/MannUsda/viewDocumentInfo.do?documentID=1020

20. The USDA's definition is not a regulatory definition with legal meaning. It is a factual definition with demographic and market awareness importance. It informs the industry of the number of cattle placed in feed yards. Subverting the understanding of placements by allowing the count to become untrackable, or hopelessly confusing, thereby losing a grip on the size of the nation's beef supply because paper transactions suddenly create cattle "placements" that could create the illusion of an extraordinary large herd that is insufficient to feed the American population, would be detrimental to the market, damaging to persons in the cattle business, disruptive of finance, and dangerous to the public which ultimately relies on placement figures and Cattle on Feed reports for assurance that its meat needs will be met.

21. LOL correctly quotes its financing statement as describing "all cattle…placed by [third-part defendants] with Four-Square Cattle Management Services under a cattle consulting agreement… . (Filing #10 at 41).

22. This information is of interest, but does not inform anyone in the industry about where the cattle are located. It offers nothing that would permit a feed yard, bank, packer, or investor, to know which cattle are at issue because it does not say where the cattle are *unless* it refers to cattle placed in a Four-Square feed yard.

23. The cattle in question were placed with Johnson & Sons. They were not placed with Four-Square. LOL has no security interest in these cattle. The expert's testimony proffered by Johnson makes this abundantly clear. The expert's reports do what expert reports should do – inform the trier of fact about an area of specialized knowledge and skill beyond the awareness of an average juror.

24. "Oligodendroglioma," a diffuse brain cancer, requires no explanation in an audience of neurosurgeons. The name communicates volumes about the illness, its diagnosis, and its treatment. But, in a courtroom "oligodendroglioma" requires a definition from an expert.

25. "Placed' in the context of where cattle are to be fed for slaughter, involves fewer consonants and vowels the oligodendroglioma, but the degree of knowledge required to understand what the term means, and to know that it is a census term with industry specific meaning, takes experts.

26. Since the industry is multifaceted, experts representing multiple facets of the industry are appropriate. The Plaintiff's experts, who are likely to be 20 minute witnesses each, offer different perspectives, allowing the trier of fact to appreciate the significance of the term "placements", and the breadth of its significance.

27. LOL's first Argument in support of its motion is without merit.

**II.  Johnson Cattle's Experts Do Not Offer or Propose "Cumulative and Duplicative" Expert Testimony**

28. LOL argues that if the jury is permitted to hear from any of Johnson & Sons' experts, it should hear from only a few, but not all of them. The argument (Brief p. 7-8) overlooks the unique perspective of each witness. As noted above, one is a veterinarian, one a nutritionist, one a custom cattle feeder, one a cattle feeder focused principally on personally owned livestock, and familiar with the Johnson operation, and one comes from finance.

29. The multi-disciplinary breadth of the term "placed" within the cattle industry is important for the jury to understand. The amount of money at issue should not be placed at risk because jurors might think, for example, that veterinarians, and nutritionists, and cattle feeders, might understand "placements" the way Johnson contends they do, but bankers or finance people should know better, and, on that basis, the jury might see a deficit in Johnson's proof and hold against it. The same is true for each of the disciplines in question.

30. It is true that the testimony of each of Johnson's five experts is designed to establish a single ultimate point, i.e., that LOL's Uniform Commercial Code filings contain descriptions of collateral that are factually deficient. But, the disciplines and perspectives invoked to reach this perspective are not cumulative, and are not unreasonably duplicative.

31. LOL's second argument for limiting Johnson's experts lacks merit.

### III. The Reports Submitted Satisfy FR Civ P 26(a)(2)(B).

32. Each witness executed a statement. Each statement describes the data and the opinions the witness will give, and therefore informs the adversary of exhibits or documents upon which the witness relies.

33. Each statement describes the qualifications of the witness and no statement identifies any publications authored. This is because there are none.

34. No statement identifies any case in which the witness testified as an expert at trial or in a deposition during the past four years. This is because none of the five have done so.

35. Finally, none of the statements describe the compensation to be paid for the study or testimony. This is because the witnesses have not made charges for their services. They were not paid to study the subject matter.

36. Part III of LOL's brief fails to assert a ground for excluding the witnesses.

## Conclusion

37. Maverick Feeders and the Sawyers "placed" cattle on feed with Paul Johnson & Sons Cattle Co. LOL's financing statement and security agreement create and perfect a security interest in cattle placed by Maverick and Sawyer with Four-Square Cattle, not Johnson & Sons.

38. Four-Square does not have a feed yard. No cattle were placed with it. A paper contract, creating an invoicing opportunity aligned with financing is not a placement. This is true for cattle demographics and census purposes, and for purposes associated with a rendition of nutritional services, veterinary services, financing services, feed yard operations, and custom feeding arrangements. Five experts, from these five disciplines, offer testimony on the factual meaning of placements. Their testimony is not cumulative. It should be received.

September 21, 2010.

        Robert P. Johnson & Keri J Maloley
        Individually and d/b/a Paul Johnson
        & Sons Cattle Co., Inc., Defendants

    By    s/David A. Domina_____
        David A. Domina # 11043
        DOMINALAW Group pc llo
        2425 S 144th St.
        Omaha NE 68144 2367
        402 493 4100

        ddomina@dominalaw.com

## Certificate of Service

On September 21, 2010, I filed Defendant Paul Johnson & Sons, et al., Brief Opposing Plaintiff's Motion in Limine to Exclude Expert Testimony (Filing #147) with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all Counsel of Record.

Jonathan Miesen
Stoel Rives, LLP
jcmiesen@stoel.com

Shawn Nichols
Cadwell, Sanford, Deibert & Gray, LLP
snichols@cadlaw.com

Steven Sanford
Cadwell Sanford Deibert & Gray LLP
SSanford@cadlaw.com

Thomas O. Kelley
McGrath North Mullin & Kratz, PC LLO
tokelley@mcgrathnorth.com

William F. Hargens
McGrath North Mullin & Kratz, PC LLO
whargens@mcgrathnorth.com

                                        David A Domina_____