UNITED STATES DISTRICT COURT

DISTRICT OF NEBRASKA

---

LOL Finance Company,

        Plaintiff,

v.

Paul Johnson & Sons Cattle Co., Inc., First National Bank of Omaha, Robert P. Johnson Keri J. Maloley, John Doe and ABC Company,

        Defendants.

---

Paul Johnson & Sons Cattle Co., Inc.,

        Third-Party Plaintiff,

v.

Maverick Feeders, Inc., Shon Sawyer and Julie Sawyer,

        Third-Party Defendants.

Case No. 09-CV-3224

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION OF DEFENDANTS PAUL JOHNSON & SONS CATTLE CO., INC., ROBERT A. JOHNSON AND KERI J. MALOLEY FOR SUMMARY JUDGMENT**

---

## INTRODUCTION

The Motion for Summary Judgment filed by Defendants Paul Johnson & Sons Cattle Co., Inc., Robert A. Johnson and Keri J. Maloley (collectively, "the PJSCC Defendants") ignores the language of their own pleadings, ignores the applicable law and takes the plain language of the financing statement filed by Plaintiff LOL Finance Company ("LOLFC") completely out of context. As set forth in LOLFC's Memorandum

of Law in support of its Motion for Summary Judgment, the PJSCC Defendants' arguments and defenses fail as a matter of law.

## STATEMENT OF FACTS

A full and complete recitation of the facts of this case, supported by detailed citations to the record as required by NECivR 56.1(a), is set forth in LOLFC's Memorandum of Law in support of its Motion for Summary Judgment. (See Docket No. 154, pp. 3-29).

## RESPONSE TO THE PJSCC DEFENDANTS' PURPORTED STATEMENT OF UNCONTROVERTED FACTS

LOLFC responds to the PJSCC Defendants' purported "Statement of Uncontroverted Facts" as follows:

3.     It is uncontroverted that Johnson Feedlot's UCC lien on the cattle in Nebraska was filed prior to LOL's Nebraska UCC lien. (Depo. Ex. 1, 2).

**RESPONSE**:  LOLFC admits that Defendant Paul Johnson & Sons Cattle Co., Inc. ("PJSCC") filed a financing statement with the Nebraska Secretary of State on February 22, 2006, identifying itself as the "creditor," Maverick Feeders, Inc. ("Maverick") as the "debtor" and describing the collateral as "all livestock." (Depo. Ex. 1 (Miesen SJ Aff. Ex. N)).  LOLFC further admits that it filed a financing statement with the Nebraska Secretary of State on June 3, 2009, identifying itself as the "creditor," Third-Party Defendants Maverick Feeders, Inc., Shon D. Sawyer and Julie K. Sawyer (hereinafter collectively referred to as "Debtors") as "debtors" and describing the collateral as "[a]ll Cattle whether now owned or hereinafter acquired by [Debtors] placed with 4-Square Cattle Services under a Cattle Consulting Agreement executed between

2

[sic] by and between [Debtors] and 4-Square Cattle Services . . . ."  (McKay SJ Aff. ¶ 23 and Ex. G).  The June 30, 2006, financing statement referenced by the PJSCC Defendants was filed with the South Dakota Secretary of State, not the Nebraska Secretary of State.  (Depo. Ex. 2 (Miesen SJ Aff. Ex. O)).  The June 30, 2006, financing statement was also terminated by Defendant First National Bank of Omaha ("FNBO") on January 29, 2007.  (Miesen SJ Aff. Exs. O-P; Kalkowski Depo. p. 41, lines 14-19).  LOLFC denies that the PJSCC Defendants' Nebraska financing statement applied to the Maverick Cattle (as defined in LOLFC's Memorandum of Law in Support of its Motion for Summary Judgment), that the PJSCC Defendants' Nebraska financing statement was filed in the proper jurisdiction or that any purported security interest acquired by the PJSCC Defendants is superior to LOLFC's prior, perfected security interest.  (See LOLFC's SJ Memo. of Law pp. 32-45).

