UNITED STATES DISTRICT COURT

DISTRICT OF NEBRASKA

---

LOL Finance Company,

        Plaintiff,

v.

Paul Johnson & Sons Cattle Co., Inc., First
National Bank of Omaha, Robert P. Johnson
Keri J. Maloley, John Doe and ABC
Company,

        Defendants.

_____

Paul Johnson & Sons Cattle Co., Inc.,

        Third-Party Plaintiff,

v.

Maverick Feeders, Inc., Shon Sawyer and
Julie Sawyer,

        Third-Party Defendants.

Case No. 09-CV-3224

**PLAINTIFF'S MEMORANDUM OF
LAW IN OPPOSITION TO
MOTION OF DEFENDANT FIRST
NATIONAL BANK OF OMAHA
FOR SUMMARY JUDGMENT**

---

## INTRODUCTION

The Motion for Summary Judgment filed by Defendant First National Bank of
Omaha ("FNBO") fails because it is based upon new defenses that were never pleaded or
otherwise raised in this case.  Moreover, FNBO's new defenses, even if they had been
properly raised, fail as a matter of law.  Accordingly, Plaintiff LOL Finance Company

("LOLFC") respectfully requests the Court to deny FNBO's Motion for Summary Judgment in all respects.

## STATEMENT OF FACTS

A full and complete recitation of the facts of this case, supported by detailed citations to the record as required by NECivR 56.1(a), is set forth in LOLFC's Memorandum of Law in support of its Motion for Summary Judgment.  (Docket No. 154, pp. 3-29).

## RESPONSE TO FNBO'S STATEMENT OF UNDISPUTED MATERIAL FACTS

LOLFC responds to FNBO's Statement of Undisputed Material Facts as follows:

**RESPONSE TO STATEMENT OF FACT NO. 1:**   LOLFC      admits      the allegations set forth in Statement of Fact No. 1.

**RESPONSE TO STATEMENT OF FACT NO. 2:**   LOLFC      admits      the allegations set forth in Statement of Fact No. 2, but affirmatively alleges that FNBO never pleaded or otherwise raised any alleged right of "set off" in this case.  Instead, FNBO only alleged two grounds to substantiate its claim to the proceeds from the sale of the cattle at issue in this case ("Maverick Cattle").  First, FNBO claimed that it has a security interest in PJSCC's "accounts receivable" and that the proceeds from the sale of the Maverick Cattle constitute PJSCC's account receivable.  (FNBO Answer ¶ 33). Second, FNBO claimed that Third-Party Defendant Maverick Feeders, Inc. ("Maverick") granted it a security interest in the Maverick Cattle and proceeds.  (Id. ¶¶ 34 and 60).  The sole witness identified by FNBO in its initial disclosures, Christopher Kalkowski,

confirmed, under oath, that these were the <u>only</u> grounds asserted by FNBO to substantiate

its claim to the proceeds.  (FNBO Disclosures p. 2 (Docket No. 98); Kalkowski Depo. p.

26, line 19, through p. 30, line 9).

**RESPONSE TO STATEMENT OF FACT NO. 3:**   <u>See</u> Response to Statement

of Fact No. 2, above.

**RESPONSE TO STATEMENT OF FACT NO. 4:**   <u>See</u> Response to Statement

of Fact No. 2, above.  In addition, the Central Account, from which FNBO used proceeds

from the sale of the Maverick Cattle to pay down the credit lines of Defendant Paul

Johnson & Sons Cattle Co., Inc. ("PJSCC"), is not a deposit account.  (Maloley Depo. p.

22, lines 8-16; Supp. Kalkowski Depo. p. 46, line 14, through p. 47, line 17; Kalkowski

Depo. p. 216, lines 10-25).

**RESPONSE TO STATEMENT OF FACT NO. 5:**   <u>See</u> Response to Statement

of Fact No. 2, above.  The Terms and Conditions speak for themselves.

**RESPONSE TO STATEMENT OF FACT NO. 6:**   <u>See</u> Response to Statement

of Fact No. 2, above.   In addition, the Central Account, from which FNBO removed

proceeds from the sale of the Maverick Cattle to pay down PJSCC's credit lines, is not a

deposit account.  (Maloley Depo. p. 22, lines 8-16; Supp. Kalkowski Depo. p. 46, line 14,

through p. 47, line 17; Kalkowski Depo. p. 216, lines 10-25).

**RESPONSE TO STATEMENT OF FACT NO. 7:**   LOLFC      admits      the

allegations set forth in Statement of Fact No. 7.

**RESPONSE TO STATEMENT OF FACT NO. 8:**   LOLFC admits that PJSCC

finished cattle for Maverick on several occasions in the past, but denies the remaining

allegations set forth in Statement of Fact No. 8.  (Johnson Depo. p. 18, lines 14-17, and p. 22, line 24, through p. 23, line 10).

**RESPONSE TO STATEMENT OF FACT NO. 9:**  LOLFC    admits    that Maverick allowed PJSCC to feed and market cattle that Maverick delivered to PJSCC's feedlot.  (Johnson Depo. p. 18, lines 14-17, and p. 22, line 24, through p. 23, line 10).

**RESPONSE TO STATEMENT OF FACT NO. 10:** LOLFC    admits    that Maverick allowed PJSCC to feed and market its cattle.  (Johnson Depo. p. 18, lines 14-17, and p. 22, line 24, through p. 23, line 10).  LOLFC denies that there was any course of dealing under which Maverick agreed that all proceeds would be deposited into any bank account of PJSCC at FNBO.  FNBO's citations to the record do not substantiate this allegation.

**RESPONSE TO STATEMENT OF FACT NO. 11:** LOLFC    admits    that    on November 12, 2007, PJSCC and Maverick entered into a contract entitled "LOC Master Promissory Note and Security Agreement/Margin" ("Security Agreement").  (Depo. Ex. 3 (Miesen SJ Aff. Ex. Q)).  LOLFC also admits that PJSCC assigned the Security Agreement to FNBO.  LOLFC denies FNBO's characterization of the collateral description contained in the Security Agreement.  The Security Agreement describes the collateral as "[a]ll of [Maverick's] livestock, including cattle, located on [PJSCC's] feedlot . . . ."  (Id.).  LOLFC also denies that any security interest created by the Security Agreement was perfected or has priority over LOLFC's perfected security interest.  (See LOLFC's SJ Memo. of Law pp. 32-52).

