## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| LOL FINANCE COMPANY, | ) | CASE NO. 4:09-CV-3224 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **FIRST NATIONAL BANK OF** |
| | ) | **OMAHA'S BRIEF IN OPPOSITION TO** |
| PAUL JOHNSON & SONS CATTLE CO., | ) | **SUMMARY JUDGMENT MOTION OF** |
| INC., FIRST NATIONAL BANK OF | ) | **LOL FINANCE COMPANY** |
| OMAHA, ROBERT P. JOHNSON and | ) | |
| KERI J. MALONEY, JOHN DOE and | ) | |
| ABC COMPANY, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| PAUL JOHNSON & SONS CATTLE CO., | ) | |
| INC., | ) | |
| | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| MAVERICK FEEDERS, INC., SHON | ) | |
| SAWYER and JULIE SAWYER, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

## INTRODUCTION

Plaintiff, LOL Finance Company ("LOL"), is correct that this case involves a priority dispute over the proceeds from the sale of certain cattle. On the other hand, LOL incorrectly asserts that it has priority to those proceeds once they have been deposited in and transferred out of a deposit account in which the deposit-taking bank, First National Bank of Omaha ("FNBO"), has a security interest perfected by control.

Under such circumstances, Nebraska's Uniform Commercial Code makes clear that the depository institution has priority over other creditors claiming an interest in the proceeds. Accordingly, LOL is not entitled to summary judgment on its claims for conversion and conspiracy to commit conversion as such claims fail as a matter of law.

Even if Nebraska's Uniform Commercial Code did not vest FNBO with priority rights, LOL is not entitled to summary judgment on its conspiracy claims because, at a minimum, there are material issues of disputed fact that go to the core of LOL's claim. These disputed issues of material fact are as follows:

1.      Whether Maverick Feeders, Inc. even owned the cattle at issue;

2.      Whether LOL's description of the collateral within its security agreement with Maverick and filed financing statement was sufficient to describe the cattle at issue in this case;

3.      Whether the proceeds from the cattle at issue are even traceable and recoverable by LOL; and

4.      Whether FNBO was a party to any agreement or plan to convert the proceeds from the sale of the cattle placed by Maverick Feeders, Inc.

## APPLICABLE LEGAL STANDARD

Summary judgment should be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Egan v. Wells Fargo Alarm Servs.*, 23 F.3d 1444, 1446 (8th Cir. 1994). The burden of establishing the nonexistence of any genuine issue of material fact is on the moving party. Fed. R. Civ. P. 56(c); *Adickes v. S.H. Kress & Co.*, 398

U.S. 144, 157 (1970). Therefore, if the defendant does not meet its initial burden with respect to an issue, summary judgment must be denied notwithstanding the absence of opposing affidavits or other evidence. *Adickes*, 398 U.S. at 159-60; *Cambee's Furniture, Inc. v. Doughboy Recreational Inc.*, 825 F.2d 167, 174 (8th Cir. 1987). In determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party, affording all reasonable inferences in favor of the nonmoving party. *Adickes*, 398 U.S. at 157; *Davis v. Hall*, 375 F.3d 703, 711 (8th Cir. 2004). "In ruling on a motion for summary judgment, a court must not weigh evidence or make credibility determinations." *Kenney v. Swift Transp., Inc.*, 347 F.3d 1041,1044 (8th Cir. 2003).

### RESPONSE TO LOL'S STATEMENT OF UNDISPUTED MATERIAL FACTS

For purposes of FNBO's opposition to LOL's Motion for Summary Judgment, FNBO responds to the facts identified in LOL's Statement of Undisputed Material Facts as follows:

RESPONSE TO STATEMENT OF FACT NOS. 1 THROUGH 17: For the limited purpose of LOL's Motion for Summary Judgment only, FNBO does not dispute these facts.

RESPONSE TO STATEMENT OF FACT NO. 18: FNBO disputes that the description of the collateral contained within LOL's financing statements and security agreement is sufficient to describe the collateral at issue in this case. (PJSCC Evidence Index, Filing No. 167-6, 15:17-19; 14:8-21; 84:17-23; 109:16-20; 119:12-15; FNBO Supplemental Evidence Index, Exhibit 11, Exhibit A at p. 7; PJSCC Evidence Index, Filing Nos. 167-11 - 167-15.)

RESPONSE TO STATEMENT OF FACT NO. 19:  For the limited purpose of LOL's Motion for Summary Judgment only, FNBO does not dispute these facts.

RESPONSE TO STATEMENT OF FACT NO. 20:  FNBO disputes that the description of the collateral contained within LOL's financing statements and security agreement is sufficient to describe the collateral at issue in this case. (PJSCC Evidence Index, Filing No. 167-6, 15:17-19; 14:8-21; 84:17-23; 109:16-20; 119:12-15; FNBO Supplemental Evidence Index, Exhibit 11, Exhibit A at p. 7; PJSCC Evidence Index, Filing Nos. 167-11 - 167-15.)

RESPONSE TO STATEMENT OF FACT NO. 21:  For the limited purpose of LOL's Motion for Summary Judgment only, FNBO does not dispute these facts.

RESPONSE TO STATEMENT OF FACT NO. 22:  FNBO disputes that the description of the collateral contained within LOL's financing statements and security agreement is sufficient to describe the collateral at issue in this case. (PJSCC Evidence Index, Filing No. 167-6, 15:17-19; 14:8-21; 84:17-23; 109:16-20; 119:12-15; FNBO Supplemental Evidence Index, Exhibit 11, Exhibit A at p. 7; PJSCC Evidence Index, Filing Nos. 167-11 - 167-15.)

RESPONSE TO STATEMENT OF FACT NO. 23:  Disputed to the extent that it implies that the collateral description was adequate. Also disputed to the extent it claims that cattle "placed" with 4-Square are "generally ear tagged and/or branded" with 4-Square logo. Loan agreement between Maverick and LOL required that any cattle "placed" with 4-Square be branded or ear tagged with the 4-Square logo. (See e.g. FNBO Supplemental Evidence Index, Exhibit 16, Exhibit A at LOLFC 000032 ("all 4-Square cattle service managed cattle financed under this agreement shall be branded or ear-

4

tagged as such.")).

RESPONSE TO STATEMENT OF FACT NO. 24:  Disputed as to what the renewals and extensions "allowed" debtors to do. Maverick's failure to pay its bills arguably is what "allowed" Maverick to buy more cattle. (Filing No. 167, Ex. 2 ¶ 11.)

RESPONSE TO STATEMENT OF FACT NO. 25:  Disputed as to cattle Maverick placed at PJSCC in 2009 ("the 2009 Maverick Cattle"). The 7-10-09 business loan agreement does not mention cattle at Paul Johnson & Son's Cattle Co., Inc. ("PJSCC") (mentions lots in northern Minnesota and "other feed-lots approved by lender") even though LOL knew as of 7-10-09 that there were cattle  at PJSCC in which LOL claimed a security interest. (FNBO Supplemental Evidence Index, Exhibit 16, Exhibit A at LOLFC000029; FNBO Supplemental Evidence Index, Exhibit 12, Exhibit A) The 2009 Maverick Cattle were never branded or ear-tagged with the 4-Square logo. (FNBO Supplemental Evidence Index, Exhibit 16 at 15:24-16:11; 65:4-14; FNBO Supplemental Evidence Index, Exhibit 12 at 59:12-17) Nothing in 7-02-09 cattle consulting agreement between Maverick and 4-Square mentions cattle at PJSCC. (FNBO Supplemental Evidence Index, Exhibit 16, Exhibit A at LOLFC000112-000120) Cattle which were allegedly financed by LOL were reportedly inspected by 4-Square at Maverick's feedlot in March-May 2009 at the same time that the cattle in issue were at PJSCC. (FNBO Supplemental Evidence Index, Exhibit 19; FNBO Supplemental Evidence Index, Exhibit 15 at 107:16-113:5) A 6/5/09 letter from LOL to FNBO indicates that LOL was claiming a security interest in cattle "managed by 4-Square cattle services". (FNBO Supplemental Evidence Index, Exhibit 14, Exhibit E) A 6/16/09 letter from LOL to PJSCC, also sent to

FNBO, states that 2009 Maverick Cattle "are being managed for Maverick by Joe Varner of Tri-County Livestock." (FNBO Supplemental Evidence Index, Exhibit 14, Exhibit B) Although the letter indicates that the cattle are "being monitored for LOL…by 4-Square…", the  letter does not state that the cattle are "placed with 4-Square under a cattle                consulting                agreement".                (Id.)

