UNITED STATES DISTRICT COURT

DISTRICT OF NEBRASKA

---

| | |
|---|---|
| LOL Finance Company, | Case No. 09-CV-3224-RGK |
| Plaintiff, | |
| v. | **PLAINTIFF'S REPLY** |
| | **MEMORANDUM OF LAW IN** |
| Paul Johnson & Sons Cattle Co., Inc., First | **SUPPORT OF MOTION FOR** |
| National Bank of Omaha, Robert P. Johnson | **SUMMARY JUDGMENT** |
| Keri J. Maloley, John Doe and ABC | **AGAINST DEFENDANT FIRST** |
| Company, | **NATIONAL BANK OF OMAHA** |
| Defendants. | |

---

Paul Johnson & Sons Cattle Co., Inc.,

Third-Party Plaintiff,

v.

Maverick Feeders, Inc., Shon Sawyer and
Julie Sawyer,

Third-Party Defendants.

---

## INTRODUCTION

If the Court properly rejects the new affirmative defenses that Defendant First

National Bank of Omaha ("FNBO") is attempting to sneak into this case at the eleventh

hour, or if the Court permits FNBO to assert those defenses but concludes that the

"Central Account" is not a "deposit account" within the meaning of Neb. Rev. Stat.

(UCC) § 9-102(29), Plaintiff LOL Finance Company ("LOLFC") is entitled to summary

judgment because FNBO has failed to create any genuine issue of material fact and its original defenses, which it has not even bothered to mention, fail as a matter of law. If, on the other hand, the Court permits FNBO to assert its new, unpleaded affirmative defenses and the Court determines that the Central Account is a deposit account, LOLFC would still be entitled to summary judgment against Defendants Paul Johnson & Sons Cattle Co., Inc. ("PJSCC"), Robert P. Johnson and Keri J. Maloley (collectively referred to as "the PJSCC Defendants") and would also be entitled to recover all sums deposited into the Approved Escrow Account. Under this second scenario, the remaining issue, FNBO's defense under Neb. Rev. Stat. (UCC) § 9-332(b), would have to proceed to trial because there is, at a minimum, a genuine issue of material fact regarding FNBO's collusion with the PJSCC Defendants to violate LOLFC's security interest.

## REPLY ARGUMENT

## I. FNBO'S NEW, UNPLEADED AFFIRMATIVE DEFENSES SHOULD NOT BE CONSIDERED BY THE COURT AND, IN ANY EVENT, FAIL AS A MATTER OF LAW.

FNBO's principal arguments in opposition to LOLFC's summary judgment motion are based upon its two new, unpleaded defenses of "set off" and a security interest in PJSCC's "deposit accounts." As set forth in LOLFC's Memorandum of Law in opposition to FNBO's summary judgment motion, FNBO should not be permitted to raise these new affirmative defenses, for the first time, at the summary judgment stage of this case. (09/30/10 LOLFC Memo. of Law pp. 9-20 (Docket No. 182)). Moreover, even if FNBO were allowed to amend the Final Progression Order and amend its Answer, its two new defenses fail as a matter of law. (Id. pp. 22-30).

In its response Brief, FNBO attempts to beef up its new defenses by claiming that its Vice President, Christopher Kalkowski, testified that the Central Account is a "deposit account." (10/06/10 FNBO Brief pp. 15 (Response to Statement of Fact No. 88)(Docket No. 190)). This allegation is not entirely accurate. FNBO supplied the Court with an incomplete portion of Mr. Kalkowski's testimony on this issue. Mr. Kalkowski's complete testimony was as follows:

> Q:    Does Johnson feedlot have the ability to make withdrawals from the central account?
>
> A:    No.
>
> Q:    Does Johnson feedlot have the ability to make its own deposits into the central account?
>
> A:    You could.
>
> Q:    Is that ever done?
>
> A:    I don't think so.
>
> Q:    Would you consider the central account to be a deposit account?
>
> A:    Technically, yes, but no, I would not consider it as in how I think you're referring to it as a deposit account.

(Kalkowski Depo. p. 216, lines 19-25 (Plaintiff's Evidence Index ("PEI") at 563)(emphasis added)). Mr. Kalkowski later clarified that all transactions involving the Central Account are controlled exclusively by FNBO:

> Q:    Are all of the transactions for the central account controlled by FNBO?
>
> A:    By our computer system, as a general rule, they should be. I'm sure there can be an exception to that.

> Q:      So if money goes into the central account, it's because FNBO put it there; correct?
>
> A:      It's because our computer system would have put it there.
>
> Q:      And conversely, if money goes out of the central account, it's because FNBO took it out of that account; correct?
>
> A:      That our computer system moved it.

(Supp. Kalkowski Depo. p. 47, lines 5-17 (PEI at 600)).   As set forth in LOLFC's Memorandum of Law in opposition to FNBO's Motion for Summary Judgment, an account which neither accepts deposits from nor allows withdrawals by the owner of the account is clearly not a "deposit account" within the meaning of Neb. Rev. Stat. (UCC) § 9-102(29).   (09/30/10 LOLFC Memo. of Law pp. 22-23 (Docket No. 182)).

