IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| LOL FINANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | 4:09CV3224 |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT P. JOHNSON, individually | ) | MEMORANDUM AND ORDER |
| and, KERI J. MALOLEY, individually | ) | |
| and, JOHN DOE, ABC COMPANY, | ) | |
| FIRST NATIONAL BANK OF | ) | |
| OMAHA, and PAUL JOHNSON & | ) | |
| SONS CATTLE CO., Inc., | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on the second motion to amend cross claim and counterclaim filed by Third Party Defendant/Cross Claimant Maverick Feeders, Inc. ("Maverick Feeders"), (filing no. 170). Maverick Feeders seeks to amend its complaint to revive its previously dismissed claim for fraud against Third Party Plaintiffs Robert Johnson ("Johnson") and Paul Johnson & Sons Cattle Company (the "Feed Yard"). The question now before the court is whether the allegations of misrepresentation and concealment within Maverick Feeders' proposed amended cross claim and counterclaim set forth the elements of common law fraud with sufficient particularity to state claim for relief. For the reasons set forth below, Maverick Feeders' motion to amend will be granted.

**BACKGROUND**

The plaintiff in this action, LOL Finance Company ("LOL") provided financing to Maverick Feeders for the purchase of cattle from Tri-County Livestock Exchange, Inc. (the "Tri-County Cattle"). Maverick Feeders contracted with the Feed Yard to custom feed the Tri-County Cattle in preparation for market. LOL claims it possessed a perfected security

interest in the Tri-County Cattle, but when the cattle were ready for market and sold, the Feed Yard wrongfully retained the entire sale proceeds. LOL filed suit against the Feed Yard, the individual defendants (Johnson and Keri J. Maloley ("Maloley")), and the Feed Yard's lender, First National Bank of Omaha ("FNBO"), for improperly converting the sale proceeds to their own use in violation of LOL's security interest.

The Feed Yard filed a third-party complaint against Maverick Feeders. Pursuant to the allegations of the third-party complaint, if LOL prevails against the Feed Yard, the Feed Yard is entitled to recover from Maverick Feeders the amount the Feed Yard is adjudged to owe LOL. Maverick Feeders counterclaimed against the Feed Yard and filed cross claims against the individual defendants and FNBO.

Maverick Feeders' proposed amended counterclaim and cross claim alleges that in early 2009, the Feed Yard needed to pay down its accumulated debt owed to FNBO, and to accomplish this goal, the Feed Yard (acting through Johnson) induced Maverick Feeders to place the Tri-County Cattle with the Feed Yard. Maverick Feeders claims the Feed Yard intended from the outset to keep the Tri-County Cattle sale proceeds and improperly used those proceeds to offset a debt allegedly owed for feeding an unrelated set of cattle (the "2008 Cattle") which Maverick Feeders had previously placed with the Feed Yard.

## ANALYSIS

A. **Pleading Standard**

When a party moves to amend under Federal Rule of Civil Procedure 15(a)(2), leave to amend will be granted if the parties' jointly consent to the amendment or with leave of the court. In general, courts are encouraged to allow amendments liberally. See Mouser v.

Caterpillar, Inc., 336 F.3d 656, 666 (8th Cir. 2003); Shen v. Leo A. Daly Co., 222 F.3d 472, 478 (8th Cir. 2000). However, the right to amend a complaint is not without limits. See K-tel Int'l, Inc. Sec. Litig., 300 F.3d 881, 899 (8th Cir. 2002)(noting futility constitutes a valid reason for denial of leave to amend).

Leave to amend should be denied as futile "where the proposed amendment would not cure the defect the party sought to correct." Asbury Square, L.L.C. v. Amoco Oil Co., 218 F.R.D. 183, 195 (S.D. Iowa 2003); see also Mississippi River Revival, Inc. v. City of Minneapolis, 319 F.3d 1013, 1018 (8th Cir. 2003) ;K-tel,Int'l, Inc., 300 F.3d at 899; Wiles v. Capitol Indemnity Corp., 280 F.3d 868, 871 (8th Cir. 2002); Ingrim v. State Farm Fire & Cas. Co., 249 F.3d 743, 745-46 (8th Cir. 2001). Where a party attempts to cure a deficient fraud pleading, a court should deny additional attempts to cure the defect "if it is readily apparent any future amendment would be futile." Asbury Square, L.L.C., 218 F.R.D. at 196.

Thus, when trying to correct deficiencies in a pleading alleging fraud, any amendment must meet the pleading requirements under Federal Rule of Civil Procedure Rule 9(b). When the pleading requirements are not met and the proposed pleading is legally insufficient on its face, the request to amend should be denied as futile. See United States ex rel. Joshi v. St. Luke's Hospital, Inc., 441 F.3d 552, 558 (8th Cir. 2006); Wiles, 280 F.3d at 871 (holding the leave to amend should be denied if the proposed amendment will fail as a matter of law).

