UNITED STATES DISTRICT COURT

DISTRICT OF NEBRASKA

| | |
|---|---|
| LOL FINANCE COMPANY,<br><br>               Plaintiff,<br><br>v.<br><br>ROBERT P. JOHNSON AND KERI J. MALOLEY, Individually and dba PAUL JOHNSON & SONS CATTLE CO., INC., JOHN DOE, ABC COMPANY, and FIRST NATIONAL BANK OF OMAHA,<br><br>               Defendants<br><br>- - - - - - - - - - - - - - - - - - - - - - - - - - -<br><br>PAUL JOHNSON & SONS CATTLE CO., INC.,<br><br>             Third Party Plaintiff,<br><br>v.<br><br>MAVERICK FEEDERS, INC., a South Dakota corporation, SHON SAWYER and JULIE SAYWER, husband and wife,<br><br>             Third Party Defendants. | No. 09-cv-3224<br>Judge Kopf<br><br><br><br>THIRD PARTY DEFENDANTS' AMENDED COUNTERCLAIM AGAINST THIRD PARTY PLAINTIFF AND CROSSCLAIM AGAINST DEFENDANTS |

## COUNTERCLAIM AND CROSS-CLAIMS

    1.    Third Party Defendants ("Maverick Feeders") incorporates each and every allegation, matter and thing pleaded in its Answer, as if fully set forth herein.

2. Due to the wrongful conduct of the Defendants, Maverick Feeders has been unable to fulfill its contractual obligations to Plaintiff ("LOL") and has sustained damage and detriment as such. Maverick Feeders, thus adopts and otherwise incorporates by this reference, Counts I-III of LOL's Complaint as part of its claims against the Defendants.

### Overview

3. Over the course of several weeks in March and April of 2009, Maverick Feeders placed 3,431 head of cattle with the Feed Yard to be fed, fattened, and sold to meat packers for profit. The Feed Yard, gained possession of these cattle under the pretense of a legitimate business transaction. In actuality, the Feed Yard already determined it would take all the proceeds from the sale of the cattle to pay down debt with FNBO. Once in control of the cattle the Feed Yard levied phony feed bills against the cattle. The Feed Yard also worked to create and inflate other claimed debt owed by Maverick as a means to pocket all the proceeds. FNBO was aware of the Feed Yard's plan, assisted in its execution and improperly benefited from the results. Maverick brings this lawsuit to recover both the money wrongfully taken from it and the damages it has suffered as a result of the Defendants' wrongful conduct.

### The 2008 Cattle

4. In approximately 2003, Maverick Feeders began shipping cattle to the Feed Yard to be fed, fatted and sold for profit. Through their earlier business arrangements Maverick's principal, Shon Sawyer, and Defendant Johnson became friends. Over the years, Sawyer and Defendant Johnson formed business-partnerships to buy, feed and sell cattle. They also took an extended fishing trip together to Montana. Defendant Maloley and Sawyer's wife also became close friends and took a vacation together to San

Antonio. Through their friendships, the Sawyer's trusted Defendants Johnson and Maloley. Beginning sometime in 2008 and through 2009, Maverick Feeders continued its business relationship with the Feed Yard by verbally agreeing to place 15 lots of cattle ("the 2008 cattle") at the Feed Yard for custom feeding, as Maverick had done in previous years. As part of this business arrangement, the Feed Yard promised to submitted feed bills on a bi-weekly basis, as that was its customary practice.

5. The Feed Yard claims the 2008 cattle did not perform well. The Feed Yard further reports that after the 2008 cattle were sold, there was not enough money left to satisfy Maverick Feeders' financial obligations to the Feed Yard and the Feed Yard's subsequent obligations to FNBO (at the time FNBO provided feeder financing to the Feed Yard which was reloaded as a loan to Maverick to purchase some of the 2008 cattle).

6. According to records produced by the Feed Yard in this litigation, five lots of the 2008 cattle in particular (lots 1844, 1845, 1877, 1887 and 1891), performed extraordinarily poor under the Feed Yard's control. According to the testimony of the Feed Yard's principals, these five lots of cattle suspiciously constitute some of the worst losses (if not the worst) in the Feed Yard's history. These five lots also coincidently make up most of the final lots from the 2008 cattle.

