United States District Court
District of Nebraska

| | |
|---|---|
| **LOL Finance Company,**<br>          Plaintiff, | No 09-cv-3224<br>Judge Kopf |
| v. | |
| **Robert P. Johnson<br>and Keri J. Maloley<br>Individually and d/b/a<br>Paul Johnson & Sons Cattle Co., Inc.,<br>John Doe and<br>ABC Company**<br>          Defendants. | Paul Johnson & Sons Cattle Co., Inc.,<br>Robert P. Johnson, and Keri J.<br>Maloley's Answer Amended<br>Counterclaim of Maverick et al Against<br>PJSCC<br>And Answer to Cross Claims Against<br>Defendants (#204)<br>And<br>*FR Civ P* 12b Motion |
| **Paul Johnson & Sons Cattle Co., Inc.,**<br>          Third Party Plaintiff, | |
| v. | |
| **Maverick Feeders, Inc.,<br>A South Dakota Corporation,<br>Shon Sawyer and Julie Sawyer,<br>Husband and wife,**<br>          Third Party Defendants | |

**Motion for Dismissal**

Defendants Kerri Maloley and Robert Johnson request dismissal of the Counterclaims and/or Cross Claims against them. They fail to state claims on which relief can be granted. *FR Civ P* 12(b) (6). No allegations state claims against them.

The Counterclaim's Count I alleging breach of contract fails to state a claim against Robert Johnson or Keri Maloley upon which relief can be granted. Mr. Johnson and Ms. Maloley were not parties to a contract with Maverick.

The Counterclaim's second claim, asserting conversion, fails to state a claim against Robert Johnson or Keri Maloley upon which relief can be granted as it fails

to allege that these defenses converted funds and, on its face, asserts that any alleged conversion was committed only by Paul A. Johnson & Sons Cattle Co., Inc. Of course, no conversion occurred as alleged below. *FR Civ P* 12b(6).[1]

### Answer Amended Counterclaim Against PJSCC
### And Answer to Cross Claims Against Defendants (#204)

The Third Party Defendants, Maverick Feeders, Inc., Shon Sawyer and Julie Sawyer, filed a Counterclaim against Paul Johnson & Sons Cattle Co., Inc., the Third Party Plaintiff. They also filed Cross-Claims against Defendants Robert P. Johnson and Keri J. Maloley, individually, and d/b/a Paul Johnson & Sons Cattle Co., Inc. Robert P. Johnson and Keri J. Maloley filed a Motion to Dismiss the Third and Fourth claims set forth in the Maverick Feeder/Sawyer Counterclaims and Cross-Claims. They preserve the Motion, and here answer the Amended Counterclaim against PJSCC and the Cross Claims against other Defendants.

1. All allegations of PJSCC's Amended Answer to Plaintiff's Amended Complaint (Filing #25), and all allegations of PJSCC's Third Party Complaint against the Third Party Defendants, (Filing #26) are incorporated and renewed here.

2. The Amended Counterclaim filed by Maverick Feeders, Inc., Shon Sawyer and Julie Sawyer (collectively "Maverick" below) is vague. It fails to identify the precise parties against whom the allegations are asserted and is denominated as a Counterclaim an d Cross Claims. Which allegations apply to whom is not clear. It asserts, in some instances, that the Defendants are jointly and severally liable to Maverick (see paragraphs 53, 54, 62-64, and 67(d)) but it is not specific about the wrongful acts asserted against Keri J. Maloley or against Robert Johnson. For this reason, except as expressly noted below or required by the context, all allegations of this Answer referring to PJSCC, or Ms. Maloley or Mr. Johnson are intended to apply to each of them and all of them. PJSCC, or Ms. Maloley or Mr. Johnson, or so many of them as are actually

---

[1] No separate Brief is filed with this Motion and no ruling prior to trial is requested. The Motion is filed as a prelude to trial as a Rule 50 Motion is expected to be made then.

intended to be sued, choose to refer to themselves collectively as "Johnson Cattle" in this filing. They answer the Complaint as follows.

