IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| LOL FINANCE COMPANY, | ) | 4:09CV3224 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| PAUL JOHNSON & SONS CATTLE | ) | |
| CO., INC., FIRST NATIONAL BANK | ) | |
| OF OMAHA, ROBERT P. JOHNSON, | ) | |
| KERI J. MALOLEY, JOHN DOE and | ) | |
| ABC COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| PAUL JOHNSON & SONS CATTLE | ) | |
| CO., INC., | ) | |
| | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MAVERICK FEEDERS, INC., | ) | |
| SHON SAWYER and JULIE | ) | |
| SAWYER, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

The plaintiff, LOL Finance Company ("LOLFC" or "LOL"), claims (1) that the defendants, Paul Johnson & Sons Cattle Co., Inc. ("PJSCC"), Robert P. Johnson ("Johnson"), and Keri J. Maloley ("Maloley"), converted cattle and proceeds from sales of cattle in which LOLFC held a security interest; (2) that sales proceeds were also converted by the defendant, First National Bank of Omaha ("FNBO"); (3) that

all of the defendants[1] conspired to convert the cattle and sales proceeds; and (4) that LOLFC is entitled to replevin certain proceeds that were deposited into an escrow account pursuant to a temporary restraining order.[2] *See* Amended Complaint (filing [19](#)). LOLFC has moved for summary judgment on all claims and requests the court to award it (1) the escrowed funds in the principal amount of $630,290.28; (2) additional damages for net sales proceeds in the principal amount of $1,496,152.49; and (3) prejudgment interest. *See* Plaintiff's Motion for Summary Judgment (filing [153](#)). I find that LOLFC is entitled to summary judgment on the replevin claim for the escrowed funds, but I shall not order the payment of such funds to LOLFC until the conclusion of this case. I also find that LOLFC is entitled to summary judgment on the conversion claim for the full amount of damages requested, but only against PJSCC and Johnson. In all other respects the motion will be denied.

PJSCC claims in a third-party complaint that the owners of the cattle, Maverick Feeders, Inc. ("Maverick"), and Shon and Julie Sawyer (collectively, "the Sawyers"), have a contingent liability for feed bills and the cost of defending this action if

---

[1] Two fictitious defendants, John Doe and ABC Company, have not been served.

[2] The temporary restraining order, which was entered with the consent of the parties on November 5, 2009, notes that Johnson and Maloley had represented to the court that they and their company, PJSCC, were in possession of approximately 500 to 550 head of cattle placed with PJSCC by Maverick and the Sawyers, and that approximately 350 head of the cattle were in the process of being shipped to Tyson Fresh Meats, Inc. in Lexington, Nebraska. It was agreed that the cattle being shipped to Tyson would be sold as scheduled and the entire amount of sale proceeds deposited into an escrow account at the First National Bank of Columbus. It was also agreed that Johnson, Maloley, PJSCC would continue to feed and care for the remaining cattle until they were ready to be marketed, at which time they would be sold and the entire amount of sale proceeds again deposited into the approved escrow account. The court directed that "[t]he money deposited into the approved escrow account pursuant to this Temporary Restraining Order shall remain deposited in such account until further Order of the Court." Temporary Restraining Order (filing [18](#)).

LOLFC prevails on its claims. *See* Third-Party Complaint (filing 26). No motion has been filed with respect to these contingent claims.

Maverick and the Sawyers claim (1) that PJSCC breached its contract to custom feed the cattle; (2) that the defendants converted the cattle and sales proceeds; (3) that PJSCC and Johnson committed fraud and deceit; and (4) that the defendants conspired to convert the cattle and proceeds. *See* Answer to Third-Party Complaint, Counterclaim and Cross-Claim (filing 40) and Amended Counterclaim and Cross-Claim (filing 204).[3] The second claim relates to counts 1 and 2 of LOLFC's amended complaint,[4] while the fourth claim corresponds to count 3. Maverick and the Sawyers do not make any claim regarding the escrowed funds.

PJSSC, Johnson, and Maloley have joined in filing a motion for summary judgment (filing 165) concerning all claims alleged against them in LOLFC's amended complaint and in the counterclaim and cross-claims of Maverick and the Sawyers. These defendants argue that LOLFC does not have a perfected security interest in the cattle and proceeds because the collateral description in its security agreement and financing statement is insufficient. PJSSC also claims to have a prior security interest. No argument is made regarding the claims alleged by Maverick and the Sawyers. This motion for summary judgment will be denied in its entirety.

FNBO has filed three separate motions regarding the claims for conversion and conspiracy alleged in counts 2 and 3 of LOLFC's amended complaint and counts 2 and 4 of Maverick and the Sawyers' cross-claim. *See* Defendant FNBO's Motion for Summary Judgment on Claims Asserted by Plaintiff LOL Finance Co. (filing 168),

---

[3] Somewhat confusingly, in these pleadings Maverick and the Sawyers are jointly designated as "Maverick Feeders."

[4] In their pleadings, however, the third-party defendants have erroneously incorporated by reference counts 2 and 3 of LOLFC's amended complaint into their claim for conversion.

-3-

Motion for Summary Judgment on Claims Asserted by Third-Party Defendant Maverick Feeders, Inc. (filing 169), and Motion to Dismiss Maverick Feeders, Inc.'s Crossclaim (filing 206).[5]   FNBO argues (1) that it has a priority interest in sales proceeds that were deposited by PJSCC in a checking account at FNBO and then transferred to FNBO to pay down PJSCC's loans; (2) that the conversion claim fails because the cattle sales proceeds were irreversibly commingled with other deposited funds; (3) that Maverick and the Sawyers cannot recover consequential damages; (4) that LOLFC cannot recover prejudgment interest; and (5) that LOLFC does not have a valid security interest.

FNBO's first motion for summary judgment will be granted in part and denied in part.  With respect to count 2 of LOLFC's amended complaint, the motion will be granted insofar as it is claimed that FNBO converted funds deposited in PJSCC's checking account by applying the funds to pay down PJSCC's loans.  The motion will be denied, however, to the extent it is alleged that FNBO aided and abetted the conversion committed by PJSCC.  The motion also will be denied with respect to count 3 of LOLFC's amended complaint (conspiracy claim).  Because Maverick and the Sawyers filed an amended pleading with leave of court after FNBO filed the second motion for summary judgment, that motion is technically moot.[6]  As discussed next, however, FNBO's motion to dismiss Maverick and the Sawyers' amended pleading will be converted into a motion for summary judgment.  Treated as such, the

---

[5] Although FNBO only refers to claims asserted by "Maverick Feeders, Inc.," I construe these claims as also being brought by the Sawyers.

[6] The amended pleading was filed for the purpose of reviving a fraud claim against PJSCC and Johnson that had been dismissed for Maverick and the Sawyers' failure to allege a sufficient factual basis for the claim; no change was made regarding the conversion and conspiracy claims.  *See* Memorandum and Order entered on October 27, 2010 (filing 203).  Maverick and FNBO have stipulated that the amended pleading should not be construed as asserting a claim against FNBO for conspiracy to commit fraud or deceit.  *See* Stipulation filed October 8, 2010 (filing 192).

-4-

motion will be granted in part and denied in part with respect to the conversion claim, and will be denied with respect to the conspiracy claim.

### *Preliminary Procedural Issues*

FNBO's motions for summary judgment were filed on September 24, 2010. Maverick and the Sawyers filed an opposing brief and index of evidence on September 30, 2010. Their amended counterclaim and cross-claim was filed on November 3, 2010. FNBO's motion to dismiss the amended pleading was filed on November 12, 2010. It reads, in part:

> Defendant, First National Bank of Omaha ("FNBO"), pursuant to Fed. R. Civ. P. 12(b)(6), hereby moves for the dismissal of the Amended Crossclaim filed against FNBO by Maverick Feeders, Inc. in the above captioned action for the reason that it fails to state a claim upon which relief can be granted. In support of this Motion, FNBO offers its Brief in Support of FNBO's Rule 12(b)(6) Motion to Dismiss Crossclaim filed herewith which incorporates FNBO's previously filed Brief in Support of its Summary Judgment Motion (Filing No. 175) and Reply Brief in Support of Motion for Summary Judgment (Filing No. 202). In addition, FNBO offers the Evidence Index of FNBO in Support of its Summary Judgment Motion (Filing No. 174) and Evidence Index of FNBO in Opposition to LOL Finance Motion for Summary Judgment (Filing No. 191) in support of FNBO's Motion to Dismiss Maverick Feeders, Inc.'s Crossclaim. Because FNBO has presented to the Court matters outside the pleadings in support of this Motion, FNBO respectfully requests that the Court treat FNBO's Motion as one for summary judgment under Rule 56 as permitted by Fed. R. Civ. P. 12(d).

(Filing 206, at 1-2.)

On November 22, 2010, Maverick filed a brief in opposition to the motion to dismiss, stating that it "resists the motion on the grounds and for the reasons set forth in the resistance to the summary judgment motion (Dkt# 200) and record citations

therein, . . ..." (Filing 218, at 1-2.)[7]  Maverick did not object to FNBO's request that its motion be treated as one for summary judgment.

As requested by FNBO, the Rule 12(b)(6) motion to dismiss will be treated as a Rule 56 motion for summary judgment.  *See* Fed.R.Civ.P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.").  Because the issues presented by the motion to dismiss are identical to those presented by the previously filed motion for summary judgment, and because Maverick and the Sawyers have fully responded to FNBO's arguments and evidence, I conclude that the motion may be considered under Rule 12(d) without further notice.  *See Riehm v. Engelking*  538 F.3d 952, 962 n. 5 (8th Cir. 2008) (plaintiffs had constructive notice of district court's treatment of defendants' motion to dismiss as motion for summary judgment where plaintiffs introduced and relied on material outside complaint); *Madewell v. Downs*, 68 F.3d 1030, 1048 (8th Cir. 1995) (lack of formal notice that district court will treat Rule 12(b)(6) motion to dismiss as motion for summary judgment is harmless where nonmoving party has submitted evidence in opposition to motion).

PJSCC, Johnson, and Maloley also filed their motion for summary judgment in advance of Maverick's amended pleading, on September 16, 2010.  The motion is now moot insofar as it requests that "the Court render summary judgment in favor of each [the defendants], individually, . . . on all third party claims of the Third Party Defendants against them, or any of them." (Filing 165, at 1.) On November 29, 2010, PJSCC, Johnson, and Maloley responded to Maverick and the Sawyers' amended counterclaim and cross-claim by filing an "Answer [to] Amended Counterclaim of

_____

    [7] Although this brief only references "Maverick," the earlier brief filed in opposition to FNBO's motion for summary judgment indicated that "Maverick" included all of the third-party defendants.