4.     It is uncontroverted that LOL's purported lien on the cattle in South Dakota does not give adequate notice.  The description of the collateral in LOL's South Dakota lien is both inaccurate and ambiguous in its terms (Ex. 8, 9, 10, 11, 12, 13).

**RESPONSE:**  The PJSCC Defendants' Statement of Uncontroverted Fact No. 4 sets forth legal arguments and conclusions, not statements of fact as required by NECivR 56.1(a).  The PJSCC Defendants' legal arguments and conclusions are denied.  The collateral description set forth in LOLFC's Commercial Security Agreement and financing statement is legally sufficient as a matter of law.  (See LOLFC's SJ Memo. of Law pp. 33-45).

5.     It is uncontroverted what the terms "placed", "placed" and "placements" mean in the cattle industry.  It is also uncontroverted that LOL's use of the term "placed" in it's [sic] liens in both South Dakota and Nebraska does not comply with common

industry definitions and that the language is at best misleading and vague (Ex. 8, 9, 10, 11, 12, 13).

**RESPONSE:** The PJSCC Defendants' Statement of Uncontroverted Fact No. 5 sets forth legal arguments and conclusions, not statements of fact as required by NECivR 56.1(a). The PJSCC Defendants' legal arguments and conclusions are denied. LOLFC's Commercial Security Agreement and financing statement describe the collateral as "All of the cattle whether now owned or hereafter acquired by Debtor and placed by Debtor with 4-Square Cattle Management Services under a Cattle Consulting Agreement executed between Debtor and 4-Square Cattle Management Services . . . ." (McKay SJ Aff. ¶¶ 10-11 and Exs. B-C). The term "placed," as used in LOLFC's Commercial Security Agreement and financing statement, clearly and unambiguously refers to cattle placed by Debtors with 4-Square Cattle Services ("4-Square") for consulting services under a Cattle Consulting Agreement. (LOLFC's SJ Memo. of Law pp. 33-45). The record before the Court conclusively shows that the Maverick Cattle were, in fact, placed by Debtors with 4-Square for consulting services pursuant to a Cattle Consulting Agreement. (Sawyer Aff. ¶¶ 10-11; Sauder Aff. ¶¶ 8-12 and Exs. B-E).

6.    It is undisputed that no cattle could ever be placed with 4-Square for feed or for any other purpose (Ex. 6 and 7).

**RESPONSE:** The PJSCC Defendants' Statement of Uncontroverted Fact No. 6 sets forth legal arguments and conclusions, not statements of fact as required by NECivR 56.1(a). The PJSCC Defendants' legal arguments and conclusions are denied. The record before the Court conclusively shows that the Maverick Cattle were, in fact, placed

by Debtors with 4-Square for cattle-consulting services pursuant to a Cattle Consulting Agreement.  (Sawyer Aff. ¶¶ 10-11; Sauder Aff. ¶¶ 8-12 and Exs. B-E).

## ARGUMENT

## LOLFC'S SECURITY INTEREST IS PRIOR AND SUPERIOR TO ANY ALLEGED INTEREST IN THE MAVERICK CATTLE AND PROCEEDS CLAIMED BY THE PJSCC DEFENDANTS.

Although it is not entirely clear, the PJSCC Defendants appear to be making two arguments in support of their Motion for Summary Judgment.  First, the PJSCC Defendants argue that they have an "agricultural lien" that is superior to LOLFC's security interest.  Second, the PJSCC Defendants argue that the collateral description contained in LOLFC's financing statement is insufficient. As set forth in LOLFC's Memorandum of Law in support of its Motion for Summary Judgment, both of these arguments fail as a matter of law.