4

**RESPONSE TO STATEMENT OF FACT NO. 12:** LOLFC admits that it is claiming a priority security interest in the Maverick Cattle. LOLFC further admits that it is claiming that the Maverick Cattle were placed with 4-Square Cattle Services ("4-Square") for consulting services under a Cattle Consulting Agreement. LOLFC denies that Maverick was the sole owner of the Maverick Cattle. The Maverick Cattle were jointly owned by Maverick, Shon D. Sawyer and Julie K. Sawyer (hereinafter collectively referred to as "Debtors"). (Sawyer Aff. ¶¶ 11-14; Sauder Aff. ¶¶ 8-12 and Exs. B-E).

**RESPONSE TO STATEMENT OF FACT NO. 13:** LOLFC denies the allegations set forth in Statement of Fact No. 13. The early inspection reports indicate that the Maverick Cattle were ear-tagged with green ear tags bearing the 4-Square logo prior to being shipped to PJSCC's feedlot. (See Sauder Aff. ¶ 13 and Ex. F). Upon learning that the Maverick Cattle were not tagged after they were delivered to PJSCC's feedlot, 4-Square promptly sent PJSCC 4,000 ear tags bearing the 4-Square logo to be placed on the Maverick Cattle. (Id. ¶ 16 and Ex. I-J; Maloley Depo. p. 57, line 1, through p. 58, line 5). PJSCC and FNBO both understood that 4-Square sent the ear tags to PJSCC to indentify the Maverick Cattle as 4-Square cattle. (Maloley Depo. p. 59, lines 22-25; Kalkowski Depo. p. 163, line 6, through p. 164, line 3).

**RESPONSE TO STATEMENT OF FACT NO. 14:** LOLFC admits that PJSCC began selling the Maverick Cattle in September 2009. LOLFC denies that the sales were made in the ordinary course of business or consistent with any course of dealing or course of performance. The sales were made pursuant to a well-established plan

5

developed by PJSCC, FNBO and their attorneys to convert the proceeds from the sale of the Maverick Cattle in contravention of LOLFC's perfected security interest.   (See Statement of Fact Nos. 46-53 and 72-100 and related record citations set forth in LOLFC's SJ Memo. of Law).

**RESPONSE TO STATEMENT OF FACT NO. 15:**  LOLFC admits that PJSCC deposited most of the proceeds from the sale of the Maverick Cattle into its Business Checking Account with FNBO.  At least one check, representing proceeds from the sale of the Maverick Cattle in the amount of $491,534.72, was retained by PJSCC.  (See Statement of Fact Nos. 103-11 and related record citations set forth in LOLFC's SJ Memo. of Law).

**RESPONSE TO STATEMENT OF FACT NO. 16:**  LOLFC    admits    the allegations set forth in Statement of Fact No. 16, but affirmatively alleges that FNBO never pleaded or otherwise raised any alleged security interest in PJSCC's "deposit accounts" in this case.  Instead, FNBO only alleged two grounds to substantiate its claim to the proceeds from the sale of the Maverick Cattle.  First, FNBO claimed a security interest in PJSCC's "accounts receivable" and that the proceeds from the sale of the Maverick Cattle constitute PJSCC's account receivable.  (FNBO Answer ¶ 33).  Second, FNBO claimed that Maverick granted it a security interest in the Maverick Cattle and proceeds.  (Id. ¶¶ 34 and 60).  The sole witness identified by FNBO in its initial disclosures, Mr. Kalkowski, confirmed, under oath, that these were the only grounds asserted by FNBO to substantiate its claim to the proceeds.  (FNBO Disclosures p. 2 (Docket No. 98); Kalkowski Depo. p. 26, line 19, through p. 30, line 9).

**RESPONSE TO STATEMENT OF FACT NO. 17**: <u>See</u> Response to Statement of Fact No. 16, above.

**RESPONSE TO STATEMENT OF FACT NO. 18:** <u>See</u> Response to Statement of Fact No. 16, above. LOLFC denies that transfers or "sweeps" of PJSCC's Business Checking Account were conducted pursuant to any course of dealing or course of performance. Instead, the sweeps were performed automatically. (Kalkowski Depo. p. 196, lines 15-21). LOLFC also denies that any proceeds were taken by FNBO directly from PJSCC's Business Checking Account to pay down PJSCC's credit lines. Instead, the proceeds were first transferred into PJSCC's Central Account. (Kalkowski Depo. p. 214, line 1, through p. 215, line 9; Supp. Kalkowski Depo. p. 43, line 13, through p. 44, line 7). The Central Account is not a deposit account. (Maloley Depo. p. 22, lines 8-16; Supp. Kalkowski Depo. p. 46, line 14, through p. 47, line 17; Kalkowski Depo. p. 216, lines 10-25).

**RESPONSE TO STATEMENT OF FACT NO. 19:** <u>See</u> Response to Statement of Fact No. 16, above.

**RESPONSE TO STATEMENT OF FACT NO. 20:** <u>See</u> Response to Statement of Fact No. 16, above.

**RESPONSE TO STATEMENT OF FACT NO. 21:** <u>See</u> Response to Statement of Fact No. 16, above.

**RESPONSE TO STATEMENT OF FACT NO. 22:** <u>See</u> Response to Statement of Fact No. 16, above.

**RESPONSE TO STATEMENT OF FACT NO. 23:** <u>See</u> Response to Statement of Fact No. 16, above. In response to specific inquiries regarding the status of the proceeds from the sale of the Maverick Cattle, FNBO's Vice President, Mr. Kalkowski, assured LOLFC that the proceeds from the sale of the Maverick Cattle were being kept separate from PJSCC's other funds and were not being used to pay down PJSCC's credit lines with FNBO. (McKay SJ Aff. ¶¶ 31 and 34 and Ex. L). Mr. Kalkowski admits that he told LOLFC's Senior Loan Officer, Ronald C. McKay, that PJSCC was holding the proceeds until all of the Maverick Cattle had been sold. (Kalkowski Depo. p. 220, line 24, through p. 221, line 6; Depo. Ex. 52 (Miesen SJ Aff. Ex. M). Mr. Kalkowski further admits that he assured Mr. McKay that all of the proceeds, less the fees for feeding and caring for the Maverick Cattle, would be paid to LOLFC. (Kalkowski Depo. p. 186, line 25, through p. 188, line 9).

**RESPONSE TO STATEMENT OF FACT NO. 24:** <u>See</u> Response to Statement of Fact No. 16, above. LOLFC admits that FNBO and PJSCC's accounts were and are located in Nebraska. LOLFC further admits that the proceeds from the sale of the Maverick Cattle were sent to FNBO and PJSCC in Nebraska. The Maverick Cattle, however, were located in three separate states at various times. (Sawyer Aff. ¶¶ 11-14).

## ARGUMENT

## I. FNBO'S NEW, UNPLEADED DEFENSES OF "SET OFF" AND A SECURITY INTEREST IN PJSCC'S "DEPOSIT ACCOUNTS" FAIL AS A MATTER OF LAW.