RESPONSE TO STATEMENT OF FACT NO. 26:  Disputed: Sawyer testified that Tri-County Livestock paid for all the cattle originally. (FNBO Supplemental Evidence Index, Exhibit 16 at 46:4-7) Documents in LOL's loan files indicate that Maverick had a "side agreement" relating to cattle financed by LOL. (FNBO Supplemental Evidence Index, Exhibit 17, Exhibit A at LOLFC000518; FNBO Supplemental Evidence Index, Exhibit 17, Exhibit B at LOLFC000493) In September 2009 LOL drafted a "release of interest" for Varner to sign to get him out of the cattle "which would be remaining in our deal" after Varner severed his relationship with Maverick. (FNBO Supplemental Evidence Index, Exhibit 12, Exhibit B) The record does not disclose the terms of the "release of interest" (because it was not produced by LOL in discovery) and LOL's director of lending does not know whether the document was ever signed or whether Mr. Varner released any interest he claimed in the 2009 Maverick Cattle. (FNBO Supplemental Evidence Index, Exhibit 17 at 68:22-69:6) Accordingly, LOL's director of lending does not know whether Varner had an ownership interest in the cattle as of September 2009. (FNBO Supplemental Evidence Index, Exhibit 17 at 108:11-109:5)

RESPONSE TO STATEMENT OF FACT NOS. 27 THROUGH 30:  For the limited purpose of LOL's Motion for Summary Judgment only, FNBO does not dispute these facts.

6

RESPONSE TO STATEMENT OF FACT NO. 31:  Disputed: only a portion of the purchase price for the cattle purchased at Tri-County was funded by LOL. (FNBO Supplemental Evidence Index, Exhibit 15 at 136:3-21)

RESPONSE TO STATEMENT OF FACT NO. 32:  For the limited purpose of LOL's Motion for Summary Judgment only, FNBO does not dispute these facts.

RESPONSE TO STATEMENT OF FACT NO. 33:  Disputed: the cattle consulting agreement makes no mention of cattle purchased from Tri-County cattle, nor does it mention any cattle at PJSCC. (FNBO Supplemental Evidence Index, Exhibit 16, Exhibit A at LOLFC000112-000120)

RESPONSE TO STATEMENT OF FACT NOS. 34 THROUGH 44:  For the limited purpose of LOL's Motion for Summary Judgment only, FNBO does not dispute these facts.

RESPONSE TO STATEMENT OF FACT NO. 45:  Disputed: Maverick's financial statement dated 1-31-09 which was provided by Maverick to both LOL and FNBO confirms a significant debt owed by Maverick to PJSCC for cattle placed by Maverick at PJSCC in 2008. ("the 2008 Maverick Cattle") (FNBO Supplemental Evidence Index, Exhibit 14, Exhibit D; FNBO Supplemental Evidence Index, Exhibit 16 at 95:22-96:9; 101:15-20; FNBO Supplemental Evidence Index, Exhibit 17, Exhibit C at LOLFC000620, 624; FNBO Supplemental Evidence Index, Exhibit 17 at 58:24-61:17)

RESPONSE TO STATEMENT OF FACT NO. 46:  For the limited purpose of LOL's Motion for Summary Judgment only, FNBO does not dispute these facts.

RESPONSE TO STATEMENT OF FACT NO. 47:  Disputed: according to information provided by PJSCC to FNBO on or before July 1, 2009, PJSCC intended to

deduct from the sale of the 2009 Maverick Cattle amounts owed by Maverick to PJSCC with respect to the 2008 and 2009 Maverick Cattle and pay off the lien claimed by LOL. (FNBO Supplemental Evidence Index, Exhibit 14, Exhibit F at p. 2; FNBO Supplemental Evidence Index, Exhibit 14 at 176:22-177:3)

RESPONSE TO STATEMENT OF FACT NO. 48   Disputed: the quoted testimony indicates that "at some point" Mr. Johnson told Mr. Kalkowski that PJSCC was planning on using proceeds from the 2009 Maverick Cattle to pay off the debt with respect to the 2008 Maverick Cattle. (FNBO Supplemental Evidence Index, Exhibit 14 at 62:6-16)

RESPONSE TO STATEMENT OF FACT NO. 49:  Disputed: no agreement was reached during the March 31, 2009 conference call that PJSCC would  exercise a right of setoff. Bob Johnson testified that there was some discussion of "setoff" which went "over his head". (FNBO Supplemental Evidence Index, Exhibit 13 at 48: 12-16) Only later, after consulting with his own attorneys at the Domina firm, did PJSCC decide it could setoff funds. (FNBO Supplemental Evidence Index, Exhibit 13 at 52:21-53:5; 54:2-18)

RESPONSE TO STATEMENT OF FACT NO. 50:  Disputed: Mr. Kalkowski testified that the four tasks outlined in his notes and file memorandum were to be undertaken in order to determine whether FNBO would be interested in providing financing with respect to the Maverick Cattle. (FNBO Supplemental Evidence Index, Exhibit 14 at 71:8-72:9)   Mr. McKay acknowledged that the four tasks outlined by Mr. Kalkowski would be typical tasks for a lender to undertake in analyzing whether to provide financing to a prospective borrower. (FNBO Supplemental Evidence Index, Exhibit 18 at No. 17; FNBO Supplemental Evidence Index, Exhibit 15 at 162:4-163:5)

RESPONSE TO STATEMENT OF FACT NOS. 51 & 52:  Disputed: for the reasons set forth above, FNBO disputes that it agreed to a "plan" as defined by LOL.

RESPONSE TO STATEMENT OF FACT NO. 53:  FNBO admits that Mr. Kalkowski testified as quoted, but disputes the inference which LOL asks the court to draw from that testimony, *i.e.* that FNBO was "mistaken" in its belief as to what was stated in the financing statement. FNBO submits that given the ambiguous collateral description provided by LOL in the above-referenced financing statement it was reasonable for FNBO to assume that the cattle described in the financing statement were cattle located at a feedlot operated by 4-Square and/or that the "consulting services" provided by 4-Square consisted of feedlot services. Furthermore, LOL never provided FNBO with a copy of any consulting agreement between Maverick and 4-Square until after this lawsuit was filed. (FNBO Supplemental Evidence Index, Exhibit 15 at 85:16-86:8) Moreover, LOL had informed FNBO that Joe Varner was "managing" the cattle while 4-Square's role was simply that of "monitoring" the cattle.  (FNBO Supplemental Evidence Index, Exhibit 14, Exhibit B)

RESPONSE TO STATEMENT OF FACT NO. 54:  Disputed: FNBO conducted a lien search which it concluded showed that LOL had no security interest in the 2009 Maverick Cattle. (FNBO Supplemental Evidence Index, Exhibit 14 at 115:14-116:14) FNBO also disputes the inference that LOL apparently asks the court to draw from the testimony cited; *i.e.* that FNBO had an obligation to ask for further information from LOL regarding any lien it may claim in the 2009 Maverick Cattle. Nothing in the lien search or in the correspondence which LOL sent to FNBO in June 2009 suggested that the 2009 Maverick Cattle were "placed with 4-Square under a cattle consulting

agreement".

RESPONSE TO STATEMENT OF FACT NO. 55:  Disputed: according to Mr.
Sawyer's testimony, there were approximately 1,000 head of cattle at Maverick's
feedyard in South Dakota in addition to those which had been purchased from Tri-
County Livestock at the time he decided to send some of the cattle to PJSCC. (FNBO
Supplemental Evidence Index, Exhibit 16 at 118:8-14) The cattle purchased from Tri-County
Livestock was not branded or ear-tagged in any manner that would identify them as
such. (FNBO Supplemental Evidence Index, Exhibit 16 at 15:24-16:11; 65:4-14) Although
Mr. Sawyer testified that he shipped 3,431 head of "Tri-County" cattle to PJSCC in
March and April of 2009, inspection reports prepared by 4-Square indicate that those
same cattle were located at Maverick's feedyard in May 2009. (FNBO Supplemental
Evidence Index, Exhibit 19; FNBO Supplemental Evidence Index, Exhibit 15 at 108:10-113:5)

RESPONSE TO STATEMENT OF FACT NO. 56:  FNBO disputes LOL's
definition of "Maverick Cattle" to the extent it assumes those cattle were the same
cattle purchased from Tri-County Livestock for the reasons set forth in response to
paragraph 55 above.

RESPONSE TO STATEMENT OF FACT NO. 57:  FNBO disputes LOL's
definition of "Maverick Cattle" to the extent it assumes those cattle were the same
cattle purchased from Tri-County Livestock for the reasons set forth in response to
paragraph 55 above.