## II.   LOLFC HAS ACCURATELY AND EFFECTIVELY TRACED THE PROCEEDS CONVERTED BY FNBO.

LOLFC has submitted a tracing analysis that effectively and accurately traces the proceeds from seven checks in the total amount of $2,000,494.43 issued by meat-packing companies for the Maverick Cattle (as defined in LOLFC's Memorandum of Law in Support of its Motion for Summary Judgment) from the time the checks were deposited into PJSCC's Business Checking Account to the time they were removed from the Central Account by FNBO to pay down PJSCC's operating line of credit.   (Miesen SJ Aff. ¶¶ 7-8 and Exs. C-F (PEI at 296-97 and 308-41)).   Applying the tracing rule approved in the case of In re Turner, 13 B.R. 15, 22 (Bankr. D. Neb. 1981), LOLFC's tracing analysis conclusively shows that FNBO applied proceeds from the seven checks in the total amount of $1,596,227.45 to pay down PJSCC's operating line of credit.   (Id.

Ex. F (PEI at 335-41)).  Of this amount, the sum of $1,496,152.49 is due to LOLFC based upon its security interest.  (09/16/10 LOLFC Memo. of Law p. 52 (Docket No. 154)).

FNBO claims that LOLFC's analysis deals with funds transferred through multiple accounts (PJSCC's Business Checking Account and Central Account) while the Court in Turner only had to trace funds through one account.  (10/06/10 FNBO Brief p. 23 (Docket No. 190)).  FNBO further claims that the Court in Turner traced funds as of a "date certain," while LOLFC's tracing analysis traces the funds up to the time they were used by FNBO to pay down PJSCC's operating line of credit.  (Id.).  These are distinctions without any significance.  As indicated above, LOLFC's tracing analysis accurately applies the Turner rule to trace the proceeds from the seven checks from the time they were deposited into PJSCC's Business Checking Account to the time they were removed by FNBO from PJSCC's Central Account to pay down PJSCC's operating line of credit.  (Miesen SJ Aff. Ex. F (PEI at 335-41)).  FNBO has yet to identify a single error in LOLFC's tracing analysis.

FNBO also claims that LOLFC's tracing analysis does not account for the fact that FNBO subsequently made certain advances to PJSCC on its credit lines.  (10/06/10 FNBO Brief p. 23 (Docket No. 190)).  FNBO's argument ignores the fact that it became liable for conversion when it exercised dominion and control over the proceeds by applying them to pay down PJSCC's operating line of credit.  See General Electric Capital Corp. v. Union Planters Bank, N.A., 409 F.3d 1049, 1060 (8th Cir. 2005); Ag Services of America, Inc. v. Empfield, 255 Neb. 957, 959, 587 N.W.2d 871, 873 (1999).

Whether FNBO subsequently used some or all of the proceeds to make additional advances to PJSCC, loaned them out to other borrowers or gave them to a charity is immaterial.

Finally, FNBO claims, based upon the total proceeds from the sale of the Maverick Cattle, the total legitimate fees charged by PJSCC and the amounts deposited into the Approved Escrow Account, that the maximum amount of recoverable proceeds from FNBO is approximately $1.5 million.  (10/06/10 FNBO Brief p. 24 (Docket No. 190)).  LOLFC agrees.  As set forth in its Motion for Summary Judgment and accompanying Memorandum of Law, LOLFC is only seeking to recover proceeds from FNBO in the amount of $1,496,152.49 (Total Proceeds Due to Debtors of $2,126,442.77 – Amounts Deposited in Approved Escrow Account of $630,290.28).  (09/16/10 LOLFC Motion p. 2 (Docket No. 153); 09/16/10 LOLFC Memo. of Law pp. 52-56 and 58 (Docket No. 154)).  Thus, even though LOLFC was able to effectively trace proceeds in the amount of $1,596,227.45, it is only entitled to recover $1,496,152.49 of those proceeds from FNBO.  (Id.).

## III. THE COLLATERAL DESCRIPTIONS IN LOLFC'S FINANCING STATEMENT AND SECURITY AGREEMENT ARE SUFFICIENT AS A MATTER OF LAW.

FNBO makes the same arguments asserted by the PJSCC Defendants regarding the collateral descriptions set forth in LOLFC's financing statement and Commercial Security Agreement.  Like the PJSCC Defendants, FNBO ignores the applicable legal standards and the plain language of LOLFC's financing statement and Commercial Security Agreement.