    **B.**    **Fraud**.

To prove a claim for fraud under Nebraska law a plaintiff must establish "(1) that a representation was made; (2) that the representation was false; (3) that when made, the representation was known to be false or made recklessly without knowledge of its truth and

3

as a positive assertion; (4) that it was made with the intention that it should be relied upon; (5) that the party did so reply; and (6) that he or she suffered damage as a result." Eichner v. Mid America Financial Inv. Corp., 748 N.W.2d 1, 12-13 (Neb. 2008). Fraud is defined to include a "representation that an event, which is in the control of the maker, will or will not take place in the future, if the representation as to the future event is known to be false when made or is in reckless disregard as to its truthfulness or falsity and the other elements of fraud are present." NECO, Inc. v. Larry Price & Associates, Inc., 597 N.W.2d 602, 606 (Neb. 1999).

Fraud may also include the concealment or "suppression of material facts with the intent to mislead or deceive." Ord v. AmFirst Investment Services, 704 N.W.2d 796, 804 (Neb. App. 2005)(internal citations omitted).

> To prove fraudulent concealment, a plaintiff must show that (1) the defendant had a duty to disclose a material fact; (2) the defendant, with knowledge of the material fact, concealed the fact; (3) the material fact was not within the plaintiff's reasonably diligent attention, observation, and judgment; (4) the defendant concealed the fact with the intention that the plaintiff act in response to the concealment or suppression; (5) the plaintiff, reasonably relying on the fact or facts as the plaintiff believed them to be as the result of the concealment, acted or withheld action; and (6) the plaintiff was damaged by the plaintiff's action or inaction in response to the concealment.

Id. (internal citations omitted).

Maverick Feeders need not prove its allegations to justify a motion to amend, but it must establish the amendment would not be futile. In other words, Maverick Feeders must be able to make a showing that its amended claims will not fail as a matter of law. See United States ex rel. Joshi, 441 F.3d at 558; Wiles, 280 F.3d at 871.

C.     **Analysis of Maverick Feeders' Pleading.**

1.     **The Initial Cross Claims and Counterclaims**.

Maverick Feeders' initial counterclaim against the Feed Yard and cross claim against Johnson, Maloley, and FNBO, alleged (1) breach of contract by the Feed Yard, (2) conversion by the Feed Yard and FNBO, (3) fraud and deceit by the Feed Yard, Johnson, and Maloley, and (4) civil conspiracy by all Defendants. With respect to the claim for fraud, Maverick Feeders asserted the Feed Yard made representations "[that] led [Maverick Feeders] to believe the Feed Yard could successfully feed its cattle and secure a profitable price from nearby packers," (filing no. 40, ¶ 37). Maverick Feeders also asserted the Feed Yard made promises to "settle up" after the Tri-County Cattle were sold, but that it "failed to provide any contemporaneous accounting for cattle sold" and "failed to make payment to LOL on its security interest" even though "the Feed Yard was contractually obligated to Maverick Feeders to do so," (filing no. 40, ¶¶ 16. 17 & 27).

The initial claims for fraud and conspiracy to commit fraud were dismissed by Judge Kopf under Federal Rule of Civil Procedure 12(b)(6), (filing no. 54). Specifically, Judge Kopf noted the representations made by the Feed Yard were best characterized as "sales talk, or puffing" or "predictions or expressions of mere possibilities." Judge Kopf further noted that under Nebraska law, representations of future events may be fraudulent if the representation is known to be false when made and the other elements of fraud are present (filing no. 54, p. 9). However, Maverick Feeders did not allege any facts that the Feed Yard knew its representations were false when made to Maverick Feeders, nor did it provide specifics regarding when or where the representations were made (filing no. 54, p. 9). Judge Kopf found Maverick Feeders' assertions based on the Feed Yard's allegedly unfulfilled contractual obligations were unsupported by factual allegations that the Feed Yard had no

5

intention of fulfilling the obligations at the time it entered the contract (filing no. 40, p. 11).

### 2. Maverick Feeders' First Motion to Amend.

Maverick Feeders attempted to cure the defects in its fraud claims by moving for leave to amend. Although Maverick Feeders provided additional facts regarding the dates and contents of the alleged misrepresentations, the undersigned magistrate judge concluded the proposed amended complaint still failed to state a fraud claim and denied Maverick Feeders' motion, (filing no. 121). The court held Maverick Feeders had failed to address the overriding claim defects identified by Judge Kopf; specifically, Maverick Feeders' proposed amended complaint failed to adequately allege that when the Feed Yard was communicating with Maverick Feeders in an effort to obtain the Tri-County Cattle business, the Feed Yard concealed material information or knew its representations were false, it had no intention of fulfilling its contractual obligations, and it did not intend to finance the Tri-County Cattle despite its representations to the contrary, (filing no. 121, pp. 16-18). However, noting that discovery was not complete, Maverick Feeders' motion was denied without prejudice.