7. The Feed Yard has given volatile and conflicting reports of the amount owed on the 2008 cattle, ranging from $54,000 to now $1,177,286,16. In June of 2009, the Feed Yard reported to FNBO that the amount of debt was approximately $619,000, even though all but a handful of the 2008 cattle had been sold. The Feed Yard alleged in recent pleadings that the debt was approximately $960,000. The Feed Yard admits

that it did not send an invoice to Maverick Feeder's setting forth the exact amount of debt, claiming it is the customer's obligation to track this information (even though the Feed Yard did not provide all feed bills and closeout statements for the 2008 cattle).

8. The Feed Yard's closeout records produced in this litigation show the following in regard to the worst five lots of the 2008 cattle:

| Lot # | Date of Final Close Out | Claimed Loss Per Head | Average Days on Feed |
|---|---|---|---|
| 1844 | 2/21/2009 | 957.04 | 468 |
| 1845 | 2/21/2009 | 747.01 | 493 |
| 1877 | 6/15/2009 | 528.23 | 351 |
| 1887 | 8/2/2009 | 575.52 | 409 |
| 1891 | 3/19/2009 | 597.29 | 311 |

9. Maverick was not provided closeouts for these lots of cattle. The 2008 cattle which were closed out prior to February of 2009 (but delivered around the same time) do not show similar staggering losses, where not on feed for nearly as long (industry standard is 180 days) and feed bills and closeout documentation were contemporaneously provided to Maverick. Beginning in February of 2009, and starting with the five lots of cattle described in paragraph eight above, a trend emerged where the Feed Yard began hiding information from Maverick Feeders regarding feed charges, and claimed losses.

### The Tri-County Cattle

10. Beginning in March of 2009, and continuing for several weeks, Maverick Feeders began sending large groups of cattle to the Feed Yard to be custom fed ("the Tri-County cattle"). The shipments of Tri-County cattle totaled 3,431 head.

11. The Tri-County cattle were purchased, in part, through a line of credit with LOL. Additional financial contribution of approximately $1,000,000 were required to purchase, feed and care for the Tri-County cattle before placement at the Feed Yard.

12 At the time of delivery to the Feed Yard (excluding debt owed LOL), Maverick anticipated significant equity in the Tri-County cattle with typically feeding and eventual sale to meat packers.

### The Plan

13. Beginning in December of 2008 and continuing for several months, the Feed Yard's borrowing basis with FNBO started trending in a negative direction. The Feed Yard also was carrying a large amount of revolving debt on both its operating line of credit and customer finance line of credit with FNBO. On or about December 12, 2008, the Feed Yard increased its customer finance line of credit with FNBO by $2 million.

14. On February 11, 2009, the Feed Yard, through Bob Johnson, reported to FNBO that it had accumulated debt with Maverick Feeders and was working on getting payment. On information and belief, this statement was an excuse to account for the Feed Yard's growing debt and negative borrowing basis. Contemporaneous with this meeting, the Feed Yard had not invoiced Maverick Feeders or otherwise described any past due debt that it was then reporting to FNBO.

15. Between February and March of 2009, Shon Sawyer of Maverick Feeders and Defendant Johnson had conversations about Maverick Feeders placing additional lots of cattle at the Feed Yard. Sawyer and Defendant Johnson discussed the Feed Yard's corn contracts and expected price of feed for cattle placed at the Feed Yard in the

immediate future. Based on Sawyer's comparisons of corn contracts and expected feed costs at neighboring feed lots, the Feed Yard appeared to offer the best competitive choice for the Tri-County cattle. At no point during these conversations did the Feed Yard specify or claim a large debt on the 2008 cattle.

16. On March 4, 2009, the Feed Yard had an annual review with FNBO during which the Feed Yard's debt and its claims of money due from Maverick were discussed. With the Feed Yard's encouragement, on March 9, 2009, Maverick began shipping the Tri-County cattle to the Feed Yard to be custom fed. With the injection of new cattle from Maverick Feeders and knowing that more where on the way, on March 31, 2009, Defendant Johnson had a meeting with FNBO and its counsel where a plan was hatched to recover the Feed Yard's self-reported "debt".