3. The allegations in paragraphs 1 and 2 of the Counterclaim are denied. Allegations in ¶ 3 of the Counterclaim alleging occurrences during March and April 2009, are denied except to the extent that they admit allegations of Johnson Cattle's Answer, and its Third Party Complaint. Johnson Cattle denies that it "worked to create and inflate other claimed debt owed by Maverick as a means to pocket all the proceeds".[2]

### The 2008 Cattle

4. Johnson Cattle admits that Maverick Feeders began doing business with it several years before 2008, and perhaps in 2003. Johnson Cattle denies that it "became friends" with Shon Sawyer. It admits one fishing trip occurred, and Sawyer, Robert Johnson, and a nutritionist traveled for a short trip to Montana. Sawyer arranged the trip, endeavored to persuade a feed supplier to pay for it, but this arrangement fell through, and Johnson paid for it though this was not the intention when the trip was planned. The fishing trip was not "extended". Maloley and Sawyer's wife became acquainted. They did not take a vacation to San Antonio, Texas though they did travel there together at the invitation of a pharmaceutical company to attend a seminar concerning animal health related issues. No special relationship existed between Johnson Cattle and Sawyers. Johnson Cattle admits that Defendants continued their cattle feeding relationship with Plaintiff's feed yard and that Sawyer placed cattle on feed with Johnson Cattle. Johnson Cattle submitted biweekly feed bills while cattle were on feed. This procedure was discontinued after the cattle left the feed yard, and this discontinuance occurred in the ordinary course of business. Paragraph 4 is otherwise denied.

5. Johnson Cattle admits Maverick's ¶ 5 allegations. Cattle brought to Johnson Cattle in 2008 by Maverick were not quality animals. They consisted of Jersey breed dairy animals, and heiferettes. Jerseys are dairy animals; they are notoriously bad at gaining weight, growing, or converting to slaughter condition when placed in a feed

---

[2] Paragraphs numbered 4 – 67 coincide numerically with identically numbered paragraphs responded to in the Maverick et al Counterclaim and Cross-claim.

AR9940                                    3

yard. Heiferettes are female beef-type animals, but reach the feed yard where they are to be finished in pregnant condition, requiring either that the fetus be aborted, or that the cow will have a calf, in which case the cow's energies otherwise available for growth are diverted to feeding nourishing the calf. When the cattle were sold, Maverick realized substantial losses as a result of deals it made with third parties supplying cattle of below-average market condition or weight. In all other respects, the Counterclaim's fifth paragraph's allegations are denied.

    6.  The Counterclaim's ¶ 6 allegations are admitted in part and denied in part. Lots 1844, 1845, 1877, 1887 and 1891, comprised of cattle placed at Johnson Cattle by Maverick, performed poorly compared with the industry standards for quality beef cattle fed on corn rations in feed yards. But the cattle placed by Sawyer consisted of Jersey dairy animals and beef heiferettes. Jersey dairy cattle are not beef animals. They do not gain weight comparably with beef animals, and they do not convert grain to beef readily because they are bred, genetically, to support and favor milk production over body growth. Heiferettes perform poorly in feed yards because their pregnant status, coupled with calving or loss of fetuses, sets them back, creates health risks, and, in this instance, subjected the group of heiferettes (one of the lots) to extraordinarily high death loss. Similarly, the Jerseys sustained higher than average death loss as they were in the feed yard for a longer than desirable period of time. Sawyer refused to sell the Jerseys and heiferettes, despite Johnson Cattle's repeated requests that he do so. Sawyer caused the animals to be retained in the PJSCC feed yard for an excessively long period. He insisted upon handling packer negotiations in virtually all instances and he refused to accept offers solicited by PJSCC from buyers who were willing to take the cattle because Sawyer continued to believe he could maximize his profits through his own devices. The cattle were kept at the PJSCC feed yard so long, and contrary to Johnson's objection, that they disrupted the flow of cattle in and out of the yard, tied up yards, caused Johnson to be required to turn away cattle feeding opportunities for high quality, longstanding customers who would have paid PJSCC, and placed both PJSCC and Sawyer in a position of vulnerability. Sawyer did not pay Johnson, and Sawyer's losses on the cattle