Maverick et al Against PJSCC And Answer to Cross Claims Against Defendants (#204) And FR Civ P 12b Motion." (Filing 221, at 1.) This filing purportedly includes both an answer and a Rule 12(b)(6) motion to dismiss, but the defendants state in a footnote that "[n]o separate Brief is filed with this Motion and no ruling prior to trial is requested. The Motion is filed as a prelude to trial as a Rule 50 Motion is expected to be made then." (Filing 221, at 2., n. 1.) Unlike FNBO's motion to dismiss, this filing does not rely upon any matters outside the pleadings.

The purported motion to dismiss is a nullity and will not be considered. Under the Federal Rules of Civil Procedure, a motion to dismiss for failure to state a claim upon which relief can be granted "must be made before pleading if a responsive pleading is allowed." Fed. R. Civ. P. 12(b).

The brief filed by PJSCC, Johnson, and Maloley in support of their motion for summary judgment fails to comply with Nebraska Civil Rule 56.1(a). This local rule provides that a party moving for summary judgment "must include in the brief in support of the summary judgment motion a separate statement of material facts about which the moving party contends there is no genuine issue to be tried and that entitles the moving party to judgment as a matter of law. <u>Failure to submit a statement of facts may be grounds to deny the motion</u>." NECivR 56.1(a)(1) (emphasis in original). "The statement of facts should consist of <u>short</u> numbered paragraphs, each containing pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials that support the material facts stated in the paragraph. . . . The statement must not contain legal conclusions. <u>Failure to provide citations to the exact locations in the record supporting the factual allegations may be grounds to deny the motion</u>." NECivR 56.1(a)(2) (emphasis in original).

Although the defendants' supporting brief purports to contain a 4-paragraph "statement of uncontroverted facts," this statement generally consists of arguments and legal conclusions, which are not sufficient to establish that summary judgment

should be entered for the defendants.[8]  The motion for summary judgment filed by PJSCC, Johnson, and Maloley (filing 165) therefore will be denied in all respects.[9]

The brief filed by PJSCC, Johnson, and Maloley in opposition to LOLFC's motion for summary judgment fails to comply with Nebraska Civil Rule 56.1(b). This local rule provides that "[t]he party opposing a summary judgment motion should include in its brief a concise response to the moving party's statement of material facts. The response should address each numbered paragraph in the movant's statement and, in the case of any disagreement, contain pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies. Properly referenced material

---

[8] Facts referenced in other sections of the defendants' brief are disregarded because LOLFC and Maverick were only obligated to respond to the separate statement.  *See* NECivR 56.1(b)(1); *Plan Pros, Inc. v. Zych*, No. 8:08CV125, 2009 WL 5213997, at *1 n. 1 (D.Neb. Dec. 22, 2009) ("When a party moving for summary judgment fails to provide a court with a statement of what facts the moving party believes are material, it is extremely difficult, if not impossible, for a court to ascertain what facts are pertinent to the summary judgment evaluation. Moreover, stating the material facts in a brief supporting a motion for summary judgment is essential because the party opposing the motion must directly respond to the moving party's statements of material fact."); *Resler v. Telex Communications, Inc.,* No. 4:08CV3023, 2008 WL 4585429, at *1 (D.Neb. Oct. 14, 2008) ("This practice [of scattering facts throughout the 'argument' section of a brief in support of a motion for summary judgment] renders it difficult for the court to identify all of the material facts and, perhaps more importantly, frustrates the [opposing party's] ability to respond to each of the [moving party's] material facts as required by the local rules.").

[9] The brief is also deficient in failing to explain why summary judgment should be granted with respect to the claims alleged by Maverick and the Sawyers.  Under our local rules, a supporting brief "must concisely state the reasons for the motion and cite to supporting authority.  A party's failure to brief an issue raised in a motion may be considered a waiver of that issue." NECivR 7.0.1(a)(1)(A). In any event, the motion was not renewed after the filing of the amended counterclaim and cross-claim.

facts in the movant's statement are considered admitted unless controverted in the opposing party's response." NECivR 56.1(b)(1) (emphasis in original).

LOLFC satisfied the requirements of Nebraska Civil Rule 56.1(a) by setting out in its supporting brief a 124-paragraph statement of material facts that includes pinpoint references to the record. PJSCC, Johnson, and Maloley have not made a concise response to this statement in their opposing brief. Instead, the defendants have responded with their own 22-paragraph statement of material facts (which they failed to provide in support of their cross-motion for summary judgment). While I will give due consideration to any additional facts that are properly referenced in the defendants' statement, *see Jenkins v. Winter, 540 F.3d 742, 747 (8th Cir.2008)* (holding that district court erred in not considering statement of facts presented in opposition to summary judgment motion), LOLFC's statement of material facts, to the extent it is supported by the record, will be deemed admitted by PJSCC, Johnson, and Maloley because these facts are not controverted by the defendants' response.[10]

---

[10] *See, e.g., Ballard v. Heineman, 548 F.3d 1132, 1133 (8th Cir. 2008)* ("We follow the district court in considering [the defendants'] statements of fact in support of their motions for summary judgment 'deemed admitted' under Nebraska Local Civil Rule 56.1(b) because [the plaintiff] did not respond to those statements of fact."); *Libel v. Adventure Lands of America, Inc., 482 F.3d 1028, 1033 (8th Cir. 2007)* (district court was not obliged to scour record looking for factual disputes and did not abuse discretion in deeming admitted moving party's statements of undisputed facts where opposing party's responses violated Iowa Local Rule 56.1); *Jones v. United Parcel Service, Inc., 461 F.3d 982, 991 (8th Cir. 2006)* (district court did not abuse discretion in deeming admitted defendants' uncontroverted facts where plaintiff's response violated W.D. Missouri Local Rule 56.1; district court was not required to give specific notice of rule violation before disregarding the response); *Northwest Bank and Trust Co. v. First Illinois Nat'l. Bank, 354 F.3d 721, 725 (8th Cir. 2003)* (district courts may adopt local rules designed to streamline resolution of summary judgment motions). *See also Cordray v. 135-80 Travel Plaza, Inc., 356 F.Supp.2d 1011, 1014-15 (D.Neb. 2005)* (granting summary judgment based in part on opposing party's failure to address each numbered paragraph of moving party's statement of material facts).

By contrast, FNBO has complied with NECivR 56.1(b) by responding to each paragraph of LOLFC's statement of material facts with appropriate references to the record.  FNBO has also complied with NECivR 56.1(a) by providing a 24-paragraph statement of material facts in support of its motion for summary judgment.  Finally, LOLFC and Maverick have complied with NECivR 56.1(b) in responding to FNBO's statement of material facts.

### *Undisputed Facts*

Based upon my examination of the record and careful review of the statement of material facts as set forth in LOLFC's brief in support of its motion for summary judgment (filing 154, at 3-29), and FNBO's response in its opposing brief (filing 190, at 3-18), and of the statement of material facts as set forth in FNBO's brief in support of its motion for summary judgment (filing 175, at 4-10), and the responses of LOLFC (filing 182, at 2-8) and Maverick and the Sawyers (filing 200, at 2), I find there is no genuine dispute regarding the following facts:

Plaintiff LOL Finance Company ("LOLFC" or "LOL") is a Minnesota corporation with its principal place of business located in Arden Hills, Minnesota. (McKay[11] Aff. [filing 155-2] ¶ 2; Amended Complaint [filing 19] ¶ 1; PJSCC Answer [filing 25] ¶ 1; FNBO Answer [filing 37] ¶ 1.)  LOLFC is engaged in the business of providing financing to agricultural businesses and producers, including cattle producers. (McKay Aff. [filing 155-2] ¶ 3; Amended Complaint [filing 19] ¶ 9; PJSCC Answer [filing 25] ¶ 9; FNBO Answer [filing 37] ¶ 9.)

LOLFC provides financing for cattle producers in cooperation with its sister company, Land O'Lakes Purina Feed LLC ("LOLPF"), doing business as 4-Square Cattle Services ("4-Square"). Both LOLFC and LOLPF are subsidiaries of Land

---

[11] Ronald C. McKay is a senior loan officer for LOLFC.

O'Lakes, Inc. (McKay Aff. [filing 155-2] ¶ 4; Sauder[12] Aff. [filing 155-16] ¶ 2.) 4-Square provides cattle-consulting services to cattle producers. The services provided by 4-Square include cattle sourcing, profitability analysis, cattle accounting and cattle monitoring and inspections. 4-Square also assists cattle producers in obtaining financing through LOLFC. (Sauder Aff. [filing 155-16] ¶ 2; McKay Aff. [filing 155-2] ¶ 5.)

Defendant Paul Johnson & Sons Cattle Co., Inc. ("PJSCC"), is a Nebraska corporation with its principal place of business located in Nebraska. (Amended Complaint [filing 19] ¶ 2; PJSCC Answer [filing 25] ¶ 2; FNBO Answer [filing 37] ¶ 2.) PJSCC operates a cattle feedlot near Bertrand, Nebraska, where it feeds cattle for its own account and on a custom basis for others. (Johnson Depo. [filing 156-8] at 7:24-8:8; Johnson Decl. [filing 167-2] ¶ 3.)

Defendant Robert P. Johnson ("Johnson") is a citizen of the State of Nebraska. (Amended Complaint [filing 19] ¶ 4; PJSCC Answer [filing 25] ¶ 4; FNBO Answer [filing 37] ¶ 4.) Johnson is the chief executive officer and president of PJSCC. (Johnson Decl. [filing 167-2] ¶ 2.)

Defendant Keri J. Maloley ("Maloley") is a citizen of the State of Nebraska. (Amended Complaint [filing 19] ¶ 5; PJSCC Answer [filing 25] ¶ 5; FNBO Answer [filing 37] ¶ 5.) Maloley is employed by PJSCC as an office manager and bookkeeper. (Maloley Decl. [filing 167-4] ¶ 2.)

Defendant First National Bank of Omaha ("FNBO") is a national banking association with its principal place of business located in Omaha, Nebraska. (Amended Complaint [filing 19] ¶ 3; FNBO Answer [filing 37] ¶ 3; PJSCC Answer

---

[12] Michelle H. Sauder is a financial analyst for 4-Square.

[filing 25] ¶ 3.)  At all relevant times, PJSCC was a deposit and loan customer of FNBO. (Kalkowski[13] Aff. [filing 174-1] ¶ 7.)