### A.    The PJSCC Defendants Do Not Have Any Valid Interest in The Maverick Cattle and Proceeds.

In their Answer to LOLFC's First Amended Complaint, the PJSCC Defendants claimed that their interest in the Maverick Cattle and related proceeds was based upon a security interest:

> 60.    PJSCC is a perfected creditor with a perfected security interest in the cattle because is the creditor identified in a security agreement, perfected by the filing of an appropriate financing statement, with the Nebraska Secretary of State.  The security agreement is dated November 12, 2007.  The original financing statement was filed March [sic] 22, 2006.  The security agreement has been in full force and effect at all relevant times and applies to the cattle.  Paul Johnson & Sons Cattle Co., Inc. perfected its security interest in South Dakota on June 30, 2006, PJSCC's filings are prior to those of the [sic] LOLFC.

5

(PJSCC Answer ¶ 60 (Docket No. 25) (emphasis added); see also PJSCC Third-Party Complaint ¶¶ 6-9 (Docket No. 26)(confirming that the PJSCC Defendants' claims are based upon "financing statements and security agreements"); Report of Parties' Rule 26(f) Planning Conference pp. 6-8 (Docket No. 50)((same)).

The law is clear that "while a debtor is located in a jurisdiction, the local of that that jurisdiction governs perfection . . . of a security interest in collateral." Neb. Rev. Stat. (UCC) § 9-301(1). Maverick is a South Dakota corporation with its principal place of business located in Hurley, South Dakota. (First Amended Complaint ¶ 11; PJSCC Answer ¶ 11; FNBO Answer ¶ 11). The Sawyers are a married couple who have continuously resided in Hurley, South Dakota, since 1995. (Sawyer Aff. ¶ 3; Johnson Depo. p. 25, lines 16-24; Maloley Depo. p. 31, lines 4-21). Consequently, at all pertinent times, Debtors were "located" in South Dakota. Neb. Rev. Stat. § 9-307(b)(1) and (2). Because Debtors were and are located in South Dakota, the law of South Dakota governs "perfection" of any security interest in the Maverick Cattle and proceeds.

There is no dispute that LOLFC was the first to file in South Dakota. (McKay Aff. ¶ 10 and Ex. C). In fact, the PJSCC Defendants are not identified as a "creditor" in any financing statement filed in South Dakota. The only South Dakota financing statements at issue in this case identify FNBO, not the PJSCC Defendants, as the "creditor." (Depo. Exs. 2 and 4 (Miesen Aff. Exs. O and R)). The first financing statement (filed on June 30, 2006) was terminated by FNBO on January 29, 2007. (Miesen SJ Aff. Ex. O-P; Kalkowski Depo. p. 41, lines 14-19). The second financing statement (filed on January 26, 2007) was filed almost four years after LOLFC filed its

6

February 28, 2003, financing statement.  (Depo. Ex. 4 (Miesen SJ Aff. Ex. R); McKay SJ Aff. ¶ 10 and Ex. C).

Apparently realizing the deficiencies in their claimed security interest, the PJSCC Defendants now argue that their interest in the Maverick Cattle is based upon an "agricultural lien."  (PJSCC Defendants' Memo. of Law pp. 4-5).  As an initial matter, the PJSCC Defendants' allegations are directly contrary to the specific allegations set forth in their Answer, as quoted above.  The PJSCC Defendants cannot obtain or avoid summary judgment by contradicting the specific allegations in their pleadings.  Nat. Surety Corp. v. Ranger Ins. Co., 260 F.3d 881, 886 (8th Cir. 2001)("Judicial efficiency demands that a party not be allowed to controvert what it has already unequivocally told a court by the most formal and considered means possible"); Knudsen v. U.S., 254 F.3d 747, 752 (8th Cir. 2001)(same-party cannot avoid summary judgment by contradicting his pleadings); Roberson v. City of Austin, 2007 U.S. Dist. LEXIS 67991 **2-3 (D. Minn. 2007)("A party cannot create a genuine issue as to a material fact – and thereby avoid summary judgment – by making an allegation in a pleading and then contradicting that allegation . . . ."); Phillips v. Avis, Inc., 1996 U.S. Dist. LEXIS 7342 *5 ("A party opposing a motion for summary judgment cannot attempt to avoid summary judgment by contradicting its express factual assertions, because a party's assertion of fact in a pleading is a judicial admission by which it is bound throughout the course of the proceeding").