FNBO relies upon two defenses to support its Motion for Summary Judgment. First, FNBO claims that it has a priority security interest in PJSCC's deposit accounts and

is entitled to immunity from conversion liability under Neb. Rev. Stat. (UCC) §§ 9-327 and 9-332. (FNBO Memo. of Law pp. 10-13 and 14-15). Second, FNBO claims that it has a right of "set off" under Neb. Rev. Stat. (UCC) § 9-340 and its loan documents, which is superior to LOLFC's security interest. (Id. pp. 13-14). These arguments fail as a matter of law for a number of reasons.

### A. FNBO Cannot Raise New Defenses at the Summary Judgment Stage of This Case.

The first reason why FNBO's defenses fail is because they have never been part of this case. FNBO did not plead a right of set off or a security interest in PJSCC's deposit accounts as affirmative defenses or claims in this case. Instead, FNBO's claim to the proceeds from the sale of the Maverick Cattle has been based solely upon two allegations: (1) FNBO has a security interest in PJSCC's "accounts receivable" and the proceeds constitute PJSCC's account receivable; and (2) Maverick granted FNBO a security interest in the Maverick Cattle and proceeds. (FNBO Answer ¶¶ 33-34 and 60 (Docket No. 37)). As set forth in FNBO's Answer:

> 33.    FNBO denies the allegations of paragraph 33 of the Complaint. FNBO further affirmatively alleges that it has a perfected security interest in the accounts receivable of PJSCC which is prior and superior to any claim of LOLFC.
>
> 34.    FNBO denies the allegations of paragraph no 34 of the Complaint, and affirmatively alleges that FNBO's security interest in the assets of Maverick Feeders which were cared for by PJSCC is prior and superior to Plaintiff's rights.
>
> * * *
>
> 60.    FNBO is the holder of a perfected security interest in the cattle held by PJSCC and the proceeds therefrom pursuant to Financing Statements

filed with the office of the Nebraska Secretary of State, and <u>holds a valid and perfected security interest in cattle and proceeds</u> which is prior and superior to that of LOLFC.

(FNBO Answer ¶¶ 33-34 and 60 (Docket No. 37)(emphasis added)).

FNBO submitted an Answer to Debtors' Cross-Claims on September 21, 2010. (<u>See</u> Docket No. 161).  Even in this recent pleading, which was filed <u>only three days before it filed its Motion for Summary Judgment</u>, FNBO did not raise its new defenses. Instead, it incorporated the affirmative defenses that it asserted in response to LOLFC's First Amended Complaint.  (<u>Id</u>. pp. 5-6).

FNBO's new defenses were also not otherwise raised during the course of this case.  Until it filed its summary judgment motion, FNBO never claimed that it was relying on any right of set off or security interest in PJSCC's deposit accounts.  To the contrary, FNBO confirmed that it was relying <u>only</u> on the specific security interests pleaded in its Answer.

FNBO only identified one witness in its initial disclosures, Mr. Kalkowski. (FNBO Disclosures p. 2 (Docket No. 98)).  During his deposition, Mr. Kalkowski confirmed that FNBO's claim to the proceeds was based <u>solely</u> upon the specific security interests set forth in its Answer:

> Q:    In paragraphs 33 and 34 of its answer, FNBO claims to have certain security interests; correct?
>
> A:    In 33 it does.
>
> Q:    And in 34 it does as well?
>
> A:    Yes, it does.

Q:     In paragraph number 33, FNBO claims to have a security interest in Johnson feedlot's accounts receivable; correct.

A:     Yes.

Q:     And in paragraph number 34, FNBO claims to have a security interest in the assets of Maverick Feeders which were cared for by Johnson feedlot, do you see that?

A:     I do.

Q:     Is that referring to the cattle that Maverick delivered to Johnson feedlot in March and April of 2009?

A:     I believe it would.

* * *

Q:     In paragraph number 60, FNBO is repeating its assertion that it has a security interest in Maverick's cattle; correct?

A:     I don't see reference to Maverick's cattle in there.  It is repeating its interest in the cattle held by Paul Johnson & Sons and proceeds from there.

Q:     In the context of this case, do you understand that to refer to the cattle that Maverick delivered to Johnson feedlot in March and April of 2009?

A:     I would believe that that would be included in that statement.

Q:     After all, those are the cattle we're talking about in this case, right?

A:     Correct.

* * *

Q:     You understand that FNBO is claiming that it's entitled to the proceeds from the sale of Maverick's cattle, don't you?

A:     I believe that would be a true statement.

Q:     And my question to you is FNBO basing that claiming on the security interests that are referenced in its answer?

11

A:      That would be my correlation.

Q:      That's you understanding; correct?

A:      I would agree with that.

Q:      Is there any other basis for FNBO's claim that it's entitled to the proceeds from the sale of Maverick's cattle?

A:      There may be, but primarily would be the – our interest in our filing on Paul Johnson & Sons cattle.

Q;      If there are any other reasons why FNBO believes that it has an interest in those proceeds, I would like to hear about that.  What is your understanding of that topic?  Is there any other basis for FNBO's claim that it has a right to the proceeds from the sale of Maverick's cattle.  Are you aware of any such basis?

A:      We would have a security interest in – I am basing it on the idea that we have a security interest in the assets of Paul Johnson & Sons Cattle which include notes receivable and the proceeds from those.

Q:      But that's the same security interest that's referenced in the answer, right?

A:      I believe so, yes.

Q:      All right.  And I'm asking you is there any other basis that you're aware of for FNBO's claim that it's entitled to any of the proceeds from the sale of Maverick's cattle?

A:      Not at this moment.

(Kalkowski Depo. p. 27, line 5-21, p. 28, lines 1-14 and 25, p. 29, lines 1-25, and p. 30, lines 1-9).

The Affidavit submitted by Mr. Kalkowski in support of FNBO's summary judgment motion directly contradicts his deposition testimony, which was given only a month earlier.  Mr. Kalkowski now claims that FNBO's claim to the proceeds is based

upon a right of set off and a security interest in PJSCC's "deposit accounts." (See Kalkowski Aff. ¶¶ 8 and 10).

Set off is an affirmative defense that must be specifically pleaded. Arch Ins. Co. v. Precision Stone, Inc., 584 F.3d 33, 42 n. 6 (2d Cir. 2009)(numerous cases cited therein); Fed.R.Civ.P. 8(c)(1).   A right to proceeds based upon a competing security interest is also an affirmative defense that must be specifically pleaded. See Fed.R.Civ.P. 8(c)(1)("a party must affirmatively state any avoidance or affirmative defense").  FNBO waived these affirmative defenses by failing to raise them in its Answer. Piekarski v. Home Owners Savings Bank, F.S.B., 956 F.2d 1484, 1489 (8th Cir. 1992); Modern Leasing, Inc. of Iowa v. Falcon Mfg. of California, Inc., 888 F.2d 59, 62-63 (8th Cir. 1989); Sayre v. Musicland Group, Inc., 850 F.2d 350, 353-55 (8th Cir. 1988); Fed.R.Civ.P. 12(b).