RESPONSE TO STATEMENT OF FACT NOS. 58 & 59:  For the limited
purpose of LOL's Motion for Summary Judgment only, FNBO does not dispute these
facts.

RESPONSE TO STATEMENT OF FACT NO. 60:  Disputed: FNBO disputes LOL's claim that it sent the proposed Subordination Agreement to FNBO "to avoid any misunderstanding". FNBO asserts that a reasonable inference to be drawn from the fact that the Subordination Agreement was sent was that LOL was concerned that it did not have a valid prior perfected security interest in the 2009 Maverick Cattle. Furthermore, FNBO disputes LOL's conclusion that the cover letter and Subordination Agreement "made it perfectly clear that the Maverick Cattle had been placed by debtors with 4-Square under a cattle consulting agreement". In fact, the cover letter did not state that the 2009 Maverick Cattle had been placed with 4-Square under a cattle consulting agreement. Furthermore, the proposed Subordination Agreement did not mention any debt owed by Maverick to LOL secured by cattle at PJSCC (or anywhere else) and instead indicated that Maverick "now desires financing by [LOL] for its cattle farming operations" and that LOL "is willing to provide such financing so long as it can obtain a priority lien on those items it finances…." If anything, this suggests that LOL had not yet provided financing to Maverick and would only be willing to do so if it could obtain a priority lien in the cattle.

RESPONSE TO STATEMENT OF FACT NOS. 61 THROUGH 64:  For the limited purpose of LOL's Motion for Summary Judgment only, FNBO does not dispute these facts.

RESPONSE TO STATEMENT OF FACT NO. 65:  Disputed: Mr. Kalkowski testified that the fact that 4-Square sent the ear tags to PJSCC indicated that 4-Square wanted the cattle identified as 4-Square cattle. FNBO further disputes any proposed inference that the fact that 4-Square sent the ear tags to PJSCC proves that the cattle

were "4-Square cattle". To the contrary, the fact that the cattle were not ear-tagged as "4-Square cattle" when they were allegedly at Maverick's feedyard indicates that the cattle were never intended to be "4-Square cattle".

RESPONSE TO STATEMENT OF FACT NO. 66: FNBO admits that the letter in question was sent by Mr. McKay and received by FNBO but disputes that any inference that the letter provided notice to FNBO that the 2009 Maverick Cattle were subject to a perfected security interest in favor of LOL. In fact, the letter states that the cattle were being "managed for Maverick by Joe Varner of Tri-County Livestock" and did not indicate that the cattle had been placed with 4-Square under a cattle consulting agreement.

RESPONSE TO STATEMENT OF FACT NO. 67: Disputed: although Mr. Kalkowski testified that he talked to Mr. McKay on June 16, 2009, Mr. Kalkowski did not testify that Mr. McKay "notified him of LOLFC's security interest in the Maverick Cattle." To the contrary, Mr. Kalkowski testified that Mr. McKay thought LOL might have financed the 2009 Maverick Cattle but didn't appear to know whether those cattle had been financed by LOL.

RESPONSE TO STATEMENT OF FACT NO. 68: Disputed: Mr. Kalkowski did not tell Mr. McKay that a subordination agreement was not necessary because FNBO was not claiming any interest in the "Maverick Cattle". (FNBO Supplemental Evidence Index, Exhibit 10 at ¶ 5; FNBO Supplemental Evidence Index, Exhibit 14, Exhibit A at p. 1)

RESPONSE TO STATEMENT OF FACT NO. 69: Disputed: Mr. Kalkowski did not provide such assurances to Mr. McKay. Furthermore, according to Mr. Kalkowski's notes of a conversation he had with Mr. McKay on August 13, 2009, Mr. McKay told Mr. Kalkowski that

Mr. McKay would re-read a draft subordination agreement Mr. Kalkowski had sent him and that Mr. McKay would potentially send language revising the draft. (FNBO Supplemental Evidence Index, Exhibit 10 at ¶ 6)

RESPONSE TO STATEMENT OF FACT NO. 70: Disputed. The 2009 Maverick Cattle were delivered to PJSCC in March and April of 2009 but were not inspected by 4-Square at PJSCC until June 2009. In fact, in March through May 2009 cattle which were allegedly financed by LOL were reportedly inspected by 4-Square at Maverick's feedlot. (FNBO Supplemental Evidence Index, Exhibit 19; FNBO Supplemental Evidence Index, Exhibit 15 at 107:16-113:5)

RESPONSE TO STATEMENT OF FACT NOS. 71 THROUGH 79: For the limited purpose of LOL's Motion for Summary Judgment only, FNBO does not dispute these facts except to the extent that the imply or infer that FNBO was a participant in the purported "Plan." FNBO disputes that it participated or agreed to any purported "Plan" to convert any cattle or proceeds thereof.

RESPONSE TO STATEMENT OF FACT NO. 80: Disputed. Mr. Kalkowski did not testify that FNBO assisted PJSCC in implementing "the Plan" as defined by LOL. Furthermore, Mr. Kalkowski did not testify that he had "multiple" conference calls with Mr. Kalkowski and Mr. Johnson throughout the summer of 2009 as suggested by LOL. In addition, Mr. Kalkowski testified that he left it up to Mr. Johnson to decide what to do with respect to the Maverick debt. (FNBO Supplemental Evidence Index, Exhibit 14 at 242:21-25) Mr. Johnson confirmed that PJSCC made the decision to assert a right of setoff against Maverick only after consulting with its own counsel. (FNBO Supplemental Evidence Index, Exhibit 13 at 52:21-53:5; 54:2-18)

RESPONSE TO STATEMENT OF FACT NO. 81: Disputed: Mr. Kalkowski testified that at some point he was informed by Bob Johnson that PJSCC had added a feed adjustment to Maverick's bills because Maverick was a high risk customer. (FNBO Supplemental Evidence Index, Exhibit 14 at 205:3-206:11) Mr. Kalkowski specifically denied being told that the adjustments were "just made up" by Mr. Johnson to recoup old feed bills. (FNBO Supplemental Evidence Index, Exhibit 14 at 206:5-11)

RESPONSE TO STATEMENT OF FACT NO 82: Disputed: Mr. Kalkowski testified that Mr. Meyers discussed with him and Mr. Johnson options that might be available with respect to setoff but also testified that he left it up to Mr. Johnson to decide what to do with respect to the Maverick debt. (FNBO Supplemental Evidence Index, Exhibit 14 at 242:2-25) Mr. Johnson confirmed that PJSCC made the decision to assert a right of setoff against Maverick only after consulting with its own counsel. (FNBO Supplemental Evidence Index, Exhibit 13 at 52:21-53:5; 54:2-18)

RESPONSE TO STATEMENT OF FACT NO. 83: Disputed: although Mr. Meyers apparently had a discussion with an attorney that he thought had been in contact with Mr. Johnson (see FNBO Supplemental Evidence Index, Exhibit 14, Exhibit C), Mr. Johnson testified that he never met with the attorney. (FNBO Supplemental Evidence Index, Exhibit 13 at 34:2-10)

RESPONSE TO STATEMENT OF FACT NOS. 84 THROUGH 86: For the limited purpose of LOL's Motion for Summary Judgment only, FNBO does not dispute these facts.

RESPONSE TO STATEMENT OF FACT NO. 87: Disputed: FNBO disputes that all proceeds deposited into PJSCC's business checking account (Account No. XXXX2555) were automatically transferred into the "Central Account" (Account No. XXXXX7549). Although

some funds were in fact transferred, others were not as PJSCC on a continual basis was drawing checks out of its checking account. Consequently not all of the funds deposited into PJSCC's checking account were in fact transferred or "swept" into the Central Account. (FNBO Evidence Index (Filing No. 174), Exhibit 1, Exhibit H-J.)

RESPONSE TO STATEMENT OF FACT NO. 88: Disputed: Mr. Kalkowski testified that PJSCC could deposit money into the central account. (FNBO Supplemental Evidence Index, Exhibit 14 at 216:10-18) He also testified that the central account was a deposit account. (FNBO Supplemental Evidence Index, Exhibit 14 at 216:21-23)

RESPONSE TO STATEMENT OF FACT NO. 89: Disputed: Mr. Kalkowski testified that funds in the business account were automatically swept on a daily basis into PJSCC's central account and that once the funds were collected they would be automatically: 1) swept out of the central account to pay down PJSCC's operating line of credit; or 2) swept back into the checking account to pay checks that had been presented for payment. (FNBO Supplemental Evidence Index, Exhibit 14 at 200:10-19;) (FNBO Evidence Index (Filing No. 174), Exhibit 8 111:23-112:6; Exhibit 3 134:2-134:11; Exhibit 1 at Exhibits H-J.)