### A.      The Collateral Description in LOLFC's Financing Statement is Sufficient as a Matter of Law.

With respect to financing statements, the applicable legal standard is whether a financing statement contains just enough information "to induce a subsequent creditor to make further inquiries." Thorp Commercial Corp. v. Northgate Indus., Inc., 654 F.2d 1245, 1249 (8th Cir. 1981); U.S. v. Southeast Mississippi Livestock Farmers Assoc., 619 F.2d 435, 439 (5th Cir. 1980)(upholding financing statements because "any reasonable party examining the financing statements . . would have been sufficiently alerted to direct an inquiry to [the secured creditor]"); Bryan Bros. Cattle Co. v. Glenbrook Cattle Co., LLC, 2006 U.S. Dist. LEXIS 29926 **24-25 (N.D. Miss. 2006)(financing statement upheld because it was "sufficient to put a reasonable purchaser on notice that it should at least inquire into the status of the cattle in question"); In re Pickle Logging, Inc., 286 B.R. 181, 184 (Bankr. M.D. Ga. 2002)("The description merely needs to raise a red flag to a third party indicating that more investigation may be necessary to determine whether or not an item is subject to a security agreement"). Even a collateral description that is vague or ambiguous can pass this test. Indeed, vague or ambiguous descriptions, by their very nature, prompt further inquiry. In re Tri-State Equipment, Inc., 792 F.2d 967, 971 (10th Cir. 1986); Thorp, 654 F.2d at 1249-53; Bryan Bros., 2006 U.S. Dist. LEXIS 29926 at **24-25; First Bank v. Eastern Livestock Co., 837 F.Supp. 792, 800 (S.D. Miss. 1993). Because the purpose of a financing statement is simply to provide inquiry notice, courts liberally and leniently construe collateral descriptions contained in financing statements. CLC Equipment Co. v. Brewer, 139 F.3d 543, 545 (5th Cir. 1998); U.S. v. Collingwood

Grain, Inc., 792 F.2d 972, 974 (10th Cir. 1986); Tri-State, 792 F.2d at 971; In re Bob

Schwermer & Assocs., Inc., 27 B.R. 304, 309 (N.D. Ill 1983); Border State Bank v.

Bagley Livestock Exchange, Inc., 690 N.W.2d 326, 331 (Minn. Ct. App. 2003), pet for

rev. denied (Minn. Feb. 23, 2005); Polk Co. Bank v. Graven, 745 S.W.2d 793, 795 (Mo.

Ct. App. 1988).

      The collateral description set forth in LOLFC's financing statement easily passes

this test.  While it is true that the collateral description refers to cattle "placed by Debtor

with 4-Square," FNBO, like the PJSCC Defendants, conveniently ignores the rest of the

language of the description, which makes its meaning perfectly clear.   The full

description provides that LOLFC's security interest applies to "cattle whether now owned

or hereafter acquired by Debtorr [sic] and placed by Debtor with 4-Square Cattle

Management Services under a Cattle Consulting Agreement executed between Debtor

and 4-Square Cattle Management Services . . . ."   (McKay SJ Aff. Ex. C (PEI at

25)(emphasis added)).  FNBO admits that "4-Square provides cattle-consulting services

to cattle producers."  (LOLFC Statement of Fact No. 11 (09/16/09 LOLFC Memo. of

Law p. 4 (Docket No. 154); FNBO Resp. to LOLFC Statement of Fact No. 11 (10/06/10

FNBO Response Brief p. 3 (Docket No. 190)).  FNBO further admits that a company can

provide cattle-consulting services without owning or operating a cattle feedlot.

(Kalkowski Depo. p. 117, line 17, through p. 118, line 14 (PEI at 538-39)).  Based upon

these undisputed facts, as well as the plain language of LOLFC's financing statement and

the policy of liberally and leniently construing collateral descriptions, the collateral

description contained in LOLFC's financing statement is clearly sufficient to prompt

interested parties to <u>at least</u> conduct further inquiry.  Even if the collateral description were ambiguous, which it is not, any ambiguity would simply provide an additional reason for further inquiry.  <u>Tri-State</u>, 792 F.2d at 971-72; <u>Thorp</u>, 654 F.2d 1249-53; <u>Bryan Bros</u>., 2006 U.S. Dist. LEXIS 29926 at **24-25; <u>First Bank</u>, 837 F.Supp. at 800.  Accordingly, the collateral description in LOLFC's financing statement is sufficient as a matter of law.

**B.      The Collateral Description in LOLFC's Commercial Security Agreement is Also Sufficient as a Matter of Law.**

With respect to security agreements, the applicable standard is not whether the collateral description provides sufficient notice to third parties.  <u>GP Credit Co., LLC v. Orlando Residence, Ltd</u>., 349 F.3d 976, 982 (7th Cir. 2003)("The purpose of the security agreement in a UCC-governed transaction, as distinct from the financing statement, is to define the rights of the parties, not to confer rights on third parties").  Instead, the applicable standard is whether the collateral description "make[s] possible the identification of the collateral described."  Neb. Rev. Stat. (UCC) § 9-108, Off. Cmt. 2.  A description satisfies this standard and "reasonably describes" the collateral if, among other things, it uses an "allocational formula or procedure" or a method that allows the collateral to be "objectively determinable."  <u>Id</u>. § 9-108(b)(5) and (6).