### 3. Maverick Feeders' Second Motion to Amend.

Now, having the benefit of discovery to augment and bolster its pleading, Maverick Feeders again seeks to amend its complaint to include claims of fraud against Johnson and the Feed Yard (filing no. 170). Specifically, Maverick Feeders now includes factual support for its allegations that the Feed Yard knew its representations regarding the business arrangement were false when made, and that it had no intention of performing its obligations under the contract. The factual basis for the proposed amendment stems, in part, from alleged conversations between FNBO and Johnson, as a representative of the Feed Yard.

Maverick Feeders cites the following additional facts regarding those communications to support its claim for fraud:

- Beginning in December of 2008 and continuing for several months, the Feed Yard's borrowing basis with FNBO started trending in a negative direction. The Feed Yard was also carrying a large amount of revolving debt on both its operating line of credit and customer finance line of credit with FNBO. On or about December 12, 2008, the Feed Yard increased its customer finance line of credit with FNBO by $2 million, (filing no. 170-1, ¶13).

- On February 11, 2009, the Feed Yard, through Johnson, reported to FNBO that Maverick Feeders' debt to the Feed Yard had accumulated, and the Feed Yard was pursuing payment. On information and belief, this statement was an excuse to account for the Feed Yard's growing debt and negative borrowing basis. As of the date of this meeting, the Feed Yard had not invoiced Maverick Feeders or otherwise described the alleged past due debt it was then reporting to FNBO, (filing no. 170-1, ¶ 14).

- Between February and March of 2009, Shon Sawyer of Maverick Feeders and defendant Johnson had conversations about Maverick Feeders placing additional lots of cattle at the Feed Yard. Sawyer and defendant Johnson discussed the Feed Yard's corn contracts and expected price of feed for cattle placed at the Feed Yard in the immediate future. Based on Sawyer's comparisons of corn contracts and expected feed costs at neighboring feed lots, the Feed Yard appeared to offer the best competitive choice for the Tri-County Cattle. At no point during these conversations did the Feed Yard specify or claim a large debt was owed on the 2008 Cattle, (filing no. 170-1, ¶ 15).

- On March 4, 2009, the Feed Yard had an annual review with FNBO during which the Feed Yard's debt and its claims of money due from Maverick Feeders were discussed. On March 9, 2009, with the Feed Yard's encouragement, Maverick began shipping the Tri-County Cattle to the Feed Yard to be custom fed. With the injection of new cattle from Maverick Feeders and knowing that more were on the way, on March 31, 2009, Johnson met with FNBO and its counsel and a plan was made for the Feed Yard's recovery of the "debt" owed by Maverick Feeders, (filing no. 170-1, ¶ 16).

- During the meeting, the Feed Yard, FNBO and its counsel agreed the best way to implement the plan was to use the doctrine of set off, (filing no. 170-1, ¶17). The parties determined they needed to do four things before they could

- claim a right to set off and keep the proceeds from selling the Tri-County cattle: (a) confirm Maverick owned the cattle; (b) conduct a lien search to check for other creditors; (c) check Maverick's corporate status; and (d) check with Maverick's bank in South Dakota to confirm it was not claiming a lien against the cattle, (filing no. 170-1, ¶18).

- To bolster the plan to take all the proceeds from the Tri-County cattle, the Feed Yard additionally decided to artificially inflate Maverick's feed bills with a charge which it identified as "feed adjustment" (filing no. 170-1, ¶19).

- During depositions, Defendant Johnson admitted that the feed adjustment charges were arbitrary numbers made up to extract extra money for Maverick's claimed debt. Maloley, who prepared the feed bills, testified that she is not aware of any other Feed Yard customer being levied a feed adjustment charge in the past (filing no. 170-1, ¶20).