17. During the meeting, the Feed Yard, FNBO and its counsel agreed that the best way to implement the plan was to use the doctrine of set off.

18. During the meeting, the parties determined that they needed to do four things before they could claim a right to set off and keep the proceeds from the Tri-County cattle: (a) confirm that Maverick owned the cattle; (b) conduct a lien search to check for other creditors; (c) check Maverick's corporate status; and (d) check with Maverick's Bank in South Dakota to confirm it was not claiming a lien against the cattle.

19. To bolster the plan to take all the proceeds from the Tri-County cattle, the Feed Yard additionally decided to artificially inflate Maverick's feed bills with a charge which it identified as "feed adjustment".

20. During depositions, Defendant Johnson admitted that the feed adjustment charges were arbitrary numbers made up to extract extra money from Maverick pay

claimed debt. Defendant Maloley, who prepared the feed bills, testified that she is not aware of any other Feed Yard customer being levied a feed adjustment charge in the past.

21. FNBO was aware that the Feed Yard was using the fictitious feed adjustment charges to try and collect claimed debt.

### The Feed Bill Scheme

22. When the Tri County cattle began arriving in March and April of 2009, the Feed Yard discussed the possibility of financing the cattle with Maverick and the initial relationship in regard to the Tri County Cattle, from Maverick's perspective, appeared to be a continuation of the parties prior legitimate business dealings.

23. By April of 2009, the Tri County cattle had all been placed with the Feed Yard. At the time, Maverick was oblivious to the Feed Yard's plan to use the doctrine of setoff against inflated debt from the 2008 cattle and to use fake feed adjustment charges to keep all the proceeds from the sale of the Tri County cattle.

24. After the arrival of the last of the Tri-County cattle on April 11, 2009, the Feed Yard was in position to start pumping debt in to the last of the 2008 cattle. The Feed Yard also delayed in disclosing feed bills containing the feed adjustment charge until after all the Tri County cattle arrived. The first feed bills were not disclosed to Maverick until May 7, 2009, several weeks after the first feed bills had been generated. After May 7, 2009, The Feed Yard again continued to hold feed bills, and did not again send a feed bill to Maverick until June 19, 2009. Closeouts for the last of the 2008 cattle were also not shared with Maverick.

25. When Maverick received the Tri-County feed bills that included a feed adjustment charge, it immediately questioned the charge. Defendant Johnson told

Sawyer that this was a cost passed on from corn contracts with Jeff Biegert (contrary to Johnson's admissions that it was to recover debt).

26. Subsequent feed bills from June-September also continued to reflect high "feed adjustment" charges. Over a period of months, the Feed Yard attempted to charge Maverick $307,167.66 in total feed adjustment charges based on an arbitrary calculation used by Defendant Johnson to recover old debt. The bills also conflicted as certain lots of cattle were charged comparatively more while consuming less feed over an identical period, adding to the suspicious nature of the bills and the Feed Yard's true intentions

27. Between April and October of 2009, Shon Sawyer called Defendant Johnson on nearly a daily basis to discuss the cattle's performance, feed costs, feeder financing, and other information related to the parties' business relationship. During several dozen phone conversations, Defendant Johnson never disclosed the plan to take all the proceeds from the cattle that was hatched back on March 31 and repeatedly pacified Sawyer's questions as to how the proceeds from the Tri County cattle would be divvied up. Defendant Johnson also remained non-committal about the nature, source and extent of debt from any of the 2008 cattle.

28. By July, Johnson had still not submitted a final invoice from the 2008 cattle or otherwise demanded payment on that un-quantified debt.

29. By July, Maverick (through Sawyer) began pressing Johnson for some indication as to how much debt was claimed as owing on the 2008 cattle. Sawyer also asked for an explanation regarding the suspicious Tri-County feed bills that began arriving in May after the cattle were all finally delivered. Playing off their friendship and trust, Johnson assured Sawyer that they would work it all out once the Tri-County

cattle were sent to the meat packers. In reality, Johnson was putting Sawyer off until the cattle could be sold at the meatpackers, and the proceeds safely diverted by the Feed Yard to its back pocket.