7. The Counterclaim's ¶ 7 allegations are denied. Conflicting reports as to amounts owed were not given, though the amounts did vary as cattle came and left the feed yard, and as sums were collected. At the end of June 2009, the indebtedness due from Maverick and Sawyers to the feed yard was at least substantial and exceeded $600,000. Invoices for amounts due, by lot, were sent. Closeouts were available. Accordingly, except to the extent admitted, all allegations in paragraph 7 of the Counterclaim are denied.

8. The Counterclaim's ¶ 8 allegations are admitted only to the extent they are consistent with Johnson Cattle's records, but they are otherwise denied.

9. The Counterclaim's ¶ 9 allegations are denied. Closeouts were furnished for all cattle fed by Johnson Cattle when they were closed out. No charges were hidden or concealed, and all charges were for the cattle placed by Maverick and Sawyers with Johnson.

**The Tri-County Cattle**

10. The Counterclaim's ¶ 10 allegations are admitted to the extent that 3,431 head of cattle were shipped to Johnson Cattle in 2009. Otherwise, paragraph 10 is denied.

11. The Counterclaim's ¶ 11 allegations are denied. Johnson Cattle was informed that the "tri-county cattle" were owned by someone other than Maverick, and were free of security interests. They entered the feed yard on this basis and with this understanding. Later, Sawyer claimed the cattle owned by Maverick and him, though this was never documented.

12. The Counterclaim's ¶ 12 allegations are denied.

**The Alleged Plan**

13. The Counterclaim's ¶ 13 allegations are denied. Johnson Cattle supplied base borrowing reports. Any financial changes in Johnson Cattle's status were

14. The Counterclaim's ¶ 14 allegations are denied except to the extent that Johnson Cattle admits Maverick had not paid it and Johnson Cattle was requesting payment. This fact was true. Maverick Feeders continued to be invoiced, and Johnson Cattle supplied its services, and furnished feed to the cattle, and did so in an appropriate manner even though Maverick promised but failed to pay it.

15. The Counterclaim's ¶ 15 allegations are denied except to the extent that conversations occurred in which Maverick, speaking through Sawyer, promised Johnson Cattle that cattle would be placed in the feed yard, proceeds would be used to pay the costs to feed them, and the remaining proceeds would be used to pay for unpaid feed yard services on the Jersey and heiferette cattle, and others for which payment had not been made by Maverick. Maverick proposed this arrangement. Johnson did not solicit it. Johnson had no secret plan for the cattle so placed, but agreed to accept them solely based on the representations made by Maverick. PJSCC's charges for its services for feeding the cattle were consistent with industry practices though Johnson added to its invoices past due amounts as requested or expected by Maverick. The indebtedness of Maverick to PJSCC was repeatedly identified by Maverick and its payment from the proceeds of the cattle was promised.

16. The Counterclaim's ¶ 16 allegations are denied except to the extent that PJSCC conducted business as usual with FNBO, its lender, including reporting to it sums due from Maverick as those sums had been pledged by Johnson Cattle to FNBO as collateral. PJSCC reported to FNBO, in the ordinary course of business, the arrival of cattle Maverick identified as "tri-county" cattle in its Counterclaim, and which it represented to be cattle available to be fed, sold, with proceeds used to pay current feeding bills and past obligations of Maverick to PJSCC because the cattle were owned by Maverick or related entities, and were free of liens. PJSCC reported to FNBO

17. The Counterclaim's ¶ 17 allegations are denied. FNBO agreed to give Maverick's plan for the payment of its debt an opportunity to be successful.

18. The Counterclaim's ¶ 18 allegations are denied to the extent they purport to allege communications between Johnson Cattle and FNBO.