Third-Party Defendant Maverick Feeders, Inc. ("Maverick") is a South Dakota corporation with its principal place of business in South Dakota. (Amended Complaint [filing 19] ¶ 11; PJSCC Answer [filing 25] ¶ 11; FNBO Answer [filing 37] ¶ 11.)  Maverick is owned by Third-Party Defendants Shon D. Sawyer and Julie K. Sawyer (collectively, "the Sawyers"), who have resided on a farm near Hurley, South Dakota, continuously since approximately 1995.  (Sawyer Aff.[14] [filing 155-1] ¶ 3; Johnson Depo. [filing 156-8] at 25:16-24; Maloley Depo. [filing 156-10] at 31:4-21.) Shon Sawyer is Maverick's president. (Sawyer Aff. [filing 155-1] ¶ 2.) Maverick and the Sawyers are engaged in the business of raising and marketing cattle. (Sawyer Aff. [filing 155-1] ¶ 4; McKay Aff. [filing 155-2] ¶ 6; Sauder Aff. [filing 155-16] ¶ 3.)

In November 2002, Maverick and the Sawyers retained 4-Square to provide them with cattle-consulting services and to assist them in obtaining financing from LOLFC to purchase and raise cattle. To implement their business relationship, Maverick and the Sawyers entered into a Cattle Consulting Agreement with 4-Square on November 20, 2002. (Sawyer Aff. [filing 155-1] ¶ 5; Sauder Aff. [filing 155-16] ¶ 4 and Ex. A [filing 155-17].)  Pursuant to the terms of the Cattle Consulting Agreement, 4-Square assisted Maverick and the Sawyers in obtaining financing from LOLFC. (Sawyer Aff. [filing 155-1] ¶ 6; Sauder Aff. [filing 155-16] ¶ 5; McKay Aff. [filing 155-2] ¶ 7.)

On November 22, 2002, LOLFC provided Maverick and the Sawyers with a revolving line of credit in the principal amount of $2 million to purchase and raise

---

[13] Chris Kalkowski is a vice president of FNBO in the agribusiness lending department.

[14] The affiant is Shon Sawyer.

-12-

cattle. (Sawyer Aff. [filing 155-1] ¶ 7; McKay Aff. [filing 155-2] ¶ 8 and Ex. A [filing 155-3].)   To secure the revolving line of credit, Maverick and the Sawyers also entered into a Commercial Security Agreement with LOLFC on November 22, 2002. (Sawyer Aff. [filing 155-1] ¶ 8; McKay Aff. [filing 155-2] ¶ 9 and Ex. B [filing 155-4].)  The Commercial Security Agreement describes the collateral as follows:

> All of the cattle whether now owned or hereafter acquired by Grantor and placed by Grantor with 4-Square Cattle Management Services under a Cattle Consulting Agreement executed between Grantor and 4-Square Cattle Management Services, all additions thereto, whether such additions are by reproduction, purchase, acquisition, inheritance, gift or otherwise; all feed and grain inventories now owned or hereafter acquired used for feeding such cattle; all commodity futures contracts, hedging accounts, other documents of title, accounts, contract rights, now owned or hereafter acquired by Grantor pertaining to such cattle; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and other accounts proceeds), and any & all equities or patronage credit.

(Commercial Security Agreement (McKay Aff. Ex. B) [filing 155-4]) at 1.)

LOLFC filed a financing statement in both Minnesota and South Dakota, on February 27 and 28, 2003, respectively.  (McKay Aff. [filing 155-2] ¶ 10 and Ex. C [filing 155-5].)  The financing statements describe the collateral as follows:

> All of the cattle whether now owned or hereafter acquired by Debtorr [sic] and placed by Debtor with 4-Square Cattle Management Services under a Cattle Consulting Agreement executed between Debtor and 4-Square Cattle Management Services, all additions thereto, whether such additions are by reproduction, purchase, acquisition, gift, inheritance or otherwise; all feed and grain inventories now owned or hereafter acquired used for feeding such cattle; all commodity futures contracts, hedging accounts, other documents of title, accounts contract rights, now owned or hereafter acquired by Grantor pertaining to such cattle; all records of any kind relating to any of the foregoing; all

proceeds relating to any of the foregoing (including insurance, general intangibles and other accounts proceeds), and & all equities or patronage credit; whether any of the foregoing is now owned or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing.

(McKay Aff. Ex. C [filing 155-5].)  LOLFC filed a continuation statement in both Minnesota and South Dakota, on January 17 and 24, 2008, respectively. (McKay Aff. [filing 155-2] ¶ 11 and Ex. D [filing 155-6].)

The revolving line of credit was renewed and extended on multiple occasions from 2002 through 2009.  (Sawyer Aff. [filing 155-1] ¶ 9; McKay Aff. [filing 155-2] ¶ 15; Sauder Aff. [filing 155-16] ¶ 6.)

Since approximately 2004, Maverick has on several occasions delivered cattle to PJSCC's feedlot to be fed and raised to market weight.  (Johnson Depo. [filing 156-8] at 18:14-17, 22:24-23:10; Johnson Decl. [filing 174-17] ¶ 4; Sawyer Depo. [filing 174-12] at 84:22-24.)  Maverick consented to PJSCC's selling of these cattle at market. (Sawyer Aff. [filing 174-14] ¶ 14; Johnson Depo. [filing 156-8] at 18:14-17,  22:24-23:10.)

On February 22, 2006, PJSCC filed a financing statement with the Nebraska Secretary of State identifying itself as the "creditor" and Maverick as the "debtor." The collateral is described as "all livestock."  (Depo. Ex. 1 (Miesen [15] Aff. Ex. N) [filing 156-15].)  Defendants have been unable to identify any security agreement supporting the February 22, 2006, financing statement. (Johnson Depo. [filing 156-8] at 23:11-24:12; Maloley Depo. [filing 156-10] at 28:17-29:13; Kalkowski Depo. [filing 156-12] at 35:5-36:7.)

---

[15] Jonathan C. Miesen is the attorney of record for LOLFC.

-14-

On June 30, 2006, PJSCC or FNBO filed a financing statement with the South Dakota Secretary of State identifying FNBO as the "creditor" and Maverick as the "debtor." The collateral is described as all of Maverick's "assets now or hereafter in the care of [PJSCC]." (Depo. Ex. 2 (Miesen Aff. Ex. O) [filing 156-16].) FNBO terminated the June 30, 2006, financing statement on January 29, 2007. (Miesen Aff. Exs. O, P [filings 156-16, 156-17]; Kalkowski Depo. [filing 156-12] at 41:14-19.)

On January 26, 2007, FNBO filed a financing statement with the South Dakota Secretary of State identifying itself as the "creditor" and Maverick as the "debtor." The collateral is described as "[a]ll of [Maverick's] assets now or hereafter in the care or possession of [PJSCC] . . . ." (Depo. Ex. 4 (Miesen Aff. Ex. R) [filing 156-19].)

During 2007, PJSCC agreed to provide financing to Maverick to purchase and raise certain cattle. PJSCC obtained the funds to finance the cattle under its "customer finance" credit line with FNBO. (Kalkowski Depo. [filing 156-12] at 54:17-56:3.)

On November 12, 2007, PJSCC and Maverick entered into a contract identified as a "LOC Master Promissory Note and Security Agreement/Margin." Under the terms of the security agreement, Maverick granted PJSCC a security interest in "[a]ll of [Maverick's] livestock, including cattle, on [PJSCC's] feedlot . . . ." (Depo. Ex. 3 (Miesen Aff. Ex. Q) [filing 156-18].) On the same day it was signed, PJSCC assigned all of its rights under the Security Agreement to FNBO. (Depo. Ex. 3 [filing 156-18]; Johnson Depo. [filing 156-8] at 31:18-32:15; Kalkowski Depo. [filing 156-12] at 43:12-18.)

The cattle financed by PJSCC/FNBO did not perform well. PJSCC claims that Maverick incurred losses on the cattle ranging from approximately $600,000.00 to $960,000.00. (Johnson Depo. [filing 156-8] at 266:3-10; Kalkowski Depo. [filing 156-12] at 54:17-56:16.)

From November 7, 2008, through January 19, 2009, Maverick and the Sawyers purchased 3,504 head of cattle from Tri-County Livestock Exchange, Inc. ("Tri-County"), in Motley, Minnesota. (Sawyer Aff. [filing 155-1] ¶ 11; Sauder Aff. [filing 155-16] ¶ 8; McKay Aff. [filing 155-2] ¶ 18.)[16]  Maverick and the Sawyers informed Tri-County that the cattle purchases were going to be financed by LOLFC through 4-Square.  (Sawyer Aff. [filing 155-1] ¶ 12; Sauder Aff. [filing 155-16] ¶ 9; McKay Aff. [filing 155-2] ¶ 19.)

To facilitate the purchases, Tri-County sent copies of the invoices (referred to as "Buyer Recaps") to 4-Square. (Sawyer Aff. [filing 155-1] ¶ 12; Sauder Aff. [filing 155-16] ¶ 9 and Ex. B [filing 155-18]; McKay Aff. [filing 155-2] ¶ 19.)  Upon receipt of the Buyer Recaps, 4-Square prepared Cattle Receipt and Evaluation Agreements for each Buyer Recap.  The Cattle Receipt and Evaluation Agreements confirmed the placement of the cattle into the 4-Square consulting program. (Sauder Aff. [filing 155-16] ¶ 10 and Ex. C [filing 155-19].)

---

[16] In responding to LOLFC's statement of facts, FNBO states that "Documents in LOL's loan files indicate that Maverick had a 'side agreement' relating to cattle financed by LOL. (FNBO Supplemental Evidence Index, Exhibit 17, Exhibit A [filing 191-19] at LOLFC000518; FNBO Supplemental Evidence Index, Exhibit 17, Exhibit B [filing 191-20] at LOLFC000493) In September 2009 LOL drafted a 'release of interest' for [Joe] Varner to sign to get him out of the cattle 'which would be remaining in our deal' after Varner severed his relationship with Maverick. (FNBO Supplemental Evidence Index, Exhibit 12, Exhibit B [filing 191-6]) The record does not disclose the terms of the 'release of interest' (because it was not produced by LOL in discovery) and LOL's director of lending does not know whether the document was ever signed or whether Mr. Varner released any interest he claimed in the 2009 Maverick Cattle. (FNBO Supplemental Evidence Index, Exhibit 17 [Wilken Depo. (filing 191-18)] at 68:22-69:6) Accordingly, LOL's director of lending does not know whether Varner had an ownership interest in the cattle as of September 2009.  (FNBO Supplemental Evidence Index, Exhibit 17 [Wilken Depo. (filing 191-18)] at 108:11-109:5)" (Filing 190 at 6.) However, FNBO has not defended against LOLFC's amended complaint or Maverick and the Sawyers' amended cross-claim by asserting that Varner is a necessary or indispensable party.