Moreover, the PJSCC Defendants do not have any valid "agricultural lien."  The only potential agricultural lien available to the PJSCC Defendants would have been an

agister's lien under Neb. Rev. Stat. § 54-201.  See Neb. Rev. Stat. (UCC) § 9-102(5).

There is no dispute that the PJSCC Defendants received full payment of all of their fees

for feeding and caring for the Maverick Cattle.  (Johnson Depo. p. 86, line 7, through p.

87, line 4; Maloley Depo. p. 87, lines 13-18; Kalkowski Depo. p. 219, line 18, through p.

220, line 7).  Indeed, they extracted $319,190.53 more than their actual fees and costs for

feeding and caring for the Maverick Cattle through bogus "feed adjustments" and errors

in the cattle close-out statements.  (Depo. Exs. 6-11 (Miesen SJ Aff. Ex. B); LOLFC's SJ

Memo. of Law pp. 17-18; Johnson Depo. p. 222, lines 2-13; Maloley Depo. p. 183, line

21, through 185, line 13, and p. 188, line 1, through p. 189, lined 25).  Consequently, any

agister's lien that the PJSCC Defendants may have held was extinguished through

payment.  See Graff v. Burnett, 226 Neb. 710, 715, 414 N.W.2d 271, 275-76 (1987);

Sticknell v. Haggerty, 158 Neb. 34, 38-39, 62 N.W.2d 107, 109 (1954).  Moreover, the

PJSCC Defendants' agister's lien only applied to the Maverick Cattle.  It could not be

extended to pay for any other debts, including alleged debts relating to prior groups of

cattle.  See Neb. Rev. Stat. § 54-201(2)(agister's lien only applies to "such livestock" that

were actually fed and cared for by the agister).

### B.    The Collateral Description Contained in LOLFC's Commercial Security Agreement and Financing Statement is Sufficient as a Matter of Law.

The PJSCC Defendants also claim that the collateral description contained in

LOLFC's financing statement is legally insufficient.  In support of their argument, the

PJSCC Defendants have submitted declarations from their friends and colleagues in the

cattle industry[1] claiming that the term "placed," no matter how it is used, only has one meaning in the cattle industry—placement of cattle on feed in a cattle feedlot. As set forth in LOLFC's Memorandum of Law in support of its Motion for Summary Judgment, as well as LOLFC's Memorandum of Law in support of its Motion in Limine to Exclude Expert Testimony, this argument fails as a matter of law.

Under Revised Article 9 of the Uniform Commercial Code, a financing statement is legally sufficient, among other things, if it "indicates the collateral covered by the financing statement." Neb. Rev. Stat. (UCC) § 9-502(a)(3). A financing statement "sufficiently indicates the collateral" if it provides a description of the collateral pursuant to Neb. Rev. Stat. (UCC) § 9-108 or an indication that it covers all assets or all personal property. Id. § 9-504.[2] A collateral description is sufficient under Section 9-108 if it "reasonably identifies" the collateral. Id. § 9-108(a). A financing statement may contain "minor errors or omissions" as long as they do not make the financial statement "seriously misleading." Id. § 9-506(a).

The provisions of revised Article 9 relating to financing statements establish a system of "notice filing." Id. § 9-502 Official Comment No. 1. A financing statement is

---

[1] The PJSCC Defendants rely primarily on a declaration submitted by Judith Ackland, who is the Chief Financial Officer of Biegert, LLC. Biegert, LLC is the company that conspired with the PJSCC Defendants and their counsel to try to convert the proceeds from the sale of the Maverick Cattle by using the bogus "Biegert Assignment." (LOLFC's SJ Memo. of Law pp. 18-19).