The deadline for amending pleadings in this case expired over three months ago, on June 16, 2010.  (Final Progression Order p. 2 (Docket No. 51)).  FNBO never brought any motion to amend its Answer to state the new defenses it is now asserting in its summary judgment motion.  FNBO also never sought to amend the Final Progression Order to bring a motion to amend, as required by Rule 16(b)(4) of the Federal Rules of Civil Procedure.  FNBO has offered no explanation whatsoever for its failure to seek to amend its Answer or its failure to seek permission to amend the Final Progression Order to amend its Answer.  Under these circumstances, FNBO should not be permitted to assert new defenses at the summary-judgment stage of this case.  See Williams v.  Little Rock Mun. Water Works, 21 F.3d 218, 224-25 (8th Cir. 1994)(party seeking to add new

claims or defenses late in a case "must justify the belatedness of her motion [to amend]");
Bediako v. Stein Mart, Inc., 354 F.3d 835, 840-41 (8th Cir. 2004)(holding that district court properly denied motion to amend filed after discovery deadline and after opposing party had filed a summary judgment motion); Hammer v. City of Osage Beach, 318 F.3d 832, 844-45 (8th Cir. 2003)(same).  Similarly, FNBO should not be permitted to seek or avoid summary judgment by having Mr. Kalkowski contradict his prior deposition testimony.  See Progressive Northern Ins. Co. v. McDonough, 608 F.3d 388, 391 (8th Cir. 2010); American Airlines, Inc. v. KLM Royal Dutch Airlines, Inc., 114 F.3d 108, 111 (8th Cir. 1997).

FNBO's attempt to interject new defenses into this case at the eleventh hour is particularly egregious because it is simply the latest episode in a long history of misconduct in this case.  FNBO's failure to cooperate, failure to make disclosures, failure to respond to discovery and failure to respond to court orders have become legendary in this case.  FNBO's misconduct has been the subject of seven separate Orders issued by Magistrate Judge Zwart.  (See 07/14/10 Memorandum and Order (Docket No. 79); 07/22/10 Memorandum and Order (Docket No. 82); 08/02/10 Memorandum and Order (Docket No. 87); 08/09/10 Memorandum and Order (Docket No. 103); 08/11/10 Memorandum and Order (Docket No. 108); 08/19/10 Memorandum and Order (Docket No. 116); 09/01/10 Memorandum and Order (Docket No. 135)).  The following is a chronology of FNBO's misconduct:

1.     FNBO failed and refused to participate in the preparation of the parties' Rule 26(f) Report in violation of the Court's Memorandum and Order dated

14

February 8, 2010. (08/09/10 Memorandum and Order p. 1 (Docket No. 103); 06/09/01 Miesen Aff. ¶ 2 and Ex. A (Docket No. 57)).

2.      FNBO failed and refused to make its initial disclosures in violation of Rule 26(a) and the Court's Memorandum and Order dated February 8, 2010. (08/09/10 Memorandum and Order p. 2 (Docket No. 103); 06/09/10 Miesen Aff. ¶ 5 (Docket No. 57)).

3.      FNBO failed and refused to respond to LOLFC's written discovery. (08/09/10 Memorandum and Order p. 2 (Docket No. 103); 06/09/10 Miesen Aff. ¶¶ 3 and 5-11 and Exs. B-E (Docket No. 57)).

4.      FNBO failed and refused to respond to Debtors' written discovery. (08/09/10 Memorandum and Order p. 2 (Docket No. 103); 06/28/10 Nichols Aff. ¶¶ 2-3 and Ex. 1 (Docket No. 68)).

5.      FNBO failed to cooperate with efforts by counsel for LOLFC and Debtors to secure compliance with their clients' outstanding written discovery to avoid intervention by the Court. (08/09/10 Memorandum and Order p. 2 (Docket No. 103; 06/09/10 Miesen Aff. ¶¶ 5-10 and Exs. B-E (Docket No. 57); 06/28/10 Nichols Aff. ¶¶ 2-3 and Ex. 1 (Docket No. 68)).

6.      During July 2010, Magistrate Judge Zwart issued two Orders requiring FNBO to comply with the discovery propounded by LOLFC and Debtors. (See Docket Nos. 79 and 82).

7.     FNBO failed to take any action to comply with Magistrate Judge Zwart's Orders.  Accordingly, LOLFC and Debtors filed motions for sanctions.  (See Docket Nos. 83 and 89).

8.     On August 2, 2010, Magistrate Judge Zwart issued a Memorandum and Order, requiring FNBO to "immediately comply with this court's order granting the plaintiff's previous motion to compel."  (Docket No. 87, p. 2).

9.     FNBO persisted in its failure to comply with Magistrate Judge Zwart's Orders.   On August 9, 2010, Magistrate Judge Zwart issued yet another Memorandum and Order requiring FNBO to produce the documents requested by LOLFC and Debtors.  Magistrate Judge Zwart also ordered FNBO to prepare a detailed privilege log.  (Docket No. 103, pp. 3-5).

10.     FNBO produced a privilege log, but it was incomplete.  (Docket No. 107).

11.     As a sanction for failing to comply with her Orders, Magistrate Judge Zwart issued a Memorandum and Order on August 11, 2010, holding that FNBO waived the attorney/client privilege.  (Docket No. 108, p. 5).  As stated by Magistrate Judge Zwart: "FNBO's repeated history of unresponsiveness to the discovery requests of the other parties in this case and its total disregard for the discovery process and this court's previous orders, provide ample grounds for which this court can find a waiver of all of FNBO's objections, including those based on the attorney-client privilege and work production doctrines, to the discovery requests in question.  (Id. p. 3)(emphasis added)).

12.    FNBO persisted in failure to produce documents and comply with other requirements of Magistrate Judge Zwart's Orders.  Accordingly, LOLFC was forced to file another motion for sanctions.  (See 08/12/10 Miesen Aff. ¶¶ 1-4 (Docket No. 110)).

13.    On August 19, 2010, Magistrate Judge Zwart issued a Memorandum and Order directing the parties to reach an agreement regarding certain supplemental depositions necessitated by FNBO's late production of documents and the sanctions to be awarded to LOLFC based upon FNBO's failure to comply with her Orders.  (Docket No. 116, pp. 1-2).