RESPONSE TO STATEMENT OF FACT NO. 90: Disputed: Mr. Kalkowski testified that he had money moved from PJSCC's operating line to the customer line as requested by  Ms. Maloley in a fax and that the fax referenced  "payment on receivable from Maverick." (FNBO Supplemental Evidence Index, Exhibit 14 at 226:1-231:4; FNBO Supplemental Evidence Index, Exhibit 14, Exhibit A at p. 2)

RESPONSE TO STATEMENT OF FACT NOS. 91 & 92: For the limited purpose of LOL's Motion for Summary Judgment only, FNBO does not dispute these

facts.

RESPONSE TO STATEMENT OF FACT NO. 93:  Disputed: Mr. Kalkowski testified that he was not aware that Mr. Johnson was trying to use Mr. Kalkowski as the "bad guy." (FNBO Supplemental Evidence Index, Exhibit 14 at 203:9-204:1)

RESPONSE TO STATEMENT OF FACT NO. 94:  Disputed: Mr. Kalkowski denies making any such statement to Mr. McKay. (FNBO Supplemental Evidence Index, Exhibit 14 at 199:20-200:9)

RESPONSE TO STATEMENT OF FACT NO. 95:  Disputed: Mr. Kalkowski testified that Mr. Johnson told Mr. Kalkowski that Mr. Johnson was not going to distribute the proceeds anywhere until all the 2009 Maverick Cattle had been sold. (FNBO Supplemental Evidence Index, Exhibit 14 at 220:24-221:8) Also disputed to the extent that the definition of "Maverick Cattle" includes only those cattle placed by Maverick with PJSCC in 2009. Mr. Kalkowski did not testify that he told Mr. McKay that Mr. Johnson had agreed to deduct only the feed bills owed on the cattle placed by Maverick with PJSCC in 2009 before paying any proceeds to LOL. (FNBO Supplemental Evidence Index, Exhibit 14 at 186:25-188:9)

RESPONSE TO STATEMENT OF FACT NO. 96:  For the limited purpose of LOL's Motion for Summary Judgment only, FNBO does not dispute these facts.

RESPONSE TO STATEMENT OF FACT NO. 97:  Disputed: Mr. Kalkowski testified that funds in the business account were automatically swept on a daily basis into PJSCC' central account and that once the funds were collected they would be automatically: 1) swept out of the central account to pay down PJSCC's operating line of credit; or 2) swept back into the checking account to pay checks that had been

16

presented for payment. (FNBO Supplemental Evidence Index, Exhibit 14 at 200:10-19) (FNBO Evidence Index (Filing No. 174), Exhibit 8 111:23-112:6; Exhibit 3 134:2-134:11; Exhibit 1 at Exhibits H-J.)

RESPONSE TO STATEMENT OF FACT NOS. 98 THROUGH 116: For the limited purpose of LOL's Motion for Summary Judgment only, FNBO does not dispute these facts except for those set forth in Statement of Fact No. 111. Although FNBO admits that Mr. Kalkowski testified during his deposition on September 3, 2010 that FNBO had been unable to locate any records confirming the deposit of a replacement check from Tyson Fresh Meats, Inc. ("Tyson") in the amount of $491,534.72, subsequent to that deposition FNBO was able to confirm that a check from Tyson in the amount of $491,514.72 was deposited on May 3, 2010 in PJSCC's checking account maintained at FNBO. It should be noted that Mr. Kalkowski was not aware that a replacement check had been issued by Tyson until early August 2010 when he was asked to locate specific checks deposited in PJSCC's account. When he could not locate the original check from Tyson he contacted Keri Maloley at PJSCC and she told him that a replacement check had been issued by Tyson and later deposited in PJSCC's account at FNBO. (FNBO Supplemental Evidence Index, Exhibit 10 at ¶ 7)

RESPONSE TO STATEMENT OF FACT NOS. 117 THROUGH 124: Disputed: FNBO disputes these facts insofar as they are utilized in LOL's tracing analysis. FNBO disputes that FNBO retained any proceeds as alleged by LOL. LOL's analysis assumes that once amounts are swept out of the central account to reduce the balance owed on PJSCC's operating line of credit the funds at that point have been converted by FNBO. This ignores the fact that FNBO—often the very next business day—advanced money on the operating line. In that regard, LOL has not shown and cannot show that the

amount owed by PJSCC to FNBO was permanently reduced as a result of these "sweep" transactions that LOL would have the Court treat as permanent withdrawals from the account by FNBO. (FNBO Evidence Index (Filing No. 174), Exhibit 1, Exhibits H-J.)

## ADDITIONAL FACTS SUBMITTED BY FNBO IN OPPOSITION TO LOL'S MOTION FOR SUMMARY JUDGMENT

FNBO set forth in its Brief in support of its Motion for Summary Judgment a statement of material undisputed facts in support of FNBO's Motion for Summary Judgment. (Filing No. 175.) FNBO incorporates those facts herein by this reference in opposition to LOL's Motion for Summary Judgment. (Filing No. 174.) Briefly summarized, those undisputed facts show:

1.      PJSCC was a loan and deposit customer of FNBO. (FNBO Evidence Index (Filing No. 174), Exhibit 1 ¶ 7.) PJSCC's loan and deposit documents with FNBO made clear that FNBO had a security interest perfected by control in all accounts held by PJSCC at FNBO. (FNBO Evidence Index (Filing No. 174) Exhibit 1, Exhibits A-E.)

2.      As part of its banking relationship with PJSCC, FNBO would "sweep" funds in PJSCC's accounts held at FNBO. This arrangement required FNBO at the close of each banking day to determine whether the collected balance in PJSCC's deposit accounts held at FNBO were their "target balance." If there were excess funds within PJSCC's deposit accounts held at FNBO at the close of a banking day, then FNBO was required to set those funds off against PJSCC's outstanding loan balance. If the funds within PJSCC's deposit accounts held at FNBO at the close of a banking day were below the "target balance," then FNBO was required to advance funds sufficient to meet the target balance from PJSCC's line of credit. (FNBO Evidence Index (Filing No. 174), Exhibit 1, Exhibit F § 31.)

3.      The proceeds of the sale of the 2009 Maverick Cattle were deposited by PJSCC in its FNBO checking account. (FNBO Evidence Index (Filing No. 174) Exhibit 3, 233:1-15; 134:2-134:11; Exhibit 8, 111:23-112:6.) PJSCC's decision to deposit the proceeds of the 2009 Maverick Cattle was made by PJSCC after consultation with its own legal counsel. (FNBO Evidence Index (Filing No. 174), Exhibit 3, 138:24-140:10, Exhibit 9, 52:21-55:16.) Consistent with the terms of PJSCC's and FNBO's banking relationship, and with the parties' course of dealing and course of performance, during the period in which PJSCC was depositing the proceeds from the sale of the 2009 Maverick Cattle in its checking account at FNBO, FNBO would perform nightly "sweeps" of PJSCC's checking account. On some days, funds were taken from PJSCC's checking account and ultimately transferred to FNBO in order to pay down PJSCC's loans from FNBO. On other days, funds were drawn down from PJSCC's credit line with FNBO and ultimately deposited in PJSCC's checking account. (FNBO Evidence Index (Filing No. 174), Exhibit 8, 111:23-112:6; Exhibit 3 134:2-134:11.)

4.      In this case, LOL claims a security interest in the proceeds of the cattle sold by PJSCC in September through November 2009. LOL bases its claim on a security agreement and financing statement which described the collateral in which it had a security interest as follows:

> "[a]ll of the cattle whether now or hereafter acquired by [Maverick] and placed by [Maverick] with 4-Square Cattle Management Services under a Cattle Consulting Agreement . . . ."

(Filing Nos. 155-5, 155-6, 155-8 & 155-9.) LOL was the drafter of the collateral description language within its security agreement with Maverick as well as the financing statements filed in an attempt to perfect its purported security interest. (FNBO Supplemental Evidence Index, Exhibit 15 at 74:17-75:9; 118:11-18)

5.      The USDA defines "placement" as "cattle put into a feedlot, fed a ration which will

produce a carcass that will grade select or better, and are intended for the slaughter market." (FNBO Supplemental Evidence Index, Exhibit 11, Exhibit A at p. 7). This definition is the same meaning commonly attributed to the phrase "placed with" by persons participating in the livestock industry. (PJSCC Evidence Index, Filing Nos. 167-11 - 167-15; Filing No. 167-6, 15:17-19; 14:8-21; 84:17-23; 109:16-20; 119:12-15.)