In this case, there is no ambiguity regarding the cattle covered by LOLFC's Commercial Security Agreement.  The detailed and meticulous records used by 4-Square to formally introduce the Maverick Cattle into the 4-Square consulting program make identification of the collateral described in the Commercial Security Agreement

"objectively determinable."  When the Maverick Cattle were purchased, the seller, Tri-County Livestock Exchange, Inc. ("Tri-County"), issued invoices (described as "Buyer Recaps"), which described the Maverick Cattle by type, quantity and weight.  (Sauder Aff. ¶ 9 and Ex. B (PEI at 58 and 72-86)).  Upon receipt of the Buyer Recaps, 4-Square prepared Cattle Receipt and Evaluation Agreements to confirm the placement of the Maverick Cattle by Maverick Feeders, Inc., Shon D. Sawyer and Julie K. Sawyer (hereinafter collectively referred to as "Debtors") into the 4-Square consulting program. (Id. ¶ 10 and Ex. C (PEI at 58-59 and 87-116)).  A separate Cattle Receipt and Evaluation Agreement was prepared for each Buyer Recap.  (Id. Ex. C (PEI at 87-116)).  The applicable Buyer Recaps are attached to each of the Cattle Receipt and Evaluation Agreements.  (Id.).  Consequently, there can be no dispute that the Maverick Cattle were specifically placed with 4-Square for consulting services.  Indeed, FNBO has admitted that "[t]he Cattle Receipt and Evaluation Agreements confirmed the placement of the cattle into the 4-Square consulting program."  (LOLFC Statement of Fact No. 29 (09/16/10 LOLFC Memo. of Law p. 8 (Docket No. 154)(emphasis added); FNBO Resp. to LOLFC Statement of Fact No. 29 (10/06/10 FNBO Brief p. 6 (Docket No. 190)). There is also no dispute that LOLFC and Debtors entered into the January 8, 2009, Cattle Consulting Agreement to specifically cover the Maverick Cattle that were placed into the 4-Square consulting program pursuant to the Cattle Receipt and Evaluation Agreements. (Sawyer Aff. ¶ 11 (PEI at 3); Sauder Aff. ¶ 12 and Ex. E (PEI at 59 and 163-71)).

FNBO argues that the Maverick Cattle were not placed with 4-Square because they were placed with PJSCC.  If 4-Square operated a cattle feedlot, FNBO might have a

point.  4-Square, however, does not operate a cattle feedlot.  Instead, as FNBO admits, 4-Square is a consulting company that "provides cattle-consulting services to cattle producers."  (LOLFC Statement of Fact No. 11 (09/16/09 LOLFC Memo. of Law p. 4 (Docket No. 154); FNBO Resp. to LOLFC Statement of Fact No. 11 (10/06/10 FNBO Response Brief p. 3 (Docket No. 190)).  FNBO also admits that a company does not have to own or operate a feedlot to provide cattle-consulting services.  (Kalkowski Depo. p. 117, line 17, through p. 118, line 14 (PEI at 538-39)).  There is absolutely no reason why cattle cannot be simultaneously placed with 4-Square for cattle-consulting services and placed in a feedlot for cattle-feeding services.  The services performed by a cattle-consulting company are completely different than the services performed by a cattle feedlot.  (Sauder Aff. ¶ 2 (PEI at 57)).  In fact, one of the services provided by 4-Square is assisting cattle producers locate suitable cattle feedlots.  (See Cattle Consulting Agreement, Consulting Services Amendment (PEI at 168)).

## IV.    THERE IS AMPLE EVIDENCE OF FNBO'S CONSPIRACY AND COLLUSION WITH THE PJSCC DEFENDANTS.

If FNBO's attempt to sneak its new defenses into this case is properly rejected, or if the Court permits those defenses but concludes that the Central Account is not a deposit account within the meaning of Neb. Rev. Stat. (UCC) § 9-102(29), there would be no need for the Court to determine whether FNBO may be liable for colluding with the PJSCC Defendants under Neb. Rev. Stat. (UCC) § 9-332(b).  Under either one of those circumstances, the only issue would be whether LOLFC effectively traced the proceeds from the sale of the Maverick Cattle that were deposited into PJSCC's Business

Checking Account at FNBO.  (See 09/16/10 LOLFC Memo. of Law p. 56 (Docket No. 154)).   As previously stated, LOLFC has accurately and effectively traced those proceeds.  (See Miesen SJ Aff. Ex. F (PEI at 335-41)).

If, on the other hand, the Court permits FNBO to interject its new defenses and concludes that the Central Account is a deposit account, the Court would then be required to consider whether there is sufficient evidence in the record to establish FNBO's collusion with the PJSCC Defendants.  Relying on the Official Comments to Section 9-332, courts have applied the standards set forth in the Restatement (Second) of Torts § 876 to determine what conducts constitutes "collusion" under Section 9-332.  See City Bank v. Compass Bank, 2010 U.S. Dist. LEXIS 47857 *44 (W.D. Tex. 2010); In re Machinery, Inc., 342 B.R. 790, 799 (Bankr. E.D. Mo. 2006); Neb. Rev. Stat. § 9-332 Off. Cmt. 4 (referring to "collusion" language from Article 8"); Neb. Rev. Stat. § 8-115 Off. Cmt. 5 (referring to Section 876).   Under Section 876, a person may be liable for injury to a third-party inflicted by another if that person: (a) does a tortious act in concert with the other or pursuant to a common design with him; (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself; and (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.  Section 876 has been followed by the Nebraska Supreme Court.  See, e.g., Frank H. Gibson, Inc. v. Omaha Coffee Co., 179 Neb. 169, 181, 137 N.W.2d 701, 709 (1965).