Maverick Feeders alleges the Feed Yard developed and implemented a plan to keep all proceeds from the sale of the Tri-County Cattle as an attempt to off set debt allegedly remaining owed by Maverick Feeders to the Feed Yard for the 2008 Cattle. To further this allegedly fraudulent transaction, Maverick Feeders claims: 1) it was fraudulently induced to place the Tri-County Cattle with the Feed Yard due to false representations made by the Feed Yard; 2) it was induced to continue its relationship with the Feed Yard even after suspicious feed bills arrived due to promises that the parties would settle up after the sale of the Tri-County Cattle; and 3) the Feed Yard promised to finance the Tri-County Cattle in order to gain information about competing security interests in the Tri-County Cattle. Maverick Feeders further contends that: 1) the Feed Yard knew the representations it made in February and March of 2009 to induce placement of the Tri-County Cattle with the Feed Yard were untrue at the time they were made and 2) the Feed Yard had no intention of following through with its contractual obligations.

As discussed in the previous two opinions on the issue of fraud, (filing nos. 54 & 121), Maverick Feeders is charged with the task of presenting facts from which it is reasonable to believe the Feed Yard knew its representations and promises were false when made. See International Travel Arrangers v. NWA, Inc., 991 F.2d 1389, 1403 (8th Cir. 1993); Brown v. North Central F.S., Inc., 987 F.Supp. 1150, 1156-57 (N.D. Iowa 1997).

> Such facts would include facts in the form of affirmative evidence from which it can reasonably be inferred that, at the time the promises were made, the defendant would have been unable to perform its promises or had already undertaken action that was inconsistent with its commitments . . . or that the defendant was insolvent, knew it could not perform the promises, repudiated the promises soon after they were made, with no intervening change in the situation, failed even to attempt performance, or continued to offer assurances after it was clear that it would not perform as promised.

Brown, 987 F.Supp. at 1159 (citations omitted).

The amended complaint contains the necessary level of detail regarding the conversations between the Feed Yard and Maverick Feeders. Maverick Feeders provides a number of general dates and the content of conversations between the Feed Yard and Maverick Feeders beginning in February of 2009 and continuing through October of 2009. These conversations included representations of corn prices Maverick Feeders could expect to be billed if it placed the Tri-County Cattle with the Feed Yard, (filing no. 170-1, ¶ 15), promises regarding how proceeds from the sale of the Tri-County Cattle would be divided, (filing no. 170-1, ¶¶ 27, 30 & 41), and the Feed Yard's feigned interest in assisting with financing the Tri-County Cattle, (filing no. 170-1, ¶¶ 34-38). See Commercial Prop. Inv., Inc. v. Quality Inns Int'l, 61 F.3d 639, 644 (8th Cir. 1995)(finding a party must plead time, place and contents of false representations in order to "facilitate a defendant's ability to respond and prepare a defense to charges of fraud").

Through information gained in the discovery process, Maverick Feeders has now identified conversations between the Feed Yard and FNBO which, if taken as true, could reasonably be construed as evidence the Feed Yard never intended to keep its contractual promises, and never intended to "settle up" with the Feed Yard upon the sale of the Tri-County Cattle. As alleged in Maverick Feeders' proposed pleading, in early 2009, the Feed Yard was working to maintain its lending status with FNBO and to that end, on February 11, 2009, it told FNBO that Maverick Feeds owed the Feed Yard a significant amount of money when, in truth, the Feed Yard had never billed Maverick Feeders for this alleged debt. After February 11 and throughout March of 2009, the Feed Yard made representations regarding its anticipated feed charges, division of sale proceeds, and financing assistance it may provide, and thereby convinced Maverick Feeders to place its cattle with the Feed Yard. Based on the Feed Yard's representations, Maverick Feeders delivered Tri-County Cattle to the Feed Yard beginning in March and throughout April of 2009. However, during that same period of time, on March 31, 2009, Johnson and FNBO were discussing how the Feed Yard could use the doctrine of set off to retain all proceeds from selling the Tri-County Cattle. When considered in context, one could reasonably infer the Feed Yard made false representations regarding corn and cattle finishing prices and the division of sale proceeds to Maverick Feeders to get its business and the delivery of its cattle, knew these representations were false when made, and intended all along to sell the Tri-County Cattle and keep all the money rather than fulfill its contractual obligations or "settle up" with Maverick when the cattle were sold. Maverick Feeders' additional factual allegations raised on this second motion to amend remove this action from the realm of a disputed business dealing to a potentially fraudulent transaction. Maverick Feeders' proposed amendment is not futile and should be allowed.

Accordingly,

IT IS ORDERED:

1) Third Party Defendant/Cross Claimant Maverick Feeders' motion for leave to amend, (filing no. 170), is granted.

2) Maverick Feeders shall file its amended counterclaim and cross claim, a copy of which is attached to its motion (see filing no. 170-1), on or before November 3, 2010.

3) The stipulation filed between Maverick Feeders and First National Bank of Omaha, (filing no. 192), is granted, and Maverick Feeders' amended cross and counterclaims are not construed as alleging a fraud claim against FNBO.

October 27, 2010.    BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.