30. In late August of 2009, Sawyer was invited to spend the evening at the Feed Yard. Sawyer became sufficiently concerned about the lack of information and the growing size of the feed bills that he confronted Johnson, and told him that his feed bills stunk so bad that he could smell them in South Dakota, or something to that effect. Defendant Johnson continued to assure Sawyer that everything was on the level as it had been throughout the parties' business relationship and friendship.

31. By September, the Feed Yard quit sending feed bills altogether.

32. Between September 14 and November 3, 2009, the Feed Yard began shipping the Tri County cattle to the meatpackers for sale. The Feed Yard's records regarding the sale show the following for recovered proceeds and feed fees (including the phony feed adjustment charge).

| Lot | Proceeds | Feed Fees |
|---|---|---|
| 1996 | 779,405.30 | 372,740.19 |
| 1997 | 428,890.51 | 224,566.92 |
| 1999 | 706,010.86 | 342,642.21 |
| 2000 | 504,289.85 | 247,795.18 |
| 2005 | 521,445.63 | 283,175.91 |
| 2006 | 788,716.80 | 410,930.96 |
| TOTAL | 3,728,758.95 | 1,881,855.37 |

33. With the inclusion of over $307,000 in fake feed adjustment charges, the Feed Yard collected approximately $2.2 million in addition to its own feed bills, which it kept consistent with the plan finalized on March 31, 2009.

## The Financing Scheme

34. To further disguise its true plan throughout the spring and in to the summer of 2009, the Feed Yard, through Johnson, indicated to Sawyer that the Feed Yard was interested in financing the Tri-County cattle which would take Plaintiff LOL out of the mix. By this process, the Feed Yard would pay off Maverick's third party debt on the cattle through a feeder finance line of credit offered to Johnson from FNBO (which is a customary service for many commercial feed lots). The Feed Yard would then recover the disbursements from its feeder finance line of credit with FNBO, feed costs, and interest from Maverick once the cattle were taken to the meat packers. Maverick had previously participated in such an arrangement with the Feed Yard.

35. Acting on the Feed Yard's overtures, Sawyer provided a personal balance sheet to the Feed Yard on April 15, 2009. The Feed Yard also obtained a subordination agreement from Campbell County Bank, Maverick's general banker at the time. This exercise was another part of the Feed yard's plan to gain possession of all the Tri-County cattle and investigate security interests that might pose a hurdle to its plan to keep the proceeds from the sale of the cattle.

36. Between April and July of 2009, Maverick and the Feed Yard continued to discuss a financing arrangement. As part of the financing discussions, Johnson repeatedly asked Sawyer for a letter indicating that Campbell County Bank did not have any interest in the Tri-County cattle. Sawyer informed Johnson on several occasions that Campbell County did not have an interest in these cattle. Defendant Johnson's inquires were calculated solely to make sure no other secured party needed to be included on

proceed checks for the sale of Tri-County cattle so the Feed Yard could keep all the proceeds as planned.

37. Despite Sawyer's representations the Feed Yard, with the assistance of FNBO, contacted Campbell County directly and received a letter on or about July 22, 2009, disclaiming a need to be placed on the Tri-County proceed checks.

38. Once the Feed Yard received the Campbell County letter, it no longer expressed any willingness to finance the cattle. Once the Feed Yard obtained the letter from Campbell County, it felt satisfied that no other secured party could prevent it from executing its plan to take all the proceeds from the sale of the Tri-County cattle. Consistent with its preconceived plan to take all the money from the sale of Tri-County cattle, on October 14, 2009, the Feed Yard attempted to assign over $400,000 in collected proceeds (without consideration) to a Biegert, LLC, a company owned by Defendant Johnson's close personal friend Jeff Biegert.

### The Sale of the Tri-County Cattle

39. As the Tri-County cattle began selling, Maverick was not in any way informed of the results of the sale or the final feed bills claimed against the proceeds. During September and October of 2009, Shon Sawyer continued to have nearly daily communication with Defendant Johnson regarding the performance of the Tri- County cattle. Defendant Johnson made Sawyer generally aware that cattle were being shipped but continued to keep Sawyer in the dark about the Feed Yard's true intentions to take all the proceeds.

40. As cattle were being sold, LOL expressed concerns to FNBO and the Feed Yard about the handling of Tri-County proceeds in line with its now well known security interest.