19. The Counterclaim's ¶ 19 allegations are denied. Furthermore, feed bills were not artificially inflated. Adjustments were made as requested by Maverick, only.

20. The Counterclaim's ¶ 20 allegations are denied and the reference to "during depositions" is denied as an inaccurate reference to the testimony of Robert P. Johnson or Keri J. Maloley. Feed adjustment figures were those requested or approved by Maverick for the purpose of identifying sums to be paid on its past due debt and were to be credited, when paid, to that debt. This arrangement was made because Maverick requested it and directed it.

21. The Counterclaim's ¶ 21 allegations are denied for the reasons set forth in paragraph 20 and elsewhere above.

### There Was No Feed Bill Scheme

22. The Counterclaim's ¶ 22 allegations are admitted only to the extent that business that occurred between Maverick and the feed yard was constituted legitimate business dealings to the extent of Johnson Cattle's involvement. Johnson Cattle was assured that the cattle were free of liens, placed in the feed yard unencumbered, to be fed, and available to have proceeds used to pay current feed bills and prior feeding obligations.

23. The Counterclaim's ¶ 23 allegations are admitted in part and denied in part. Cattle were placed in the yard by April of 2009. They were represented as free of liens and available for feeding and, upon sale, it was represented that their proceeds would be used to pay current and prior bills. Maverick requested that feed bills be rendered to it as was done so that it could distribute, for its internal purposes which were

24. Feed bills continued to be sent on a biweekly basis in the ordinary course of business. Feed bills were not held. In addition, closeouts for all cattle sold were promptly mailed by PJSCC to its customer, Maverick, in the ordinary course of business.

25. The Counterclaim's ¶ 25 allegations are denied. Contrary to these allegations, Sawyer acknowledged the invoices, with the requested adjustments and acknowledged that the feed bill adjustments were as expected and requested.

26. The Counterclaim's ¶ 26 allegations are denied. The feed bill adjustments were placed into feed bills as Maverick requested, no excessive charges were made. No distortions in the feed bills for current charges were made. Adjustments, to cover unpaid previous debt were posted as Maverick expected, directed, and sought.

27. The Counterclaim's ¶ 27 allegations are denied. Sawyer and Johnson talked regularly about the cattle. Johnson Cattle continuously advised Sawyer of their condition, size, readiness for market, and, when appropriate, available prices for sale to the extent bids were obtained by Johnson Cattle. Throughout this time Sawyer persistently affirmed that the cattle, when sold, would produce proceeds to be used to pay current and past due obligations to the feed yard. Sawyer, with the support of others affiliated with him, continued to affirm that the cattle were free of encumbrances. He continued to direct that when the cattle were sold, proceeds be used and applied accordingly.

28. The Counterclaim's ¶ 28 allegations are denied.

29. The Counterclaim's ¶ 29 allegations are denied. Sawyer knew the amount of the debt due for services and feed furnished by the feed yard. These sums were invoiced on a biweekly basis for the 2008 cattle and for the 2009 cattle, with additional feeding adjustments, which reflected entries requested by Maverick for the purpose of assisting Maverick with its recordkeeping and the amount of old debt being

30. The Counterclaim's ¶ 30 allegations are denied. Sawyer appeared at PJSCC in August 2009. Johnson Cattle expected, and encouraged, Sawyer to see the cattle and their condition. Sawyer did not confront Robert Johnson, did not complain about the feed bills, did not assert that there was anything wrong with the feed bills or say that they "stink so bad you could smell them in South Dakota" or anything to that effect. On the contrary, Sawyer again assured Johnson Cattle that charges accruing against the cattle for feeding services, and unpaid previous debts owed by Maverick to PJSCC, would be paid from proceeds of the sale of cattle in PJSCC 's feed yards in August 2009.

31. The Counterclaim's ¶ 31 allegations are denied.

32. The Counterclaim's ¶ 32 allegations are admitted to the extent that cattle were sold in September, October and November 2009, and proceeds were applied to pay debts due to the feed yard.