4-Square forwarded the Buyer Recaps to LOLFC with written requests to fund the purchases under the revolving line of credit. (Sauder Aff. [filing 155-16] ¶ 11 and Ex. D [filing 155-20]; McKay Aff. [filing 155-2] ¶ 19.)  Upon receipt of the funding requests, LOLFC wired funds advanced under the revolving line of credit to purchase the cattle to Tri-County's bank, First Integrity Bank in Staples, Minnesota. (Sawyer Aff. [filing 155-1] ¶ 12; McKay Aff. [filing 155-2] ¶ 19; Sauder Aff. [filing 155-16] ¶ 11.)[17]

On January 8, 2009, Maverick and the Sawyers entered into a supplemental Commercial Security Agreement with LOLFC.  This agreement contains the same collateral description as before. (McKay Aff. [filing 155-2] ¶ 20 and Ex. F [filing 155-8].)  On that same day, Maverick and the Sawyers entered into a supplemental Cattle Consulting Agreement with 4-Square. (Sawyer Aff. [filing 155-1] ¶ 11; Sauder Aff. [filing 155-16] ¶ 12 and Ex. E [filing 155-21].)

During early 2009, Maverick and the Sawyers agreed to deliver some of the cattle they purchased from Tri-County to PJSCC's feedlot to be raised to market weight. (Sawyer Aff. [filing 155-1] ¶ 14.)

Unbeknownst to Maverick and the Sawyers, PJSCC intended after selling the cattle in 2009 to apply the sale proceeds toward payment of the prior debt.  (Johnson Depo. [filing 156-8] at 68:18-69:10, 76:18-77:5, 78:13-16; Kalkowski Depo. [filing 156-12] at 61:5-24, 62:1-16.) FNBO was aware of PJSCC's intention by July 1, 2009. (Kalkowski Depo. [filing 156-12] at 176:22-177:3; Depo. Ex. 71 [filing 191-14].) FNBO supported the plan because it wanted PJSCC to pay down its credit line. (Kalkowski Depo. [filing 156-12] at 62:6-16.)

---

[17]  FNBO notes that "only a portion of the purchase price for the cattle purchased at Tri-County was funded by LOL. (FNBO Supplemental Evidence Index, Exhibit 15 [McKay Depo.] at 136:3-21)" (Filing 190 at 7.) McKay testified LOLFC did not finance $200 for each head of cattle purchased.

Chris Kalkowski and FNBO's attorney, Richard (Rick) Myers, participated in a conference call with Johnson on March 31, 2009.  They discussed whether PJSCC could exercise a right of setoff against 2,142 head of cattle that Maverick had in the feedyard, and whether FNBO would provide financing for the cattle.  (Depo. Ex. 53 (Miesen Aff. Ex. W) [filing 156-24] at 3; Kalkowski Depo. [filing 156-12] at 67:9-69:9; Johnson Supp. Depo. [filing 156-9] at 7:19-22, 9:12-25.)  It was determined they would need to (a) confirm that Maverick owned the cattle; (b) conduct a lien search to confirm no other creditors had a lien against the cattle; (c) check Maverick's corporate status; and (d) check with Maverick's South Dakota bank, Campbell County Bank, to confirm it was not claiming a lien against the cattle. (Depo. Ex. 53 [filing 156-24] at 3); Kalkowski Depo. [filing 156-12] at 68:25-69:16, 70:14-22, 71:8-74:19.)

FNBO had a lien search conducted in South Dakota, which revealed LOLFC's February 28, 2003 financing statement. (Kalkowski Depo. [filing 156-12] at 69:13-20, 112:2-18.)  FNBO believed that LOLFC's security interest only applied to cattle located at a feedlot operated by 4-Square Cattle Services; it assumed the reference in the financing statement to "cattle consulting services" meant cattle feedlot services.  (Kalkowski Depo. [filing 156-12] at 116:1-4, 12-14.)  Neither FNBO nor PJSCC ever asked LOLFC or 4-Square for a copy of the Commercial Security Agreement or a copy of the Cattle Consulting Agreement or took any other measures to try to determine whether Maverick and the Sawyers' cattle and proceeds were subject to LOLFC's security interest. (Johnson Depo. [filing 156-8] at 74:9-75:10; Maloley Depo. [filing 156-10] at 79:1-25; Kalkowski Depo. [filing 156-12] at 118:20-120:11, 156:5-19, 161:8-11.)

During March and April 2009, Maverick and the Sawyers transferred 3,431 head of cattle (the "Maverick Cattle") to PJSCC's feedlot.[18] (Depo. Exs. 6-11 (Miesen

---

[18] FNBO disputes whether all of these cattle were purchased from Tri-County. It states that "according to Mr. Sawyer's testimony, there were approximately 1,000

Aff. Ex. B [filing 156-3]); Sawyer Aff. [filing 155-1] ¶ 14; Johnson Depo. [filing 156-8] at 40:4-17, 46:17-47:21; Maloley Depo. [filing 156-10] at 41:2-21, 43:2-44:8.) The Maverick Cattle were segregated by PJSCC into six lots, which were identified as Lots 1996, 1997, 1999, 2000, 2005 and 2006. (Depo. Exs. 6-11 (Miesen Aff. Ex. B [filing 156-3]); Maloley Depo. [filing 156-10] at 41: 2-21.)

In late May or early June 2009, LOLFC learned that the Maverick Cattle had been moved to PJSCC's feedlot. (McKay Aff. [filing 155-2] ¶ 23.)  On June 3, 2009, LOLFC filed a financing statement with the Nebraska Secretary of State. (McKay Aff. [filing 155-2] ¶ 23 and Ex. G [filing 155-9].) The collateral description contained in the Nebraska financing statement is virtually identical to the collateral description contained in LOLFC's South Dakota and Minnesota financing statements. (McKay Aff. Ex. G [filing 155-9].)

On June 4, 2009, LOLFC's Senior Loan Officer, Ronald C. McKay, called Johnson and informed him that LOLFC had a security interest in the Maverick Cattle and that 4-Square was helping Maverick and the Sawyers and LOLFC monitor and manage the cattle. (McKay Aff. [filing 155-2] ¶ 24; Johnson Depo. [filing 156-8] at 54:4-56:3.)

---

head of cattle at Maverick's feedyard in South Dakota in addition to those which had been purchased from Tri-County Livestock at the time he decided to send some of the cattle to PJSCC. (FNBO Supplemental Evidence Index, Exhibit 16 [Sawyer Depo. (filing 191-16)] at 118:8-14) The cattle purchased from Tri-County Livestock was [sic] not branded or ear-tagged in any manner that would identify them as such. (FNBO Supplemental Evidence Index, Exhibit 16 [Sawyer Depo. (filing 191-16)] at 15:24-16:11; 65:4-14) Although Mr. Sawyer testified that he shipped 3,431 head of 'Tri-County' cattle to PJSCC in March and April of 2009, inspection reports prepared by 4-Square indicate that those same cattle were located at Maverick's feedyard in May 2009. (FNBO Supplemental Evidence Index, Exhibit 19 [filing 191-23]; FNBO Supplemental Evidence Index, Exhibit 15 [McKay Depo. (Filing 191-15)] at 108:10-113:5) (Filing 190 at 10.)

On June 5, 2009, after learning that FNBO was PJSCC's lender and had filed a financing statement with the South Dakota Secretary of State identifying Maverick as a debtor and cattle as collateral, LOLFC sent FNBO a proposed Subordination Agreement. (McKay Aff. [filing 155-2] ¶ 25 and Ex. H [filing 155-10]; Kalkowski Depo. [filing 156-12] at 141:8-143:10.)

Also on June 5, 2009, 4-Square's Financial Analyst, Michelle H. Sauder, contacted PJSCC's bookkeeper, Keri J. Maloley, and informed her that the Maverick Cattle were owned by Maverick and the Sawyers and financed by LOLFC. Sauder told Maloley that 4-Square would be monitoring and inspecting the Maverick Cattle for Maverick and the Sawyers and LOLFC. (Sauder Aff. [filing 155-16] ¶ 15 and Ex. H [filing 155-24]; Maloley Depo. [filing 156-10] at 55:7-56:21.)

Sauder also informed Maloley that 4-Square would be sending PJSCC ear tags bearing the 4-Square logo to be placed on the Maverick Cattle to identify them as 4-Square cattle. (Sauder Aff. [filing 155-16] ¶ 15; Maloley Depo. [filing 156-10] at 56:22-25.)  That same day, Sauder ordered 4,000 ear tags from 4-Square's ear-tag supplier, Lextron Southeast. Lextron Southeast shipped the ear tags directly to PJSCC's feedlot. The ear tags arrived at PJSCC's feedlot on June 9, 2009. Maloley signed the receipt for the ear tags. (Sauder Aff. [filing 155-16] ¶ 16 and Exs. I, J [filings 155-11, 155-12]; Maloley Depo. [filing 156-10] at 57:1-58:5.)  FNBO was aware that 4-Square sent the ear tags to PJSCC. (Kalkowski Depo. [filing 156-12] at 162:1-11, 305:5-11.)  Johnson, Maloley and Kalkowski all understood that 4-Square sent the ear tags to PJSCC to identify the Maverick Cattle as 4-Square cattle. (Maloley Depo. [filing 156-10] at 59:22-25; Kalkowski Depo. [filing 156-12] at 163: 6-164:3; Johnson Depo. [filing 156-8] at 59:18-60:12.)[19]

_____

[19] The Cattle Consulting Agreement provided: "It shall be Participant's obligation to assure that Participant's Cattle are marked to the satisfaction of Consultant so that the Cattle will be clearly distinguishable and identifiable as Participant's Cattle, as cattle in the Program, and distinguishable and identifiable

On June 16, 2009, McKay sent a letter to both PJSCC and FNBO notifying them that LOLFC had a "first lien" on the Maverick Cattle; that "the cattle are being managed for Maverick by Joe Varner of Tri-County Livestock"; and that "[t]he cattle are being monitored for LOL Finance Co. by 4-Square Cattle Services." (McKay Aff. [filing 155-2] ¶ 26 and Exs. I, J [filings 155-11, 155-12]; Johnson Depo. [filing 156-8] at 56:6-57:20; Kalkowski Depo. [filing 156-12] at 153:3-155:22.)[20]

4-Square inspected the Maverick Cattle on a monthly basis while they were at PJSCC's feedlot. 4-Square also continued to prepare monthly status reports relating to the Maverick Cattle, which were distributed to Maverick and the Sawyers and LOLFC. (Sauder Aff. [filing 155-16] ¶ 18 and Exs. K-Q [filings 155-27, 155-28, 155-29, 155-30, 155-31, 155-32, 155-33]; Sawyer Aff. [filing 155-1] ¶ 15; Johnson Depo. [filing 156-8] at 61:14-65:6; Maloley Depo. [filing 156-10] at 67:5-68:17; Kalkowski Depo. [filing 156-12] at 164:4-21.)