[2] The PJSCC Defendants argue that a collateral description that refers to "all of the debtor's assets" or "all of the debtor's property" is insufficient. (PJSCC Defendants' Memo. of Law p. 4, n. 1). This rule is only true for security agreements. A different standard applies to financing statements. Revised Article 9 specifically allows a financing statement to contain a very broad, generic collateral description, including "all assets or all personal property." Neb. Rev. Stat. (UCC) § 9-504(2).

not required to actually describe the collateral.  Thorp Commercial Corp. v. Northgate Indus., Inc., 654 F.2d 1245, 1248 (8th Cir. 1981) ("The description of collateral in the financing statement does not function to identify the collateral and define the property which the creditor may claim . . . ."); In re Cushman Bakery, 526 F.2d 23, 28 (5th Cir. 1975) ("a financing statement is not intended to enable other creditors to learn the 'true nature' of the secured transaction"), cert. denied, 425 U.S. 937 (1976); First Bank v. Eastern Livestock Co., 837 F. Supp. 792, 799 (S.D. Miss. 1993) ("in order to perfect a security interest, [a financing statement] need not specifically identify the property which is the subject of a security interest"); In re Bob Schwermer & Assocs., Inc., 27 B.R. 304, 309 (Bankr. N.D. Ill. 1983) ("the financing statement is not intended to enable other creditors to learn the 'true nature' of the secured transaction").  Instead, the purpose of a financing statement is simply to provide notice to interested third parties that the debtor's assets might be subject to a preexisting security interest.  Thorp, 654 F.2d at 1248-49; Cushman, 526 F.2d at 28; Ag Venture Financial Services, Inc. v. Montagne, 409 B.R. 685, 698 (Bankr. D. Vt. 2009) ("A financing statement is intended merely to put creditors on notice that further inquiry is prudent"); First Bank, 837 F. Supp. at 799 ("the sole function of financing statements . . . is to put third parties – usually prospective buyers or lenders – on notice that there may be an enforceable security interest in the property of the debtor"); Bob Schwermer, 27 B.R. at 309; Border State Bank v. Bagley Livestock Exchange, Inc., 690 N.W.2d 326, 331 (Minn. Ct. App. 2003), pet. for rev. denied (Minn.

Feb. 23, 2005).  As stated by the drafters of Revised Article 9:

> This section adopts a system of "notice filing."  What is required to be filed is . . . only a <u>simple record providing a limited amount of information</u> (financing statement). * * * The notice itself indicates merely that a person <u>may</u> have a security interest in the collateral indicated.  <u>Further inquiry from the parties concerned will be necessary to disclose the complete state of affairs</u>.  Section 9-210 provides a statutory procedure under which the secured party, at the debtor's request, may be required to make disclosure.  However, in many cases, information may be forthcoming without the need to resort to the formalities of that section.

Neb. Rev. Stat. (UCC) § 9-502 Official Comment 1 (emphasis added).

A financing statement is simply intended to be a "starting point" for investigation by interested third parties.  <u>In re Outboard Marine Corp.</u>, 300 B.R. 308, 320 (Bankr. N.D. Ill. 2003) (quoting <u>In re Environmental Aspecs, Inc.</u>, 235 B.R. 378, 385 (E.D.N.C. 1999)).  "Further inquiry, beyond the financing statement, is thus required, with the burden of that inquiry placed on anyone in search of additional information."  <u>Outboard Marine</u>, 300 B.R. at 320.  Because the purpose of a financing statement is simply to provide notice, courts liberally and leniently construe collateral descriptions.  <u>CLC Equipment Co. v. Brewer</u>, 139 F.3d 543, 545 (5th Cir. 1998) ("Collateral descriptions are liberally construed"); <u>U.S. v. Collingwood Grain, Inc.</u>, 792 F.2d 972, 974 (10th Cir. 1986) ("The consistent trend of courts construing the Uniform Commercial Code is to be lenient in judging the sufficiency of descriptions in financing statements"); <u>In re Tri-State Equipment, Inc.</u>, 792 F.2d 967, 971 (10th Cir. 1986); <u>Bob Schwermer</u>, 27 B.R. at 309; <u>Border State</u>, 690 N.W.2d at 331 ("We liberally construe descriptions in the security agreement and financing statement because their essential purpose is to provide notice,

11

not to definitively describe each item of collateral"); <u>Polk County Bank v. Graven</u>, 745 S.W.2d 793, 795 (Mo. Ct. App. 1988).