14.    On August 27, 2010, FNBO's former attorneys filed motions to withdraw as FNBO's counsel in this case.  (Docket Nos. 124-25).  FNBO retained new counsel who filed a motion to extend the discovery and other deadlines in this case. (Docket No. 126).

15.    On September 1, 2010, Magistrate Judge Zwart issued a Memorandum and Order allowing FNBO's former counsel to withdraw and granting short extensions of various deadlines.  (Docket No. 135).  In her Memorandum and Order, Judge Zwart noted the "long history of FNBO's discovery abuses in this case" and emphasized that FNBO was just as much to blame as its former counsel:

> Until recently, and then only in response a [sic] to threatened sanctions, FNBO has been almost completely absent from this case and its discovery proceedings, including failing to attend noticed depositions of other parties and witnesses.  As a result, this case is stuck in a quagmire of discovery disputes directly attributable to FNBO's misconduct.  Although FNBO's former counsel accepted responsibility for all of the discovery issues, the court specifically notes FNBO was aware of the disputed issues in this case

17

> and anticipated this lawsuit before the plaintiff's complaint was even filed.
> Based on the information before the court, FNBO itself, not merely its
> counsel, was aware of and/or received the parties' written discovery
> requests, yet it failed to timely provide full and complete responses to its
> former counsel.   While it appears FNBO's former counsel failed to
> demand, remind, insist or cajole the bank to provide Rule 26 disclosures,
> responses to discovery, or participate in  this case, the bank's indifference is
> also blameworthy.  Simply stated, while the other parties were working on
> this case, FNBO knew it had work to do but did nothing . . . ."

(Id. p. 2)(emphasis added)).

In light of its long history of playing "hide the ball" in this case, FNBO should not be permitted raise new defenses at the summary-judgment stage.  See Williams, 21 F.3d at 224-25 (plaintiff's attempt to include new claims in response to summary judgment motion denied where she was dilatory and evasive during discovery); Elema-Schonander, Inc. v. K.C.F. Medical Supply Co., Inc., 869 F.2d 1124, 1126 (8th Cir. 1989)(defendant's attempt to include new counterclaims in response to summary judgment motion denied where plaintiff "did nothing until the last minute" and sought to interject new theories into the case); see also Bediako, 354 F.3d at 840 (new claims or defenses should be disallowed when the party asserting them has acted in "bad faith" or with a "dilatory motive").  Under the circumstances of this case, allowing FNBO to assert new defenses in response to LOLFC's pending summary judgment motion would simply reward FNBO for its strategy of lying in the weeds and failing and refusing to disclose critical information.

LOLFC would also be substantially prejudiced if FNBO were allowed to assert its new defenses.  Discovery in this case closed on September 17, 2010.  (See 09/01/10 Memorandum and Order p. 5 (Docket No. 135)).  FNBO waited until after the discovery

deadline to assert its new defenses.  As a consequence, FNBO has effectively prevented LOLFC from taking any meaningful discovery regarding those defenses.  LOLFC would have taken substantial discovery regarding FNBO's new defenses if they had been properly raised in this case.  (09/30/10 Supp. Miesen Aff. ¶ 2).  LOLFC would have also retained an banking expert to refute FNBO's claim that the Central Account (the account from which it took proceeds to pay down PJSCC's credit lines) is a "deposit account." (Id. ¶ 3).  Finally, LOLFC has been prejudiced because it filed a comprehensive summary judgment motion in reliance on the affirmative defenses that were <u>actually pleaded</u> by FNBO in this case.  (<u>See</u> LOLFC's SJ Memo. of Law pp. 50-52).  FNBO has not even bothered to raise those affirmative defenses to support its summary judgment motion.

If the Court nevertheless allows FNBO to assert its new defenses, then the Court should also permit LOLFC to amend its First Amended Complaint to assert a claim against FNBO for fraudulent inducement.  Mr. Kalkowski, on behalf of FNBO, made the following misrepresentations to LOLFC:

1.      During a telephone conversation on or about June 16, 2009, LOLFC's Senior Loan Officer, Mr. McKay, asked Mr. Kalkowski if FNBO was claiming any interest in the Maverick Cattle and proceeds.  Mr. Kalkowski responded that FNBO was <u>not</u> claiming any interest in those assets.  (McKay SJ Aff. ¶ 27 and Ex. L).  Mr. Kalkowski made this representation to Mr. McKay despite the fact that he and FNBO's attorney, Richard ("Rick") Myers, <u>had been actively working with PJSCC since March 31, 2009, to develop and implement a secret plan to retain all of the proceeds from the</u>

sale of the Maverick Cattle.  (LOLFC's SJ Memo. of Law, Statement of Fact Nos. 46-54).

2.    Mr. McKay called Mr. Kalkowski again in early October 2009, after PJSCC started selling the Maverick Cattle.  Mr. McKay was concerned that PJSCC might not turn over the proceeds.  (McKay SJ Aff. ¶¶ 30-31).  Mr. Kalkowski assured Mr. McKay that the proceeds were being kept separate from PJSCC's other funds and were not being used to pay PJSCC credit lines with FNBO.  (Id. ¶¶ 31 and 34 and Ex. L).  Mr. Kalkowski admits that he told Mr. McKay that PJSCC was going to hold the proceeds until all of the Maverick Cattle had been sold.  (Kalkowski Depo. p. 220, line 24, through p. 221, line 6; Depo. Ex. 52 (Miesen SJ Aff. Ex. V)).  Mr. Kalkowski further admits that he and PJSCC's President, Defendant Robert P. Johnson, had agreed to turn all of the proceeds from the sale of the Maverick Cattle, less fees for feeding and caring for the Maverick Cattle, to LOLFC.  (Kalkowski Depo. p. 186, line 25, through p. 188, line 9).  Mr. Kalkowski's statements were false.  Mr. Johnson testified that he never told Mr. Kalkowski that PJSCC was going to hold the proceeds until the Maverick Cattle had been sold.  (Supp. Johnson Depo. p. 59, lines 1-18).   Mr. Johnson also denied that he ever reached any agreement with Mr. Kalkowski to pay any of the proceeds to LOLFC.  (Id. p. 55, line 25, through p. 56, line 24).  Instead, Mr. Johnson claimed that Mr. Kalkowski made him turn all of the proceeds over to FNBO.  (McKay SJ Aff. ¶ 30).