6.     The 2009 Maverick Cattle were not "placed with" 4-Square, as that term is utilized by the USDA and the livestock industry. (PJSCC Evidence Index, Filing No. 167-6, 15:17-19; 14:8-21; 84:17-23; 109:16-20; 119:12-15.)

## DISCUSSION

**I.     LOL CANNOT ESTABLISH THE PRIMA FACIE ELEMENTS OF ITS CONVERSION & CONSPIRACY CLAIMS AGAINST FNBO.**

### A.     FNBO HAS PRIORITY TO FUNDS UNDER NEBRASKA'S UNIFORM COMMERCIAL CODE.

FNBO has filed its own motion for summary judgment in this case which sets forth the reasons why judgment should be entered in its favor on LOL's conversion claim. FNBO will not restate in full all of those reasons herein, but rather, will incorporate by reference its Brief in support of FNBO's Motions for Summary Judgment filed in this case. (Filing No. 175.)

Succinctly, though, FNBO as a secured creditor of PJSCC, is entitled to super-priority to funds deposited within PJSCC's deposit account at FNBO. *See* Neb. UCC § 9-327(3) (2010). LOL relies upon Neb. UCC § 9-310(a) in arguing that its security interest in the proceeds of the sale of the cattle placed by Maverick at PJSCC has priority and is enforceable against FNBO. This provision expressly recognizes that the filing of a financing statement will not perfect a security interest in proceeds placed in a

20

deposit account. *See* Neb. UCC §§ 9-310(a) & 9-312(b) (2010). Consequently, once the proceeds from the sale of the cattle placed by Maverick with PJSCC were deposited in PJSCC's checking account at FNBO, any secured claim of LOL in those proceeds lost priority to FNBO's security interest in PJSCC's account.  *See, e.g., City Bank v. Compass Bank*, No. EP-09-CV96-KC, 2010 WL 1959808 at *16 (W.D. Tex. May 12, 2010) (deposit taking bank with security interest in deposit account perfected by control was protected from conversion claim from parties claiming security interest in proceeds deposited within deposit account).

Similarly, FNBO was vested with a right of setoff in the funds deposited in PJSCC's deposit account. Under Nebraska's Uniform Commercial Code, FNBO's setoff right has priority over other secured parties claiming an interest in proceeds deposited in PJSCC's deposit account at FNBO. *See* Neb. UCC § 9-340(a) (2010); *see also Kentucky Highlands Investment Corp. v. Bank of Corbin, Inc.*, 217 S.W.3d 851, 856 (Ky. App. 2006) ("A depository bank may properly exercise its right of setoff against a secured party who seeks to assert an interest in a commercial deposit account – regardless of whether the secured party claims a security interest in the deposit account as original collateral or its proceeds."). Thus, to the extent that LOL's purported security interest in the proceeds of the cattle placed by Maverick with PJSCC attached to PJSCC's deposit account when the funds were deposited there, FNBO's right to setoff those funds against debts owed by PJSCC are superior to LOL's purported security interest. *See* Clark and Clark, 2 *The Law of Secured Transactions Under the Uniform Commercial Code* ¶ 3.11[1] at 3-85 (Rev. ed. Apr. 2010) ("UCC 9-340(a) gives a depository bank's common-law right of setoff priority over a security interest held by

another secured party, including one who claims the deposit account as cash proceeds of an asset-based loan.").

Finally, FNBO is also protected by the Nebraska Uniform Commercial Code to the extent it is a transferee of funds which PJSCC deposited in its deposit account at FNBO. Under the Code, transferees of funds from deposit accounts are protected from claims such as that made by LOL. *See* Neb. UCC § 9-332(b) (2010). FNBO is a transferee of the funds from PJSCC's deposit account insofar as certain funds were periodically transferred from PJSCC's deposit account to FNBO in order to pay down PJSCC's debt with FNBO. These transfers were automatically performed pursuant to the Treasury Services Agreement and only occurred when the funds within PJSCC's deposit account exceeded the predetermined "target balance." Therefore, FNBO, as a transferee of funds from a deposit account, takes the funds free of any security interest that LOL may claim in them. *See, e.g., Keybank National Assoc. v. Ruiz Food Products, Inc.*, Case No. 04-296-MHW, 2005 WL 2218441 at *7 (D. Idaho 2005) (finding that transferee of deposit account funds takes free of security interest under UCC § 9-332 because of "broad protections for transferees . . . to ensure that security interests in deposit accounts do not impair the free flow of funds").

    **B.**    **LOL CANNOT STATE A CLAIM FOR CONVERSION AGAINST FNBO BECAUSE BY THE TIME THE FUNDS PURPORTEDLY REACHED FNBO THEY HAD BEEN IRREVERSIBLY COMINGLED.**

LOL does not allege that FNBO converted the cattle placed by Maverick with PJSCC. Rather, LOL alleges that FNBO converted the proceeds from the sale of the cattle placed by Maverick with PJSCC when they were deposited in PJSCC's demand deposit account and allegedly utilized to pay down a portion of PJSCC's indebtedness

to FNBO. LOL cannot show which, if any, proceeds from the sale of the cattle placed by Maverick with PJSCC were used to pay down PJSCC's debt to FNBO because those proceeds were comingled in PJSCC's account. LOL attempts to do this in the form of an affidavit submitted by LOL's counsel in support of LOL's summary judgment motion.

The tracing analysis proffered by LOL should be rejected for several reasons. First, the *Turner*[1] case upon which LOL's analysis is based is distinguishable on its facts. In *Turner,* a bankruptcy court was trying to trace funds allegedly converted by a debtor by depositing the funds in a single account. In the present case, by contrast, we have multiple accounts and multiple lines of credit which render the *Turner* analysis meaningless. Furthermore, the *Turner* Court was trying to determine rights to funds in the account in question as of a date certain. In the case at bar, however, LOL is not trying to determine rights to funds in the accounts as of a date certain. Instead, *Turner* as well the cases cited in *Turner* in support of the tracing analysis it uses, dealt with tracing funds of a single debtor and/or trustee. In the case at bar, by contrast, LOL is trying to trace proceeds from multiple accounts from which funds are deposited and withdrawn. LOL's analysis incorrectly assumes that once amounts are swept out of the central account to reduce the balance owed on PJSCC's operating line of credit the funds at that point have been converted by FNBO. This ignores the fact that FNBO— often the very next business day—advanced money on the operating line. In that regard, LOL has not shown and cannot show that the amount owed by PJSCC to FNBO was permanently reduced as a result of these "sweep" transactions that LOL would have the Court treat as permanent withdrawals from PJSCC's deposit account by FNBO.

---

[1] *In re Turner*, 13 B.R. 15 (Bankr. D. Neb. 1981).

Second, LOL's analysis assumes that approximately $2 million in sales proceeds were improperly deposited into the operating account. This ignores the following undisputed facts:

      1.     The total sales proceeds from the 2009 Maverick Cattle was $3.7 million;

      2.     Maverick and LOL do not dispute the that Johnson was owed approximately $1.6 million in feed bills with respect to the 2009 Maverick Cattle; and

      3.     $630,000 of the sales proceeds are in an escrow account which, obviously, could not have been converted by FNBO.

Based on the above undisputed facts, at the very most, only approximately $1.5 million of the proceeds were improperly deposited into the FNBO account. This ignores, of course, the other $300,000 in disputed feed bills with respect to the 2009 Maverick cattle which would reduce that amount further.

Finally, there is simply no rhyme or reason regarding which cattle proceeds checks LOL chooses to plug into its tracing analysis. For example, LOL includes sales from Lot 1996 on September 11, 2009 and September 21, 2009 but ignores a sale from that lot on September 10, 2009. (Compare Filing Nos. 156-1 ¶ 7 and 156-3 p. 1.) Likewise, LOL includes sales from Lot 2006 on October 17, 2009 but ignores sales from that lot 2006 on October 20, 2009 and October 22, 2009. (Compare Filing Nos. 156-1 ¶ 7 and 156-3 p. 6.)

In light of the above, FNBO submits that even if the *Turner* analysis applies here there are genuine issues of material fact regarding how the analysis should be applied to

the facts of this case. Ultimately, those issues will need to decided by the jury based on

any testimony LOL can adduce from fact witnesses (it chose not to designate an expert

witness on tracing) rather than through testimony from legal counsel.