In this case, there is overwhelming evidence showing: (a) that FNBO acted in concert with the PJSCC Defendants to convert the proceeds from the sale of the Maverick Cattle; and (b) that FNBO gave substantial assistance and encouragement to the PJSCC Defendants to convert those proceeds when it knew that the PJSCC Defendants' conduct amounted to conversion.

FNBO and its counsel are the ones who actually conceived of the plan for PJSCC to claim a right of "set off" to keep all of the proceeds from the sale of the Maverick Cattle.  (Depo. Ex. 53, p. 3 (PEI at 680); Kalkowski Depo. p. 67, line 9, through p. 69, line 16, p. 70, lines 14-22, and p. 72, line 10, through p. 74, line 19 (PEI at 526-28); Johnson Depo. p. 76, line 18, through p. 77, line 16, p. 78, line 13, through p. 79, line 22, p. 68, line 18, through p. 70, line 4 (PEI at 361-62 and 360-61); Supp. Johnson Depo. p. 7, lines 19-22, and p. 9, lines 12-25 (PEI at 417)).  FNBO conceived and approved of the plan because it wanted PJSCC to use the proceeds to pay off the Prior Debt (as defined by LOLFC's Memorandum of Law in Support of Motion for Summary Judgment), which had been financed by FNBO.  (Kalkowski Depo. p. 62, lines 6-16, and p. 59, lines 9-16 (PEI at 525 and 524)).

PJSCC and FNBO agreed on the tasks to be completed for PJSCC to claim a right of set off.  (Depo. Exs. 53, p. 3 (PEI at 680); Kalkowski Depo. p. 70, lines 17-22, and p. 72, lines 10-13 (PEI at 527)).  FNBO actively assisted PJSCC in completing those tasks. (Kalkowski Depo. p. 72, line 10, through p. 74, line 19, and p. 88, line 6, through p. 91, line 5 (PEI at 527-28 and 531-32)).

FNBO learned of LOLFC's security interest in the Maverick Cattle and proceeds when LOLFC sent FNBO a proposed Subordination Agreement on June 5, 2010. (McKay SJ Aff. ¶ 25 and Ex. H (PEI at 13 and 42-44)).   Any confusion over whether 4-Square operated a cattle feedlot, whether the Maverick Cattle had been placed with 4-Square for consulting services or whether LOLFC was claiming a security interest in the Maverick Cattle and proceeds was resolved by the Subordination Agreement and related cover letter.   (Kalkowski Depo. p. 142, lines 12-18 (PEI at 545)).   In addition to the Subordination Agreement, on June 16, 2009, LOLFC's Senior Loan Officer, Ronald C. McKay, sent Mr. Kalkowski a formal letter notifying him of LOLFC's security interest in the Maverick Cattle and proceeds.   (McKay SJ Aff. ¶ 26 and Ex. J (PEI at 13-14 and 46-47); Kalkowski Depo. p. 153, line 3, through p. 155, line 22 (PEI at 547-48)).   Mr. McKay also personally contacted Mr. Kalkowski to provide him with the same information.   (McKay SJ Aff. ¶ 27 (PEI at 14); Kalkowski Depo. p. 149, line 4, through p. 151, line 10 (PEI at 546-47)).   Mr. Kalkowski knew that 4-Square had sent 4,000 ear tags to PJSCC to be placed on the Maverick Cattle to identify them as 4-Square cattle. (Kalkowski Depo. p. 162, lines 1-11, and p. 163, line 6, through p. 164, line 3 (PEI at 550)).   Mr. Kalkowski also knew that 4-Square was conducting regular inspections of the Maverick Cattle and that PJSCC was providing 4-Square with regular reports so that it could monitor the performance of the Maverick Cattle.   (Id. p. 164, lines 4-21, p. 164, line 22, through p. 165, line 1).   Based upon these undisputed facts, FNBO was fully aware of the nature and extent of LOLFC's security interest by June 2009.