41. Both LOL and Sawyer inquired as to the status of the proceeds throughout late September and October. The Feed Yard, through Defendant Johnson gave its assurances to Sawyer that proceeds would soon be paid out. When those verbal promises went unfulfilled, the Feed Yard began fielding questions by explaining that FNBO was calling the shots as to how the proceeds were being handled. FNBO in turn promised LOL that the proceeds were being deposited in a separate account and that proceeds would be properly sorted out even though the proceeds were being deposited into a sweep account. Also, at the time, FNBO knew that the Feed Yard planned to keep the proceeds and knew that the proceeds would be used to pay down the Feed Yard's operating and feeder finance lines of credit through the account sweeps.

42. Despite notice of LOL's security interest, FNBO allowed the Feed Yard to keep all the proceeds from the Tri-County cattle, and to pay down its lines of credit.

43. Based on the lack of response from the Defendants, LOL sued and received an injunction as to the small amount of proceeds from the Tri-County cattle that have not disappeared. Only injunctive relief from this Court prevented the Feed Yard from sending over $400,000 of proceeds to Biegert, LLC as part of the sham assignment, and last act to keep all the proceeds.

## COUNT 1 – BREACH OF CONTRACT

44. Maverick Feeders restates each and every allegation above as though set forth herein.

45. Maverick Feeders and the Feed Yard had an express contract by which the Feed Yard would feed and sell the Tri-County cattle and remit the proceeds from the cattle, less feed costs, to Maverick at the time of sale.

46. As part of its contractual promises, the Feed Yard promised to supply bi-weekly invoices. The Feed Yard also had an obligation to pay off Maverick Feeders' financier, and otherwise make sure that LOL's security interest in the cattle were addressed by payment contemporaneous with the sale of all cattle. The Feed Yard also had a duty to pay proceeds, beyond legitimate feed costs, to Maverick and LOL.

47. The Feed Yard failed to provide any contemporaneous accounting for cattle sold, refused to send proceeds beyond Feed Costs to Maverick and LOL in knowing violation of LOL's security interest, caused Maverick Feeders to default on its obligations to LOL, and otherwise is in breach of its contract to custom feed these cattle for Maverick Feeders' financial benefit.

48. Maverick Feeders has sustained damage and detriment as a result of the Feed Yard's breach of contract, including lost equity in the cattle, lost opportunity, trucking and other shipping charges, interest to its lender, damage to credit, and other financial damage and detriment, all of which is expected to exceed $2 million.

## COUNT 2 – CONVERSION

49. Maverick Feeders restates each and every allegation above as though set forth herein, and additionally adopts and incorporates by this reference Counts II and III of LOL's Amended Complaint.

50. The Tri-County cattle placed in the possession of the Feed Yard were sold without any contemporaneous accounting or other documented justification for withholding payment to LOL or Maverick Feeders.

51. The Feed Yard has improperly set-off separate debt, the amount of which is disputed, on the Tri-County cattle, without notice to Maverick Feeders.

52. Maverick Feeders has a possessory interest in the cattle and the proceeds from their sale which the Feed Yard and Defendant First National Bank of Omaha has wrongfully converted.

53. Maverick Feeders has sustained damage and detriment as a result of the act of conversion by the Feed Yard and all Defendants, including lost equity in the cattle, lost opportunity, trucking and other shipping charges, interest to its lender, damage to credit, and other financial damage and detriment, all of which is expected to exceed $2 million by the time of trial.

54. The Feed Yard and all Defendants are joint and severally liable to Maverick Feeders for all damage and detriment caused by their tortious conduct.

## COUNT 3 – FRAUD AND DECEIT

55. Maverick Feeders restates each and every allegation above as though set forth herein.

56. Nebraska law provides that a party is liable for fraud as a result of (1) a representation made as a statement of fact, which was untrue and known to be untrue by the party making it, or was recklessly made; (2) made with intent to deceive and for purposes of inducing the other party to act upon it; and (3) that the other party be induced by reliance on it to act to his injury or damage.