33. The Counterclaim's ¶ 33 allegations are denied. All sums collected by the feed yard were due to it for its services, feed, and goods furnished to the Maverick, and for costs incurred and paid by PJSCC to provide care for Maverick's cattle, to the extent of Maverick's debt. No sums other than those due were collected.

### There Was No Financing Scheme

34. The Counterclaim's ¶ 34 allegations are denied. PJSCC provides customer financing for cattle through FNBO. This is a well-recognized industry practice. Like other feed yards, PJSCC offered its customers an opportunity to pledge cattle as first priority collateral for promissory notes which would be made payable to the feed yard,

35. The Counterclaim's ¶ 35 allegations are denied except to the extent that Maverick and its principals executed documents, provided documentation, and conducted themselves in connection with the financing arrangement in the ordinary course of business, and as required to obtain credit through FNBO and PJSCC. A subordination or release of filings by Campbell County Bank may have been one of these requirements, but if so it was a requirement made in the ordinary course of business to assure that some or all cattle placed with PJSCC by Maverick were free of liens so PJSCC and FNBO would have first priority security interests in the cattle.

36. The Counterclaim's ¶ 36 allegations are denied. The financing occurred as alleged in paragraph 35 above with only limited, and ordinary, involvement by Johnson Cattle.

37. The Counterclaim's ¶ 37 allegations are denied to the extent of its reference to representations and admitted to the extent that Campbell County Bank may have issued a letter on or about July 22 disclaiming interests in proceeds of sale of cattle placed at PJSCC. This was an ordinary course of business event and banking requirement.

38. The Counterclaim's ¶ 38 allegations are denied. PJSCC was never willing to finance Maverick cattle except to the extent that FNBO would do so. Furthermore, financing was not necessary except to furnish cash flow to facilitate PJSCC's operations. When Maverick elected against this financing, but continued its assurance that the cattle were free of liens and proceeds could and would be used to pay sums due to the feed yard for its feeding and care of the current animals, with the balance to be paid to prior debt, and with the cattle already in the feed yard, PJSCC proceeded

### Sale of the "Tri-County Cattle"

39. The Counterclaim's ¶ 39 allegations are denied. Maverick knew the amounts of its obligations to PJSCC for current and former feed, and feeding services. Sawyer continued to speak regularly with Johnson Cattle about the cattle, their condition, markets, margins, and costs, and he continued to assure Johnson, as they discussed the markets and the condition of the cattle, that proceeds of sale would be sufficient to retire Maverick's debt to PJSCC. Maverick's principals negotiated from time to time with Ackers for the sale of some cattle. Other times, Johnson Cattle conducted these negotiations at Maverick's request. Maverick was timely informed of all bids, counterproposals, sales, delivery dates, deliveries, and amounts of proceeds of sale of cattle received when Maverick cattle were sold.

40. The Counterclaim's ¶ 40 allegations are denied. LOL did express concerns about its debt but did not furnish any proof that cattle placed with Johnson Cattle were financed by LOL, or covered by any security interest held by LOL. LOL did not assert that any claim to the cattle it had was superior to the claims, or rights to recover sale proceeds, of Johnson Cattle.

41. Except to the extent described in ¶ 40 above, the Counterclaim's ¶ 41 allegations are denied. Neither Johnson Cattle nor FNBO gave Maverick any promises or assurances that proceeds in cattle sales would be used for any purpose other

42. The Counterclaim's ¶ 42 allegations are denied. LOL had no security interest. PJSCC and FNBO were entitled to all proceeds of sale which they retained and applied against the debts owed by Maverick to Johnson Cattle.