While the Maverick Cattle were at its feedlot, PJSCC provided 4-Square with monthly reports so that 4-Square could monitor the performance of the Maverick Cattle. (Sauder Aff. [filing 155-16] ¶ 19 and Exs. R-T [filings 155-34, 155-35, 155-36] ; Maloley Depo. [filing 156-10] at 60:1- 67:1; Johnson Depo. [filing 156-8] at 65:13-66:5; Kalkowski Depo. [filing 156-12] at 164:22-165:1, 305:16-19.)

Johnson decided to artificially inflate Maverick and the Sawyers' feed bills with fictitious "feed adjustments." (Depo. Exs. 6-11 (Miesen Aff. Ex. B [filing 156-3]).) PJSCC added total "feed adjustments" to Maverick and the Sawyers' bills for the

---

from the Cattle of other Program participants.  Consultant may require all Cattle to be identified by ear tags issued by Consultant."  (Sauder Aff. Ex. E [filing 155-21] at 3.)

[20] McKay also personally contacted Kalkowski on June 16, 2009, but the substance of their conversation is in dispute. (McKay Aff. [filing 155-2] ¶ 27; Kalkowski Depo. [filing 156-12] at 149:4-151:10; Kalkowski Aff. [filing 191-1] ¶ 5.)

Maverick Cattle in the amount of $307,167.66. (Depo. Exs. 6-11 (Miesen Aff. Ex. B [filing 156-3]); Johnson Depo. [filing 156-8] at 222:2-13.)  Johnson admitted during his deposition that the purported "feed adjustments" were simply "arbitrary numbers" that he made up to extract extra amounts from Maverick and the Sawyers, in part to pay the prior debt. (Johnson Depo. [filing 156-8] at 222:9-224:5, 195:10-25, 204:7-205:10, 206:20-207:1.)

Maloley, who prepared the feed bills, confirmed Johnson's testimony.[21] (Maloley Depo. [filing 156-10] at 100:18-22, 101:5-9, 201:23-202:17.) Maloley also testified that PJSCC had never charged Maverick and the Sawyers or any other customer any purported "feed adjustments" in the past. (Maloley Depo. [filing 156-10] at 102:1-103:15, 146:6-13.)

During the summer of 2009, Kalkowski and Myers participated in conference calls with Johnson "to troubleshoot as to how to recover the [Maverick] debt." (Kalkowski Depo. [filing 156-12] at 241:23-243:9; Supp. Johnson Depo. [filing 156-9] at 30:1-10.)  Kalkowski testified, however, that he left it up to Johnson to decide what to do with respect to the Maverick debt.  (Kalkowski Depo. [filing 156-12] at 242:21-25.)

In September 2009, PJSCC began selling the Maverick Cattle to meat-packing companies. (Sawyer Aff. [filing 155-1] ¶ 16; Depo. Exs. 6-11 (Miesen Aff. Ex. B [filing 156-3]).)  PJSCC did not turn any of the proceeds from the sale of the Maverick Cattle over to Maverick and the Sawyers or LOLFC. (Johnson Depo. [filing 156-8] at 268:4-10; Sawyer Aff. [filing 155-1] ¶ 16; McKay Aff. [filing 155-2] ¶ 30.) The proceeds from the sale of the Maverick Cattle were deposited into PJSCC's

---

[21] Kalkowski also testified that he became aware "[p]robably in the middle of the feeding period sometime" that PJSCC was adding a feed adjustment to the closeout statements for the Maverick Cattle. (Kalkowski Depo. [filing 156-12] at 205:3-207:13.)

business checking account with FNBO. (Maloley Depo. [filing 156-10] at 108:19-109:25, 110:1-2; Kalkowski Depo. [filing 156-12] at 196:15-18.)

At the close of each banking day, funds in PJSCC's business checking account were automatically swept into a special clearing account identified as the "central account." (Kalkowski Depo. [filing 156-12] at 214:1-215:9; Supp. Kalkowski Depo. [filing 156-13] at 43:13-44:7.)  PJSCC could not withdraw money from the central account. (Maloley Depo. [filing 156-10] at 22:8-16; Supp. Kalkowski Depo. [filing 156-13] at 46:14-47.)   Funds swept into the central account were automatically applied by FNBO to pay down PJSCC's operating line of credit. (Kalkowski Depo. [filing 156-12] at 196:15-21, 217:1-18; Miesen Aff. [filing 156-1] ¶ 7-8 and Exs. C-F [filings 156-4, 156-5, 156-6, 156-7].)

Pursuant to a faxed request from Maloley, Kalkowski reversed a payment to PJSCC's operating line of credit and instead applied the funds from the central account to PJSCC's "customer finance" credit line for "payment on [a] receivable from Maverick."  (Kalkowski Depo. [filing 156-12] at 226:1-231:14; Depo. Ex. 52 (Miesen Aff. Ex. V) [filing 156-23] at 2.)

In early October 2009, McKay spoke with Johnson on the telephone. During this conversation, Johnson stated, for the first time, that he was planning to use the proceeds from the sale of the Maverick Cattle to pay the prior debt. Johnson further claimed that PJSCC's banker, Kalkowski, was making him use the proceeds to pay the prior debt. (McKay Aff. [filing 155-2] ¶ 30.)  McKay objected to Johnson using any of the proceeds to pay the prior debt and reminded Johnson that LOLFC held a perfected security interest in the Maverick Cattle and proceeds. (McKay Aff. [filing 155-2] ¶ 30.) After speaking with Johnson, McKay contacted Kalkowski. McKay relayed to Kalkowski the substance of his telephone conversation with Johnson. Kalkowski denied that FNBO was forcing Johnson to use the proceeds to pay the prior debt. (McKay Aff. [filing 155-2] ¶¶ 31 and 34 and Ex. L [filing 155-14] at 3.)

-23-

Several weeks passed and neither Maverick nor LOLFC received any proceeds from the sale of the Maverick Cattle. McKay called Johnson on the telephone on Friday, October 16, 2009, to inquire about the proceeds. During this conversation, Johnson acknowledged that he could not use the proceeds from the sale of the Maverick Cattle to pay the prior debt and promised to forward the proceeds, after deducting PJSCC's fees for feeding and caring for the Maverick Cattle, to LOLFC the following week.[22] (McKay Aff. [filing 155-2] ¶¶ 32 and 34 and Ex. L [filing 155-14] at 3.) On the following Monday, October 19, 2009, Maloley called McKay on the telephone and informed him that he would have to communicate with PJSCC's attorney, David A. Domina, regarding the Maverick Cattle and proceeds. (McKay Aff. [filing 155-2] ¶ 33.)

On November 3, 2009, LOLFC commenced this action and filed a motion for a temporary restraining order to freeze the proceeds from the sale of the Maverick Cattle. (*See* filings 1, 8.) On November 5, 2009, with the consent of all of the parties,

---

[22] It is also undisputed that on October 16, 2009, PJSCC acquired a purported assignment of an alleged debt owed by Maverick to a company called Biegert, LLC. (Depo. Ex. 21 (Miesen Aff. Ex. T) [filing 156-21].) Biegert claimed that Maverick owed his company approximately $430,000.00 relating to alleged losses from a prior cattle partnership. (Johnson Depo. [filing 156-8] at 93:11-94:4.) The owner of Biegert, LLC, Jeff Biegert, is a close friend of Johnson. (Johnson Depo. [filing 156-8] at 170:7-12; Maloley Depo. [filing 156-10] at 206:9-207:21; Kalkowski Depo. [filing 156-12] at 208:21-23.) Biegert is also another client of PJSCC's attorneys, Domina Law Group. (Kalkowski Depo. [filing 156-12] at 208:24-209:4.) Johnson, Domina Law Group and Biegert decided that Biegert LLC would assign the Biegert debt to PJSCC "for collection purposes." (Depo. Ex. 21 [filing 156-21]; Johnson Depo. [filing 156-8] at 97:6- 98:22, 267:12-268:3.) During their depositions, Johnson and Maloley admitted that PJSCC did not provide any consideration to Biegert LLC for the purported assignment (Johnson Depo. [filing 156-8] at 98:1-3, 186:16-20), and that any amounts collected by PJSCC to pay the Biegert debt would simply be turned over to Biegert LLC (Johnson Depo. [filing 156-8] at 186:1-20, 267:12-25; Maloley Depo. [filing 156-10] at 97:15-98:11). The evidence does not show that any proceeds from the sale of the Maverick Cattle were actually paid to Biegert.

-24-

the court issued a temporary restraining order requiring, among other things, that proceeds from the sale of the remaining Maverick Cattle be deposited into an approved escrow account at FNBO's sister bank, First National Bank of Columbus, pending the disposition of this case on the merits. (*See* filing 18.)[23]

Johnson testified that the proceeds from the sale of the Maverick Cattle that would be due to Maverick and the Sawyers, in the absence of any other claim, would be calculated as the total sales proceeds less PJSCC's fees, plus interest charged on those fees. (Johnson Depo. [filing 156-8] at 118:5-12.) The amount of sales proceeds,

---

[23] LOLFC suggests through its statement of facts that the temporary restraining order was violated when a replacement check was deposited into PJSCC's business checking account rather than into the approved escrow account, but LOLFC has not sought to remedy this alleged violation. Although not material to LOLFC's pending motion for summary judgment, it is undisputed that on September 27, 2009, PJSCC delivered 420 head of the Maverick Cattle to Tyson Fresh Meats, Inc. ("Tyson") in Lexington, Nebraska. (Miesen Aff. Ex. Z [filing 156-27].) On September 29, 2009, Tyson issued a check for the 420 head of cattle delivered by PJSCC in the amount of. (Miesen Aff. Ex. Z [filing 156-27].) During discovery in this case, PJSCC produced a copy of the check stub, but not the actual check issued by Tyson on September 29, 2009. (See Miesen Aff. Ex. Z [filing 156-27].) On April 6, 2010, five months after the issuance of the temporary restraining order, Tyson issued an "Outstanding Check Status Report" to PJSCC indicating that the September 29, 2009, check had not be cashed. (Depo. Ex. 89 (Miesen Aff. Ex. AA) [filing 156-28].) Maloley filled out the report and requested a replacement check from Tyson. (Depo. Ex. 89 [filing 156-28]; Supp. Maloley Depo. [filing 156-10] at 48:17-49:23.) Sometime after April 6, 2010, Tyson issued a replacement check in the amount of $491,534.72 to PJSCC. (Supp. Maloley Depo. [filing 156-10] at 49:24-50:1.) PJSCC did not deposit the replacement check into the approved escrow account. Maloley testified that because the original check was sent prior to the issuance of the temporary restraining order, she believed PJSCC had the right to retain the proceeds from the replacement check. (Supp. Maloley Depo. [filing 156-10] at 50:2-21.) She claimed that she did not know who made the actual decision to retain the proceeds. (Supp. Maloley Depo. [filing 156-10] at 50:22-24.) The replacement check was deposited into PJSCC's business checking account with FNBO on May 3, 2010.(Supp. Maloley Depo. [filing 156-10] at 50:2-11; Kalkowski Aff. [filing 191-1] ¶ 7.)