Based upon the foregoing principles, the true test for the sufficiency of a collateral description in a financing statement is whether the description contains just enough information "to induce a subsequent creditor to make further inquiries." <u>Thorp</u>, 654 F.2d at 1249; <u>U.S. v. Southeast Mississippi Livestock Farmers Assoc</u>., 619 F.2d 435, 439 (5th Cir. 1980) (upholding financing statements because "any reasonable party examining the financing statements . . . would have been sufficiently alerted to direct an inquiry to [the secured creditor]"); <u>Bryan Brothers Cattle Co. v. Glenbrook Cattle Co., LLC</u>, 2006 U.S. Dist. LEXIS 29926 **24-25 (N.D. Miss. 2006) (financing statement upheld because it was "sufficient to put a reasonable purchaser on notice that it should at least inquire into the status of the cattle in question"); <u>In re Pickle Logging, Inc.</u>, 286 B.R. 181, 184 (Bankr. M.D. Ga. 2002) ("The description merely needs to raise a red flag to a third party indicating that more investigation may be necessary to determine whether or not an item is subject to a security agreement"); <u>In re Van Rhee</u>, 80 B.R. 844, 846 (W.D. Mich. 1987) (affirming bankruptcy court's ruling upholding collateral description in financing statement because it was "sufficient to notify third parties that additional inquiry may have been warranted"); <u>Flores de N.M., Inc. v. Bandra Negra Intern., Inc</u> 151 B.R. 571, 583 (Bankr. D. N.M. 1993) ("A description contained within a financing statement is thus sufficient if it puts a potential lender on notice to inquire whether a security interest exists"); <u>Moffat County State Bank, v. Producers Livestock Marketing Assoc</u>., 598 F. Supp. 1562, 1567 (D. Colo. 1984), <u>aff'd</u>, 833 F.2d 1562 (10th Cir. 1987).  Even a

12

collateral description that is vague or ambiguous can pass this test.  Indeed, vague or ambiguous descriptions, by their very nature, prompt further inquiry.  <u>Tri-State</u>, 792 F.2d at 971-72; <u>Thorp</u>, 654 F.2d at 1249-53; <u>Bryan Brothers</u>, 2006 U.S. Dist. LEXIS at **24-25; <u>First Bank</u>, 837 F.Supp. at 800.  "Only where the financing statement does not perform its notice function by reason of an inadequate, ambiguous or misleading description of the encumbered property will it be deemed insufficient to constitute perfection of the secured party's interest in the collateral."  <u>First Bank</u>, 837 F. Supp. at 800 (cases cited therein); <u>In re Katz</u>, 563 F.2d 766, 768-69 (5th Cir. 1977).

In this case, LOLFC's financing statement clearly and unambiguously describes the collateral as "[a]ll of the cattle whether now owned or hereafter acquired by [Debtors] and placed by [Debtors] under a Cattle Consulting Agreement executed between [Debtors] and 4-Square]."  (McKay SJ Aff. Ex. C).  There is only one minor mistake in LOLFC's financing statement.  In one place, the word "Debtor" is incorrectly spelled "Debtorr."  (<u>Id</u>. Ex. C).  This minor and obvious mistake clearly does not make the financing statement "seriously misleading."  Neb. Rev. Stat. (UCC) § 9-506(a).

The PJSCC Defendants' argument that the term "placed" is some special term of art in the cattle industry that can only refer to cattle placed on feed at a feedlot is belied by the other security agreements and financing statements at issue in this case.  The security agreements and financing statements relied upon by the PJSCC Defendants and FNBO do not refer to cattle "placed" at the PJSCC Defendants' feedlot.  To the contrary, they refer to cattle "located" at the PJSCC Defendants' feedlot and cattle "in the care and possession" of the PJSCC Defendants.  (Depo. Exs. 2, 3 and 4 (Miesen SJ Aff. Exs. O, Q

13

and R)).[3]  If the term "placed" were some special term of art that solely and exclusively referred to physical delivery of cattle to a feedlot, then clearly the PJSCC Defendants and FNBO would have used that special term in their own security agreements and financing statements.