Mr. Kalkowski knew his representations were false at the time they were made. Mr. Kalkowski was well aware that PJSCC was selling the Maverick Cattle and depositing the proceeds into its Business Checking Account with FNBO.  (Kalkowski

Depo. p. 196, lines 15-18, p. 222, line 22-25, and p. 223, line 1). Mr. Kalkowski also knew that the proceeds could not be held for any length of time because they were being automatically swept out of PJSCC's Business Checking Account into PJSCC's Central Account and then taken by PJSCC to pay down PJSCC's credit lines <u>on a daily basis</u>. (Kalkowski Depo. p. 214, line 1, through p. 215, line 9, p. 196, lines 15-21, and p. 217, lines 1-10). Mr. Kalkowski admits that he was aware that the proceeds were not being held, but were being used by FNBO to pay down PJSCC's credit lines. (<u>Id</u>. p. 196, lines 15-25, p. 197, lines 1-4, p. 222, lines 22-25, and p. 223, lines 1-6). Despite his representations to Mr. McKay, Mr. Kalkowski further admits that he did nothing to stop FNBO from using the proceeds to pay down PJSCC's credit lines. (<u>Id</u>. p. 197, lines 1-4).

If LOLFC had known that PJSCC and FNBO were planning to retain the proceeds, it would have seized the Maverick Cattle during the summer of 2009, long before they had been sold. (09/30/10 Supp. Miesen Aff. ¶ 5). Similarly, if LOLFC had known that FNBO was using the proceeds to pay down PJSCC's credit lines, it would have commenced this action a month earlier and forced at least another $742,186.60 of proceeds to be deposited in the Agreed Escrow Account. (<u>Id</u>.; Miesen SJ Aff. ¶ 7 and Ex. E; 11/05/09 Temporary Restraining Order pp. 2-3 (Docket No. 18)). Mr. Kalkowski's misrepresentations were carefully crafted to prevent LOLFC from doing either of these things. Mr. Kalkowski's misrepresentations provide the basis for a prima facie claim for fraudulent inducement. <u>See</u> <u>Eichner v. Mid America Financial Investment Corp</u>., 275 Neb. 462, 474-75, 748 N.W.2d 1, 12-13 (Neb. 2008).

What is good for the goose is good for the gander.  If FNBO is allowed to assert two new defenses, LOLFC should be allowed to assert at least one new claim.

**B.**    **The Account From Which FNBO Converted the**
          **Proceeds From the Sale of the Maverick Cattle**
          **is Not a Deposit Account.**

FNBO's Brief conspicuously fails to mention PJSCC's Central Account.  FNBO did not take funds from PJSCC's Business Checking Account to pay down PJSCC's credit lines.  Instead, the funds were first transferred into PJSCC's Central Account, which is a special "clearing account."  (Supp. Kalkowski Depo. p. 43, line 13, through p. 44, line 7; Kalkowski Depo. p. 214, line 1, through p. 216, line 9).  It was from the Central Account, not PJSCC's Business Checking Account, that PJSCC converted the proceeds from the sale of the Maverick Cattle to pay down PJSCC's credit lines. (Kalkowski Depo. p. 217, lines 1-18; Supp. Kalkowski Depo. p. 47, lines 18-25, and p. 48, lines 11; Miesen SJ Aff. ¶¶ 7-8 and Exs. C-F).  The reason this fact is important is that the Central Account is not a deposit account.

The statutes relied upon by FNBO, Neb. Rev. Stat. (UCC) §§ 9-327, 9-340 and 9-332, only apply to "deposit accounts."  Revised Article 9 defines a "deposit account" as "a demand, time, savings, passbook, or similar account maintained with a bank."  Id. § 9-102(29).  Revised Article 9 grants special privileges for deposit accounts to promote "the free flow of funds."  See id. § 9-332 Official Comment 3.

The Central Account is not a "demand, time, savings, passbook or similar account."  Instead, as noted above, it is a special "clearing account" that is used only by FNBO as a conduit for internal transfers between PJSCC's deposit accounts and credit

lines.  (Supp. Kalkowski Depo. p. 43, line 13, through p. 44, line 19; Kalkowski Depo. p. 214, line 1, through p. 217, line 10).  The Central Account does not serve any of the purposes of a deposit account.  PJSCC cannot make deposits into the Central Account. (Maloley Depo. p. 22, lines 8-16; Supp. Kalkowski Depo. p. 46, line 14, through p. 47, line 17; Kalkowski Depo. p. 216, lines 16-20).  PJSCC also cannot withdraw funds from the Central Account.  (Maloley Depo. p. 22, lines 8-16; Supp. Kalkowski Depo. p. 46, line 14, through p. 47, line 17; Kalkowski Depo. p. 216, lines 13-15).  In essence, the Central Account is simply a dummy account used by PJSCC for its own internal purposes.  Consequently, by no stretch of the imagination can the Central Account be considered a "deposit account" within the meaning of Section 9-102(29).   See Black's Law Dictionary p. 429 (demand account is a "deposit which the depositor may demand (withdraw) at any time"); p 1343 (savings account is an account "maintained in a commercial and savings bank for purpose of accumulating money, in contrast to a checking account"); p. 1483 (time account is "[a]nother term for a savings account or certificate of deposit") (6th Ed. 1990).  Extending the protections afforded by Sections 9-327, 9-340 and 9-332 to the Central Account would do nothing to promote the free flow of funds in the banking system.

In sum, any protection afforded to FNBO under Sections 9-327, 9-340 and 9-332 was forfeited when the proceeds from the sale of the Maverick Cattle were transferred into PJSCC's Central Account.  Because the Central Account is not a "deposit account," FNBO's new defenses under Sections 9-327, 9-340 and 9-332 fail as a matter of law.

### C. FNBO Did Not and Could Not Exercise a Right of Setoff.

FNBO claims that its right of set off allowed it to use proceeds from the sale of the Maverick Cattle to pay down PJSCC's credit lines. This argument fails for two simple reasons.

First, FNBO was not exercising any right of set off by using the proceeds to pay down PJSCC's credit lines. Instead, the proceeds were transferred from PJSCC's Business Checking Account into the Central Account and then swept out of the Central Account to pay down PJSCC's credit lines <u>automatically</u> on a daily basis. (Kalkowski Depo. p. 214, line 1, through p. 217, line 10; Supp. Kalkowski Depo. p. 47, line 18, through p. 48, line 11). Conspicuously absent from FNBO's moving papers is any allegation that FNBO was, in fact, exercising its set-off rights by applying the proceeds to PJSCC's credit lines. Instead, Mr. Kalkowski makes it clear in his Affidavit, and made it clear during his depositions, that the funds transfers were performed automatically, not pursuant to the exercise of any claimed right of set off. (Kalkowski Aff. ¶ 12). Obviously, if FNBO had been exercising its set-off rights, it would not have continued to make advances to PJSCC, which it did throughout the fall of 2009. (<u>Id</u>.; <u>see</u> Miesen SJ Aff. Ex. F).