      **C.    THERE IS A MATERIAL ISSUE OF DISPUTED FACT AS TO WHETHER LOL'S DESCRIPTION OF THE COLLATERAL WITHIN ITS SECURITY AGREEMENT WITH MAVERICK AND FILED FINANCING STATEMENT WAS SUFFICIENT TO DESCRIBE THE CATTLE AT ISSUE IN THIS CASE.**

Both LOL's financing statement and its security agreement describe the

collateral in which LOL has a security interest as "[a]ll of the cattle whether now or

hereafter acquired by [Maverick] and placed by [Maverick] with 4-Square Cattle

Management Services under a Cattle Consulting Agreement . . . ." This description does

not apply to the cattle in this case because it is undisputed that the cattle at issue in this

case were placed with PJSCC. At the very least, LOL's use of the term "placed with" is

ambiguous and raises a material issue of disputed fact as to whether LOL's security

interest even attached to those cattle placed with PJSCC.

Neb. UCC § 9-203(b)(3)(A) provides that, in order for a security interest to be

enforceable, the debtor must authenticate a security agreement "that provides a

description of the collateral . . . ." Similarly, Neb. UCC §§ 9-502(a)(3) and 9-504(1)

require the financing statement to contain a sufficient description of the collateral in

order to be effective. Under Neb UCC § 9-108(a), a description of collateral is

sufficient if it "reasonably identifies what is described." LOL claims that its description

which identifies cattle "placed by [Maverick] with with 4-Square Cattle Management

Services under a Cattle Consulting Agreement . . ." is a computational or allocational

formula or procedure which is permitted to describe collateral under Neb UCC § 9-

108(b)(5).

In this case, the security agreement relied upon by LOL to establish its purported security interest does not describe the cattle at issue. The cattle at issue clearly were placed with PJSCC and not with 4-Square. (*See* FNBO Supplemental Evidence Index, Exhibit 11, Exhibit A at p. 7 (defining "placements" as "cattle put into a feedlot, fed a ration which will produce a carcass that will grade select or better, and are intended for the slaughter market"); (PJSCC Evidence Index, Filing Nos. 167-11 - 167-15; Filing No. 167-6, 15:17-19; 14:8-21; 84:17-23; 109:16-20; 119:12-15.)) Because LOL's description of the collateral in its security agreement and financing statement do not describe the collateral, LOL is not a secured party with respect to the proceeds of the cattle placed by Maverick with PJSCC nor is its purported interest perfected. *See, e.g., In re Lady Madonna Indus., Inc.*, 99 B.R. 536, 539 (Bankr. S.D.N.Y. 1989) ("It is axiomatic that a security agreement is not enforceable against the debtor or third parties unless the collateral is in the possession of the secured party, or the security agreement contains a description of the collateral."). Since LOL was the drafter of the security agreement and financing statement, these documents should be construed against LOL. *See Signal Capital Corp. v. Lake Shore Nat'l Bank*, 273 Ill. App. 3d 761, 772, 652 N.E.2d 1364, 1372 (Ill. App. Ct. 1995) (security agreements should be construed against the drafter).

In this case, FNBO submits that the term "placed with" unquestionably means providing specified livestock to a feeding operation such as a feed lot or feedyard. This position is supported not only by the extrinsic testimony offered by PJSCC in support of its Motion for Summary Judgment, but also by existing case law in which that phrase appears in relation to cattle or other livestock. *See, e.g., Border State Bank v. Bagley*

*Livestock*, 690 N.W.2d 326, 329 (Minn. App. 2005)  ("contract further provided that the cattle Johnson *placed with* Anderson were considered to be owned by Johnson Farms and any offspring is to be sold under Johnson Farms' name") (emphasis added) (internal quotations omitted); *In re: Wales*, Case No. 01-06262; Adv. No. 02-20068, 2004 WL 5851364 at *2 (S.D. Iowa) (June 23, 2004) ("Under the agreement, Plaintiffs *placed* breeding cattle into the care of the Judgment Defendants.") (emphasis added); *American Bank & Trust v. Shaull*, 2004 S.D. 40, 47, 678 N.W.2d 779, 787 (2004) ("Feldman's claim is grounded upon its ownership interest in the cattle it *placed with* Shaull for feeding and care pursuant to a bred cow agreement dated November 30, 2000.") (emphasis added); *In re Hofmann*, 144 B.R. 459, 464 (Bankr. N.D. 1992) ("In the instant case, pursuant to the cattle lease agreements, the Hofmanns were to care for the Holstein cows *placed with* them and ultimately return the cattle back to the Werners at the end of each yearly lease term.") (emphasis added); *Waterman v. Alta Verde Indus., Inc.*, 643 F. Supp. 797, 804 (E.D.N.C. 1986) (addressing dispute in which contract provided "[t]his agreement shall apply to all cattle *placed with* Feedyard from time to time or purchased by Feedyard for Owner's account") (emphasis added).

Even if the Court is not prepared to find as a matter of law that the description of collateral within LOL's financing statement applies only to those cattle placed with 4-Square for feeding, then the Court should, at the very least, find that the collateral description within LOL's security agreement and financing statement is insufficient due to its vagueness or ambiguity. *See, e.g., World Wide Tracers, Inc. v. Metropolitan Protection, Inc.*, 384 N.W.2d 442, 448 (Minn. 1986) (determining that collateral description within security agreement was too ambiguous and misleading to create a

27

security interest in the collateral at issue). At a minimum, though, the Court should find that the language in the security agreement and financing statement describing the collateral is ambiguous giving rise to a fact question as to its meaning. *See, e.g., Aircraft Equipment Co. v. Kiowa Tribe of Okla.*, 1998 Okla. 126, 133, 975 P.2d 450, 453 n.6 (1998) ("Where the language of a security agreement is unambiguous, the intent of the parties is a question of law; but where the language of a security agreement is ambiguous, the intent of the parties is a question of fact for the jury to decide."); *Davenport Ltd. v. 75th & Dodge I, L.P.*, 279 Neb. 615, 621, 279 N.W.2d 416, 422 (Mar. 26, 2010) ("The meaning of an ambiguous contract, however, is generally a question of fact."). LOL has in essence conceded as much by offering parol evidence on the meaning of the phrase "place with" as used in its security agreement and financing statement. (LOL Evidence Index, Filing No.155-2 ¶ 13); *see also Davenport*, 279 Neb. at 622-23, 279 N.W.2d at 423 ("In this regard, therefore, if a contract is ambiguous, the meaning of the contract is a question of fact, and a court may consider extrinsic evidence to determine the meaning of the contract. A written instrument is open to explanation by parol evidence when its terms are susceptible to two constructions or where the language employed is vague or ambiguous.").

### D.   LOL'S CLAIM OF CIVIL CONSPIRACY FAILS BECAUSE NO UNDERLYING TORT OF CONVERSION HAS BEEN COMMITTED BY FNBO AND THERE IS NO EVIDENCE THAT FNBO EVER COLLUDED WITH PJSCC TO CONVERT ANY PROPERTY

Because there is no viable underlying claim against FNBO for conversion, LOL's conspiracy claim for conversion also must fail. Under Nebraska law, "a conspiracy is not a separate and independent tort in itself; rather, it depends upon the existence of an underlying tort." *Ashby v. State*, 279 Neb. 509, 526-27, 779 N.W.2d 343, 357 (2010).

28

Thus, "a civil conspiracy is only actionable if the alleged conspirators actually committed some underlying misconduct." *Id*. "[W]ithout such underlying tort, there can be no cause of action for a conspiracy to commit the tort." *Id*.; *see also Lamar Co., LLC v. City of Fremont*, 278 Neb. 485, 499, 771 N.W.2d 894, 907 (2009) (affirming summary judgment motion against civil conspiracy claim where court determined that plaintiff's property rights had been extinguished by operation of law).