Despite its knowledge of LOLFC's security interest, FNBO continued to assist the PJSCC Defendants in carrying out the plan to keep all of the proceeds from the sale of the Maverick Cattle in a number of ways, including the following:

a.      On June 16, 2009, in response to Mr. McKay's inquiry concerning LOLFC's proposed Subordination Agreement, Mr. Kalkowski represented to Mr. McKay that FNBO was not claiming any interest in the Maverick Cattle and proceeds.  (McKay SJ Aff. ¶¶ 27 and 34 and Ex. L (PEI at 14, 16 and 51)).  Mr. Kalkowski made this statement to Mr. McKay despite the fact that he and FNBO's counsel had been working with PJSCC since March 31, 2009, to develop and implement their plan to retain all of the proceeds from the sale of the Maverick Cattle.

b.      Mr. Kalkowski and FNBO's counsel participated in multiple conference calls with Mr. Johnson during the summer of 2009 to help PJSCC "troubleshoot as to how to recover the [Prior Debt]" from the proceeds from the sale of the Maverick Cattle. (Kalkowski Depo. p. 241, line 23, through p. 243, line 9 (PEI at 569-70); Supp. Johnson Depo. p. 30, lines 1-10 (PEI at 423)).  They also discussed how PJSCC could continue with the plan despite LOLFC's security interest in the Maverick Cattle and proceeds. (See Kalkowski Depo. p. 123, line 13, through p. 124, line 5, and p. 126, lines 12-22 (PEI at 540-41)).  Mr. Kalkowski admits that he provided PJSCC with assistance in figuring out to how to respond to LOLFC's security interest.  (Supp. Kalkowski Depo. p. 22, lines 5-8 (PEI at 594)).

c.      Mr. Kalkowski worked with FNBO's counsel during the summer of 2009 to find ways to "take other $'s owed [i.e., the Prior Debt] out of the check when [the

Maverick Cattle were] sold."  (Depo. Ex. 50 (PEI at 675); Kalkowski Depo. p. 268, line

6, through p. 270, line 21; and p. 241, line 23, through p. 242, line 20 (PEI at 576-77 and

569-70)).  Among other things, Mr. Kalkowski proposed that the Maverick Cattle be sold

in PJSCC's name, rather than under Debtors' names.  (Depo. Ex. 65 (PEI at 683)).

   d. FNBO's counsel lined up an attorney for PJSCC and "shared theories and

ideas" with that attorney regarding ways to retain the proceeds from the sale of the

Maverick Cattle.   (Depo. Ex. 64 (PEI at 682); Supp. Johnson Depo. p. 34, line 11,

through p. 35, line 4 (PEI at 424)).  When PJSCC retained another attorney, FNBO's

counsel contacted the new attorney to bring him up to speed on the plan to keep all of the

proceeds.  (<u>See</u> Kalkowski Depo. p. 159, lines 19-25 (PEI at 549)).

   e. FNBO was aware of and approved the fictitious "feed adjustments" used by

PJSCC to collect the Prior Debt.  (Kalkowski Depo. p. 205, lines 3-18, and p. 207, lines

2-13 (PEI at 560 and 561).

   f. FNBO knew that PJSCC was not going to turn any proceeds from the sale

of the Maverick Cattle over to Debtors or LOLFC.  (Johnson Depo. p. 139, line 22,

through p. 141, line 6, and p. 153, lines 9-20 (PEI at 377 and 380)).  FNBO also knew

that the proceeds were being deposited into PJSCC's Business Checking Account,

automatically swept into PJSCC's Central Account and then used to pay down PJSCC's

operating credit line on a daily basis.  (Kalkowski Depo. p. 196, lines 15-18, p. 214, line

1, through p. 215, line 9, and p. 217, lines 1-18 (PEI at 558 and 563)).  Yet, when Mr.

McKay inquired about the status of the proceeds as the Maverick Cattle were being sold,

Mr. Kalkowski lied and told him that PJSCC was not distributing the proceeds anywhere

and that FNBO and PJSCC had agreed that all of the proceeds, less fees for feeding and caring for the Maverick Cattle, would be paid to LOLFC. (McKay SJ Aff. ¶¶ 31 and 34 and Ex. L (PEI at 15, 16 and 53); Kalkowski Depo. p. 186, line 25, through, p. 187, line 20, and p. 220, line 24, through p. 221, line 6 (PEI at 556 and 564); Depo. Ex. 52, p. 1 (PEI at 676); Supp. Johnson Depo. p. 55, line 25, through p. 56, line 24, and p. 59, line 2, through p. 60, line 8 (PEI at 429 and 430); Supp. Maloley Depo. p. 43, line 17, through p. 45, line 9 (PEI at 504)). If LOLFC had known that FNBO was using the proceeds to pay down PJSCC's credit lines, it would have commenced this action a month earlier and forced at least another $742,186.60 of proceeds to be deposited into the Approved Escrow Account. (09/30/10 Supp. Miesen Aff. ¶ 5 (Docket No. 183); Miesen SJ Aff. ¶ 7 and Ex. E (PEI at 296 and 328-34); 11/05/09 Temporary Restraining Order pp. 2-3 (Docket No. 18)).

FNBO tries to give the Court the impression that it had no involvement in the decision to keep the proceeds from the sale of the Maverick Cattle. To support its argument, FNBO strings together various incomplete excerpts from Mr. Johnson's depositions, primarily his supplemental deposition. As indicated above, FNBO's own documents and testimony firmly establish that FNBO was involved in the plan from the time it was conceived by FNBO and its counsel on March 31, 2009, to the time the proceeds were used by FNBO to pay down PJSCC's credit lines. In addition, excerpts from Mr. Johnson's testimony, particularly from his original deposition, confirm FNBO's

involvement:

> Q:    And was Mr. Kalkowski from FNBO part of the process of trying to determine whether Johnson feedlot could retain all of the proceeds from the sale of Maverick's cattle?