57. In a scheme dating back to February of 2009, the Feed Yard decided through Defendant Johnson to induce Maverick to place all the Tri-County cattle at the Feed Yard and keep all the proceeds from the sale of these cattle. Using their years of friendship and business dealings as leverage, the Feed Yard coaxed Maverick into the trap laid on March 31.

58. Once the Tri-County cattle were placed with the Feed Yard, it was able to execute its three-part scheme to apply the doctrine of set off to phony debt, increase feed bills through phony feed adjustment charges, and to gain information on competing secured interests that might prevent the Feed Yard from taking the proceeds. The plan was further perpetuated by keeping Maverick in the dark by promising to finance the cattle and hiding the documentation that would alert Maverick as to the fraudulent plan

59. Maverick was additionally induced into continuing its relationship with the Feed Yard under the false promise and belief that feed bills would be sorted out once the Tri-County cattle were sold, even though Defendant Johnson knew at the time he made such statements that he planned to take all the proceeds even if he did not have the debt to substantiate taking all the proceeds.

60. The Feed Yard's wrongful intent is further evidenced by the fact that it pocketed over $2 million in proceeds from the Tri-County cattle beyond even its own inflated debt. The Feed Yard's wrongful intent is further evidenced by its attempts to assign over $400,000 owed to Maverick and LOL to Biegert, LLC, without any consideration, which was prevented by injunctive relief and a subsequent constructive trust.

61. The Feed Yard's statements and actions of inserting a feed adjustment charge on Maverick bills, promises to feed the cattle, to provide reporting as to bills in the customary manner and offering to finance the Tri-County cattle, were false statements and actions intended to deceive Maverick Feeders to its injury. These actions and statements instead were part of a plan to set Maverick up in order to obtain possession of over 3,400 head of cattle and to gain the inside track on keeping all proceeds from their eventual sale, which it used to pay down its debt with FNBO. Defendant Johnson's additional promises to settle up at that end, and assurances to Maverick that everything was on the level, were also untruthful statements designed to injury Maverick. Defendant Johnson knew as of March 31, 2009, (prior to receiving all the Tri-County cattle), that he was going to take all the proceeds no matter what.

62. Maverick Feeders has sustained damage and detriment as a result of the Defendant Johnson and the Feed Yard's fraudulent conduct, including lost equity in the cattle, lost opportunity, trucking and other shipping charges, interest to its lender, damage to credit and other financial damage and detriment, all of which is expected to exceed $2 million by the time of trial.

63. Defendant Johnson and the Feed Yard are liable for all damage and detriment caused to Maverick as a result of their tortious conduct..

64. The Feed Yard and Defendants Johnson are also subject to punitive or other exemplary damages to as a result of their fraudulent conduct.

## COUNT 4—CIVIL CONSPIRACY

65. Maverick Feeders restates each and every allegation above as though set forth herein and hereby adopts and incorporates by reference Count III of LOL's Amended Complaint.

66. Maverick Feeders has sustained damage and detriment as a result of the collusion between the Feed Yard and all Defendants, including lost equity in the cattle, lost opportunity, trucking and other shipping charges, interest to its lender, damage to credit and other financial damage and detriment, all of which is expected to exceed $2 million, by the time of trial.

67. The Feed Yard and all Defendants are joint and severally liable to Maverick Feeders for all damage and detriment caused by their tortious conduct.

Wherefore, Maverick Feeders prays that the Court enter relief as follows:

a. that the Third-Party Complaint be dismissed on its merits with prejudice;

b. that Maverick Feeders be awarded a money judgment in an amount to be proven at trial on its counterclaim and cross-claims;

c. that Maverick Feeders recover its costs, including pre-judgment interest and all their disbursements so taxable;

d. for punitive damages arising from the tortious conduct of the Feed Yard and the Defendants; and

e. for such other and further relief as the Court deems just and equitable in this action.

Dated this   3rd   day of November , 2010.

                                            CADWELL SANFORD DEIBERT & GARRY, LLP

                                            /s/  Shawn Nichols
                                            Steven W. Sanford
                                            Shawn Nichols
                                            200 East 10th Street, Suite 200
                                            PO Box 2498
                                            Sioux Falls, SD  57101-2498
                                            (605) 336-0828
                                            E-mail:  *ssanford@cadlaw.com*
                                            Attorneys for Third Party Defendants