43. The Counterclaim's ¶ 43 allegations are admitted to the extent that a suit was filed, and admitted to the extent the Court, with the consent of the parties including PJSCC and FNBO, agreed to deposit funds in an account at First National Bank of Columbus, which account was opened by Johnson Cattle's lawyer for the benefit of all parties and in compliance with the consent order entered by the Court. The Court's order is not a ruling in favor of LOL or Maverick. It is a ruling designed to hold funds for the benefit of the parties, which funds are to be distributed as ordered by the Court. Paragraph 43 of the Counterclaim is otherwise denied.

**Count I – No Breach of Contract Occurred**

44. All allegations of paragraph 1 through 43 of the Answer, above, are renewed here.

45. The Counterclaim's ¶ 45 allegations are denied. Maverick and Johnson Cattle contractually agreed, and performed their agreement, that PJSCC would feed and care for Maverick's cattle for sums consistent with Johnson Cattle's usual and ordinary charges for yardage and feed, and Maverick would pay PJSCC on a biweekly basis. PJSCC fulfilled the contract. Maverick did not. Invoices were not paid when received. 2008 cattle were sold, and proceeds were insufficient to pay the feed yard. 2009 cattle were sold, by agreement of the parties, and their proceeds were used first to pay for feed and feeding charges for the 2009 cattle, and then to retire residual debt left unpaid upon sale of the 2008 cattle. No charges of any amount, for anything that did not reflect actual debt to PJSCC owed by Maverick, was deducted from sale proceeds or retained by the feed yard. The feed yard fulfilled its contract, but Maverick did not.

46. The Counterclaim's ¶ 46 allegations are denied. Except to the extent of complications caused by Maverick's failure to perform its obligations and make payments timely, the feed yard received the cattle placed with it, put them on appropriate feeds and feeding rations, provided suitable care, assured adequate consideration and attention by nutritionists and veterinarians, raised the cattle to market weight, and sold them or delivered them when sold as authorized or directed by Maverick. Maverick's obligation was to pay the feed yard and the feed yard's obligation to provide feed and care for the animals. Johnson Cattle performed PJSCC 's obligations. Maverick and its principals did not perform theirs until the cattle were sold and the proceeds were applied against Maverick debt, and the debt was thereby collected.

47. Except to the extent admitted in ¶ 46 above, the Counterclaim's ¶ 47 allegations are denied.

48. The Counterclaim's ¶ 48 allegations are denied. All sums collected by PJSCC for the sale of livestock placed with it by Maverick was used to pay debt due to PJSCC. Maverick lost no equity, no opportunities, incurred no charges, contracted no additional interest, and suffered no damage to its credit by reason of any act or omission of Johnson Cattle.

**Count II – There Was No Conversion**

49. All allegations in ¶¶ 1 through 48 of the Answer, above, are renewed here.

50. The Counterclaim's ¶ 50 allegations are denied and all allegations above are renewed here.

51. The Counterclaim's ¶ 51 allegations are denied and all allegations above are renewed here.

52. The Counterclaim's ¶ 52 allegations are denied. Maverick had an ownership interest in the cattle subject to the adjuster's rights and liens of Johnson Cattle and FNBO, and subject to Maverick's obligations to Johnson Cattle and FNBO under the

53. The Counterclaim's ¶ 53 allegations are denied. Maverick sustained no loss. All sums collected by Johnson Cattle were actually owed to it.

54. The Counterclaim's ¶ 54 allegations are denied.

**Count III – No Fraud and No Deceit Was Committed by Johnson Cattle**

55. All allegations in ¶¶ 1 through 54 of the Answer, above, are renewed here.

56. The Counterclaim's ¶ 56 allegations do not assert well-plead facts. This paragraph purports to state the law, but it does not correctly recite the elements of proof for either intentional or negligent misrepresentation or omission. Paragraph 56 of the Counterclaim is denied.

57. Paragraph 57 of the Counterclaim is denied. All allegations in paragraphs 1 through 56 above are renewed here.

58. Paragraph 58 of the Counterclaim is denied. All allegations in paragraphs 1 through 57 above are renewed here.

59. Paragraph 59 of the Counterclaim is denied. All allegations in paragraphs 1 through 58 are renewed here.

60. Paragraph 60 of the Counterclaim is denied. All allegations above are renewed here. The allegations in ¶¶ 57 through 60 all ignore and misrepresent the statements and assurances made by Maverick and its principals, the actual debt owed to the feed yard for current and previous cattle, the agreement for its payment, the obligations owed as priority items to suppliers of feed, and generally accepted industry practices.