PJSCC's fees, and interest charged on those fees are all reflected on the face of closeout statements for the Maverick Cattle. (Depo. Exs. 6-11 (Miesen Aff. Ex. B) [filing 156-3].)  The amounts shown are:

| Lot | Sales Proceeds | Fees | Interest |
|-----|----------------|------|----------|
| 1996 | $779,405.30 | $372,740.19 | $6,893.14 |
| 1997 | $428,890.51 | $224,566.92 | $4,706.67 |
| 1999 | $706,010.86 | $342,646.21 | $6,407.00 |
| 2000 | $504,289.85 | $247,795.18 | $6,294.58 |
| 2005 | $521,445.63 | $283,175.91 | $6,109.61 |
| 2006 | $788,716.80 | $410,930.96 | $9,240.34 |
| Total | $3,728,758.95 | $1,881,855.37 | $39,651.34 |

(Depo. Exs. 6-11 (Miesen Aff. Ex. B) [filing 156-3].)  Based upon these figures, the net proceeds due to Maverick and the Sawyers can be calculated as follows:

| | |
|---|---|
| Total Sales Proceeds | $3,728,758.95 |
| Total Fees | ($1,881,855.37) |
| Total Interest | ($ 39,651.34) |
| Net Proceeds | $1,807,252.24 |

The "Total Fees" referenced above include the fictitious "feed adjustments" PJSCC added to Maverick and the Sawyers' closeout statements. The amount of fictitious "feed adjustments" are:

| Lot | "Feed Adjustment" |
|-----|-------------------|
| 1996 | $56,746.64 |
| 1997 | $37,473.32 |
| 1999 | $58,535.72 |
| 2000 | $38,384.52 |
| 2005 | $47,099.52 |
| 2006 | $68,927.94 |
| Total | $307,167.66 |

(Depo. Exs. 6-11 (Miesen Aff. Ex. B) [filing 156-3].)   During her deposition, PJSCC's bookkeeper, Maloley, admitted that the proceeds reflected on two of the

closeout statements were understated and that Maverick and the Sawyers were entitled to the following credits:

| Lot | Mistake | Actual | Difference |
|---|---|---|---|
| 1999 | $1,197.31 | $12,479.55 | $11,282.24 |
| 2006 | $ 299.33 | $1,039.96 | $740.63 |
| Total | | | $12,022.87 |

(Maloley Depo. [filing 156-10] at 183:21-184:13, 188:1-189:25; Depo. Exs. 6-11 (Miesen Aff. Ex. B) [filing 156-3].)  Adding back the fictitious "feed adjustments" and the credits conceded by Maloley results in total proceeds due to Maverick and the Sawyers as follows:

| | |
|---|---|
| Net Proceeds | $1,807,252.24 |
| "Feed Adjustments" | $ 307,167.66 |
| Credits for Mistakes | $ 12,022.87 |
| Total | $2,126,442.77 |

Proceeds in the principal amount of $630,290.28 have been deposited into the approved escrow account. (Miesen Aff. [filing 156-1] ¶ 4 and Ex. A [filing 156-2].) Defendants retained the remaining net proceeds in the amount of $1,496,152.49 ($2,126,442.77 - $630,290.28). (Johnson Depo. [filing 156-8] at 268:4-10.) PJSCC concedes that at least $426,494.00 of the proceeds deposited into the approved escrow account belongs to Maverick and the Sawyers. (Johnson Depo. [filing 156-8] at 269:13-271:3.)

As of September 1, 2010, the following amounts were due to LOLFC under the revolving line of credit:

| | |
|---|---|
| Principal | $2,075,772.83 |
| Interest | $ 156,805.03 |
| Total | $2,232,577.86 |

(McKay Aff. [filing 155-2] ¶ 36 and Ex. M [filing 155-15].)

The business checking account into which PJSCC deposited the proceeds from the sale of Maverick Cattle was a deposit account in which FNBO held a security interest perfected by control. (Kalkowski Aff. [filing 174-1] ¶¶ 10, 18, 20-23) Neither LOL nor Maverick had control or ownership of this account. (Kalkowski Aff. [filing 174-1] ¶¶ 20, 21.)  PJSCC drew funds from the account to pay costs and expenses incurred in operating its feedyard. (Maloley Depo. [filing 174-19] at 111:23-112:6; Johnson Depo. [filing 174-13] at 134:2-11.) PJSCC deposited proceeds derived from the sale of other cattle, including cattle owned by PJSCC, into this account. (Kalkowski Aff. [filing 174-1] ¶ 18.) LOL, Maverick, PJSCC, and FNBO never entered into a written agreement with regard to the disposition and use of the funds deposited by PJSCC into its demand deposit accounts held at FNBO. (Kalkowski Aff. [filing 174-1] ¶ 23.)

PJSCC was a borrower from FNBO on three separate promissory notes. One promissory note dated September 25, 2008 was for a principal amount of $350,000. A second note dated September 25, 2008 was for a principal amount of $3,000,000. A third note dated December 16, 2008 was for a principal amount of $6,000,000. All three of these promissory notes contained the following provision granting FNBO a right of setoff in all of PJSCC's accounts at FNBO:

> RIGHT OF SETOFF. To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender to the extent permitted by applicable law, to charge or setoff all sums owing on the debt against any and all such accounts.

(Kalkowski Aff. Exs. A, B, C [filings 174-2, 174-3, 174-4.)

-28-

As security for the sums advanced under the promissory notes identified above, PJSCC provided FNBO a security interest in all of PJSCC's accounts, including its deposit accounts held at FNBO. The security agreement provided, in part, as follows:

GRANT OF SECURITY INTEREST. For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

COLLATERAL DESCRIPTION. The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:
*** 
(B) Accounts and Other Rights to Payment. All rights I have now or in the future to payments including, but not limited to, payment for property or services sold, leased, rented, licensed, or assigned, whether or not I have earned such payment by performance. This includes any rights and interests (including all liens and security interests) which I may have by law or agreement against any Account Debtor or obligor of mine.
***
In addition, the word "Collateral" also includes all the following, whether now owned or hereafter arising, and wherever located:
***
(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of the sale, lease, consignment or other disposition of any of the property described in this Collateral section.
***

RIGHT OF SETOFF. To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts

-29-

Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender to the extent permitted by applicable law, to charge or setoff all sums owing on the debt against any and all such accounts.

(Kalkowski Aff. Ex. D [filing 174-5].)

PJSCC's deposit accounts at FNBO are governed by a deposit account agreement, which during the relevant time period provided, in part, as follows:

Setoff. To the fullest extent permitted by law, we shall have a lien and right of setoff against any funds you have in this account or in any other account which you may have with us for purposes of satisfying any liability, indebtedness or obligation you owe to us (including overdrafts and fees), and you grant us a security interest in such funds and in any items in the process of collection to secure payment and performance of, any liabilities, indebtedness or obligations that you may now or hereafter owe to us (whether sole, several, joint, joint and several, absolute or contingent, due or become due, liquidated or unliquidated, secured or unsecured). We are authorized to exercise against the entire amount of the account whatever setoff or other rights we may have with respect to any one of you, regardless of which of you is in default and irrespective of your contributions to the account.

(Kalkowski Aff. Ex. E [filing 174-6].)

As part of its banking relationship with PJSCC, FNBO provided treasury services to PJSCC. The treasury services provided by FNBO are set forth in the Terms and Conditions for Treasury Services ("Treasury Services Agreement"). (Kalkowski Aff. Ex. F [filing 174-7].) The terms of the Treasury Services Agreement called for a "sweep arrangement" in PJSCC's accounts held at FNBO. This arrangement required FNBO at the close of each banking day to determine whether the collected balance in PJSCC's deposit accounts held at FNBO were at their "target balance." If there were excess funds within PJSCC's deposit accounts held at FNBO

at the close of a banking day, then FNBO was required to apply those funds to PJSCC's outstanding loan balance. If the funds within PJSCC's deposit accounts held at FNBO at the close of a banking day were below the "target balance," then FNBO was required to advance funds sufficient to meet the target balance from PJSCC's line of credit. (Kalkowski Aff. Ex. F [filing 174-7] § 31.)

## DISCUSSION

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). In ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. See *Dancy v. Hyster Co.*, 127 F.3d 649, 652-53 (8th Cir. 1997). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue; the court merely determines whether there is evidence creating a genuine issue for trial. See *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999).

The moving party bears the burden of showing there are no genuine issues of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). However, "a party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)) (internal marks omitted).

### *Conversion Claims*

"Tortious conversion is any distinct act of dominion wrongfully asserted over another's property in denial of or inconsistent with that person's rights." *Zimmerman*

-31-

*v. FirsTier Bank, N.A.*, 585 N.W.2d 445, 451 (Neb. 1998). "The plaintiff must establish a right to immediate possession of the property at the time of the alleged conversion." *Id.* "In other words, 'the essence of conversion is not acquisition by the wrongdoer, but the act of depriving the owner wrongfully of the property.'" *Id.*, at 452 (quoting *Terra Western Corp. v. Berry and Co.*, 295 N.W.2d 693, 696 (Neb. 1980)). "[I]n an action for damages alleged to have been sustained by reason of the conversion of personal property, the plaintiff must recover, if at all, upon the strength of his own title and not upon the weakness of the title of the defendant." *Allen v. Dealer Assistance, Inc.*, 299 N.W.2d 744, 747 (Neb. 1980). "When property is subject to a security interest, an exercise of dominion or control over the property that is inconsistent with the rights of the secured party constitutes, as to that secured party, a conversion of the property." *Ag Services of America, Inc. v. Empfield*, 587 N.W.2d 871, 873 (Neb. 1999).

There is no genuine dispute that Maverick and the Sawyers owned the 3,431 head of cattle that were delivered to PJSCC for custom feeding in 2009. FNBO contends there is uncertainty whether these were the cattle that were purchased from Tri-County with financing provided by LOLFC,[24] but from my examination of the

---

[24] According to FNBO, the evidence is inconclusive because: "The 7-10-09 business loan agreement does not mention cattle at Paul Johnson & Son's Cattle Co., Inc. ('PJSCC') (mentions lots in northern Minnesota and "other feed-lots approved by lender") even though LOL knew as of 7-10-09 that there were cattle at PJSCC in which LOL claimed a security interest. The 2009 Maverick Cattle were never branded or ear-tagged with the 4-Square logo. Nothing in 7-02-09 cattle consulting agreement between Maverick and 4-Square mentions cattle at PJSCC. Cattle which were allegedly financed by LOL were reportedly inspected by 4-Square at Maverick's feedlot in March-May 2009 at the same time that the cattle in issue were at PJSCC. A 6/5/09 letter from LOL to FNBO indicates that LOL was claiming a security interest in cattle 'managed by 4-Square cattle services'. A 6/16/09 letter from LOL to PJSCC, also sent to FNBO, states that 2009 Maverick Cattle 'are being managed for Maverick by Joe Varner of Tri-County Livestock.' Although the letter indicates that the cattle are 'being monitored for LOL…by 4-Square…', the letter does not state

record, I also find no genuine dispute as to these facts. The principal issue raised by the defendants is whether LOLFC has a valid security interest.