The PJSCC Defendants' argument that the word "placed" can only have one meaning in the cattle industry is also patently absurd.  The term "placed" can have a number of meanings in the cattle industry, depending upon the context in which it is used.  Cattle can be "placed on" pasture.  Cattle can be "placed under" a delivery contract with a meat-packing company.  Cattle can be "placed in" a meat-packing plant.  Cattle can be "placed on" the Chicago Board of Trade under a futures contract.  (McKay SJ Aff. ¶ 13; McKay Depo. p. 180, lines 1-25, and p. 183, line 21 through p. 185, line 19).  In the context of LOLFC's financing statement, the term "placed" clearly and unambiguously means cattle "placed with" 4-Square for cattle-consulting services under a Cattle Consulting Contract.  (McKay SJ Aff. Ex. C).  Any reasonable person reviewing the collateral description contained in LOLFC's financing statement would understand that the term "placed" does not refer to physical placement of cattle "at" any particular location, but instead refers to legal placement of cattle "with" 4-Square "under a Cattle Consulting Agreement."

If the collateral description contained in LOLFC's financing statement referred to cattle "placed at 4-Square feedlot" or even cattle placed "at" some location, the PJSCC

---

[3]    Financing statements filed by Debtors' other creditors similarly describe cattle collateral as assets or livestock "in the care or possession" or "in the possession" of cattle feedlots.  (See Miesen SJ Aff. Ex. S).

Defendants might have an argument.  The description, however, contains no such language.  It does not refer to <u>any</u> geographic location.  It does not even refer to cattle placed "at" 4-Square.  Instead, it plainly refers to cattle placed "with" 4-Square <u>under a contract</u>.  (McKay Aff. Ex. C and G).  Moreover, the referenced contract is not a "feeding agreement" or a "feedlot agreement."  Instead, the referenced contract is a "Cattle <u>Consulting</u> Agreement."  (<u>Id</u>.) (emphasis added).  Defendants readily admit that a company can provide cattle-consulting services without owning or operating a feedlot.  As Mr. Kalkowski testified:

> Q:     Does the collateral description refer to any feedlot operated by 4-Square.
>
> A:     Not that I see.
>
> Q:     Does the collateral description refer to cattle placed under a cattle feeding or cattle feedlot agreement.
>
> A:     It referenced a cattle consulting agreement.
>
> Q:     Which doesn't mean – which isn't feeding or feedlot, is it?
>
> A:     No, it does not say feeding or feedlot.
>
> Q:     And instead, what it refers to is cattle placed with 4-Square under a cattle consulting agreement, doesn't it?
>
> A:     It does say that.
>
> Q:     What does consulting mean to you?
>
>                                 * * *
>
> A:     A whole range of things.  In cattle consulting, it could be purchase, feeding, care, marketing, arrangement of financing.

Q:      Would you agree that a company can provide cattle consulting services without operating a feedlot?

A:      Yes.

(Kalkowski Depo. p. 117, line 17, through p. 118, line 6, and p. 118, lines 9-14).

In sum, the PJSCC Defendants' entire argument hinges upon the term "placed" in LOLFC's financing statement being viewed in isolation and taken out of context. When placed in the context of the entire description, the term "placed" clearly means cattle placed by Debtors with 4-Square for cattle-consulting services under a Cattle Consulting Agreement. The description reasonably describes the collateral. At a bare minimum, applying the lenient and liberal standard for construing financing statements, the description was clearly sufficient to prompt a reasonable person to at least conduct a further inquiry. Even if the term "placed," as it is used in LOLFC's financing statement, could be twisted out of context to have more than one meaning, any ambiguity regarding that term would, in and of itself, prompt additional inquiry by interested parties. Tri-State, 792 F.2d at 971-72; Thorp, 654 F.2d at 1249-53; Bryan Brothers, 2006 U.S. Dist. LEXIS at **24-25; First Bank, 837 F.Supp. at 800. Accordingly, the collateral description is sufficient as a matter of law.