Second, and more important, FNBO could not exercise any right of set off. The loan documents providing FNBO with set-off rights (promissory notes, security agreement and deposit account agreement) provide that FNBO can only exercise its right of set off "[t]o the extent permitted by law" and/or if there has been a "default." (Promissory Notes p. 2 (Kalkowski Aff. Exs. A-C); Commercial Security Agreement p. 3

(Kalkowski Aff. Ex. D); Commercial Deposit Agreement § 15 (Kalkowski Aff. Ex. E)).

Under Nebraska law, a debt must be due for a creditor to exercise a right of set off.

Miracle Hills Centre Ltd. Partnership v. Nebraska Nat. Bank of Omaha, 230 Neb. 899,

902, 434 N.W.2d 304, 306 (Neb. 1989).  During his deposition, Mr. Kalkowski testified

that there were no payment defaults under any of PJSCC's credit lines at the time FNBO

was using the proceeds from the sale of the Maverick Cattle to pay down PJSCC's credit

lines.  (Kalkowski Depo. p. 217, lines 19-25, and p. 218, lines 1-12).  Mr. Kalkowski's

summary judgment Affidavit is similarly barren of any allegation that there were any

payment defaults by PJSCC under any of its credit lines during this period of time.

Accordingly, FNBO also did not have the right to set off any proceeds.

> **D.  Even if the Central Account Were a Deposit Account, FNBO Would Still be Liable for Collusion and Conspiracy to Convert LOLFC's Collateral.**

Sections 9-327, 9-340 and 9-332 do not provide a depository bank with a license

to conspire and collude with its depositors to convert proceeds subject to a third party's

security interest.  Consequently, even if the Central Account could be considered a

"deposit account," FNBO's new defenses would still fail based upon FNBO's direct

involvement in the collusion and conspiracy to convert the proceeds from the sale of the

Maverick Cattle.

Prior to the revisions to Article 9, depository banks were subject to the "ordinary

course rule."  This rule was based upon Comment 2(c) to former Section 9-306, which

provided:

> Where cash proceeds are covered into the debtor's checking account and paid out in the operation of the debtor's business, recipients of the funds of course take free of any claim which the secured party may have in them as proceeds.  <u>What has been said relates to payments and transfers in the ordinary course</u>.  The law of fraudulent conveyances would no doubt in appropriate cases support recovery of proceeds by a secured party from a transferee <u>out of the ordinary course of business or otherwise in collusion with the debtor to defraud the secured party</u>.

Neb. Rev. Stat. (UCC) § 9-306 Comment 2(c) (2000)(emphasis added)).  As noted by the Eighth Circuit in <u>General Electric Capital Corp. v. Union Planters Bank, N.A</u>., 409 F.3d 1049, 1055-56 (8th Cir. 2005), most courts "recognize[d] this official comment as law." A secured creditor was, therefore, able to recover traceable proceeds transferred out of a deposit account if the payee, including a depository bank using its debtor's funds to pay down a loan, received the funds "'out of the ordinary course or otherwise in collusion with the debtor.'"  <u>Id</u>. at 1056.  In <u>General Electric</u>, the Court specifically acknowledged the secured creditor's right to trace and recover proceeds that were deposited into the debtor's deposit account and regularly swept out of that account by the depository bank. <u>Id</u>. at 1053-59.

When Article 9 was revised, the rule set forth in Comment 2(c) was incorporated into Section 9-332, which provides:

> A transferee of funds from a deposit account takes the funds free of a security interest in the deposit account <u>unless the transferee acts in collusion with the debtor in violating the rights of the secured party</u>.

Neb. Rev. Stat. (UCC) § 9-332(b)(emphasis added).  Section 9-332 "is a codification of comment 2(c) to section 9-306 of Prior Article 9."  <u>In re Machinery, Inc.</u>, 342 B.R. 790,

798 (Bankr. E.D. Mo. 2006).  Section 9-332, however, is more deferential to depository banks.  "[I]t requires the secured creditor to show that the transferee acted in collusion with [the] debtor in receiving the funds rather than merely taking them out of the ordinary course."  Id.   In Machinery, Inc., which involved the same parties and issues in General Electric, the United States Bankruptcy Court for the Eastern District of Missouri held that Section 9-332 applied to the dispute over the depository bank's removal of proceeds from the debtor's deposit account, but held that the secured creditor failed to introduce sufficient evidence of collusion between the depository bank and the debtor to recover the proceeds.  342 B.R. at 798-800.

In contrast to the Machinery, Inc. case, the evidence in this case of FNBO's collusion with PJSCC and its counsel to convert the proceeds from the sale of the Maverick Cattle is overwhelming.  FNBO and its counsel participated with PJSCC in hatching the plan to convert the proceeds in March 2009.  (Depo. Ex. 53 (Miesen SJ Aff. Ex. W); Kalkowski Depo. p. 67, line 9, through p. 69, line 16, p. 70, lines 14-22, and p. 72, line 10, through p. 74, line 19; Johnson Depo. p. 76, line 18, through p. 77, line 16, p. 78, line 13, through p. 79, line 22, and p. 68, line 18, through p. 70, line 4; Supp. Johnson Depo. p. 7, lines 19-22, and p. 9, lines 12-25).  FNBO supported the plan because it provided PJSCC with funds to pay down its credit lines with FNBO.  (Kalkowski Depo. p. 62, lines 6-16).  As Mr. Kalkowski testified:

Q:    Did Mr. Johnson tell you that he was planning on retaining all of the proceeds from the sale of the cattle and using them to pay off the prior debt?

A:    At some point he did, yes.

Q:      And FNBO supported that plan, didn't it?

A:      Yeah, I think so.

Q:      FNBO supported Mr. Johnson's plan because it wanted Johnson feedlot to use the money that it would obtain from the sale of Maverick's cattle to pay down the customer credit line, right?

A:      Yes.

(Kalkowski Depo. p. 62, lines 6-16).  FNBO actively assisted PJSCC in completing the tasks necessary for PJSCC to implement the plan.  (Depo. Ex. 53, p. 3 (Miesen SJ Aff. Ex. W); Kalkowski Depo. p. 70, lines 14-22, p. 72, line 10, through p. 74, line 19, and p. 88, line 6, through p. 91, line 5).