For the reasons set forth above, FNBO did not commit any act of conversion with respect to the proceeds deposited in PJSCC's deposit account held at FNBO in which FNBO held a security interest perfected by control and to which FNBO had a right of setoff. While it may be true that FNBO was informed of LOL's purported security interest in the cattle placed by Maverick with PJSCC before the proceeds from the sale of the cattle were deposited in PJSCC's checking account at FNBO, and FNBO may have even discussed with PJSCC LOL's and Maverick's rights with respect to the proceeds, these facts do not establish a prima facie case for conversion in light of the aforementioned statutory protections for deposit institutions with respect to deposit accounts in which they have a security interest. *See, e.g.*, Neb. UCC § 9-341 (2010). There is simply no evidence that the discussions between FNBO and PJSCC resulted in a plan or conspiracy to improperly deprive any person of any right or interest. In fact, Paul Johnson testified that the substance of his discussions with FNBO and its counsel on these topics went right "over his head." (FNBO Evidence Index (Filing No. 174), Exhibit 9 48:12-16.) Consequently, Mr. Johnson sought his own separate legal counsel and acted based upon that counsel's advice. (FNBO Evidence Index (Filing No. 174), Exhibit 9 54:2-18.) Mr. Johnson testified as follows with respect to FNBO's

involvement in the decision regarding deposit of the proceeds of the cattle placed by

Maverick at PJSCC:

    2    Q   Were you involved in trying to determine
    3 whether Johnson feedlot could retain all the proceeds
    4 from the sale of Maverick's cattle?
    5    A   Possibly.
    6    Q   Well, do you recall being part of that process
    7 or not?
    8    A   Yeah.
    9    Q   You were?  Yes?
    10    A   Yes.
    11    Q   Who else was involved in trying to determine
    12 whether Johnson feedlot could retain all the proceeds
    13 from the sale of Maverick's cattle?
    14    A   I think that's when I seeked legal services.
    15    Q   Would that have been from the Domina law
    16 offices?
    17    A   Correct.
    18       MR. RAFFETY:  I'll object on privileged.
    **19    Q   Was Chris Kalkowski or anybody else from FNBO**
    **20 involved in trying to determine whether Johnson feedlot**
    **21 could retain all the proceeds from the sale of**
    **22 Maverick's cattle?**
    **23    A   I don't know what he was doing.**

(FNBO Evidence Index (Filing No. 174), Exhibit 3, 19:2-23.)

                                    ***

    24    Q   Does -- is this an example of what FNBO would
    25 do in sweeping your business checking account?
    1    A   I presume.
    2    Q   Did you know that FNBO was sweeping your
    3 business checking account?
    4    A   Yes, yes.
    **5    Q   Did you have any discussions with FNBO about**
    **6 sweeping your business checking account to obtain the**
    **7 proceeds from the sale of Maverick's cattle?**
    **8    A   I never talked about that, no.**
    9    Q   If I were to tell you that almost all of the
    10 checks for the proceeds from the cattle in the six lots
    11 we're talking about were deposited and then swept by
    12 FNBO like the deposit we just saw, would that surprise
    13 you?

14   A   No.
15   Q   Was -- was that something that FNBO typically
16 did?
17   A   Yes.
**18   Q   Who -- who participated in the decision to use
19 the proceeds from the six lots that we've been talking
20 about to pay Johnson feedlot's loans with FNBO?
21   A   I would say the law firm and myself.
22   Q   Did you also have discussions with Chris
23 Kalkowski about using the proceeds from the six lots to
24 pay down Johnson feedlot's loans with FNBO?
25   A   Possibly after I talked to the law office.
1   Q   So Mr. Kalkowski knew that you were going to
2 be depositing the proceeds from those six lots into your
3 business checking account; right?
4   A   He knew after I seeked legal counsel, he was
5 told what I was going to do.
6   Q   He was told by whom?
7   A   By me.
8   Q   And what did you tell him?
9   A   That we were going to sweep that money or take
10 that money.**

(FNBO Evidence Index (Filing No. 174), Exhibit 3, 138:24-140:10.)

                                 ***
25      Q.  Did you and Chris Kalkowski in the summer
 1  of 2009 have any discussions about a negative
 2  balance?
 3      A.  I'm sure we did, yes.
 4      Q.  Do you know what specifically you talked
 5  about?
 6      A.  I don't recall.  I imagine it's with the
 7  Maverick debt isn't included in here.
 8      Q.  Did -- do you recall in June of 2009
 9  receiving any pressure from Chris Kalkowski to
10  chisel that number down?
11          MR. HARGENS:  Object to the form.
12          MR. RAFFETY:  Same objection.
13          THE WITNESS:  I think something was
14  discussed, but --
15  BY MR. NICHOLS:
16      Q.  What was the nature of the discussion?
17      A.  Somehow we have to get this number lower.
18      Q.  Did you tell Chris how you were going to
19  go about getting that number lower?

20      A.   Not really.  I mean, we were going to try
21  to get some money from Maverick to clear it up.
**22      Q.   Did Chris offer you any advice on how to**
**23  get this number reduced?**
**24      A.   Not really.  I mean, not other than trying**
**25  to figure it out, how you can get some money.**

(FNBO Evidence Index (Filing No. 174), Exhibit 9, 28:25-29:25.)

***

**18      Q.   Do you recall whether he encouraged you to**
**19  keep the money?**
**20      A.   He didn't encourage me -- or he said it**
**21  was my call.**
**22      Q.   Did he offer you any suggestions as to**
**23  what to do?**
**24      A.   Not really.**
**25      Q.   Did you and Chris discuss the Land O'Lakes**
**1  lien?**
**2      A.   No.**

(FNBO Evidence Index (Filing No. 174), Exhibit 9, 30:18-31:2.)

***

5      Q.   Did you talk to Chris in October of 2009
6  about selling the Maverick cattle?
7      A.   I'm sure I did.
8      Q.   What types of things would you guys
9  discuss when you talked about it?
10     A.   I don't know.
**11      Q.   Did Chris ever tell you that a check**
**12  should be made payable to Land O'Lakes or Maverick**
**13  Feeders?**
**14      A.   No.**
**15      Q.   Never directed how the check should be**
**16  cut?**
**17      A.   No.**

(FNBO Evidence Index (Filing No. 174), Exhibit 9, 45:5-17.)

***

**5      Q.   Did you feel in October of 2009 pressure**
**6  to take all of the Maverick proceeds and apply them**

7 **to your debt to FNBO?**
8              MR. HARGENS:  Object to the form.
9              MR. RAFFETY:  Same objection.
**10             THE WITNESS:  No pressure.**

(FNBO Evidence Index (Filing No. 174), Exhibit 9, 46:5-10.)

                              ***

**3     Q.  Is it fair to say that the purpose of the**
**4 conference call was to try to figure out how Johnson**
**5 Feedlot and FNBO could keep the proceeds from the**
**6 sale of the cattle that Maverick was delivering in**
**7 March and April of 2009?**
**8     A.  No.**

(FNBO Evidence Index (Filing No. 174), Exhibit 9, 48:3-8.)

                              ***

21     Q.  So you are saying as of March 31st, 2009,
22 it was your plan to send the proceeds from the sale
23 of Maverick's cattle after the payment of your fees
24 for feeding and caring for those cattle to Maverick?
25     A.  To either Maverick or Tri County or Joe
1 Varner.  We couldn't tell.
2     Q.  Now, obviously that plan changed at some
3 point, didn't it?
4              MR. RAFFETY:  Object to the form.
5              THE WITNESS:  Yeah.
6 BY MR. HARGENS:
7     Q.  When did it change?
8     A.  When no attempt was made to get any of the
9 debt cleared up.
10     Q.  No attempt by Maverick?
11     A.  Correct.
12     Q.  So Maverick didn't pay off the old debt,
13 right?
14     A.  Correct.
15     Q.  And at that point, you decided to keep the
16 proceeds from the sale of Maverick's cattle?
17     A.  Correct.
18     Q.  To pay that debt, correct?
19     A.  Correct.
**20     Q.  And was the plan to claim the right of**
**21 setoff to justify keeping the cattle?**

22          MR. RAFFETY:  Object to the form --
**23          THE WITNESS:  I --**
24          MR. RAFFETY:  -- and foundation.
**25          THE WITNESS:  -- don't know.**
1 BY MR. MIESEN:
**2     Q.  When did this the plan to keep all of the**
**3 proceeds, when was that -- when did that become the**
**4 plan?**
5          MR. RAFFETY:  Object to the form.
**6          THE WITNESS:  After I talked -- after**
**7 I got Domina Law Office involved.**
8 BY MR. MIESEN:
**9     Q.  And I think the testimony was that you**
**10 retained Domina Law Group sometime in June of 2009?**
**11     A.  I think so.**
**12     Q.  So prior to retaining Domina Law Group,**
**13 the plan was to return the net proceeds over to**
**14 Maverick, correct?**
**15     A.  Correct.**
**16     Q.  And after retaining Domina Law Group, the**
**17 plan changed to keeping all of the proceeds?**
**18     A.  Correct.**
**19     Q.  Yet we do know that in March of 2009 you**
**20 were discussing potentially retaining the proceeds**
**21 to retain the old debt, right?**
22          MR. HARGENS:  Object to the form and
23 foundation.  Asked and answered.
24          MR. RAFFETY:  Same.
**25          THE WITNESS:  There was some talk**
**1 about it.  Something needed to be done.**
2 BY MR. MIESEN:
**3     Q.  Mr. Kalkowski testified during his**
4 deposition that during late summer of 2009 you and
5 he agreed that the proceeds from the sale of
6 Maverick's cattle after deducting your fees for
7 feeding and caring for those cattle would be turned
8 over to LOL Finance Company.
**9          Did you reach an agreement with**
**10 Mr. Kalkowski that that is what would be done with**
**11 the proceeds?**
12          MR. HARGENS:  Object to the form.
13          MR. RAFFETY:  Same objection.
**14          THE WITNESS:  I don't recall that,**
**15 but I was doing everything that I was told by the**
**16 law office.**

34

(FNBO Evidence Index (Filing No. 174), Exhibit 9, 52:21-55:16.)