> A:    Probably.

> Q:    You do remember him being involved; correct?

> A:    I imagine.

> Q:    I don't want you to speculate.

> A:    Yeah, right.

> Q:    <u>Was he involved</u>?

> A:    <u>I think so</u>.

> Q:    <u>And were people from Domina law office involved as well</u>?

> * * *

> A:    <u>Yeah</u>.

(Johnson Depo. p. 77, lines 1-18 and 21(PEI at 361)(emphasis added)).

> Q:    And you recall having discussions with Mr. Kalkowski where <u>Mr. Kalkowski indicated that FNBO wanted those proceeds to pay down Johnson feedlot's loans; right</u>?

> A:    <u>Correct</u>.

> Q:    And is that why <u>Mr. Kalkowski was helping Johnson feedlot try to figure out the status of the security interest[s] and liens against Maverick Feeder's cattle</u>?

> * * *

> A:    <u>I would imagine</u>.

(Johnson Depo. p. 79, lines 13-22 (PEI at 362)(emphasis added)).

18

Q:      So Mr. Kalkowski knew, number one, that the proceeds from the six lots were going to be deposited into your business checking account; right?

A:      Correct.

Q:      And then he also agreed that those proceeds would be used to pay Johnson feedlot's loans with FNBO; right?

A:      Correct.

Q:      And when the packer checks were deposited, that's exactly what happened; correct?

A:      Correct.

Q:      The amounts were deposited, and then immediately that money was taken out of your account and used to pay Johnson feedlot's loans with FNBO; right?

A:      Correct.

Q:      And Mr. Kalkowski was fully aware that that was the plan, correct?

A:      I believe so.

Q:      And you know so because you discussed it with him; right?

A:      Yeah.

(Johnson Depo. p. 140, line 11, through p. 141, line 6 (PEI at 377)(emphasis added)).


Q:      So in other words, Chris Kalkowski was fully involved in the decision about what to do from the proceeds – with the proceeds from the sale of the Maverick cattle; right?

                                    * * *

A:      He was somewhat involved, I would say.

(Johnson Depo. p. 151, line 18-21, and p. 152, line 5 (PEI at 380)(emphasis added)).

> Q:      Further down in that paragraph, the – there's a sentence that indicates that you told Mr. Sawyer that your hands were tied and that you were getting pressure to do what you were doing from your bank.  Do you see that?
>
> A:      Yes.
>
> Q:      Were you getting pressure from FNBO to retain the proceeds from the sale of Maverick's cattle?
>
> A:      They were wanting their money, yes.

(Johnson Depo. p. 147, line 21, through p. 148, line 4 (PEI at 379)(emphasis added)).

In short, there is abundant evidence to show that FNBO colluded with the PJSCC Defendants to violate LOLFC's security interest.  At a bare minimum, there is ample evidence to create a genuine issue of material fact for trial.

## V.      THE OTHER ALLEGED FACT ISSUES RAISED BY FNBO ARE RED HERRINGS.

In a final attempt to avoid summary judgment, FNBO identifies six alleged fact issues.  (10/06/10 FNBO Brief p. 37 (Docket No. 190)).  None of these alleged fact issues preclude summary judgment.

Two of the alleged fact issues identified by FNBO relate to the sufficiency of the collateral description in LOLFC's financing statement and Commercial Security Agreement.  The law is clear that the sufficiency of the collateral description in LOLFC's financing statement is a question of law, not fact.  Tri-State, 792 F.2d at 970; Pickle Logging, 286 B.R. at 184 ("'The question of sufficiency of [a] description of [collateral] in a [recorded document] is one of law'"); In re John Oliver Co., Inc., 91 B.R. 643, 645 (Bankr. N.H. 1988) (sufficiency of collateral description is "a question of law"); Driggers

v. Continental Grain Co., 435 S.E.2d 722, 722 (Ga. Ct. App. 1993), rev. denied (Ga. Jan.

7, 1994); Citizens Nat. Bank of Evansville v. Wedel, 489 N.E.2d 1203, 1208 (Ind. Ct.

App. 1986) ("In light of the purpose of the collateral description in a financing statement

– to provide enough notice for further inquiry – we note the adequacy of the description

in the financing statement is a question of law"); Valley Federal Savings Bank v. Stahl,

793 P.2d 851, 854 (N.M. 1990) ("Whether the description of the collateral is adequate is

a question of law, not of fact").  As previously stated, and as FNBO admits, 4-Square's

undisputed records conclusively show that the Maverick Cattle were, in fact, placed with

4-Square for consulting services under the January 8, 2009, Cattle Consulting Agreement.

Consequently, there is also no genuine issue of material fact regarding the collateral

description in LOLFC's Commercial Security Agreement.