61. Paragraph 61 of the Counterclaim is denied. All allegations in paragraphs 1 through 60 above are renewed here. There was no secret plan concocted by Johnson Cattle to collect past debt. Past debt was owed, and collected by PJSCC as (a) directed by Maverick, (b) authorized by law and (c) occurs in the ordinary course of

62. Paragraph 62 of the Counterclaim is denied. Maverick sustained no loss. All sums collected by PJSCC were actually owed to it.

63. Paragraph 63 of the Counterclaim is denied and all allegations in paragraphs 1 through 62 above are renewed.

64. Paragraph 64 of the Counterclaim is denied. Neither punitive nor exemplary damages are permitted by Nebraska law which governs the rights and obligations of the parties. No wrongful or fraudulent conduct was committed by Johnson Cattle.

## Count IV – No Civil Conspiracy

65. All allegations in ¶¶ 1 through 64 of the Answer, above, are renewed here.

66. Paragraph 66 of the Counterclaim is denied. Maverick sustained no loss. All sums collected by Johnson Cattle were actually owed to it.

67. Paragraph 67 of the Counterclaim is denied. This ¶ is the Claimant's Request for Relief. The right to all relief requested is contested and denied.

## Affirmative Defenses

68. The Counterclaim's Count I alleging breach of contract fails to state a claim against Robert Johnson or Keri Maloley upon which relief can be granted. Mr. Johnson and Ms. Maloley were not parties to a contract with Maverick.

69. The Counterclaim's second claim, asserting conversion, fails to state a claim against Robert Johnson or Keri Maloley upon which relief can be granted as it fails to allege that these defenses converted funds and, on its face, asserts that any alleged conversion was committed only by PJSCC. No conversion occurred as alleged above. *FR Civ P* 12b(6).

70. None of the claims in the Counterclaim allege the facts state legally cognizable claims upon which relief can be granted. *FR Civ P* 12b(6).

71. Maverick, its principals, and its lender are estopped and equitably estopped, to assert that any proceeds of sale of cattle placed at PJSCC were converted, or in any way misused or misapplied as all sums retained from cattle sale proceeds were applied against the debts owed by Maverick and its principals to PJSCC for cattle feeding services. In addition, the terms "place", "placed" and "placement" are terms of industry art in the cattle trade; they mean that cattle are moved from a former location to a feedyard to be fed a mixed ration of grain, minerals and forages to promote growth, weight gain and to prepare the animals ingesting the ration for slaughter for human and other consumption.

72. When Maverick and its principals placed cattle at PJSCC to be fed, they knew that, as an adjuster, PJSCC was entitled to be paid from the proceeds and sale of the cattle, for feed, and its service fee, other costs, and feeding services extended by PJSCC to care for the livestock. It also knew, and agreed, that any additional proceeds would be applied to debts remaining unpaid after the liquidation and sale of cattle sold previously, which cattle did not produce sufficient revenues to pay PJSCC in full. Accordingly, PJSCC's rights as an adjuster entitle it to retain some or all proceeds, sale of the cattle, and it did so lawfully and in accord with generally accepted industry practices.

73. There is no civil conspiracy comprising an actionable tort by or among Johnson Cattle and FNBO or others.. No conspiracy to defraud, or engage in wrongful conduct against Maverick occurred. Maverick was indebted to PJSCC for all sums PJSCC collected from proceeds of sale of Maverick cattle. These collections occurred in the ordinary course of business as cattle were sold, with sale proceeds applied first to current feed bills, then to outstanding unpaid feed bills on previous cattle. This practice is consistent with industry practices, and the agreement made by Maverick and its principals with PJSCC.