Under the Uniform Commercial Code, a security interest attaches to collateral, and is enforceable against the debtor and third parties with respect to the collateral, when three conditions have been met: (1) the debtor has signed a security agreement which contains a description of the collateral in question, including after-acquired collateral; (2) value has been given; and (3) the debtor has rights in the collateral. *See* Neb. UCC § 9-203(1); *In re Damrow Cattle Co., Inc.*, 300 B.R. 479, 486 (Bkrtcy. D.Neb. 2003). The defendants deny that the first condition was satisfied, and contend that the description of the collateral was insufficient.

The purpose of a collateral description in a security agreement is "evidentiary." Neb. UCC § 9-108 Official Comment 2. The test of sufficiency of a description under Section 9-108 "is that the description do the job assigned to it: Make possible the identification of the collateral described." *Id.* Revised Article 9 does not require an "exact and detailed" description. *Id.* A description of collateral "is sufficient, whether or not it is specific, if it reasonably identifies what is described." Neb. UCC. § 9-108(a). Examples of reasonable identification include descriptions of collateral by specific listing, category, a type of collateral defined in the Uniform Commercial Code, quantity, "computational or allocational formula or procedure," or "any other method, if the identity of the collateral is objectively determinable." Neb. UCC § 9-108(b).

In LOLFC's security agreement, the collateral is described as including "[a]ll of the cattle whether now owned or hereafter acquired by [Maverick and the Sawyers] and placed by [them] with 4-Square Cattle Management Services under a Cattle

---

that the cattle are 'placed with 4-Square under a cattle consulting agreement'." (Filing 190, at 5-6 (citations to record omitted).)

Consulting Agreement . . . [and] all proceeds relating to any of the foregoing . . ..” This description clearly is sufficient.

It is undisputed that when the Maverick Cattle were purchased, the seller, Tri-County, issued “Buyer Recaps” which described the cattle by type, quantity and weight, and that upon receipt of the Buyer Recaps, 4-Square prepared Cattle Receipt and Evaluation Agreements to confirm the placement of the cattle by Maverick and the Sawyers into the 4-Square consulting program.  This documentation makes the identity of the collateral “objectively determinable.”

The defendants argue that the Maverick Cattle were not placed with 4-Square because they were placed with PJSCC.  They contend “placed with” is a term of art in the cattle feeding industry which connotes a physical placement of cattle in a feedyard.  However, 4-Square is not involved in the business of feeding cattle.  It is undisputed that 4-Square’s business simply is to provide consulting services to cattle producers.  Consistent with the description of collateral in LOLFC’s security agreement, the supplemental Cattle Consulting Agreement that was entered into on January 8, 2009, specified that it applied to “[a]ll Cattle *placed with* [4-Square] by [Maverick and the Sawyers] for participation in the Program not to exceed 5500 head at any one time.” (Sauder Aff. Ex. E [filing 155-21] at 1 (emphasis supplied).)  It was also specified that 4-Square’s fees “shall be payable upon execution of this Agreement and *placement* of the Cattle in the Program.” (Sauder Aff. Ex. E [filing 155-21] at 2, 7 (emphasis supplied).)  I find no ambiguity in the collateral description, which reasonably identifies the Maverick Cattle.

Generally, “a financing statement must be filed to perfect all security interests and agricultural liens.”  Neb. UCC § 9 -310(a).  A financing statement is sufficient if it provides the names of the debtor and the secured party and “indicates the collateral covered by the financing statement.” Neb. UCC § 9-502(a).  “A financing statement sufficiently indicates the collateral that it covers if the financing statement provides . . . a description of the collateral pursuant to section 9-108.”  Neb. UCC

-34-

§ 9-504.  Because the financing statements filed by LOLFC describe the collateral using language identical to the collateral description in the security agreement, the financing statements are likewise sufficient.  There is no dispute that the financing statements were filed in the proper locations.  Consequently, I find as a matter of law that LOLFC has a perfected security interest in the Maverick Cattle and proceeds from the sale of such cattle.

PJSCC argues that it "held a superior lien over that asserted by LOL with respect to the cattle that are the subject of this lawsuit.  Each party had lien statements on file with the Nebraska Secretary of State's office.  [PJSCC's] lien was filed on 2/22/06 and on 6/30/06.[25]  By contrast, LOL's lien in Nebraska was not filed until 6/3/09, which was not only long after Johnson Cattle's lien was filed, but several months after the cattle LOL claims an interest in began to arrive at Johnson Cattle." (Filing 166 at 5 (citations to record omitted).)  There is no merit to this argument.

In the first place, PJSCC does not have a valid security interest. As previously discussed, a written security agreement is required to create an enforceable security interest.  *See* Neb. UCC § 9-203(b)(3).  The defendants have been unable to identify any security agreement relating to the February 22, 2006 or June 30, 2006 financing statements. Second, even if PJSCC had a valid security agreement with Maverick, the financing statements it relies upon are ineffective as a matter of law.  FNBO, not PJSCC, is identified as the "creditor" in the June 30, 2006 financing statement. Moreover, that financing statement was terminated by FNBO on January 29, 2007. The February 22, 2006 financing statement is ineffective because it was not filed in South Dakota.

The general rule is that "while a debtor is located in a jurisdiction, the local law of that jurisdiction governs perfection . . . of a security interest in collateral." Neb.

---

[25] In point of fact, the June 30, 2006 financing statement was filed with the South Dakota Secretary of State.

UCC § 9-301(1). Maverick is a South Dakota corporation, and its principal place of business also is located in South Dakota. The Sawyers have lived on their ranch near Hurley, South Dakota, continuously since approximately 1995.  Consequently, at all pertinent times, the debtors were located in South Dakota.  *See* Neb. UCC § 9-307(b)(1) and (2). Because the debtors were and are located in South Dakota, the law of South Dakota governs perfection of security interests in the Maverick Cattle. There is no dispute that LOLFC was the first to file in South Dakota.

PJSCC argues that Nebraska law applies under Neb. UCC § 9-301(2), which provides that while collateral is located in a jurisdiction, "the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a possessory security interest in that collateral." As indicated by its plain language, Section 9-301(2) only applies to possessory security interests. PJSCC did not attempt to perfect its security interest in the Maverick Cattle by taking possession of the cattle. Instead, it attempted to perfect its security interest by filing a financing statement. Section 9-301(2) therefore is inapplicable.[26]  *See Capital Solutions, LLC v. Konica Minolta Business Solutions U.S.A., Inc.*, Nos. 08-2027-JWL, 08-2191-JWL 2010 WL 446936, *3 (D.Kan. Feb. 5, 2010)* (§ 9-301(2) applies only to the perfection of possessory security interests).

PJSCC also claims that Nebraska law governs the parties' security interests under Neb. UCC § 9-302, which provides: "While farm products are located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of an agricultural lien on the farm

---

[26] Furthermore, with the exception of cattle that were sold in accordance with the court's temporary restraining order, any possessory security interest would have been lost when PJSCC voluntarily relinquished possession of the Maverick Cattle to the meat-packing companies. *See* Neb. UCC § 9-313(d) ("If perfection of a security interest depends upon possession of the collateral by a secured party, perfection occurs no earlier than the time the secured party takes possession and continues only while the secured party retains possession.").

products." The only potential agricultural lien available to PJSCC would have been an agister's lien under Neb. Rev. Stat. § 54-201(2).[27]  However, there is no dispute that PJSCC received full payment of its fees for feeding and caring for the Maverick Cattle. Consequently, any agister's lien that PJSCC may have held was extinguished through payment.  *See* *Graff v. Burnett*, 414 N.W.2d 271, 275-76 (Neb. 1987); *Sticknell v. Haggerty*, 62 N.W.2d 107, 109 (Neb. 1954). Any agister's lien under Section 54-201(2) would have applied only to the Maverick Cattle; it could not be extended to secure payment of any other debts, including alleged debts relating to prior groups of cattle.

For purposes of the pending motions, FNBO does not purport to rely upon the terminated June 30, 2006 financing statement, nor upon the financing statement it filed in South Dakota on January 26, 2007. In other words, FNBO does not claim a security interest in the Maverick Cattle.  FNBO instead claims a security interest in PJSCC's business checking account,[28] and the undisputed facts support such claim.

---

[27] Section 54-201(2) provides, in part:  "When any person, firm, corporation, partnership, or limited liability company whose residence or principal place of business is located outside the State of Nebraska procures, contracts with, or hires any other person, firm, corporation, partnership, or limited liability company within the State of Nebraska to feed and take care of any kind of livestock, the person, firm, corporation, partnership, or limited liability company so procured, contracted with, or hired shall have a first, paramount, and prior lien upon such livestock for the feed and care furnished for the contract price agreed upon or, in case no price has been agreed upon, for the reasonable value of such feed and care.  A lien created under this subsection shall be treated in all respects as an agricultural lien as provided in article 9, Uniform Commercial Code, and may be enforced in the manner and form provided for the enforcement of secured transactions as provided in article 9, Uniform Commercial Code. A lien created under this subsection shall be perfected as provided in article 9, Uniform Commercial Code."  Neb. Rev. Stat. § 54-201(2).

[28] LOLFC argues this constitutes an affirmative defense which was not pleaded by FNBO, as required by Federal Rule of Civil Procedure 8(c).  To prevail on its conversion claim, however, LOLFC must prove that FNBO's exercise of dominion

-37-

Under Revised Article 9 of the Uniform Commercial Code, FNBO's security interest in PJSCC's business checking account takes priority over LOLFC's security interest in proceeds from sales of the Maverick Cattle that were deposited into that account.  *See* Neb. UCC § 9-327(3) ("[A] security interest held by the bank with which the deposit account is maintained has priority over a conflicting security interest held by another secured party.").  Because the undisputed facts demonstrate that FNBO has a perfected security interest in PJSCC's business checking account,[29] LOLFC's claim against FNBO for conversion of sales proceeds deposited into that account fails as a matter of law.[30]  The corresponding claim made by Maverick and the Sawyers likewise fails.