Finally, it should be emphasized that any feigned confusion by the PJSCC Defendants regarding the collateral description contained in LOLFC's financing statement was resolved long before the sale of the Maverick Cattle. LOLFC notified the PJSCC Defendants and FNBO both orally and in writing of its security interest in and 4-Square's involvement with the Maverick Cattle in June 2009. (McKay SJ Aff. ¶¶ 24-27,

16

30 and 32 and Exs. H-J and L; Johnson Depo. p. 54, line 4, through p. 57, line 20; Maloley Depo. p. 55, lines 7-25; Kalkowski Depo. p. 141, line 8, through p. 143, line 10, p. 149, line 4, through p. 151, lines 1-10, and p. 153, line 3, through p. 155, line 22).  In June 2009, 4-Square sent the PJSCC Defendants ear tags bearing the 4-Square logo to be placed on the Maverick Cattle.  (Sauder Aff. ¶¶ 15-16 and Exs. I-J; Maloley Depo. p. 57, line 1, through p. 58, line 5; Johnson Depo. p. 59, lines 12-17; Kalkowski Depo. p. 162, lines 1-11, and p. 305, lines 5-11).  Defendants admit that they knew the sole purpose of the ear tags was to identify the Maverick Cattle as 4-Square cattle.  (Maloley Depo. p. 59, lines 22-25; Kalkowski Depo. p. 163, line 6, through p. 164, line 3; Johnson Depo. p. 59, line 18, through p. 60, line 12).  4-Square also inspected the Maverick Cattle on a monthly basis while they were located at the PJSCC Defendants' feedlot.  (Sauder Aff. ¶¶ 17-18 and Exs. K-Q; Johnson Depo. p. 61, line 14, through p. 65, line 6; Maloley Depo. p. 67, line 5, through p. 68, line 17; Kalkowski Depo. p. 164, lines 4-21).  The PJSCC Defendants themselves furnished 4-Square with monthly feed invoices and reports so that 4-Square could monitor the performance of the Maverick Cattle.  (Sauder Aff. ¶ 19 and Exs. R-T; Maloley Depo. p. 60, line 1, through p. 67, line 1; Johnson Depo. p. 65, line 1, through p. 66, line 5; Kalkowski Depo. p. 164, line 22, through p. 165, line 1, and p. 305, lines 16-19).  By the end of the summer of 2009, the PJSCC Defendants and FNBO were so thoroughly convinced of the priority of LOLFC's security interest that they agreed, according to FNBO's Vice President, Chris Kalkowski, to turn all of the proceeds from the sale of the Maverick Cattle, less the PJSCC Defendants' fees for feeding and caring for the Maverick Cattle, over to LOLFC.  (Kalkowski Depo. p. 186, line 25, through p.

188, line 9).  Unfortunately, when the proceeds from the sale of the Maverick Cattle came rolling in, they changed their minds.

## CONCLUSION

As thoroughly addressed in LOLFC's Memorandum of Law in support of its Motion for Summary Judgment, the PJSCC Defendants' defenses and arguments fail as a matter of well-established law.  Accordingly, LOLFC respectfully requests that the PJSCC Defendants' Motion for Summary Judgment be denied by the Court in all respects.

Respectfully submitted,

STOEL RIVES LLP


By: s/Jonathan C. Miesen
     Jonathan C. Miesen
     Minn. Atty. Reg. No. 19752X

Dated:  September 27, 2010

Suite 4200
33 South Sixth Street
Minneapolis, MN 55402
Telephone:   (612) 373-8810
Facsimile:   (612) 373-8881
E-mail:         JCMiesen@stoel.com

Attorneys for Plaintiff

70308306.1 0099999-00001

18