FNBO was undaunted when it learned that the proceeds were subject to LOLFC's security interest.  To prevent LOLFC from taking any measures to protect its collateral, Mr. Kalkowski falsely represented to LOLFC that FNBO was not claiming any interest in the Maverick Cattle or proceeds.  (McKay SJ Aff. ¶¶ 27 and 34 and Ex. L).  At or around the same time, Mr. Kalkowski participated in multiple conference calls with FNBO's attorney and Mr. Johnson to help PJSCC "troubleshoot as to how to recover the [prior debt]" from the proceeds of the sale of the Maverick Cattle.  (Kalkowski Depo. p. 241, line 23, through p. 243, line 9; Supp. Johnson Depo. p. 30, lines 1-10).  Mr. Kalkowski worked with FNBO's counsel during the summer of 2009 to find ways to "take other $'s owed [i.e., prior debt] out of the check when [the Maverick Cattle] are sold."  (Depo. Ex. 50 (Miesen SJ Aff. Ex. U); Kalkowski Depo. p. 268, line 6, through p. 270, line 21; Supp. Kalkowski Depo. p. 241, line 23, through p. 242, line 20).  Among other things, Mr.

Kalkowski proposed that the Maverick Cattle be sold in PJSCC's name, rather than under Debtors' names.  (Depo. Ex. 65 (Miesen SJ Aff. Ex. Y)).  FNBO's counsel also lined up an attorney for PJSCC and "shared theories and ideas" with that attorney regarding ways to retain the proceeds from the sale of the Maverick Cattle.  (Depo. Ex. 64 (Miesen SJ Aff. Ex. X; Supp. Johnson Depo. p. 34, line 11, through p. 35, line 4).  FNBO was also aware that Mr. Johnson was using fictitious "feed adjustments" to collect the prior debt allegedly owed by Maverick.  (Kalkowski Depo. p. 205, lines 3-18, and p. 207, lines 2-13).

FNBO knew that PJSCC was not going to turn any proceeds from the sale of the Maverick Cattle over to Debtors or LOLFC.  (Johnson Depo. p. 139, line 22, through p. 140, line 25, p. 141, lines 1-6, and p. 153, lines 9-20)  FNBO also knew that the proceeds were being deposited into PJSCC's Business Checking Account, automatically swept into PJSCC's Central Account and then used to pay down PJSCC's operating credit line on a daily basis.  (Kalkowski Depo. p. 196, lines 15-18, p. 214, line 1, through p. 215, line 9, and p. 217, lines 1-18; Supp. Kalkowski Depo. p. 43, line 13, through p. 44, line 7).  Yet, when Mr. McKay inquired about the status of the proceeds, Mr. Kalkowski lied and told him that PJSCC and FNBO were holding the proceeds until after the Maverick Cattle had been sold and that all of the proceeds, less the fees for feeding and caring for the Maverick Cattle, would be paid to LOLFC.  (McKay SJ Aff. ¶¶ 31 and 34 and Ex. L; Kalkowski Depo. p. 186, line 25, through, p. 188, line 9, p. 220, line 24, through p. 221, line 6; Depo. Ex. 52, p. 1 (Miesen SJ Aff. Ex. V); Supp. Johnson Depo. p. 55, line 25, through p. 56, line 24, and p. 59, line 2, through p. 60, line 8; Supp. Maloley Depo. p. 43,

line 17, through p. 45, line 9).  Through its conspiracy and collusion with PJSCC, FNBO was able convert proceeds to pay down PJSCC's credit lines by $1,596,227.45.  (Miesen SJ Aff. ¶¶ 7-8 and Exs. C-F).

The foregoing facts, which have been <u>confirmed by FNBO's own documents and testimony</u>, establish collusion as a matter of law.  At a minimum, there is a genuine issue of material fact regarding FNBO's collusion, which precludes summary judgment on LOLFC's conversion claim.

## II.    THE PROCEEDS FROM THE SALE OF THE MAVERICK CATTLE CONVERTED BY FNBO HAVE BEEN EFFECTIVELY TRACED AND CALCULATED.

FNBO also argues that LOLFC purportedly cannot trace the proceeds that were converted by FNBO.  FNBO is mistaken.

Applying the "first in, last out" tracing rule set forth in the case of <u>In re Turner</u>, 13 B.R. 15, 22 (Bankr. D. Neb. 1981), LOLFC has painstakingly traced the proceeds from six checks issued by meat-packing companies for the Maverick Cattle from the time they were deposited into PJSCC's Business Checking Account to the time they were removed from PJSCC's Central Account by FNBO to pay down PJSCC's credit lines.  (Miesen Aff. ¶¶ 7-8 and Exs. C-F).  Proceeds in the total amount of $1,596,227.45 were effectively and accurately traced using the <u>Turner</u> rule.  (<u>Id</u>).

FNBO has not challenged the accuracy of LOLFC's tracing analysis.  It claims that LOLFC should have used the lowest intermediate balance rule, but that is <u>the exact same rule</u> set forth in the <u>Turner</u> case.  Both rules treat the proceeds to be traced as the last funds to be removed from an account.  <u>General Electric</u>, 409 F.3d at 1059-60; <u>Turner</u>,

13 B.R. at 22.  Both rules also reduce the proceeds to be traced whenever the account balance falls below the original amount of the proceeds deposited into the account. General Electric, 409 F.3d at 1060; Turner at 22.  And, of course, both rules yield the same result.  FNBO has failed to submit any tracing analysis using the lowest intermediate balance rule that conflicts with the tracing analysis submitted by LOLFC.

In a footnote, FNBO suggests that LOLFC's tracing analysis is defective because it was not done by an expert.  (FNBO Memo. of Law p. 19, n. 3).  Tracing proceeds using the Turner rule and the lowest intermediate balance rule is a matter of simple addition and subtraction.  It does not take an expert to perform this analysis.  Indeed, the Eighth Circuit provided instructions on how to perform the analysis in the General Electric case. 409 F.3d at 1060.

Finally, FNBO argues that the proceeds from the sale of the Maverick Cattle cannot be traced because it used the proceeds to make subsequent advances to PJSCC under its credit lines.  FNBO converted the proceeds when it removed them from the Central Account and used them to pay down PJSCC's credit lines.  See General Electric, 409 F.3d at 1060; Ag Services of America, Inc. v. Empfield, 255 Neb. 957, 959, 587 N.W.2d 871, 873 (Neb. 1999)  Whether FNBO subsequently used the proceeds to make additional advances to PJSCC, loaned them out to other borrowers or gave them to a charity is immaterial.

## CONCLUSION

For all of the foregoing reasons, as well as the reasons expressed in its Memorandum of Law in support of its own Motion for Summary Judgment, LOLFC

respectfully requests that FNBO's Motion for Summary Judgment be denied by the Court in all respects.

Respectfully submitted,

STOEL RIVES LLP

Dated:  September 30, 2010

By: s/Jonathan C. Miesen
    Jonathan C. Miesen
    Minn. Atty. Reg. No. 19752X

Suite 4200
33 South Sixth Street
Minneapolis, MN 55402
Telephone:    (612) 373-8810
Facsimile:    (612) 373-8881
E-mail:        JCMiesen@stoel.com

Attorneys for Plaintiff

70313726.1 0099999-00001