***

> 19   Q.  Okay.  Did you discuss with Chris
> 20 Kalkowski the possibility of using Maverick proceeds
> 21 to pay a debt to Jeff Biegert?
> 22   A.  No.
> 23   Q.  Never mentioned that to him?
> 24   A.  No.
> 25   Q.  If -- would you grab Exhibit 71 for me?
>  1 Turn to Page 2.
>  2       Did you speak with anyone at FNBO about
>  3 using proceeds from the sale of Maverick cattle to
>  4 pay debt to Jeff Biegert?
>  5   A.  I don't -- I can't recall.
>  6   Q.  Did you mention to anyone at FNBO that
>  7 Maverick owed a debt to Jeff Biegert, LLC?
>  8   A.  I don't recall.

(FNBO Evidence Index (Filing No. 174), Exhibit 9, 73:19-74:8.)

The testimony above conclusively demonstrates that FNBO was not a "co-conspirator" in any plan or scheme to deprive LOL of its purported rights in the cattle placed by Maverick at PJSCC. *See Ashby*, 279 Neb. at 526, 779 N.W.2d at 357 (a conspiracy claimant must be able "to prove the existence of at least an implied agreement . . . to accomplish an unlawful or oppressive object, or a lawful object by unlawful or oppressive means"). There is simply no evidence of any type of agreement between FNBO and PJSCC to convert anything. To the contrary, PJSCC prudently acted on the advice of *its counsel*. In light of the testimony above from Mr. Johnson, it cannot credibly be argued that FNBO acted in concert with anyone to accomplish any unlawful or oppressive object.

FNBO's actions with respect to the funds contained within PJSCC's deposit account were consistent with the parties' course of dealing and performance, and were

in accordance with contractual agreements which had been in place for years. A review of the daily account balances demonstrates that there was no concerted effort on the part of FNBO and PJSCC to deprive either LOL or Maverick of any interest they may have otherwise had in the proceeds from the sale of the cattle placed by Maverick with PJSCC. Rather, the proceeds of the sale of the cattle placed by Maverick with PJSCC, consistent with PJSCC's standard business practices, were comingled in its checking account with the proceeds from the sale of other cattle.

PJSCC's balances on its various accounts and loans with FNBO fluctuated daily between September 1, 2009 and November 4, 2009. On some days funds were swept from PJSCC's deposit account to pay down its credit line with FNBO, while on other days during this period *funds were drawn* from PJSCC's credit line and deposited within its deposit accounts. The fact that FNBO continued to advance money to PJSCC on PJSCC's line of credit after PJSCC deposited the proceeds of the sale of the cattle placed by Maverick with PJSCC in PJSCC's deposit account in and of itself undermines any conspiracy claim against FNBO. *See, e.g., City Bank v. Compass Bank*, No. EP-09-CV96-KC, 2010 WL 1959808 at *14 (W.D. Tex. May 12, 2010) (finding no collusion between the bank and the depositor where proceeds deposited in deposit account and used to pay down line of credit was subsequently drawn upon by the debtor).

## II. THERE ARE NUMEROUS MATERIAL ISSUES OF DISPUTED FACT WHICH PRECLUDE THE ENTRY OF SUMMARY JUDGMENT IN FAVOR OF LOL.

LOL's statement of undisputed material facts contained 124 paragraphs and spanned 26 pages. FNBO has disputed the material facts set forth within 48 of those paragraphs. Consequently, LOL's claims are clearly not suited for summary judgment

in LOL's favor. FNBO will not rehash each and every material fact it disputes, but succinctly, the following facts fundamental to LOL's claim are in dispute:

- Whether Maverick even had an ownership interest in the cattle at issue (FNBO Supplemental Evidence Index, Exhibit 16, Exhibit A at LOLFC000029; FNBO Supplemental Evidence Index, Exhibit 12, Exhibit A; FNBO Supplemental Evidence Index, Exhibit 16 at 15:24-16:11; 65:4-14; FNBO Supplemental Evidence Index, Exhibit 12 at 59:12-17; FNBO Supplemental Evidence Index, Exhibit 16, Exhibit A at LOLFC000112-000120; FNBO Supplemental Evidence Index, Exhibit 19; FNBO Supplemental Evidence Index, Exhibit 15 at 107:16-113:5; FNBO Supplemental Evidence Index, Exhibit 14, Exhibit B.)

- Whether LOL's collateral description contained within its security agreement sufficiently described the cattle at issue in this case (PJSCC Evidence Index, Filing No. 167-6, 15:17-19; 14:8-21; 84:17-23; 109:16-20; 119:12-15; FNBO Supplemental Evidence Index, Exhibit 11, Exhibit A at p. 7; PJSCC Evidence Index, Filing Nos. 167-11 - 167-15.)

- Whether LOL's collateral description contained within its financing statement sufficiently described the cattle at issue in this case (Id.)

- Whether the proceeds from the cattle at issue are even traceable and recoverable by LOL (FNBO Evidence Index (Filing No. 174), Exhibit 1, Exhibits H-J.)

- Whether there was any agreement or plan between FNBO and PJSCC to accomplish an unlawful or oppressive object, or a lawful object by unlawful or oppressive means (FNBO Evidence Index (Filing No. 174), Exhibit 3, 19:2-23, 138:24-140:10; Exhibit 9, 28:25-29:25, 30:18-31:2, 45:5-17, 46:5-10, 48:3-8, 52:21-55:16, 73:19-74:8.)

- Whether FNBO ever assured LOL that FNBO claimed no interest in the proceeds from the sale of the cattle placed by Maverick with PJSCC (FNBO Supplemental Evidence Index, Exhibit 10 at ¶¶ 5-6)

In light of the numerous disputed factual issues which LOL has conceded are "material" to its claims, there is no basis to award summary judgment in LOL's favor on its claims. *See, e.g., Ag Services of America, Inc. v. United Grain, Inc.*, 75 F. Supp. 2d 1037, 1052 (D. Neb. 1999) (denying summary judgment motion where there were disputed issues of material fact).

**III.    LOL IS NOT ENTITLED TO PREJUDGMENT INTEREST**

Under Nebraska law, "[p]rejudgment interest may be awarded only as provided in Neb. Rev. Stat. § 45-103.02(2)." *Dutton-Lainson Co. v. The Continental Ins. Co.*, 279 Neb. 365, 377, 788 N.W.2d 433 (Feb. 5, 2010). "Under § 45-103.02(2), prejudgment interest is recoverable only when the claim is liquidated, that is, when there is no reasonable controversy as to the plaintiff's right to recover and the amount of such recovery. This determination requires a two-pronged inquiry. There must be no dispute as to the amount due and to the plaintiff's right to recover." *Id.* (citing *Archbold v. Reifenrath*, 274 Neb. 894, 744 N.W.2d 701 (2008)).

In this case, there is no question that there is a dispute as to both whether LOL has a right to recover from FNBO and as to the amount of such recovery. Consequently, there is no basis for LOL to make a prejudgment interest claim, and this Court should deny LOL's motion for summary judgment on this issue.

### CONCLUSION

For the foregoing reasons, FNBO respectfully requests that this Court deny LOL's Motion for Summary Judgment on its claims filed against FNBO.

Dated this 6th day of October, 2010.

First National Bank of Omaha,
Defendant,


By:/s/Thomas O. Kelley_____
   William F. Hargens (#16578)
   Thomas O. Kelley (#22667)
   McGrath North Mullin & Kratz, PC LLO
   Suite 3700 First National Tower
   1601 Dodge St.
   Omaha, Nebraska 68102
   (402) 341-3070
   (402) 952-1848 fax
   whargens@mcgrathnorth.com
   tokelley@mcgrathnorth.com

   Attorneys for Defendant, First National
   Bank of Omaha

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on the 6th day of October, 2010, I electronically filed the foregoing document with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the following:

David A. Domina
ddomina@dominalaw.com

Mark D. Raffety
mraffety@dominalaw.com

Shawn M. Nichols
snichols@cadlaw.com

Steven W. Sanford
ssanford@cadlaw.com

Jonathan C. Miesen
JCMiesen@stoel.com

/s/Thomas O. Kelley

Thomas O. Kelley