FNBO claims that whether the proceeds from the sale of the Maverick Cattle have

been effectively traced presents a fact issue.  As previously discussed, FNBO has only

raised straw-man issues regarding LOLFC's tracing analysis.  FNBO has yet to show, or

even claim, that LOLFC's tracing analysis is off by a single penny.

FNBO suggests that there is an issue of fact regarding Debtors' ownership of the

Maverick Cattle.  This allegation is truly a red herring.  FNBO includes a number of

citations to its supplemental evidence index to support its assertion, but none of them

controvert the fact that the Maverick Cattle were owned by Debtors.  (10/08/10 FNBO

Brief p. 37 (Docket No. 190)).  Ironically, materials included in FNBO's index merely

confirm Debtors' ownership of the cattle.  For example, in a Loan Memorandum

Comments report, FNBO discusses the Maverick Cattle and specifically identifies them

as cattle "owned by MF [Maverick Feeders]."  (Depo. Ex. 71, p. 2 (FNBO Supp. Evid. Index Ex. 14, Exhibit F)).  A mountain of additional, <u>undisputed</u> evidence in the record confirms Debtors' ownership of the Maverick Cattle:

     a.     In his Affidavit, Mr. Sawyer confirms that Debtors purchased the Maverick Cattle.  (Sawyer Aff. ¶ 11 (PEI at 3)).

     b.     In her Affidavit, Ms. Sauder confirms that the Maverick Cattle were purchased by Debtors with funds advanced by LOLFC.  (Sauder Aff. ¶¶ 8-11 and Exs. B-D)(PEI at 59-60 and 72-162)).  The invoices (Buyer Recaps) specifically reference "Maverick Feeders" and "Lot Shon," referring to Shon Sawyer.  (<u>Id</u>. Ex. B (PEI at 72-86)).

     c.     In his Affidavit, Mr. McKay confirms that the Maverick Cattle were purchased by Debtors with funds advanced by LOLFC.  (McKay SJ Aff. ¶¶ 18-19 (PEI at 11-12)).

     d.     All of the cattle closeout statements and other records relating to the Maverick Cattle identify the "owner(s)" as "Maverick Feeders/Shon [Sawyer]."  (Miesen SJ Aff. Ex. B (PEI at 302-07); Sauder Aff. Exs. S-U (PEI at 266-92)).  In addition, the PJSCC Defendants have confirmed, under oath and in their pleadings, that the Maverick Cattle were owned by Debtors.  (11/04/09 Johnson Declaration ¶¶ 13-14 (Docket No. 15-1); PJSCC's Third-Party Complaint ¶ 1 (Docket No. 26)).

     Finally, FNBO claims that there is an issue as to whether it colluded with the PJSCC Defendants.  Although FNBO's collusion is confirmed by its own records and testimony, LOLFC concedes that there is likely a genuine issue of material fact regarding

this issue.  However, as discussed above, this fact issue would only preclude summary judgment with respect to proceeds deposited into PJSCC's Business Checking Account and only if the Court permits FNBO to assert its new defenses <u>and</u> concludes that PJSCC's Central Account is a deposit account.

## VI.   FNBO CONCEDES THAT IT HAS NO INTERESET IN THE FUNDS DEPOSITED INTO THE APPROVED ESCROW ACCOUNT.

FNBO's arguments only relate to the funds deposited into PJSCC's accounts. FNBO concedes that it has no interest in the amounts deposited into the Approved Escrow Account pursuant to the Court's Temporary Restraining Order.   As Mr. Kalkowski testified:

> Q:     You're aware that an escrow account was created in this case, right?
>
> A:     I am.
>
> Q:     Is FNBO claiming any interest in the money deposited in the escrow account?
>
> A:     We are not.

(Kalkowski Depo. p. 53, lines 3-8).  Consequently, even if the Court were to permit FNBO to assert its two new, unpleaded affirmative defenses and conclude that PJSCC's Central Account is a deposit account, LOLFC would still be entitled to summary judgment for all amounts deposited into the Approved Escrow Account.

## CONCLUSION

If the Court does not permit FNBO to assert its new defenses, or if the Court permits FNBO to assert those defenses but concludes that the Central Account is not a deposit account, then LOLFC is entitled to judgment against FNBO as a matter of law.

If, on the other hand, the Court permits FNBO to assert its new defenses <u>and</u> concludes that the Central Account is a deposit account, LOLFC would still be entitled to judgment as a matter of law for the funds deposited into the Approved Escrow Account.  Under this latter scenario, LOLFC's claims against FNBO would have to proceed to trial as there is, at a bare minimum, a genuine issue of material fact regarding FNBO's collusion with the PJSCC Defendants.

Respectfully submitted,

STOEL RIVES LLP


By: s/Jonathan C. Miesen
Dated:  October 11, 2010          Jonathan C. Miesen
                                  Minn. Atty. Reg. No. 19752X

Suite 4200
33 South Sixth Street
Minneapolis, MN 55402
Telephone:   (612) 373-8810
Facsimile:   (612) 373-8881
E-mail:      JCMiesen@stoel.com

Attorneys for Plaintiff

70331616.1 0099999-00001