### Election of Remedies Required

74. The Counterclaim asserts breach of contract in Count I, and fraud and civil conspiracy in Counts III and IV. The fraud claim, and the breach of contract claim, are inconsistent. Breach of contract assumes the existence of a contract. Fraud assumes and asserts that no mutual assent occurred and that any contract that might otherwise have existed was void. Claims for breach of contract and fraud may not be pursued simultaneously, and election of remedies by the defense is required. This election must be made prior to trial as Maverick cannot proceed with the presentation of evidence on inconsistent theories and then choose at the conclusion of trial and prior to jury submission, on which theory it proceeds because doing so would permit the introduction of evidence that is inconsistent. Without notice of the actual theory upon which trial will proceed, neither Johnson Cattle nor the Court will know what evidence presented at trial is relevant to the theory upon which the case will be submitted to the jury if submission occurs. Accordingly, Johnson Cattle request that the Court require that an election of remedies be made no later than the time scheduled for the pretrial conference in this case.[3]

### Requests for Relief

75. On the foregoing basis, Johnson Cattle each and all request that

75.1 An election of remedies and legal theories, be required to be made by Maverick no later than at the time of the pretrial conference,

75.2 The Counterclaims be dismissed against Keri J. Maloley and Robert P. Johnson because they failed to state claims in one which release can be granted and (3) no consideration be given to the request for exemplary or punitive damages because none are permitted by Nebraska law.

---

[3] The law of Nebraska controls this case. *Erie R. Co. v. Tompkins*, 304 US 64 (1938). Under Nebraska law "…[a] party cannot proceed on a theory of recovery which is premised on the existence of a contract and at the same time proceed alternatively on a theory which is premised on the lack of [one]. Consequently, one who has been induced to enter into an agreement by virtue of a material representation … fraud … may either affirm … and sue for damages or disaffirm … and sue to be reinstated to the position before contract." *Tobin v. Flynn & Larson Implement Co.*, 220 Neb 259, 260-61, 369 NW2d 96, 98 (1985). This same rule is applied to elections of theories where a breach of contract claim is inconsistent with a fraud claim. *Gibb v. Citicorp Mortgage, Inc.*, 246 Neb 355, 373-4, 518 NW2d 910, 923 (1994).

75.3   The Counterclaims be dismissed in all respects with prejudice.

75.4   Johnson Cattle recover judgment for its costs.

75.5   The Court direct that the funds held in escrow at First National Bank of Columbus be released and paid to Johnson Cattle in full, with interest.

## Jury Demand

3.   Johnson Cattle respectfully demands trial by jury.

November 29, 2010.

        Robert P. Johnson, Keri J. Maloley, Paul Johnson & Sons Cattle Co., Inc.,
Defendants,


By: /s/ David A. Domina
David A. Domina, #11043
DOMINALAW Group pc llo
2425 S. 144th Street
Omaha, NE 68144
(402) 493-4100

*Plaintiff's Lawyers*

AR9940                                 18

## Certificate of Service

On November 29, 2010, I filed **Paul Johnson & Sons Cattle Co., Inc., Robert P. Johnson, and Keri J. Maloley's Answer to the Third Party Counterclaim of Maverick Feeders, Inc., Shon & Julie Sawyer** with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all Counsel of Record.

| | |
|---|---|
| Jonathan Miesen<br>Stoel Rives, LLP<br>jcmiesen@stoel.com | Shawn Nichols<br>Cadwell, Sanford, Deibert & Gray, LLP<br>snichols@cadlaw.com |
| Steven Sanford<br>Cadwell Sanford Deibert & Gray LLP<br>SSanford@cadlaw.com | Thomas O. Kelley<br>McGrath North Mullin & Kratz, PC LLO<br>tokelley@mcgrathnorth.com |
| William F. Hargens<br>McGrath North Mullin & Kratz, PC LLO<br>whargens@mcgrathnorth.com | |

                                             /s/ David A. Domina_____