However, it is a long-standing rule of law in Nebraska that "[a] person who aids in the conversion of property is responsible to the owner for its value."  *Sprague v. Allied Mills*, 261 N.W. 892, 893 (Neb. 1935).  Thus, even though FNBO does not

_____

or control over the sales proceeds deposited in PJSCC's business checking account was inconsistent with LOLFC's security interest.  FNBO is entitled to show that it has a prior security interest in the deposit account without specifically pleading this fact.  *See First Union Nat'l Bank v. Pictet Overseas Trust Corp., Ltd.*, 477 F.3d 616, 622 (8th Cir. 2007) (stating that "[when] the defense involved is one that merely negates an element of the plaintiff's prima facie case . . . it is not truly an affirmative defense and need not be pleaded despite rule 8(c).") (quoting *Masuen v. E.L. Lien & Sons, Inc.*, 714 F.2d 55, 57 (8th Cir.1983)).

[29] Generally, "a security interest in a deposit account may be perfected only by control . . .."  Neb. UCC § 9-312(b)(1).  "A secured party has control of a deposit account if . . . the secured party is the bank with which the deposit account is maintained[.]"  Neb. UCC § 9-104(a)(1).

[30] I find it unnecessary to consider FNBO's alternative arguments that it is protected as a transferee of funds from deposit accounts under Neb. UCC § 9-332(b) or that it was entitled to exercise a right of setoff against the deposited funds under Neb. UCC § 9-340(a).  I also do not consider FNBO's argument that proceeds from sales of the Maverick Cattle were irreversibly commingled with other funds before allegedly being converted by the bank.

have any liability to LOLFC or Maverick and the Sawyers for automatically sweeping excess funds out of PJSCC's checking account and applying these funds against PJSCC's indebtedness, FNBO may be found liable for otherwise aiding and abetting PJSCC's conversion of the Maverick Cattle and sales proceeds. Without going into detail, I find there is a genuine dispute whether FNBO knowingly assisted PJSCC in committing the tort of conversion.

Although there is no evidence to show that Johnson or Maloley personally benefitted from PJSCC's conversion of LOLFC's collateral, they also may be held personally liable for aiding and abetting PJSCC in the conversion. "A corporation's officer or agent is personally liable if the officer or agent causes a conversion of another's property, and it is no defense that such officer or agent converted the property while acting for the corporation." *Hecker v. Ravenna Bank*, 468 N.W.2d 88, 95 (Neb. 1991). "In accordance with the rule that an agent is liable for injury resulting from his misfeasance or malfeasance, an agent may be held liable in damages to third persons for conversion, unless he acts solely for his principal, by his direction, and without any knowledge, actual or constructive, of the wrongful conversion being committed by the principal." *Standard Grain Co. v. State Bank of Omaha*, 182 N.W. 507, 510 (Neb. 1921). *See also State Securities Co. v. Svoboda*, 110 N.W.2d 109, 112 (Neb. 1961) ("[O]ne who aids and assists in the wrongful taking of chattels is liable though he acted as agent of another."); *Talich v. Marvel*, 212 N.W. 540, 542 (Neb. 1927) ("All are principals in conversion, and every person who knowingly aids and abets another in the conversion of the property of a third person is liable to such third person for the value of the property so converted.").

Johnson, who is PJSSC's CEO, testified that he made the determination in June 2009, in accordance with instructions from his attorney, that all proceeds from the sale of the Maverick Cattle would be retained until the prior debt was paid. (Johnson Depo. [filing 156-8] at 224:19-225:15.) Johnson also testified that he made the decision to inflate the feed bills for the Maverick Cattle with arbitrary "feed adjustments." (Johnson Depo. [filing 156-8] at 222:2-224:5.) Johnson knew that

LOLFC was claiming a security interest. Based on these and other undisputed facts, I find as a matter of law that Johnson aided and abetted PJSCC in the tortious conversion of LOLFC's collateral.

The evidence does not conclusively establish that Maloley knowingly assisted her employer in committing conversion. LOLFC's motion for summary judgment therefore will be denied with respect to its claim against Maloley.

### *Conspiracy Claims*

"A civil conspiracy is a combination of two or more persons acting in concert to accomplish an unlawful or oppressive object, or a lawful object by unlawful or oppressive means." *Ashby v. State*, 779 N.W.2d 343, 357 (Neb. 2010) (citing *Lamar Co. v. City of Fremont*, 771 N.W.2d 894 (Neb. 2009); *Four R Cattle Co. v. Mullins*, 570 N.W.2d 813 (Neb. 1997)). "The gist of a civil conspiracy action is not the conspiracy charged, but the damages the plaintiff claims to have suffered due to the wrongful acts of the defendants." *Eicher v. Mid America Financial Inv. Corp.*, 702 N.W.2d 792, 805 (Neb. 2005) (citing *Wiekhorst Bros. Excav. & Equip. v. Ludewig*, 529 N.W.2d 33 (Neb. 1995)).

"A party does not have to prove a civil conspiracy by direct evidence of the acts charged. It may be proved by a number of indefinite acts, conditions, and circumstances which vary according to the purpose to be accomplished." *Ashby*, 779 N.W.2d at 357. "It is, however, necessary to prove the existence of at least an implied agreement to establish conspiracy." *Id.*

"Furthermore, a civil conspiracy is only actionable if the alleged conspirators actually committed some underlying misconduct." *Id.* (citing *Eicher v. Mid America Fin. Invest. Corp.*, 748 N.W.2d 1 (Neb. 2008)). "And a conspiracy is not a separate and independent tort in itself; rather, it depends upon the existence of an underlying tort." *Id.* "So without such underlying tort, there can be no cause of action for a

conspiracy to commit the tort." *Id.* (citing *Hatcher v. Bellevue Vol. Fire Dept.*, 628 N.W.2d 685 (Neb. 2001)).

I find there are genuine issues of material fact whether the defendants engaged in a civil conspiracy. I also point out that in order to establish that Johnson and Maloley conspired with PJSCC, it will be necessary to prove that they were "acting outside the scope of their authority or other than in the normal course of their corporate duties." *Eicher*, 748 N.W.2d at 15 (citing *Dixon v. Reconciliation, Inc.*, 291 N.W.2d 230 (Neb. 1980)).

### *Damages*

I find there is no genuine dispute regarding the amount of damages sustained by LOLFC as a result of the wrongful conversion of its collateral by PJSCC and Johnson. Such damages total $2,126,442.77.

In addition, LOLFC is entitled to prejudgment interest on the foregoing sum at the rate of 12 percent per annum. *See* Neb. Rev. Stat. §§ 45-103.02(2), 45-104.[31] As computed by LOLFC, and not disputed by the defendants, prejudgment interest totals $191,553.40, plus additional interest at the rate of $699.10 per day from September 1, 2010, through the date of entry of judgment.

Finally, FNBO argues that Maverick and the Sawyers' claim for consequential damages is too speculative. I conclude this is a matter that will need to be resolved at trial.

---

[31] "Prejudgment interest under § 45-103.02 is recoverable only when the claim is liquidated, that is, when there is no reasonable controversy as to either the plaintiff's right to recover or the amount of such recovery." *Countryside Co-op. v. Harry A. Koch Co.*, 280 Neb. 795, 814-15, __ N.W.2d __, 2010 WL 4539186, at *12 (2010). I find both conditions are satisfied in this case.

## CONCLUSION

To summarize, PJSCC and Johnson are jointly and severally liable to LOLFC for the conversion of its collateral. There is no merit to the argument that LOLFC's security interest is invalid because the collateral is described as cattle "placed with" 4-Square. There are genuine issues of material fact whether FNBO and Maloley aided and abetted the conversion, and also whether the parties engaged in a civil conspiracy. As a matter of law, however, FNBO is not liable to LOLFC or Maverick and the Sawyers for transferring funds out of PJSCC's business checking account to pay down PJSCC's loans. There is no genuine dispute concerning the amount of damages sustained by LOLFC, and it is entitled to prejudgment interest. There also is no genuine dispute that funds deposited in an escrow account pursuant to the court's temporary restraining order should be paid to LOLFC in partial satisfaction of its damages.

The claims remaining for trial include: (1) LOLFC's claim against Maloley and FNBO for aiding and abetting the conversion committed by PJSCC; (2) LOLFC's claim for conspiracy against all defendants; (3) PJSCC's third-party claims against Maverick and the Sawyers for feed bills and defense costs; (4) Maverick and the Sawyers' claim for breach of contract against PJSCC; (5) Maverick and the Sawyers' claim against all defendants for conversion, excluding FNBO's alleged conversion of funds deposited in PJSCC's business checking account; (6) Maverick and the Sawyers' claim against PJSCC and Johnson for fraud and deceit; and (7) Maverick and the Sawyers' claim against all defendants for conspiracy.

Accordingly,

IT IS ORDERED:

1. LOLFC's motion for summary judgment (filing 153) is granted in part and denied in part, as follows:

a.  The motion is granted to the extent LOLFC claims that PJSCC and Johnson converted its collateral, and the court finds these defendants are jointly and severally liable to LOLFC for damages in the principal sum of $2,126,442.77, plus prejudgment interest in the amount of $191,553.40, plus additional interest at the rate of $699.10 per day from September 1, 2010, through the date of entry of judgment.

b.  The motion is granted with respect LOLFC's replevin claim, and the court finds LOLFC is entitled to receive payment of the funds deposited in escrow pursuant to the temporary restraining order entered on November 5, 2009 (filing 18), in the principal sum of $630,290.28, which will be offset against the amount of damages awarded to LOLFC on its other claims. However, these funds shall remain deposited in the approved escrow account until further order of the court.

c.  In all other respects, the motion is denied.

2.  PJSCC, Johnson, and Maloley's motion for summary judgment (filing 165) is denied in all respects.

3.  FNBO's motion for summary judgment on claims asserted by LOLFC (filing 168) is granted in part and denied in part, as follows:

a.  The motion is granted with respect to the claim that FNBO converted cattle sales proceeds deposited into PJSCC's business checking account by transferring funds out of that account and then using the funds to pay down PJSCC's loans at the bank.

b.  In all other respects the motion is denied.

-43-

4.      FNBO's motion for summary judgment on claims asserted by Maverick and the Sawyers (filing 169) is denied without prejudice, as moot.

5.      FNBO's motion to dismiss Maverick and the Sawyers' cross-claim (filing 206), treated as a motion for summary judgment, is granted in part and denied in part, as follows:

    a.      The motion is granted with respect to the claim that FNBO converted cattle sales proceeds deposited into PJSCC's business checking account by transferring funds out of that account and then using the funds to pay down PJSCC's loans at the bank.

    b.      In all other respects the motion is denied.

6.      Entry of judgment will be withheld pending final determination of all claims.

December  23, 2010.                    BY THE COURT:

                                          *Richard G. Kopf*
                                       United States District Judge

---

    * This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.